**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (LR 5733)
Phillip Kim, Esq. (PK 9384)
Timothy W. Brown, Esq. (TB 1008)
350 Fifth Avenue, Suite 5508
New York, New York 10118
Telephone: (212) 686-1060
Fax: (212) 202-3827

Attorneys for Lead Plaintiffs and the Class



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

CARLOS MUNOZ, INDIVIDUALLY AND ON
BEHALF OF ALL OTHERS SIMILARLY
SITUATED,

               Plaintiff,

         vs.

CHINA EXPERT TECHNOLOGY, INC.; PKF NEW
YORK, CERTIFIED PUBLIC ACCOUNTANTS, A
PROFESSIONAL CORPORATION, PKF HONG
KONG, CERTIFIED PUBLIC ACCOUNTANTS;
BDO MCCABE LO LIMITED CERTIFIED PUBLIC
ACCOUNTANTS, BDO SEIDMAN, LLP,

               Defendants.

-----------------------------------------------------------X

CASE No.:  07-CV-10531 (AKH)

AMENDED COMPLAINT

Class Action

**JURY TRIAL DEMANDED**

Lead Plaintiffs Joseph Nunn, Basil Hantash, Bashar Hantash, Anna Hantash and Kenneth

Price, and named plaintiff Carlos Munoz, individually and on behalf of all other persons similarly

situated ("Plaintiffs"), by their undersigned attorneys, allege in this first amended complaint against

defendants (the "Complaint") the following based upon personal knowledge as to themselves and

their own acts, and information and belief as to all other matters, based upon, *inter alia*, the

1

investigation conducted by and through their attorneys and private investigators, which included, among other things, deposition testimony and document subpoenas, interviewing witnesses in China and reviewing the defendants' public documents and conference calls, announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding China Expert Technology, Inc. ("CXTI", or the "Company"), securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased the common stock of CXTI between March 31, 2006, and October 1, 2007, inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of federal securities laws and pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      During the Class Period, CXTI reported aggregate revenue of over $132 million from 16 different contracts to build e-government computer systems in the People's Republic of China. Ninety-nine percent of this reported revenue was never earned by, and never paid to, CXTI. The $132 million of revenue recognized by CXTI was a fraud.  The Company simply forged these contracts and claimed to have earned over $132 million of contract revenue when its true earnings were less than $1.0 million.

3.      PKF New York, Certified Public Accountants, PKF Hong Kong Certified Public Accountants (collectively "PKF"), BDO McCabe Lo Limited, and BDO Seidman, LLP (collectively "BDO"), are certified public accounting firms that audited and certified CXTI's financial statements

2

issued during the Class Period. These defendants completely abrogated their responsibilities as the Company's auditors by failing to check or confirm the existence of the $132 million of contract revenue and related accounts receivable.

4.     CXTI's financial statements violated generally accepted accounting principles ("GAAP") by falsely reporting revenue and accounts receivable during the Class Period. BDO and PKF falsely certified and opined that CXTI's financial statements were accurate and were prepared in accordance with GAAP, when in truth they were not.

5.     BDO and PKF failed to follow generally accepted auditing standards in performing the audits of CXTI's financial statements during the Class Period. BDO and PKF's audit failures were of the highest magnitude, as both failed to adhere to the most basic auditing standards, which required these auditors to confirm the existence of the 16 contracts and the $132 million in revenue and related accounts receivable that CXTI had reported during the Class Period.

6.     CXTI's customers consisted of five different Chinese local governments.. These five Chinese local governments purportedly accounted for all of the $132 million of contract revenue recognized by CXTI, pursuant to 16 contracts, during the Class Period. The auditor defendants could have easily and inexpensively confirmed the validity of the contracts, the revenue, and the accounts receivable related to work purportedly done for these five Chinese local governments. Instead, the Auditor Defendants performed none of the required audit procedures and falsely certified as accurate CXTI's wholly fraudulent financial statements. The auditor defendants, in essence, performed no audit at all.

7.     The fraudulent financial statements issued by CXTI and certified by its auditors created a market for CXTI securities that otherwise would never have existed. CXTI's entire

3

business and its artificially inflated stock price were built upon a completely fraudulent set of financial statements. When this fraud was discovered, the value of CXTI's common stock declined to pennies, damaging investors.

## JURISDICTION AND VENUE

8.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

9.      This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

10.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Moreover, during the class period CXTI common stock was traded on the NASDAQ OTC Bulletin Board, which is located in the Southern District of New York.

11.     The Court has jurisdiction over each of the defendants who filed and certified false and misleading financial statements with Securities & Exchange Commission.

12.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

13.     Named plaintiff Carlos Munoz, as set forth in his certification previously filed with the Court, which is incorporated by reference herein, purchased CXTI securities at artificially inflated prices during the Class Period and has been damaged thereby.

14.     Lead Plaintiffs Joseph Nunn, Basil Hantash, Bashar Hantash, Anna Hantash, and Kenneth Price, as set forth in their certifications previously filed with the Court, which are incorporated by reference herein, purchased CXTI securities at artificially inflated prices during the Class Period and have been damaged thereby.

15.     Defendant CXTI is a Nevada Corporation headquartered in the People's Republic of China ("PRC").  According to its most recent quarterly report filed on Form 10-Q with the SEC on May 14, 2007, CXTI was engaged in the provision of system integration services, consultancy, and agency services in the People's Republic of China.  At all relevant times herein, the Company's common stock was actively traded on the NASDAQ OTC Bulletin Board under ticker "CXTI." After defendants' fraud was uncovered in mid-2007, CXTI essentially disappeared into the ether. CXTI is no longer an operating company and has abandoned it business.  In short, the Company has inexplicably vanished.

16.     Defendant PKF Hong Kong is the Hong Kong-based affiliate office of an international association of certified public accounting firms operating under the name PKF International Limited.  PKF Hong Kong maintains affiliate offices in New York, NY.  PKF Hong Kong, together with PKF New York, audited CXTI's financial statements for the fiscal years ended December 31, 2003 and December 31, 2004, which were contained in CXTI's annual reports filed with the SEC during the Class Period. PKF Hong Kong is registered with the Public Company

5

Accounting Oversight Board. PKF Hong Kong conducts business under the following names: (i) PKF, Certified Public Accountants; (ii) PKF; (iii) PKF-Hong Kong, Certified Public Accountants; and (iv) PKF-Hong Kong.

      17.    PKF New York Certified Public Accountants, A Professional Corporation ("PKF New York") is a firm of certified public accountants, headquartered in New York, providing auditing services to a wide range of publicly traded and privately held companies. *PKF New York*, together with PKF Hong Kong, audited CXTI's financial statements for the fiscal years ended December 31, 2003 and December 31, 2004, which were contained in CXTI's annual reports filed with the SEC. CXTI directly engaged PKF New York to conduct the audits of CXTI for fiscal years 2003 and 2004. PKF New York is registered with the Public Company Accounting Oversight Board. PKF New York conducts business conducts business under the following names: (i) PKF, Certified Public Accountants; (ii) PKF; and (iii) PKF, Certified Public Accountants, P.C.

      18.    PKF New York directed and actively participated together with PKF Hong Kong in the defective audits of CXTI and therefore PKF New York and PKF Hong Kong are jointly and severally liable for the misconduct related to the audits of CXTI's financial statements for the fiscal years 2003 and 2004. PKF New York gave instructions to PKF Hong Kong as to how to ensure that US GAAS, GAAP and SEC rules were followed in connection with the audits of CXTI. Because PKF Hong Kong acted under the direction of PKF New York in conducting the audits of CXTI, PKF New York is responsible for its own and for PKF Hong Kong's misconduct in the audits. PKF New York directed, participated in, and reviewed the audit work and audit procedures for the audits of CXTI for fiscal years 2003 and 2004.

19.     PKF Hong Kong is a Chinese public accounting firm. Without the active participation and direction of PKF New York in CXTI's audits, the false and misleading financial statements and audit opinions for fiscal years 2003 and 2004 could not have been issued and filed with the SEC.

20.     Both PKF Hong Kong and PKF New York operate under the name "PKF Certified Public Accountants" and the name "PKF" without any meaningful distinction between the offices.

21.     Both PKF New York and PKF Hong Kong issued the false and misleading audit opinion and certified CXTI's false financial statements for fiscal years 2003 and 2004.

22.     Defendant BDO McCabe is the Hong Kong-based member of an international network of certified public accounting firms operating under the name BDO Seidman Alliance. BDO McCabe maintains network affiliate offices in New York, NY.  BDO McCabe, under the direction of BDO Seidman, LLP, audited CXTI's financial statements for the fiscal years ended December 31, 2005 and December 31, 2006, which were contained in CXTI's annual reports filed with the SEC for those same fiscal years.  BDO McCabe is registered with the Public Company Accounting Oversight Board.

23.     BDO Seidman, LLP ("BDO Seidman") is a national firm of certified public accountants, headquartered in New York, providing auditing services to a wide range of publicly traded and privately held companies.  BDO Seidman actively participated in performing the audits of CXTI's financial statements for the fiscal years ended December 31, 2005 and December 31, 2006, which were contained in CXTI's annual reports filed with the SEC for those same fiscal years.  BDO Seidman is registered with the Public Company Accounting Oversight Board.

24.     BDO Seidman directed BDO McCabe's audits of CXTI and is therefore jointly and severally liable along with BDO McCabe for the misconduct related to the audits of CXTI's financial

7

statements. BDO Seidman gave instructions to BDO McCabe as to how to test CXTI's financial statements, including testing the existence of revenue and directing revenue recognition practices in the course of the audits of CXTI. Because BDO McCabe acted under the direction of BDO Seidman in conducting the audits of CXTI, BDO Seidman is responsible for the misconduct in the audits. BDO Seidman reviewed, corrected, and directed BDO McCabe's audits of CXTI.

25.     BDO McCabe is a Chinese public accounting firm. Without the assistance and direction of BDO Seidman, BDO McCabe could not and would not have issued false and misleading audit opinions regarding the Company, nor could or would it have certified the Company's false and misleading financial statements during the Class Period.

26.     BDO McCabe, BDO Seidman, PKF Hong Kong and PKF New York are referred to herein collectively as the "Auditor Defendants."

                    Relevant Non-Parties

27.     Zhu Xiaoxin ("Zhu"), at all relevant times herein, was the Company's CEO, President and Director.

28.     Michael Huang Tao ("Huang"), as all relevant times herein, was the Company's Chairman and Director.

29.     Fu Wan Chung, a/k/a Simon Fu ("Fu") at all relevant times herein, was the Company's CFO and Director until his resignation on or about July 19, 2007.

30.     Zhu, Huang, and Fu are collectively referred to hereinafter as "CXTI Management."

                    **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

31.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons who purchased the common

8

stock of CXTI during the Class Period and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

32.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, CXTI's securities were actively traded on the NASDAQ Bulletin Board. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds of members in the proposed Class. Members of the Class may be identified from records maintained by CXTI or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

33.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

34.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

35.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

9

(b) whether the financial statements issued by CXTI and audited by the Auditor Defendants were materially false; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

36.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

37.     All of the financial statements issued by CXTI during the Class period violated GAAP by falsely reporting revenue and accounts receivable from non-existent contracts.  Practically none of the revenue was ever earned by, or paid to, CXTI .

38.     The Auditor Defendants falsely certified and opined that CXTI's financial statements were accurate and were prepared in accordance with GAAP, when in fact they were not.

39.     The Auditor Defendants violated generally accepted auditing standards ("GAAS") by failing to perform rudimentary auditing procedures to confirm the existence of the 16 contracts pursuant to which CXTI purportedly earned revenue, the $132 million of revenue recognized by CXTI under the 16 contracts, and the $33 million of accounts receivable reported by CXTI during the Class Period.

40.     During the Class Period, CXTI issued materially false and misleading financial statements, which were audited and certified by the Auditor Defendants, causing the price of the

Company's securities to be artificially inflated to a Class Period high of over $8.00 per share. As the truth of the Company's materially false and misleading financial statements entered the market, the Company's stock plummeted to pennies, and the SEC halted trading in CXTI stock. Shares of CXTI stock are now worthless.

41.     For the period of time beginning January 1, 2003 and ending March 31, 2007, CXTI reported revenue of over $145 million in its certified financial statements filed in quarterly and annual reports with the SEC.

42.     CXTI reported increasing revenue of $5.7 million in 2003, $26.8 million in 2004, $35.6 million in 2005 and $66.1 million in 2006 (and $13.2 million in 1Q07).

43.     Nearly all of the revenue CXTI recognized for work done during the four-year period ended on December 31, 2006 came from 16 "e-government" contracts entered into by Expert Network (Shenzhen) Company Limited ("Expert Network"), CXTI's wholly-owned subsidiary located in the People's Republic of China (the "PRC"). A snapshot of CXTI's revenue and accounts receivable is as follows.

| | 2003 | 2004 | 2005 | 2006 | Total |
|---|---|---|---|---|---|
| Revenue | $5,666,934 | $26,831,135 | $35,568,606 | $66,059,245 | $134,125,920 |
| Contracts Revenue Recognized | $4,700,000 | $26,700,000 | $35,300,000 | $65,400,000 | $132,100,000 |
| Contract Revenue as % of All Revenue | 82.90% | 99.50% | 99.20% | 99.00% | 98.50% |
| Accounts Receivable at year end | $0 | $4,438,331 | $15,423,852 | $33,631,372 | |

44.     More than 98% of CXTI's reported revenue for the annual and quarterly periods from 2003 through 2006 was fictitious. In short, CXTI fabricated nearly all of its reported revenue for these four fiscal years.

11

45.     CXTI stated that the revenue it reported in its annual reports during the Class Period was derived from 16 different contracts pursuant to which it agreed to provide "e-government" computer services to various Chinese government agencies.

46.     These 16 contracts and the revenue CXTI reported in its SEC filings as earned for each contract are as follows:[1]

| Projects | Tentative Start Date | Target Completion Date | Contract Sum | Recognized in 2003 | Recognized in 2004 | Recognized in 2005 | Recognized in 2006 | Recognized in 2007Q1 | O/S Contract Sum |
|---|---|---|---|---|---|---|---|---|---|
| Jinjiang (1st Phase) | Apr 05 | Jan 05 | 24.7 | 4.7 | 17.8 | 2.2 | -- | -- | -- |
| Jinjiang (2nd Phase) | May 05 | Aug 06 | 9.9 | -- | -- | 7.9 | 2 | | |
| Jinjiang (3rd Phase) | May 05 | Aug 06 | 12.5 | -- | -- | 6.7 | 5.9 | | |
| Jinjiang (4th Phase) | Jan 06 | Oct 06 | 5.4 | -- | -- | -- | 5.4 | -- | -- |
| Jinjiang System & Application Training | Feb 06 | Nov 06 | 1.7 | | | | 1.7 | | |
| Jinjiang System Maint. | Feb 06 | Jan 09 | 3.8 | | | | 1.2 | 0.3 | 2.3 |
| Dehua (1st Phase) | Apr 04 | Aug 06 | 15.6 | -- | 8.9 | 6.7 | -- | -- | -- |
| Dehua (2nd Phase) | Jan 05 | Nov 05 | 11.8 | -- | -- | 11.8 | -- | -- | -- |
| Dehua (3rd Phase) | Jan 06 | Jun 07 | 9.2 | -- | -- | -- | 7.1 | 1.9 | 0.1 |
| Dehua (4th Phase) | Mar 06 | Dec 06 | 11.3 | -- | -- | -- | 11.4 | -- | -- |
| Nan'an (1st Phase) | Aug 05 | Mar 07 | 13.1 | | | | 12.5 | 0.6 | |
| Nan'an (2nd Phase) | Aug 06 | Jul 07 | 18.3 | -- | -- | -- | 7.7 | 4.7 | 5.9 |
| Hui'an | Jan 06 | Jul 08 | 14.5 | | | | 9 | 3.1 | 14.5 |
| Licheng | Nov 06 | Oct 09 | 31.2 | -- | -- | -- | 1.2 | | 30 |
| Shishi City, Yinzhou District | Oct 06 | Sep 09 | 37 | | | | 1.3 | | 35.7 |
| Ningbo City (design & plan) | Apr 06 | Oct 06 | 0.3 | -- | -- | -- | 0.3 | -- | -- |

---

1  CXTI reported a total of 18 contracts from which it earned revenue, but revenue recognized in CXTI's annual reports during the Class Period was earned only from work done pursuant to 16 of the 18 contracts.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Jinjiang Unified Command System | Nov 05 | Mar 06 | 0.6 | -- | -- | -- | 0.6 | -- | -- |
| Dehua Unified Command System | Mar 06 | Jul 06 | 0.6 | -- | -- | -- | 0.6 | -- | -- |
| Cangshan District, Fuzhou | Jul 07 | Jun 09 | 12.7 | -- | -- | -- | -- | -- | 12.7 |
| Minqing County, Fuzhou | Oct 07 | Sep 10 | 22.3 | -- | -- | -- | -- | -- | 22.3 |
| Quangang District | Jul 07 | Aug 10 | 30.8 | -- | -- | -- | -- | -- | 30.8 |
| Pingtan County, Fuzhou | Oct 07 | Sep 10 | 22.4 | -- | -- | -- | -- | -- | 22.4 |
| Mawei District, Fuzhou | Oct 07 | Sep 10 | 21.7 | -- | -- | -- | -- | -- | 21.7 |
| Yongtai County, Fuzhou | Jul 07 | Jun 10 | 28.5 | -- | -- | -- | -- | -- | 28.5 |
| Xi'an City | Sep 07 | Mar 10 | 42.4 | -- | -- | -- | -- | -- | 42.4 |
| Total | | | 402.3 | 4.7 | 26.7 | 35.3 | 65.4 | 13.2 | 257.3 |

47.     These government agencies listed above, with which CXTI claimed to have signed 16 contracts, and from which CXTI claimed it had earned revenue, have told Plaintiffs' private investigator that the contracts either did not exist at all, or to the extent a contract may have existed, that the true contract price and revenue earned were only a tiny fraction of what CXTI reported in its financial statements.[2]

48.     Thus, more than 98% of the revenue recognized by CXTI and recorded in its annual reports during the Class Period was false and never existed.

**Description of the CXTI Financial Statements That Are False and Misleading**

49.     On March 31, 2006, CXTI filed its annual report on Form 10-KSB for the fiscal year ended December 31, 2005 (the "2005 Annual Report"). The 2005 Annual Report included audited

---

[2] However, $0.3 million supposedly earned pursuant to 1 of the 16 e-Government Contracts (with Yinzhou District Ningbo City) has not been investigated as of yet.

financial statements for the fiscal three years ended December 31, 2003, December 31, 2004 and December 31, 2005.

50.     The 2005 Annual Report contained the audit report of BDO McCabe dated March 10, 2006, as independent registered public accountants, opining that CXTI's financial statements for the year ended December 31, 2005 were prepared in conformity with accounting principles generally accepted in the United States of America.

51.     The 2005 Annual Report also contained the audit report of PKF dated February 22, 2005, as independent registered public accountants, opining that CXTI's financial statements for the two fiscal years ended December 31, 2003 and December 31, 2004 were prepared in conformity with accounting principles generally accepted in the United States of America.

52.     In the 2005 Annual Report, CXTI reported revenue of $35,568,606; $26,831,135; and $5,666,934 for each of the years ended December 31, 2005, December 31, 2004 and December 31, 2003, respectively.  CXTI reported net income of $6,503,319; $4,826,841; and $1,210,413 for each of the years ended December 31, 2005, December 31, 2004 and December 31, 2003, respectively. All of the revenue reported in the 2005 Annual Report was derived from work performed on contracts entered into by Expert Network, CXTI's wholly owned subsidiary in the PRC.

53.     The 2005 Annual Report reported that accounts receivable as of December 31, 2005 were $15,423,852.

54.     The 2005 Annual Report contained a schedule listing the specific contracts from which CXTI's revenue had been earned.  The schedule is as follows:

CXTI Projects as of December 31, 2005 (in $Million):

| Target | Outstanding |
|---|---|

| Projects | Tentative Start Date | Completion Date | Contract Sum | Recognized in 2003 | Recognized in 2004 | Recognized in 2005 | Contract Sum |
|---|---|---|---|---|---|---|---|
| Jinjiang (1st Phase) | Apr 03 | Jan 05 | 24.7 | 4.7 | 17.8 | 2.2 | -- |
| Jinjiang (2nd Phase) | May 05 | Aug 06 | 9.9 | -- | -- | 7.9 | 2 |
| Jinjiang (3rd Phase) | May 05 | Aug 06 | 12.5 | -- | -- | 6.7 | 5.8 |
| Dehua (1st Phase) | Apr 04 | Aug 06 | 15.6 | -- | 8.9 | 6.7 | -- |
| Dehua (2nd Phase) | Jan 05 | Nov 05 | 11.8 | -- | -- | 11.8 | -- |
| Nan'an | Aug 05 | Mar 07 | 14.5 | -- | -- | -- | 14.5 |
| Huian | Jan 06 | Jul 08 | 16.6 | -- | -- | -- | 16.6 |
| Jinjiang Unified Command System | Nov 05 | Mar 06 | 0.7 | -- | -- | -- | 0.7 |
| Total | | | 106.3 | 4.7 | 26.7 | 35.3 | 39.6 |

55.     On May 15, 2006 CXTI filed with the SEC its quarterly report for the three-month period ended March 31, 2006 ("1Q06 Quarterly Report"), stating that in the first quarter of 2006 CXTI earned $15,108,179 of revenue through its wholly-owned subsidiary, Expert Network. The 1Q06 Quarterly Report stated that the financial statements therein were prepared in conformity with accounting principles generally accepted in the United States of America.

56.     On June 16, 2006, CXTI filed an amended annual report on Form 10-KSB for the year ended December 31, 2004 (the "2004 Amended Annual Report"). The 2004 Amended Annual Report included audited financial statements for each of the years ended December 31, 2003 and December 31, 2004, respectively.

57.     The 2004 Amended Annual Report contained the audit reports of PKF dated February 22, 2005 and March 10, 2006, as independent registered public accountants, opining that CXTI's financial statements for each of the years ended December 31, 2003 and December 31, 2004, respectively, were prepared in conformity with accounting principles generally accepted in the United States of America.

58.     In the 2004 Amended Annual Report, CXTI reported revenue of $ 26,831,135 and $5,666,934 for each of the years ended December 31, 2004 and December 31, 2003, respectively.

15

CXTI reported net income of $4,826,841 and $1,210,413 for each of the years ended December 31, 2004 and December 31, 2003, respectively.

59.    The 2004 Amended Annual Report reported that accounts receivable as of December 31, 2004 were $4,438,331.

60.    All of the revenue reported in the 2004 Amended Annual Report was derived from work performed on contracts entered into by CXTI's wholly owned subsidiary, Expert Network. The 2004 Amended Annual Report contained a schedule listing the specific contracts from which CXTI's revenue had been earned. The schedule is as follows:

CXTI Projects as of December 31, 2004 (in $Million):

| Projects | Tentative Start Date | Target Completion Date | Contract Sum | Recognized in 2003 | Recognized in 2004 | Outstanding Contract Sum |
|---|---|---|---|---|---|---|
| Jinjiang (1st Phase) | Apr 03 | Jan 05 | 24.7 | 4.7 | 17.8 | 2.2 |
| Dehua (1st Phase) | Apr 04 | Aug 06 | 15.6 | -- | 8.9 | 6.7 |
| Nan'an | Aug 05 | Mar 07 | 14.5 | -- | -- | 14.5 |
| Total | | | 54.8 | 4.7 | 26.7 | 23.4 |

61.    On August 14, 2006 CXTI filed with the SEC its quarterly report for the three months ended June 30, 2006 ("2Q06 Quarterly Report") stating that in the second quarter of 2006, CXTI earned $14,085,672 of revenue through its wholly-owned subsidiary, Expert Network. The 2Q06 Quarterly Report stated that the financial statements therein were prepared in conformity with accounting principles generally accepted in the United States of America.

62.    On November 14, 2006 CXTI filed with the SEC its quarterly report for the three months ended September 30, 2006 ("3Q06 Quarterly Report"), stating that in the third quarter of 2006, CXTI earned $19,448,940 of revenue through its wholly-owned subsidiary, Expert Network.

The 3Q06 Quarterly Report stated that the financial statements therein were prepared in conformity with accounting principles generally accepted in the United States of America.

63.     On April 12, 2007, CXTI filed its annual report on Form 10-KSB for the year ended December 31, 2006 (the "2006 Annual Report"). The 2006 Annual Report included audited financial statements for the fiscal years ended December 31, 2004, December 31, 2005, and December 31, 2006, respectively.

64.     The 2006 Annual Report contained the audit report of BDO McCabe dated April 3, 2007, as independent registered public accountants, opining that CXTI's financial statements for each of the years in the periods ended December 31, 2006 and 2005 were prepared in conformity with accounting principles generally accepted in the United States of America.

65.     The 2006 Annual Report also contained the audit report of PKF dated February 22, 2005 and March 10, 2006, as independent registered public accountants, opining that CXTI's financial statements for the year ended December 31, 2004 were prepared in conformity with accounting principles generally accepted in the United States of America.

66.     In the 2006 Annual Report, CXTI reported revenue of $66,059,245, $35,568,606, and $26,831,135 for each of the years ended December 31, 2006, December 31, 2005 and December 31, 2004, respectively. CXTI reported net income of $7,844,214; $6,503,319; and $4,826,841 for each of the years ended December 31, 2006, December 31, 2005 and December 31, 2004, respectively. The 2006 Annual Report stated that "[c]ontracts with the municipality governments account for approximately 100% of our revenues." Thus, all of the revenue reported in the 2006 Annual Report was derived from work performed on contracts entered into by Expert Network, CXTI's wholly owned subsidiary.

17

67.     The 2006 Annual Report reported that accounts receivable as of December 31, 2006 were $33,631,372.

68.     The 2006 Annual Report contained a schedule listing the specific contracts from which CXTI's revenue had been earned.  The schedule is as follows:

CXTI Projects as of December 31, 2006 (in $Million)

| Project | Initial/Planned Start Date | Actual Completion Date | Contract Sum | Recognized in 2003 | Recognized in 2004 | Recognized in 2005 | Recognized in 2006 | A/O/S Contract Sum |
|---|---|---|---|---|---|---|---|---|
| Jinjiang (1st Phase) | Apr 03 | Jan 05 | 24.7 | 4.7 | 17.8 | 2.2 | -- | -- |
| Jinjiang (2nd Phase) | May 05 | Aug 06 | 9.9 | -- | -- | 7.9 | 2 | -- |
| Jinjiang (3rd Phase) | May 05 | Aug 06 | 12.5 | -- | -- | 6.7 | 5.9 | -- |
| Jinjiang (4th Phase) | Jan 06 | Oct 06 | 5.4 | -- | -- | -- | 5.4 | -- |
| Jinjiang System & Application Training | Feb 06 | Nov 06 | 1.7 | -- | -- | -- | 1.7 | -- |
| Jinjiang System Maint. | Feb 06 | Jan 09 | 3.8 | -- | -- | -- | 1.2 | 2.6 |
| Dehua (1st Phase) | Apr 04 | Aug 06 | 15.6 | -- | 8.9 | 6.7 | -- | -- |
| Dehua (2nd Phase) | Jan 05 | Nov 05 | 11.8 | -- | -- | 11.8 | -- | -- |
| Dehua (3rd Phase) | Jan 06 | Jun 07 | 9.2 | -- | -- | -- | 7.1 | 2.1 |
| Dehua (4th Phase) | Mar 06 | Dec 06 | 11.3 | -- | -- | -- | 11.4 | -- |
| Nan'an (1st Phase) | Aug 05 | Mar 07 | 13.1 | -- | -- | -- | 12.5 | 0.6 |
| Nan'an (2nd Phase) | Aug 06 | Jul 07 | 18.3 | -- | -- | -- | 7.7 | 10.6 |
| Huian | Jan 06 | Jul 08 | 14.5 | -- | -- | -- | 9 | 5.5 |
| Licheng | Nov 06 | Oct 09 | 31.2 | -- | -- | -- | -- | 31.2 |
| Shishi City | Oct 06 | Sep 09 | 37 | -- | -- | -- | -- | 37 |
| Yinzhou District Ningbo City (design & plan) | Apr 06 | Oct 06 | 0.3 | -- | -- | -- | 0.3 | -- |
| Jinjiang Unified Command System | Nov 05 | Mar 06 | 0.6 | -- | -- | -- | 0.6 | -- |
| Dehua Unified Command System | Mar 06 | Jul 06 | 0.6 | -- | -- | -- | 0.6 | -- |
| Cangshan District, Fuzhou | Jul 07 | Jun 09 | 12.7 | -- | -- | -- | -- | 12.7 |
| Minqing County, Fuzhou | Oct 07 | Sep 10 | 22.3 | -- | -- | -- | -- | 22.3 |
| Quangang District | Jul 07 | Aug 10 | 30.8 | -- | -- | -- | -- | 30.8 |
| Pingtan County, Fuzhou | Oct 07 | Sep 10 | 22.4 | -- | -- | -- | -- | 22.4 |
| Mawei District, Fuzhou | Oct 07 | Sep 10 | 21.7 | -- | -- | -- | -- | 21.7 |
| Yongtai County, Fuzhou | Jul 07 | Jun 10 | 28.5 | -- | -- | -- | -- | 28.5 |
| Total | | | 359.9 | 4.7 | 26.7 | 35.3 | 65.4 | 227.8 |

69.     On May 14, 2007 CXTI filed with the SEC its quarterly report for the three months ended March 31, 2007 ("1Q07 Quarterly Report"), stating that in the first quarter of 2007 CXTI earned $13,238,886 of revenue through Expert Network, its wholly-owned subsidiary. The 1Q07 Quarterly Report stated that the financial statements therein were prepared in conformity with accounting principles generally accepted in the United States of America.

70.     The 1Q07 Quarterly Report contains a table (set forth in ¶41 above) that shows the amount of revenue CXTI claimed to have earned through Expert Network for work Expert Network did pursuant to e-government contracts during 2003, 2004, 2005, 2006, and 1Q07, respectively (collectively "Revenue Reported in CXTI's Annual and Quarterly Reports"). (See, CXTI 10Q 1Q07), p. 23. The term "CXTI's Annual and Quarterly Reports" as used herein refers to the annual reports on SEC Form 10-K and quarterly reports on Form 10-Q that CXTI filed with the SEC during the Class Period.

### All of the Revenue Recognized and Reported in CXTI's Financial Statements Was False

71.     According to CXTI's 2006 Annual Report, all of the Revenue CXTI recognized and reported in its annual and quarterly reports described above from January 1, 2003 through December 31, 2006 was earned from work Expert Network did pursuant to 16 different contracts entered into by Expert Network ("e-Government Contracts").

72.     According to its annual reports and the e-Government Contracts, Expert Network engaged in "project consulting, management, planning and designing services to the city governments for their e-government projects, as well as providing training to the operational staff of the city governments and maintenance to the projects upon completion of construction" (hereafter "e-Government Construction Projects"). (See, CXTI 10K 06), p. 21.

19

73.     CXTI's Annual and Quarterly Reports stated that CXTI earned total revenue in the amount of $132.1 million from 16 contracts during the period beginning January 1, 2003 and ending December 31, 2006.  CXTI reported an additional $13.2 million of contract revenue in its first quarterly report for the period ended March 31, 2007.  Thus, CXTI reported total contract revenue of $145.2 million from January 1, 2003 through March 31, 2007.

74.     Nearly all of the revenue (between 98.1% and 99.6% of the revenue) reported by CXTI for the period of time beginning on January 1, 2003 and ending on March 31, 2007 was never earned by Expert Network or paid to Expert Network. In short, CXTI fabricated nearly all of this revenue, which was supposedly earned pursuant to the e-Government Contracts described in ¶41, almost all of which were falsified.

## FACTUAL BASIS FOR ALLEGATIONS THAT
## CXTI'S REPORTED REVENUE IS FALSE

75.     All of the revenue recognized by CXTI and reported in its financial statements for the period beginning January 1, 2003 and ending March 31, 2007 was purportedly earned from 18 e-government contracts entered into between CXTI's wholly-owned subsidiary, Expert Network, and various Chinese regional governmental agencies.[3] Each of the contracts was fraudulent and falsified, and to extent *any* revenue *at all* was earned, the amount actually earned was only a tiny fraction of the amount reported by CXTI in its financial statements.[4]

_____

[3] Of the 18 e-Government contracts from which CXTI reported it recognized revenue in its 1Q07 Quarterly Report, revenue earned from work done pursuant to two of those contracts, those with government institutions in Licheng and Shishi City, was not recognized until the first quarter of 2007. CXTI reported revenue from work done pursuant to the other 16 e-Government contracts during the fiscal years 2003-2006.

[4] However, $2.8 million supposedly earned pursuant to three of the 18 e-Government Contracts

76.     The basis for the allegations that the 18 contracts are fraudulent is set forth below.

**Nan'an Contracts**

77.     CXTI's Annual and Quarterly Reports were false and misleading in reporting that CXTI earned $12.5 million of revenue in 2006 and $0.6 million of revenue in 1Q07 from work Expert Network performed pursuant to an e-Government Contract with Nan'an City Administrative Electronic Information Management Company Limited dated July 12, 2005 (the "Nan'an 1st Phase Contract"), attached to Amendment No. 1 to the Registration Statement as reported in Form SB-2/A filed with SEC on May 3, 2006.

78.     CXTI's Annual and Quarterly Reports were false and misleading in reporting that CXTI earned $7.7 million of revenue in 2006 and $4.7 million of revenue in 1Q07 from work Expert Network did pursuant to an e-Government Contract with Nan'an City Administrative Electronic Information Management Company Limited dated July 10, 2006 (the "Nan'an 2nd Phase Contract"), attached to the Current Report as reported in Form 8-K filed with SEC on July 18, 2006. (Nan'an 2nd Phase Contract).

79.     The statement made in the Registration Statement as reported in Form SB-2 filed with SEC on December 29, 2005, about the existence of an e-Government Contract entered into on May 8, 2003 by Expert Network and the People's Municipal Government of Nan'an City was false (the "Nan'an Municipal Government Contract"). *See* Nan'an Municipal Government Contract, attached to the Registration Statement as reported in Form SB-2 filed with SEC on December 29, 2005.[5]

---

has not been investigated as of yet.

5   Although CXTI never recognized any revenue from the Nan'an Municipal Government Contract, that this contract never existed, and was forged, is supportive of the allegation that all of CXTI's contracts and revenue were fraudulent.

80.     According to Nan'an 1st Phase Contract, Expert Network entered into a contract with the Nan'an City Administrative Electronic Information Management Company Limited "to undertake the planning, design and construction of the Nan'an e-Government System" ("Nan'an e-Government Project 1").

81.     According to Nan'an 2nd Phase Contract, Expert Network entered into a contract with the Nan'an City Administrative Electronic Information Management Company Limited "to undertake the Phase 2 of Nan'an City e-government construction project" ("Nan'an e-Government Project 2").

82.     According to Nan'an Municipal Government Contract, Expert Network entered into a contract with the People's Municipal Government of Nan'an City to undertake "the complete planning of the Nan'an city electronic government project and to design the construction proposal as well as to provide experts inquiry services"("Nan'an e-Government Project 3").

83.     According to Nan'an 1st Phase Contract, Nan'an City Administrative Electronic Information Management Company Limited "is a company directly authorized by the Nan'an City People's Government to carry out the planning, construction implementation and management of the Nan'an City e-government system on behalf of Nan'an City People's Government."

84.     On or about June 11, 2008, Ms. Juan Wu ("Private Investigator"), an employee of Steele Business Investigation Center ("SBCS"), interviewed via telephone an employee of the Nan'an Municipality Office.

85.     The employee of Nan'an Municipality Office said he never heard of Expert Network or of Nan'an City Administrative Electronic Information Management Company Limited, the company that, according to Nan'an 1st Phase Contract, is authorized by Nan'an Municipality to manage e-Government Construction Projects for Nan'an Municipality, including Nan'an e-

22

Government Projects 1 and 2, which Expert Network was hired to do pursuant to Nan'an 1st Phase Contract and Nan'an 2nd Phase Contract.

86.     The employee of Nan'an Municipality Office said that the Private Investigator should speak to the Network Office of Nan'an Municipality, which is in charge of e-Government Construction Projects for Nan'an Municipality.

87.     On or about June 11, 2008, the Private Investigator interviewed via telephone an employee of the Network Office of Nan'an Municipality.

88.     The employee of Network Office of Nan'an Municipality stated that there were no e-Government Construction Projects for Nan'an Municipality after 2004, whereas Nan'an 1st Phase Contract was purportedly signed on July 12, 2005 and Nan'an 2nd Phase Contract was purportedly signed on July 10, 2006.

89.     The employee of Network Office of Nan'an Municipality stated that the only companies ever hired to do e-Government Construction Projects for Nan'an Municipality were companies based in Nan'an City, whereas Expert Network was based in another city: Shenzen City.

90.     The employee of Network Office of Nan'an Municipality stated that Nan'an Municipality did not enter a contract with Expert Network, and that he had never heard of Expert Network.

91.     The employee of Network Office of Nan'an Municipality stated that: a) Nan'an Municipality did not authorize Nan'an City Administrative Electronic Information Management Company Limited to manage e-Government Construction Projects for Nan'an Municipality, and b) he had never heard of Nan'an City Administrative Electronic Information Management Company Limited, the company that, according to Nan'an 1st Phase Contract, is authorized by Nan'an

23

Municipality to manage e-Government Construction Projects for Nan'an Municipality, including Nan'an e-Government Projects 1 and 2, which Expert Network claimed it was hired to do pursuant to Nan'an 1st Phase Contract and Nan'an 2nd Phase Contract.

92.     The employee of Network Office of Nan'an Municipality stated that Network Office of Nan'an Municipality is in charge of website construction for Nan'an Municipality, and that Administrative Service Center of Nan'an Municipality is in charge of other kinds of e-Government Construction Projects for Nan'an Municipality.

93.     On or about June 11, 2008, the Private Investigator interviewed on the telephone an employee, named Mr. Ye, of the Administrative Service Center of Nan'an Municipality.

94.     Mr. Ye stated that the Administrative Service Center of Nan'an Municipality was in charge of e-Government Construction Projects for Nan'an Municipality. Mr. Ye also stated that all e-Government Construction Projects for Nan'an Municipality are signed by the Administrative Service Center of Nan'an Municipality.

95.     On or about June 11, 2008, the Private Investigator sent a copy of Nan'an Municipal Government Contract, of Nan'an 1st Phase Contract, and of Nan'an 2nd Phase Contract, to Mr. Ye via e-mail.

96.     On or about June 11, 2008, the Private Investigator continued to interview via telephone Mr. Ye. Mr. Ye stated to the Private Investigator that: a) he had never before seen Nan'an Municipal Government Contract, Nan'an 1st Phase Contract, or Nan'an 2nd Phase Contract; b) he had never heard of Expert Network; and c) Nan'an Municipality had never contracted an e-Government Construction Project to Expert Network.

97.     Mr. Ye also stated that if a company were authorized by Nan'an Municipality to hire (on Nan'an Municipality's behalf) other companies to do e-Government Construction Projects, any contracts entered into among those parties would have to be submitted to Nan'an Municipality for review and approval. Yet, not only were the employees of the Network Office of Nan'an Municipality and the Administrative Service Center of Nan'an Municipality unfamiliar with Nan'an Municipal Government Contract, Nan'an 1st Phase Contract, and Nan'an 2nd Phase Contract, but they had never even heard of Expert Network.

98.     SBCS did a search for Nan'an City Administrative Electronic Information Management Company Limited, the company that, according to Expert Network's Nan'an 1st Phase Contract, is authorized by Nan'an Municipality to manage e-Government Construction Projects for Nan'an Municipality.  Among those putative construction projects were Nan'an e-Government Projects 1 and 2, which Expert Network claims that it was hired to do pursuant to Nan'an 1st Phase Contract and Nan'an 2nd Phase Contract. However, SBCS did not find any information related to Nan'an City Administrative Electronic Information Management Company Limited through internet research, relevant database research, and telephone directory assistance.

99.     CXTI's Annual and Quarterly Reports misrepresented that CXTI had earned revenue from the Nan'an 1st and 2nd Phase Contracts. The reports falsely stated that CXTI earned $12.5 million of revenue in 2006 and $0.6 million of revenue in 1Q07 through Expert Network pursuant to Nan'an 1st Phase Contract, and falsely reported that CXTI earned $7.7 million of revenue in 2006 and $4.7 million of revenue in 1Q07 through Expert Network pursuant to Nan'an 2nd Phase Contract. The reported data were false because:

(a)     Administrative Service Center of Nan'an Municipality, which manages e-Government Construction Projects for Nan'an Municipality, never signed Nan'an 1st Phase Contract, Nan'an 2nd Phase Contract, or any other contract with Expert Network;

(b)     Administrative Service Center of Nan'an Municipality did not authorize Nan'an City Administrative Electronic Information Management Company Limited to manage any e-Government Construction Projects for Nan'an Municipality, including Nan'an e-Government Projects 1 and 2, which Expert Network was hired to do pursuant to Nan'an 1st Phase Contract and Nan'an 2nd Phase Contract;

(c)     Nan'an City Administrative Electronic Information Management Company Limited does not exist;

(d)     Neither Nan'an 1st Phase Contract nor Nan'an 2nd Phase Contract was ever signed by Nan'an City Administrative Electronic Information Management Company Limited;

(e)     Nan'an 1st Phase Contract and Nan'an 2nd Phase Contract are forged documents; and

(f)     Employees in each of the Nan'an Municipality Office, the Network Office of Nan'an Municipality, and the Administrative Service Center of Nan'an Municipality have never even heard of Expert Network.

100.    Thus, none of the $25.5 million of Revenue Reported in CXTI's Annual and Quarterly Reports for e-Government Construction Projects done by Expert Network for the Nan'an Municipality was ever earned by CXTI.

101.    Additionally, the statement made in the Registration Statement as reported in Form SB-2 filed with SEC on December 29, 2005 about the existence of the "Nan'an Municipal Government Contract" was false and misleading because:

(a)    Administrative Service Center of Nan'an Municipality, which manages e-Government Construction Projects for Nan'an Municipality, never signed Nan'an Municipal Government Contract or any other contract with Expert Network;

(b)    The People's Municipal Government of Nan'an City never signed the Nan'an Municipal Government Contract or any other contract with Expert Network;

(c)    Nan'an Municipal Government Contract is a forged document; and

(d)    Employees in each of the Nan'an Municipality Office, the Network Office of Nan'an Municipality, and the Administrative Service Center of Nan'an Municipality have never even heard of Expert Network.

### Jinjiang Contracts

102.    CXTI's Annual and Quarterly Reports misrepresented virtually the entire amount of revenue it reportedly earned from a putative e-Government Contract with Jinjiang Gongcheng Management Services Co., Ltd. (the "Jinjiang Gongcheng 1st Phase Contract"). The financial statements falsely stated that CXTI earned $4.7 million of revenue in 2003, $17.8 million of revenue in 2004, and $2.2 million of revenue in 2005 from work Expert Network did pursuant to Jinjiang Gongcheng 1st Phase Contract, which was dated April 30, 2003 and was attached to the Registration Statement as reported in Form SB-2 filed with SEC on December 29, 2005.

103.    CXTI's Annual and Quarterly Reports were false and misleading in reporting that CXTI earned $7.9 million of revenue in 2005 and $2.0 million of revenue in 2006 from work Expert

Network did pursuant to an e-Government Contract with Jinjiang Gongcheng Management Services Co., Ltd. dated March 20, 2005 (the "Jinjiang Gongcheng 2nd Phase Contract"), attached to the Registration Statement as reported in Form SB-2 filed with SEC on December 29, 2005.

104.   CXTI's Annual and Quarterly Reports were false and misleading in reporting that CXTI earned $6.7 million of revenue in 2005 and $5.9 million of revenue in 2006 from work Expert Network did pursuant to an e-Government Contract with Jinjiang Gongcheng Management Services Co., Ltd. dated May 5, 2005 (the "Jinjiang Gongcheng 3rd Phase Contract"), attached to the Registration Statement as reported in Form SB-2 filed with SEC on December 29, 2005.

105.   CXTI's Annual and Quarterly Reports were false and misleading in reporting that CXTI earned $5.4 million of revenue in 2006 from work Expert Network did pursuant to an e-Government Contract with Jinjiang Gongcheng Management Services Co., Ltd. dated December 29, 2005 (the "Jinjiang Gongcheng 4th Phase Contract"), attached to Amendment No. 1 to the Registration Statement as reported in Form SB-2/A filed with SEC on May 3, 2006.

106.   CXTI's Annual and Quarterly Reports were false and misleading in reporting that CXTI earned $1.7 million of revenue in 2006 from work Expert Network did pursuant to an e-Government Contract with Jinjiang Gongcheng Management Services Co., Ltd. dated February 15, 2005 (the "Jinjiang System & Application Training Contract" or the "Jinjiang Gongcheng 5th Contract"),[6] attached to Amendment No. 1 to the Registration Statement as reported in Form SB-2/A filed with SEC on May 3, 2006.

---

[6] The Amendment No. 1 to the Registration Statement as reported in Form SB-2/A filed with SEC on May 3, 2006 on page II-8 refers to the name of the party that entered the Jinjiang Gongcheng 5th Contract with Expert Network as "Jinjiang City E-Government Project Construction Command Bureau," whereas the Jinjiang Gongcheng 5th Contract itself refers to the

107.   CXTI's Annual and Quarterly Reports were false and misleading in reporting that CXTI earned $1.2 million of revenue in 2006 and $0.3 million of revenue in 1Q07 from work Expert Network did pursuant to an e-Government Contract with Jinjiang Gongcheng Management Service Co., Ltd. dated January 30, 2005 (the "Jinjiang System Maintenance Contract" or the "Jinjiang Gongcheng 6th Contract"), attached to Amendment No. 1 to the Registration Statement as reported in Form SB-2/A filed with SEC on May 3, 2006.

108.   CXTI's Annual and Quarterly Reports were false and misleading in reporting that CXTI earned $0.6 million of revenue in 2006 from work Expert Network did pursuant to an e-Government Contract with Jinjiang City E-Government Project Construction Command Bureau dated November 22, 2005 (the Jinjiang Unified Command System Contract" or the "Jinjiang 7th Contract"), attached to Amendment No. 1 to the Registration Statement as reported in Form SB-2/A filed with SEC on May 3, 2006.

109.   According to Jinjiang Gongcheng 1st Phase Contract, Expert Network entered into a contract with Jinjiang Gongcheng Management Services Co., Ltd. "to provide comprehensive planning, design and construction plan . . .on Jinjiang Electronic Administration, and to provide

---

name of that party as "Jinjiang City Gong Cheng Management Limited Company." (See, CXTI SB-2/A  5-3-06), p. II-8; (Jinjiang Gongcheng 5th Contract). That CXTI sometimes called the company that supposedly hired Expert Network according to the Jinjiang Gongcheng 5th Contract by one name and sometimes by another name supports Plaintiffs' claim that Jinjiang Gongcheng 5th Contract is forged. Similarly, Amendment No. 1 to the Registration Statement as reported in Form SB-2/A filed with SEC on May 3, 2006 does not consistently refer to the party that entered the Jinjiang Gongcheng 2nd Phase Contract with Expert Network by the same name. Indeed, on page 30 of Form SB-2/A that party is referred to as "Jinjiang Gongcheng Management Co. Ltd," whereas on page II-4 of Form SB-2/A the party is referred to as "Jinjiang Gongcheng Management Services Co., Ltd." *See* SB-2/A 5-3-06, p. 30, II-4.

29

comprehensive expert consultation on government information construction" ("Jinjiang e-Government Project 1").

110.    According to Jinjiang Gongcheng 2nd Phase Contract, Expert Network entered into a contract with Jinjiang Gongcheng Management Services Co., Ltd. to "fully implement the Coordinated Office System (including Documents Exchange System) and the Unified Administration Approval System in all the municipal government departments, towns and streets, so that the full implementation of the Jinjiang Electronic Administration is ensuring [sic]." ("Jinjiang e-Government Project 2").

111.    According to Jinjiang Gongcheng 3rd Phase Contract, Expert Network entered into a contract with Jinjiang Gongcheng Management Services Co., Ltd. to "undertake the main contract of Jinjiang Electronic Business Construction Project." ("Jinjiang e-Government Project 3").

112.    According to Jinjiang Gongcheng 4th Phase Contract, Expert Network entered into a contract with Jinjiang Gongcheng Management Services Co., Ltd. to "undertake the project of Jinjiang City Society Medical Insurance Information System." ("Jinjiang e-Government Project 4").

113.    According to Jinjiang Gongcheng 5th Contract, Expert Network entered into a contract with Jinjiang Gongcheng Management Services Co., Ltd. to "undertake the Jinjiang e-government System Administration and Applied Technology training." ("Jinjiang e-Government Project 5").

114.    According to Jinjiang Gongcheng 6th Contract, Expert Network entered into a contract with Jinjiang Gongcheng Management Services Co., Ltd. to "carry on the repairing and maintenance

of the Jinjiang E-government Project systems' operation after the one-year free warranty period has been expired."[7] ("Jinjiang e-Government Project 6").

115.    According to Jinjiang 7th Contract, Expert Network entered into a contract with Jinjiang City E-Government Project Construction Command Bureau to "set up the Jinjiang City 'Unified Command System' for public security, which corresponds to the plan of negotiation about technology" ("Jinjiang e-Government Project 7").

116.    According to Jinjiang Gongcheng 3rd Phase Contract, Jinjiang Gongcheng Management Services Co., Ltd. "is the body designated by the Municipal government of Jinjiang City to assume the direct investment responsibility and to appoint contractor for the project."

117.    On or about June 11, 2008, the Private Investigator interviewed via telephone an employee of the Jinjiang Municipality Office.

118.    The employee of Jinjiang Municipality Office said he did not know of Expert Network.

119.    The employee of Jinjiang Municipality Office said that the Private Investigator should speak to the e-Government Office of Jinjiang Municipality, which is in charge of e-government construction projects for Jinjiang Municipality.

120.    On or about June 11, 2008, the Private Investigator interviewed via telephone an employee, named Mr. Chen, of the e-Government Office of Jinjiang Municipality. Mr. Chen stated

---

[7] That Expert Network was supposedly hired by Jinjiang Gongcheng Management Services Co., Ltd. pursuant to Jinjiang Gongcheng 6th Contract to maintain and repair the e-government project that it was hired to do pursuant to Jinjiang Gongcheng 5th Contract further supports Plaintiffs' assumption that the party that was supposed to have hired Expert Network pursuant to Jinjiang Gongcheng 5th Contract was also Jinjiang Gongcheng Management Services Co., Ltd.

that the e-Government Office of Jinjiang Municipality is an office that is part of the Jinjiang City E-Government Project Construction Command Bureau.

121.   Mr. Chen stated that the Jinjiang City E-Government Project Construction Command Bureau is an institution of the Jinjiang Municipality Office.

122.   Mr. Chen confirmed that the Jinjiang City E-Government Project Construction Command Bureau is in charge of e-government construction projects for Jinjiang Municipality.

123.   Mr. Chen stated that: a) Jinjiang Municipality did not authorize Jinjiang Gongcheng Management Services Co., Ltd. to manage e-government construction projects for Jinjiang Municipality, and b) he had never heard of Jinjiang Gongcheng Management Services Co., Ltd., the company that, according to Jinjiang Gongcheng 3rd Phase Contract, is authorized by Jinjiang Municipality to manage e-government construction projects for Jinjiang Municipality, including Jinjiang e-Government Projects 1, 2, 3, 4, 5, and 6, which Expert Network claimed it was hired to do pursuant to Jinjiang Gongcheng 1st Phase Contract, Jinjiang Gongcheng 2nd Phase Contract, Jinjiang Gongcheng 3rd Phase Contract, Jinjiang Gongcheng 4th Phase Contract, Jinjiang Gongcheng 5th Contract, and Jinjiang Gongcheng 6th Contract.

124.   Mr. Chen stated that Expert Network was the only company ever hired by Jinjiang Municipality to do an e-government construction project.

125.   Mr. Chen stated that the only e-government contract Jinjiang Municipality entered into pursuant to which Expert Network was hired to do an e-government construction project, namely Jinjiang e-Government Project 7, was signed by Jinjiang City E-Government Project Construction Command Bureau, which by CXTI's own admission signed only Jinjiang 7th Contract.

126.     Whereas the Revenue Reported in CXTI's Annual and Quarterly Reports includes revenue Expert Network earned through seven e-Government Construction Projects in Jinjiang Municipality, which Expert Network supposedly earned pursuant to the seven aforementioned e-Government Contracts, CXTI disclosed in documents it filed with the SEC that Expert Network entered into only *one* e-government contract with Jinjiang City E-Government Project Construction Command Bureau, namely Jinjiang 7th Contract.[8]

127.     Although Jinjiang Gongcheng 4th Phase Contract stated that Expert Network was hired by Jinjiang Gongcheng Management Services Co., Ltd. to "undertake the project of Jinjiang City Society Medical Insurance Information System," Mr. Chen stated that no e-Government project related to medical insurance was ever done or contracted to be done for the Jinjiang Municipality.

128.     Mr. Chen was very familiar with Expert Network. Indeed, he referred to two senior executives of Expert Network who managed Jinjiang e-Government Project 7, namely Mr. Zhu and Mr. Song Feng. Mr. Chen also referred to Expert Network's project manager for Jinjiang e-Government Project 7, namely Jiang Shaoheng.

129.     Mr. Chen mentioned further that the work Expert Network did on Jinjiang e-Government Project 7 was not good, and that Expert Network would not be hired for any other projects by the Jinjiang Municipality Office.

130.     Mr. Chen stated that as to Jinjiang e-Government Project 7, which Expert Network was hired to do by Jinjiang City E-Government Project Construction Command Bureau, Expert

---

8 The other six e-Government contracts from which Expert Network claimed to have earned revenue in Jinjiang Municipality were purportedly entered into with Jinjiang Gongcheng Management Services Co., Ltd.

Network subcontracted all of the work to other companies, including Shenzen Yingyuan Science and Technology Co., Ltd. and Sinosoft Co., Ltd.

131.   On or about June 12, 2008, the Private Investigator interviewed via telephone an employee, named Mr. Li Gan, of Shenzen Yingyuan Science and Technology Co., Ltd., a subcontractor that was hired by Expert Network to do work Expert Network was hired to do pursuant to Jinjiang 7th Contract.

132.   Mr. Li Gan stated that Jinjiang e-Government Project 7 was completed and that Shenzen Yingyuan Science and Technology Co., Ltd. had no subsequent contact with Expert Network.

133.   Mr. Li Gan stated that he had never heard of Jinjiang Gongcheng Management Services Co., Ltd.

134.   On or about June 12, 2008, SBCS tried to contact Jinjiang Gongcheng Management Services Co., Ltd., the company that, according to CXTI's "Jinjiang Gongcheng 3rd Phase Contract," is authorized by Jinjiang Municipality to manage e-Government Construction Projects for Jinjiang Municipality. Among these projects are, purportedly, Jinjiang e-Government Projects 1, 2, 3, 4, 5, and 6, which Expert Network claims that it was hired to do pursuant to Jinjiang Gongcheng 1st Phase Contract, Jinjiang Gongcheng 2nd Phase Contract, Jinjiang Gongcheng 3rd Phase Contract, Jinjiang Gongcheng 4th Phase Contract, Jinjiang Gongcheng 5th Contract, and Jinjiang Gongcheng 6th Contract.

135.   Although the Jinjiang Gongcheng 1st Phase Contract stated that the address of Jinjiang Gongcheng Management Services Co., Ltd. was No. 1 Bajialou, Qingyang, Jinjiang City, SBCS' internet research, relevant database research, and communications with telephone directory

34

assistance revealed that Jinjiang Gongcheng Management Services Co., Ltd. was not located at that address.

136.    The amendment to Jinjiang Gongcheng 1st Phase Contract, entitled "Supplementary Provisions to Contract," dated June 10, 2003 ("Amendment to Jinjiang Gongcheng 1st Phase Contract", attached to the Registration Statement as reported in Form SB-2 filed with SEC on December 29, 2005), stated that: a) the address of Jinjiang Gongcheng Management Services Co., Ltd. was South Main Street, Jinjiang City; b) the telephone number of Jinjiang Gongcheng Management Services Co., Ltd. was 0595-5785565; and c) the name of legal representative of Jinjiang Gongcheng Management Services Co., Ltd. was Chen Zengrong.

137.    The Private Investigator interviewed the person who answered the telephone at the number, 0595-5785565, which was stated as the telephone number for Jinjiang Gongcheng Management Services Co., Ltd. in Amendment to Jinjiang Gongcheng 1st Phase Contract. The man who spoke to the Private Investigator on the telephone stated that: a) the telephone number did not belong to Jinjiang Gongcheng Management Services Co., Ltd. or Chen Zengrong; and b) neither Jinjiang Gongcheng Management Services Co., Ltd. nor Chen Zengrong were located at the address corresponding to that telephone number. The man who spoke to the Private Investigator on the telephone stated that the telephone number previously belonged to Chen Zengrong, who was previously located at the address corresponding to the telephone number, but had moved.

138.    SBCS also searched the registration information of Jinjiang Gongcheng Management Services Co., Ltd., which was registered at the Industry and Commerce Administrative Bureau of Jinjiang City. The Industry and Commerce Administrative Bureau is the government institution that oversees Chinese companies.  Chinese companies must register with the Industry and Commerce

35

Administrative Bureau, and after initial registration must submit annual audit reports issued by certified accounting firms.   The Industry and Commerce Administrative Bureau reviews the qualifications of companies based on materials they submit and decides whether to allow them to remain in business.  Materials submitted by companies are kept on file at the Industry and Commerce Administrative Bureau.  The registration information of Jinjiang Gongcheng Management Services Co., Ltd. revealed that Jinjiang Gongcheng Management Services Co., Ltd. was not registered to do e-government construction projects but instead to do financial management for "Fujian Seaward Pharmaceutical Co., Ltd."  The registration information also revealed that Jinjiang Gongcheng Management Services Co., Ltd. was incorporated on December 17, 2001, but that the business license of Jinjiang Gongcheng Management Services Co., Ltd. was revoked on December 28, 2002. The registration information stated that the business license of Jinjiang Gongcheng Management Services Co., Ltd. was revoked because Jinjiang Gongcheng Management Services Co., Ltd. violated Chinese law by not filing the required annual financial audit with the government.

139.    According to all six e-Government Contracts that Expert Network entered into with Jinjiang Gongcheng Management Services Co., Ltd., all such contracts were entered into during the period of time beginning in 2003 and ending in 2005; however, it was impossible for Jinjiang Gongcheng Management Services Co., Ltd. to have entered into any of those contracts because its business license had already been revoked back in 2002.  Under Chinese law, a company may not conduct business or enter into contracts if its business license has been revoked.  Thus, Jinjiang Gongcheng Management Services Co., Ltd. could not have entered into contracts, much less have performed its business obligations pursuant to the contracts.

140.   The registration information of Jinjiang Gongcheng Management Services Co., Ltd. also stated that the principal of Jinjiang Gongcheng Management Services Co., Ltd. was Jiang Shaoheng. As stated above, Mr. Chen stated that, Jiang Shaoheng was also Expert Network's project manager. Simon Fu, CXTI's CFO, independently confirmed that Jiang Shaoheng was also Expert Network's project manager. That the same person, Jiang Shaoheng, was both the principal of Jinjiang Gongcheng Management Services Co., Ltd. and the project manager of Expert Network strongly supports the inference that Mr. Jiang may have facilitated the forgery of the six e-Government contracts supposedly entered into by Expert Network and Jinjiang Gongcheng Management Services Co., Ltd.

141.   CXTI's Annual and Quarterly Reports were false and misleading in disclosing that: 1) CXTI earned $4.7 million of revenue in 2003, $17.8 million of revenue in 2004, and $2.2 million of revenue in 2005 through Expert Network pursuant to Jinjiang Gongcheng 1st Phase Contract; 2) CXTI earned $7.9 million of revenue in 2005 and $2.0 million of revenue in 2006 through Expert Network pursuant to Jinjiang Gongcheng 2nd Phase Contract; 3) CXTI earned $6.7 million of revenue in 2005 and $5.9 million of revenue in 2006 through Expert Network pursuant to Jinjiang Gongcheng 3rd Phase Contract; 4) CXTI earned $5.4 million of revenue in 2006 through Expert Network pursuant to Jinjiang Gongcheng 4th Phase Contract; 5) CXTI earned $1.7 million of revenue in 2006 through Expert Network pursuant to Jinjiang Gongcheng 5th Contract; and 6) CXTI earned $1.2 million of revenue in 2006 and $0.3 million of revenue in 1Q07 through Expert Network pursuant to Jinjiang Gongcheng 6th Contract because:

(a)     Jinjiang City E-Government Project Construction Command Bureau, which manages e-government construction projects for Jinjiang Municipality, never

signed Jinjiang Gongcheng 1st Phase Contract, Jinjiang Gongcheng 2nd Phase Contract, Jinjiang Gongcheng 3rd Phase Contract, Jinjiang Gongcheng 4th Phase Contract, Jinjiang Gongcheng 5th Contract, or Jinjiang Gongcheng 6th Contract;

(b)   Jinjiang Municipality did not authorize Jinjiang Gongcheng Management Services Co., Ltd. to manage any e-government construction projects for Jinjiang Municipality, including Jinjiang e-Government Projects 1, 2, 3, 4, 5, and 6, which Expert Network claimed that it was hired to do pursuant to Jinjiang Gongcheng 1st Phase Contract, Jinjiang Gongcheng 2nd Phase Contract, Jinjiang Gongcheng 3rd Phase Contract, Jinjiang Gongcheng 4th Phase Contract, Jinjiang Gongcheng 5th Contract, and Jinjiang Gongcheng 6th Contract;

(c)   Jinjiang Gongcheng Management Services Co., Ltd. could not manage any of the e-Government Construction Projects for Jinjiang Municipality, because the business license of Jinjiang Gongcheng Management Services Co., Ltd. was revoked prior to each of the dates on which it supposedly entered into Jinjiang Gongcheng 1st Phase Contract, Jinjiang Gongcheng 2nd Phase Contract, Jinjiang Gongcheng 3rd Phase Contract, Jinjiang Gongcheng 4th Phase Contract, Jinjiang Gongcheng 5th Contract, and Jinjiang Gongcheng 6th Contract;

(d)   Employees in each of the Jinjiang Municipality Office, the e-Government Office of Jinjiang Municipality, and Shenzen Yingyuan Science and Technology Co., Ltd. have never even heard of Jinjiang Gongcheng Management Services Co., Ltd.;

       (e)      None of Jinjiang Gongcheng 1st Phase Contract, Jinjiang Gongcheng 2nd Phase Contract, Jinjiang Gongcheng 3rd Phase Contract, Jinjiang Gongcheng 4th Phase Contract, Jinjiang Gongcheng 5th Contract, or Jinjiang Gongcheng 6th Contract was ever signed by Jinjiang Gongcheng Management Services Co., Ltd.; and

       (f)      Jinjiang Gongcheng 1st Phase Contract, Jinjiang Gongcheng 2nd Phase Contract, Jinjiang Gongcheng 3rd Phase Contract, Jinjiang Gongcheng 4th Phase Contract, Jinjiang Gongcheng 5th Contract, and Jinjiang Gongcheng 6th Contract are forged documents.

142.    CXTI recognized and reported $55.8 of revenue in its Annual and Quarterly Reports for e-Government Construction Projects done by Expert Network in the Jinjiang Municipality pursuant to the six fake contracts entered into with Jinjiang Gongcheng Management Services Co., Ltd., and in the additional amount of $0.6 million for work done pursuant to the single legitimate contract, Jinjiang 7th Contract, entered into with Jinjiang City E-Government Project Construction Command Bureau. However, the maximum amount of revenue that Expert Network could have possibly earned in the Jinjiang Municipality was only $0.6 million, as Revenue Reported in CXTI's Annual and Quarterly Reports pursuant to the Jinjiang 7th Contract was only $0.6 million, while the remaining six contracts – and, likewise, the $55.8 million claimed to have been earned therefrom – were fictitious.

143.    Thus, at least $55.8 million out of the $56.4 million of Revenue Reported in CXTI's Annual and Quarterly Reports for e-Government Construction Projects done by Expert Network for the Jinjiang Municipality was never earned by CXTI.

## Dehua Contracts

144.    The Revenue Reported in CXTI's Annual and Quarterly Reports was false and misleading in reporting that CXTI earned $8.9 million of revenue in 2004 and $6.7 million of revenue in 2005 from work Expert Network did pursuant to an e-Government Contract with Dehua County People's Municipality of Fujian Province dated April 9, 2004 (the "Dehua 1st Phase Contract"), attached to the Registration Statement as reported in Form SB-2 filed with SEC on December 29, 2005.

145.    CXTI's Annual and Quarterly Reports were false and misleading in reporting that CXTI earned $11.8 million of revenue in 2005 from work Expert Network did pursuant to an e-Government Contract with Dehua County Electronic Administration and Contraction Management Company Limited of Fujian Province dated January 5, 2005 (the "Dehua 2nd Phase Contract"), attached to the Registration Statement as reported in Form SB-2 filed with SEC on December 29, 2005.

146.    CXTI's Annual and Quarterly Reports were false and misleading in reporting that CXTI earned $7.1 million of revenue in 2006 and $1.9 million of revenue in 1Q07 from work Expert Network did pursuant to an e-Government Contract with Fujian Province Dehua County E-Government Construction Project Management Company Limited dated January 4, 2006 (the "Dehua 3rd Phase Contract"), attached to Amendment No. 1 to the Registration Statement as reported in Form SB-2/A filed with SEC on May 3, 2006.

147.    CXTI's Annual and Quarterly Reports were false and misleading in reporting that CXTI earned $11.4 million of revenue in 2006 from work Expert Network did pursuant to an e-Government Contract with Fujian Province Dehua County E-Government Construction Project

Management Company Limited dated March 5, 2006 (the "Dehua 4th Phase Contract"), attached to Amendment No. 1 to the Registration Statement as reported in Form SB-2/A filed with SEC on May 3, 2006.

148.    CXTI's Annual and Quarterly Reports were false and misleading in reporting that CXTI earned $0.6 million of revenue in 2006 from work Expert Network did pursuant to an e-Government Contract with Fujian Province Dehua County E-Government Construction Project Management Company Limited dated February 13, 2006 (the "Unified Command System" or the "Dehua 5[th] Contract"), attached to Amendment No. 1 to the Registration Statement as reported in Form SB-2/A filed with SEC on May 3, 2006.

149.    According to Dehua 1st Phase Contract, Expert Network entered into a contract with Dehua County People's Municipality of Fujian Province "to undertake the project of Electronic Administration Planning, Design and Construction" of Dehua County ("Dehua e-Government Project 1").

150.    According to Dehua 2nd Phase Contract, Expert Network entered into a contract with Dehua County Electronic Administration and Contraction [sic] Management Company Limited of Fujian Province "to undertake the project of Electronic Administration Construction (Phase 2)" of Dehua County ("Dehua e-Government Project 2").

151.    According to Dehua 3rd Phase Contract, Expert Network entered into a contract with Fujian Province Dehua County E-Government Construction Project Management Company Limited to "fully implement the Coordinated Office System (including Documents Exchange System) and the Unified Administration Approval System in all the governmental departments, towns and streets, so

that the full implementation of the Dehua E-Government Construction Project is ensured" ("Dehua e-Government Project 3").

152.   According to Dehua 4th Phase Contract, Expert Network entered into a contract with Fujian Province Dehua County E-Government Construction Project Management Company Limited to "undertake the main contract of Dehau [sic] Electronic Business Construction Project" ("Dehua e-Government Project 4").

153.   According to Dehua 5th Contract, Expert Network entered into a contract with Fujian Province Dehua County E-Government Construction Project Management Company Limited to "undertake the Dehua County Public Security Unified Command System Construction Project" ("Dehua e-Government Project 5").

154.   Both Dehua County Electronic Administration and Contraction [sic] Management Company Limited of Fujian Province, which entered Dehua 2nd Phase Contract with Expert Network, and Fujian Province Dehua County E-Government Construction Project Management Company Limited, which entered Dehua 3rd Phase Contract, Dehua 4th Phase Contract, and Dehua 5th Contract with Expert Network, were, according to CXTI, authorized by Dehua County People's Municipality of Fujian Province to manage e-Government Construction Projects for Dehua County People's Municipality of Fujian Province.

155.   Indeed, the Dehua 2nd Phase Contract stated, "As per . . . the good cooperation relations at the performance in The Electronic Administration Construction of Dehua County (Phase 1), A [Dehua County Electronic Administration and Contraction [sic] Management Company Limited of Fujian Province] formally *entrusts* B [Expert Network] to undertake the project of Electronic Administration Construction (Phase 2)." Thus, according to Dehua 2nd Phase Contract,

Expert Network was hired to continue work it completed pursuant to Dehua 1st Phase Contract, which Expert Network signed with Dehua County People's Municipality of Fujian Province. Therefore, according to Dehua 2nd Phase Contract, Dehua County Electronic Administration and Contraction [sic] Management Company Limited of Fujian Province must have been authorized by Dehua County People's Municipality of Fujian Province.

156.    Also, according to Dehua 4th Phase Contract, "the body designated by the Municipal government of Dehau [sic] County to assume the direct investment responsibility and to appoint contractor for the project. . . [was] Fujian Province Dehua County E-Government Construction Project Management Company Limited."

157.    On or about June 17, 2008 the Private Investigator interviewed via telephone an employee of the People's Government of Dehua County, Quanzhou City, Fujian Province.

158.    The employee of the People's Government of Dehua County, Quanzhou City, Fujian Province stated that Network Office of the People's Government of Dehua County, Quanzhou City, Fujian Province was in charge of e-Government Construction Projects for Dehua County of Fujian Province.

159.    The employee of the People's Government of Dehua County, Quanzhou City, Fujian Province further stated that Mr. Wang, an employee of Network Office of the People's Government of Dehua County, Fujian Province was responsible, on behalf of Network Office of the People's Government of Dehua County, for managing e-government construction projects for Dehua County of Fujian Province.

43

160.    On or about August 14, 2008, the Private Investigator interviewed via telephone the employee, Mr. Wang, of the Network Office of the People's Government of Dehua County, Fujian Province.

161.    Mr. Wang stated that the Network Office of the People's Government of Dehua County, Fujian Province was in charge of e-government construction projects for Dehua County of Fujian Province.

162.    Mr. Wang stated that in 2004, the People's Government of Dehua County, Quanzhou City, Fujian Province and Expert Network did sign a contract, pursuant to which Expert Network was hired to implement what he stated was the general planning project of the e-Government Construction Project for the Dehua County of Fujian Province. However, according to Mr. Wang, that project was terminated because the People's Government of Dehua County, Quanzhou City, Fujian Province did not have sufficient capital and thus paid Expert Network only RMB 100,000, equivalent to only $12,126.00, according to the exchange rate in 2004, (RMB 8.2468 to $1.00), as stated by CXTI in Amendment No. 1 to the Registration Statement as reported in Form SB-2/A filed with SEC on May 3, 2006. (See, CXTI SB-2/A 5-3-06), p. F-12. According to Mr. Wang, although the project was planned to be completed in 2006, it was terminated in 2004. Mr. Wang also stated that that was the only contract that the People's Government of Dehua County entered into with Expert Network.

163.    Mr. Wang stated that after the termination in 2004 of the contract that the People's Government of Dehua County, Quanzhou City, Fujian Province had entered into with Expert Network, the People's Government of Dehua County, Quanzhou City, Fujian Province did not enter into any other contracts with Expert Network.

44

164.    Mr. Wang stated that after the 2004 termination of the contract that Dehua County People's Municipality of Fujian Province had entered into with Expert Network, the People's Government of Dehua County, Quanzhou City, Fujian Province never paid Expert Network any more money.

165.    Mr. Wang stated that after the termination of the contract that the People's Government of Dehua County, Quanzhou City, Fujian Province had entered into with Expert Network, Expert Network never did any other work on e-government construction projects, or work of any kind whatsoever, for Dehua County of Fujian Province.

166.    Mr. Wang stated that: a) the People's Government of Dehua County, Quanzhou City, Fujian Province did not authorize Dehua County Electronic Administration and Contraction Management Company Limited of Fujian Province to manage e-Government Construction Projects for Dehua County People's Municipality of Fujian Province; and b) he never heard of Dehua County Electronic Administration and Contraction Management Company Limited of Fujian Province, the company that, according to Dehua 2nd Phase Contract, is authorized by the People's Government of Dehua County, Quanzhou City, Fujian Province to manage e-Government Construction Projects for Dehua County of Fujian Province, including Dehua e-Government Project 2, which Expert Network claimed it was hired to do pursuant to Dehua 2nd Phase Contract.

167.    Mr. Wang stated that: a) the People's Government of Dehua County, Quanzhou City, Fujian Province did not authorize Fujian Province Dehua County E-Government Construction Project Management Company Limited to manage e-government construction projects for Dehua County of Fujian Province; and b) he has never heard of Fujian Province Dehua County E-Government Construction Project Management Company Limited, the company that, according to

45

Dehua 4th Phase Contract, is authorized by the People's Government of Dehua County, Quanzhou City, Fujian Province to manage e-government construction projects for Dehua County of Fujian Province, including Dehua e-Government Projects 3, 4, and 5, which Expert Network claimed it was hired to do pursuant to Dehua 3rd Phase Contract, Dehua 4th Phase Contract, and Dehua 5th Contract.

168.   SBCS did a search for Dehua County Electronic Administration and Contraction Management Company Limited of Fujian Province, the company that, according to Dehua 2nd Phase Contract, is authorized by the People's Government of Dehua County, Quanzhou City, Fujian Province to manage e-government construction projects for Dehua County of Fujian Province, including Dehua e-Government Project 2, which Expert Network was hired to do pursuant to Dehua 2nd Phase Contract. However, SBCS did not find any information related to Dehua County Electronic Administration and Contraction Management Company Limited of Fujian Province through internet research, relevant database research, or contacting telephone directory assistance.

169.   SBCS did a search for Fujian Province Dehua County E-Government Construction Project Management Company Limited, the company that, according to Dehua 4th Phase Contract, is authorized by the People's Government of Dehua County, Quanzhou City, Fujian Province to manage e-government construction projects for Dehua County of Fujian Province, including Dehua e-Government Projects 3, 4, and 5, which Expert Network was hired to do pursuant to Dehua 3rd Phase Contract, Dehua 4th Phase Contract, and Dehua 5th Contract. However, SBCS did not find any information related to Fujian Province Dehua County E-Government Construction Project Management Company Limited through internet research, relevant database research, or contacting telephone directory assistance.

46

170.   Therefore, CXTI's Annual and Quarterly Reports were false and misleading in disclosing that: 1) CXTI earned $11.8 million of revenue in 2005 through Expert Network pursuant to Dehua 2nd Phase Contract; 2) CXTI earned $7.1 million of revenue in 2006 and $1.9 million of revenue in 1Q07 through Expert Network pursuant to Dehua 3rd Phase Contract; 3) CXTI earned $11.4 million of revenue in 2006 through Expert Network pursuant to Dehua 4th Phase Contract; and 4) CXTI earned $0.6 million of revenue in 2006 through Expert Network pursuant to Dehua 5th Contract because:

(a)   the People's Government of Dehua County, Quanzhou City, Fujian Province never signed Dehua 2nd Phase Contract, Dehua 3rd Phase Contract, Dehua 4th Phase Contract, or Dehua 5th Contract;

(b)   Network Office of the People's Government of Dehua County, Fujian Province, which manages e-government construction projects for Dehua County People's Municipality of Fujian Province, never signed Dehua 2nd Phase Contract, Dehua 3rd Phase Contract, Dehua 4th Phase Contract, or Dehua 5th Contract;

(c)   the People's Government of Dehua County, Quanzhou City, Fujian Province did not authorize Dehua County Electronic Administration and Contraction Management Company Limited of Fujian Province to manage any e-government construction projects for Dehua County People's Municipality of Fujian Province, including Dehua e-Government Project 2, which Expert Network claims it was hired to do pursuant to Dehua 2nd Phase Contract;

(d)   the People's Government of Dehua County, Quanzhou City, Fujian Province did not authorize Fujian Province Dehua County E-Government

47

Construction Project Management Company Limited to manage any e-government construction projects for Dehua County People's Municipality of Fujian Province, including Dehua e-Government Projects 3, 4, and 5, which Expert Network claimed it was hired to do pursuant to Dehua 3rd Phase Contract, Dehua 4th Phase Contract, and Dehua 5th Contract;

(e)     The employee of Network Office of the People's Government of Dehua County, Fujian Province, who was in charge of managing e-government construction projects for Dehua County People's Municipality of Fujian Province, and who was in charge of the only e-Government Construction Project ever done in Dehua County of Fujian Province, had never even heard of Dehua County Electronic Administration and Contraction Management Company Limited of Fujian Province;

(f)     The same employee of Network Office of the People's Government of Dehua County, Fujian Province had never even heard of Fujian Province Dehua County E-Government Construction Project Management Company Limited;

(g)     Dehua 2nd Phase Contract was never signed by Dehua County Electronic Administration and Contraction Management Company Limited of Fujian Province;

(h)     None of Dehua 3rd Phase Contract, Dehua 4th Phase Contract, or Dehua 5th Contract was ever signed by Fujian Province Dehua County E-Government Construction Project Management Company Limited; and

(i)     Dehua 2nd Phase Contract, Dehua 3rd Phase Contract, Dehua 4th Phase Contract, and Dehua 5th Contract are forged documents.

48

171.   Additionally, CXTI's Annual and Quarterly Reports were false and misleading in disclosing that CXTI earned $8.9 million of revenue in 2004 and $6.7 million of revenue in 2005 through Expert Network pursuant to Dehua 1st Phase Contract, because only $12,126.00 was paid by the People's Government of Dehua County, Quanzhou City, Fujian Province to Expert Network for the work done pursuant to the only e-government contract it entered into with the People's Government of Dehua County, Quanzhou City, Fujian Province.

172.   CXTI's Annual and Quarterly Reports reported revenue of $48.4 million from five e-government contracts pursuant to which Expert Network supposedly performed work in Dehua County of Fujian Province.  The $48.4 million was reportedly earned for work done pursuant to five contracts: one fake contract entered into with Dehua County Electronic Administration and Contraction Management Company Limited of Fujian Province, the three fake contracts entered into with Fujian Province Dehua County E-Government Construction Project Management Company Limited, and one contract in the amount of $15.6 million - the Dehua 1st Phase Contract.   In truth, Expert Network did not earn any money from any of the five contracts, except for the Dehua 1st Contract with the People's Government of Dehua County, Quanzhou City, Fujian Province, pursuant to which Expert Network earned only $12.1 *thousand* rather than the $15.6 *million* CXTI reported earning from the Dehua 1st Contract.

173.   Thus, CXTI earned only $12 thousand of the $48.4 million of Revenue it reported earning in CXTI's Annual and Quarterly Reports for e-Government Construction Projects done by Expert Network for the Dehua County of Fujian Province.

49