UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X

CARLOS MUNOZ, INDIVIDUALLY AND                    CASE No.: 07-CV-10531 (AKH)
ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,
                                                  ECF

       Plaintiffs,


       vs.


CHINA EXPERT TECHNOLOGY, INC.;
PKF NEW YORK, CERTIFIED PUBLIC
ACCOUNTANTS, A PROFESSIONAL
CORPORATION, PKF HONG KONG,
CERTIFIED PUBLIC ACCOUNTANTS;
BDO MCCABE LO LIMITED
CERTIFIED PUBLIC ACCOUNTANTS,
BDO SEIDMAN, LLP,

       Defendants.
------------------------------------------------------------------X

## MEMORANDUM OF LAW IN OPPOSITION TO
## <u>BDO SEIDMAN, LLP'S MOTION TO DISMISS</u>


THE ROSEN LAW FIRM, P.A.

Laurence M. Rosen, Esq.  (LR 5733)
Email: lrosen@rosenlegal.com
Phillip Kim, Esq. (PK 9384)
Email: pkim@rosenlegal.com
Timothy W. Brown, Esq. (TB 1008)
Email: tbrown@rosenlegal.com
350 Fifth Avenue, Suite 5508
New York, New York 10118
Telephone: (212) 686-1060
Fax: (212) 202-3827

Lead Counsel for Plaintiffs and Class

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................... ii

STATEMENT OF FACTS ................................................................................................1

ARGUMENT…………………….. ..................................................................................6

I.      BDO Seidman's Motion to Dismiss the Section 10(b) Claim Should Be Denied...............6

        A.      The Complaint Adequately Pleads That BDO Seidman Made False and
                Misleading Statements of Material Fact ..................................................................6

        B.      Plaintiffs Sufficiently Alleged Facts That Give Rise to a Strong Inference
                of Scienter ..............................................................................................................16

                1.      Applicable Authority ...............................................................................16

                2.      BDO Seidman's Conscious Misbehavior and/or Recklessnes...................18

II.     The Section 20(a) Claim Against BDO Seidman May Be Dismissed ..............................24

III.    Plaintiffs Should Be Granted Leave to Amend .................................................................25

CONCLUSION..................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### FEDERAL CASES

*Alstom SA Sec. Litig.*,
    406 F.Supp.2d 433 (S.D.N.Y. 2005).....................................................................10, 11, 14

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
    324 F.Supp.2d 474 (2004) ............................................................................................21

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)......................................................................................................15

*Calderon v. Tower Associates Intern., Inc.*,
    1989 WL 29916 (D. Or. Mar. 28, 1989) ......................................................................15

*In re Campbell Soup Company Sec. Litig.*,
    145 F.Supp.2d 574 (D. N.J. 2001) ...............................................................................15

*In re Complete Management Inc. Sec. Litig.*,
    153 F.Supp.2d 314 (S.D.N.Y. 2001)......................................................................19, 21

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
    235 F.Supp.2d 549 (S.D. Tex. 2002) ......................................................................13, 14

*In re Global Crossing, Ltd. Sec. Litig.*,
    322 F.Supp.2d 319 (S.D.N.Y. 2004)..............................................................10, 11, 12, 13

*In re IAC/InterActiveCorp Sec. Litig.*,
    478 F. Supp. 2d 574 (S.D.N.Y. 2007).........................................................................25

*In re Kidder Peabody Sec. Litig.*,
    10 F.Supp.2d 398 (S.D.N.Y. 1998).........................................................................13, 14

*In re LaBranche Sec. Litig.*,
    405 F.Supp.2d 333 (S.D.N.Y. 2005)......................................................................11, 12, 21

*Lattanzio v. Deloitte & Touche LLP*,
    476 F.3d 147 (2d Cir. 2007)...........................................................................................7

*Lernout & Hauspie*,
    230 F.Supp.2d 152 (D. MA. 2002) ........................................................................13, 14

*In re Leslie Fay Cos. Sec. Litig.*,
    871 F. Supp. 686 (S.D.N.Y. 1995)................................................................................23

ii

*Lodge 743, Intern. Ass'n of Machinists, AFL-CIO v. United Aircraft Corp.*,
 337 F.2d 5 (2d Cir. 1964) ..........................................................................................14

*Maldonado v. Flynn*,
 597 F.2d 789 (2d Cir. 1979)......................................................................................15

*McLean v. Alexander*,
 599 F.2d 1190 (3d Cir. 1979).....................................................................................23

*Menkes v. Stolt-Nielsen S.A.*,
 2006 WL 1699603 (D. Conn. June 19, 2006)..............................................................12

*In re Metex Corp. Sec. Litig.*,
 1993 WL 330596 (E.D.N.Y. July 08, 1993)................................................................15

*In re MicroStrategy, Inc. Sec. Litig.*,
 115 F. Supp. 2d 620 (E.D. Va. 2000) ...................................................................22, 23

*Novak v. Kasaks*,
 216 F.3d 300 (2d Cir. 2000)...........................................................................16, 17, 18

*In re Oxford Health Plans, Inc. Sec. Litig.*,
 51 F.Supp.2d 290 (S.D.N.Y. 1999).......................................................................19, 21

*Pension Committee of University of Montreal Pension Plan v. Banc of America Securities, LLC*,
 592 F.Supp.2d 608 (S.D.N.Y. 2009)............................................................................11

*In re Philip Services Corp. Sec. Litig.*,
 383 F.Supp.2d 463 (S.D.N.Y. 2004).......................................................................21, 22

*In re Qwest Commc'ns Int'l, Inc.*,
 396 F. Supp. 2d 1178 (D. Colo. 2004).........................................................................24

*In re Refco, Inc. Sec. Litig.*,
 503 F.Supp.2d 611 (S.D.N.Y. 2007)............................................................................11

*Rolf v. Blyth, Eastman Dillon & Co., Inc.*,
 570 F.2d 38 (2d Cir. 1978).....................................................................................18, 19

*Rothman v. Gregor*,
 220 F.3d 81 (2d Cir. 2000)..........................................................................................18

*In re Royal Dutch/Shell Transport Sec. Litig.*,
 380 F. Supp. 2d 509 (D.N.J. 2005) .............................................................................22

*In re Salomon Analyst AT&T Litig.*,
   350 F.Supp.2d 455 (S.D.N.Y. 2004)...................................................................12

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001).....................................................................10, 11

*S.E.C. v. KPMG LLP*,
   412 F.Supp.2d 349 (S.D.N.Y. 2006)...................................................18, 19, 23

*SEC v. Pimco Advisors Fund Mgmt. LLC*,
   341 F.Supp.2d 454 (S.D.N.Y. 2004).....................................................................10

*SEC v. Price Waterhouse*,
   797 F.Supp. 1217 (S.D.N.Y. 1992)...................................................................18, 19

*Seippel v. Sidley, Austin, Brown & Wood, LLP*,
   399 F. Supp. 2d 283 (S.D.N.Y. 2005)...................................................................12

*Spool v. World Child Int'l Adoption Agency*,
   520 F.3d 178 (2d Cir. 2008)...................................................................15

*Tellabs v. Makor Issues & Rights, Ltd.*,
   127 S. Ct. 2499 (2007)...................................................................16, 17, 24

*U.S. S.E.C. v. Fehn*,
   97 F.3d 1276 (9th Cir. 1996) ...................................................................15

*U.S. S.E.C. v. Gold*,
   2006 WL 3462103 (E.D.N.Y. Aug. 18, 2006)...................................................................18

*In re Van der Moolen Holding N.V. Sec. Litig.*,
   405 F.Supp.2d 388 (S.D.N.Y. 2005)...................................................................12

*Vladimir v. Deloitte & Touche LLP*,
   1997 WL 151330 (S.D.N.Y. Mar. 31, 1997)...................................................................18

*Whalen v. Hibernia Foods PLC*,
   2005 WL 1799370 (S.D.N.Y. Aug. 1, 2005)...................................................................22

*In re Winstar Communications*,
   2006 WL 473885 (S.D.N.Y. Feb. 27, 2006)...................................................................22

*In re WorldCom, Inc. Securities Litigation*,
   2003 WL 21488087 (S.D.N.Y. June 25, 2003) ...................................................................20, 21

*In re Worlds of Wonder Sec. Litig.*,

35 F.3d 1407 (9th Cir. 1994) ............................................................................................18

*Wright v. Ernst & Young LLP*,
    152 F.3d 169 (2d Cir. 1998)...........................................................................7, 9, 10, 11

*Zell v. Intercapital Income Sec., Inc.*,
    675 F.2d 1041 (9th Cir. 1982) ...................................................................................15, 16

## FEDERAL STATUTES

15 U.S.C. § 78u-4(b)(1) ...................................................................................................16

15 U.S.C. § 78u-4(b)(2) ...................................................................................................16

## MISCELLANEOUS AUTHORITIES

PCAOB AU 150 ..................................................................................................................5

PCAOB AU 326 ..................................................................................................................5

PCAOB AU 330.04-09 ........................................................................................................5

PCAOB AU 311.02 ..............................................................................................................9

PCAOB AU 330.32 ..............................................................................................................5

PCAOB AU 330.34 ..............................................................................................................5

PCAOB AU 330.35 ..............................................................................................................5

PCAOB AU 543.04 ..............................................................................................................9

Lead Plaintiffs Joseph Nunn, Basil Hantash, Bashar Hantash, Anna Hantash and Kenneth Price, and named plaintiff Carlos Munoz, individually and on behalf of all other persons similarly situated ("Plaintiffs"), respectfully submit this memorandum of law in opposition to the motion to dismiss filed by BDO Seidman LLP.

## STATEMENT OF FACTS

The Amended Complaint ("Complaint") alleges causes of action for securities fraud against China Expert Technology, Inc. ("CXTI" or "China Expert") and its auditors arising out of their issuance of completely fraudulent financial statements for fiscal years 2003 to 2006. China Expert is a Nevada corporation that maintained its headquarters and operations in China at the time of the alleged fraud. ¶ 15. During the class period, CXTI issued financial statements claiming it had earned $134 million of revenue from 16 e-government contracts. ¶ 43. The Complaint alleges that 99% of CXTI's reported revenue for these fiscal years was completely fictitious. ¶ 225. The Complaint alleges that the auditors violated § 10(b) and § 20(a) of the Securities Exchange Act for preparing and certifying CXTI's financial statements without performing the most rudimentary auditing procedures to confirm that even one of the 16 contracts was genuine or that even a tiny portion of the $134 million of reported revenue had actually been earned. ¶¶ 43, 302-06. CXTI was a complete fraud and the auditors were highly reckless in not confirming the existence of even 1% of the reported revenue. Indeed, when investors and regulators got wind of the fraud in autumn 2007, CXTI and its management vanished into thin air. ¶¶ 272-83.

BDO Seidman LLP is an accounting firm based in New York ("BDO Seidman"). ¶ 23. BDO McCabe Lo Limited is the Hong Kong-based affiliate of BDO Seidman (referred to herein as "BDO McCabe"). ¶ 16. BDO Seidman and BDO McCabe provided audit services for the 2005 and 2006 audits of CXTI's financial statements. ¶¶ 22-24.

1

The Class period for this lawsuit begins on March 16, 2006 when CXTI filed with the SEC its fiscal 2005 annual report on form 10-KSB, which included audited financial statements for the fiscal years 2003, 2004 and 2005 ("2005 Annual Report"). ¶ 49. BDO Seidman together with BDO McCabe audited and certified the 2005 financial statements and PKF Certified Public Accountants audited and certified the 2003 and 2004 financial statements that were included in the 2005 Annual Report. ¶¶ 50-51. On April 12, 2007, CXTI filed with the SEC its fiscal 2006 annual report on form 10-KSB, which included audited financial statements for the fiscal years 2004, 2005 and 2006 ("2006 Annual Report"). ¶ 63. BDO Seidman together with BDO McCabe audited and certified the 2005 and 2006 financial statements, and PKF Certified Public Accountants audited and certified the 2004 financial statements each of which were included in the 2006 Annual Report. ¶¶ 64-65. This memorandum of law focuses only on the 2005 and 2006 financial statements audited and certified by BDO Seidman together with BDO McCabe. The 2003 and 2004 financial statements, audited and certified by PKF Certified Public Accountants, are the subject of a separate motion to dismiss by PKF Certified Public Accountants and are addressed by Plaintiffs in a separate memorandum of law in opposition thereto.

CXTI's 2005 and 2006 financial statements reported revenue of $35.6 million and $66.1 million, and net income of $6.5 million and $7.8 million, respectively. ¶ 66. The 2005 revenue of $35.6 million was reported to have been earned from 5 e-government contracts all entered into by CXTI's main operating subsidiary, Expert Network (Shenzhen) Limited ("Expert Network"), and only 2 Chinese municipal governments, the Jinjiang and Dehua municipal governments. ¶ 68. The $66.1 million of 2006 revenue was reportedly earned from 13 e-government contracts all entered into by Expert Network and a total of 5 Chinese municipal governments, the Jinjiang, Dehua, Nan'an, Huian, and Yinzhou municipal governments. *Id.* Of the 5 Chinese municipal governments with which Expert Network reportedly entered into contracts and earned revenue

from in 2006, two were the same two municipal governments CXTI supposedly earned revenue from in 2005. *Id.*

On July 19, 2007, CXTI announced its Chief Financial Officer, Simon Fu, inexplicably resigned. ¶ 284. On August 14, 2007, CXTI announced it would file its quarterly report for the period ended June 30, 2007 with the SEC late. ¶ 285. Shortly thereafter rumors began spreading that CXTI's business was a fraud. ¶ 287. On September 27, 2007, CXTI announced it dismissed auditor BDO McCabe. ¶ 288. On October 1, 2007 the SEC issued an order halting trading of CXTI's stock because there "is a lack of current and accurate information concerning the securities of China Expert . . . [and] questions regarding the adequacy and accuracy of publicly disseminated information concerning [its] (1) financial performance and business prospects and (2) current financial condition. The . . . public interest and the protection of investors require a suspension of trading in the securities . . ." ¶ 290. Between July 19, 2007 when CXTI's CFO resigned and the SEC's suspension of trading on October 1, 2007, CXTI's stock price dropped from nearly $7.0/share to less than $0.20/share – devastating investors. ¶¶ 284-91.

None of the Defendants contest the detailed allegations in the Complaint demonstrating that CXTI's financial statements were wholly fraudulent. The Complaint describes in depth Plaintiffs' investigator's conversations with Chinese government agencies whose representatives stated that the agencies did not enter into e-government contracts with Expert Network and that the purported revenue earned by CXTI was fake. ¶¶ 84-99, 117-41, 157-70, 177-89. Also, two other investigations corroborated Plaintiffs' investigator's findings. ¶¶ 198-206.

To be sure, audited financial statements that CXTI's operating subsidiary, Expert Network, from which CXTI earned over 99% of its revenue, was required to file with the regional Shenzhen government show a tiny fraction of the revenue reported in the financial statements audited and certified by BDO Seidman together with BDO McCabe. In its 2005 and

3

2006 audited financial statements filed with the Shenzhen government, Expert Network reported revenue of $855 thousand and $1.05 million, respectively, which stands in stark contrast to CXTI's 2005 and 2006 respective financial statements, certified by BDO, which reported revenue of $35.3 million and $65.4 million. ¶¶ 217, 221.

Having established that CXTI was an absolute fraud at its core, Plaintiffs charged its auditors BDO Seidman and BDO McCabe with securities fraud for auditing, preparing and certifying CXTI's 2005 and 2006 financial statements. These fraud allegations are grounded on BDO Seidman and BDO McCabe's failure to perform the most basic audit procedures, violation of the most fundamental auditing standards, and ignoring red flags. Only an auditor that willfully turned a blind eye would have missed the red flags revealed by documentation and financial records of CXTI and third parties, including financial statements Expert Network filed with the Shenzen government, that show during 2005 and 2006 CXTI earned practically no revenue from the 16 contracts with the 5 Chinese local governments and that CXTI practically did no business with them at all.

**BDO Seidman's Reckless Audit Amounted to No Audit at All**

Generally Accepted Auditing Standards ("GAAS"), which mandate the procedures an auditor must implement in auditing a publicly traded company, are promulgated by the Public Company Accounting Oversight Board ("PCAOB").[1] BDO McCabe, directed by BDO Seidman, stated in its audit opinion that "[w]e conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board." ¶ 231. GAAS required BDO Seidman and BDO McCabe to obtain competent evidence that China Expert truly entered into 16 valid e-government contracts and had actually earned $35.3 million in 2005 and $65.4 million in 2006

---

[1]  The PCAOB was established pursuant to the Sarbanes-Oxley Act in the wake of unprecedented financial scandals of the internet boom and bust.

pursuant to those 16 contracts with 5 municipal governments. ¶¶ 232-37, 270 (citing PCAOB AU 150). In addition, BDO Seidman and BDO McCabe were obligated to confirm the existence of the $15.4 million of accounts receivable at year-end 2005, and $33.6 million of accounts receivable at year-end 2006. ¶¶ 43, 247 (citing AU 330.34, 330.35). Given CXTI's $35.6 million of reported revenue in 2005, and $15.4 million of accounts receivable at year-end 2005 (which grew from $4.4 million at the beginning of 2005), BDO Seidman and BDO McCabe were required to confirm that China Expert actually received $24.6 million of cash in 2005; similarly, given China Expert's $66.1 million of reported revenue in 2006, and $33.6 million of accounts receivable at year-end 2006 (which grew from $15.4 million at the beginning of 2006), BDO Seidman and BDO McCabe were required to confirm that China Expert actually received $47.9 million of cash in 2006. ¶¶ 239-48, 263, 269 (citing AU 326, 330.04-09, 330.32). BDO Seidman and BDO McCabe obviously failed to perform any audit at all on the $101.4 million in revenue CXTI earned during 2005 and 2006 given that of the 16 e-government contracts with 5 Chinese municipal governments from which China Expert claimed to have earned a total of $101.4 million in revenue during 2005 and 2006, (a) Jinjiang municipality stated that it terminated its sole contract with CXTI after paying CXTI a total of only $600,000 (¶¶141-142), (b) Dehua municipality terminated its only contract with China Expert in 2004 and paid them only $12,160 (¶¶ 157-65), and (c) no money was earned from the other 14 contracts, which were fake.[2] Thus, nearly all of CXTI's reported revenue was fake. If BDO Seidman and BDO McCabe had preformed any of the required audit procedures by confirming the revenue, contracts or accounts receivable with third parties, it would have discovered that the contracts with Expert Network did not exist or had been terminated, that China Expert had earned only about $600,000 in

---

[2] Plaintiffs' private investigator did not investigate one of the 16 e-government contracts--with Yinzhou, from which CXTI recognized an immaterial $300,000 in revenue in 2006. ¶¶ 68, 196.

revenue in total – not the $101.4 million reported as earned during 2005 and 2006, and that the $15.4 million of accounts receivable reported at year-end 2005 and the $33.6 million of accounts receivable reported at year-end 2006 were fraudulent. BDO Seidman and BDO McCabe abrogated their most basic audit responsibilities failing to obtain any competent evidential matter to support their audit opinion.

## BDO Seidman's Motion to Dismiss the Amended Complaint

BDO Seidman moves to dismiss the Complaint on the ground that BDO's Hong Kong affiliate, BDO McCabe, signed the audit opinions for China Expert and that BDO Seidman merely reviewed and advised the BDO Hong Kong office about proper U.S. audit procedures and accounting principles, and therefore could not have known that the audit was done recklessly or with fraudulent intent. BDO Seidman's motion fails because BDO Seidman substantially conducted and directed the planning and performance of the audit, and substantially participated in the preparation of China Expert's fraudulent financial statements. ¶¶ 314-15, 318. For these reasons, as set forth below, the Court should deny BDO Seidman's motion to dismiss.

## ARGUMENT

### I.    BDO Seidman's Motion to Dismiss the Section 10(b) Claim Should Be Denied

#### A.    The Complaint Adequately Pleads That BDO Seidman Made False and Misleading Statements of Material Fact

BDO Seidman does not dispute that CXTI's financial statements certified by BDO McCabe and filed with the SEC are materially false and misleading. Indeed, the magnitude and brazenness of the fraud makes it impossible for BDO Seidman to deny that CXTI's financial statements are wholly fraudulent. Rather, BDO Seidman attempts to escape all liability by claiming that because it did not sign the audit opinions, it is not liable. However, because BDO Seidman participated in conducting the audit and in drafting the misleading statements, and

because the investing public knows that when a foreign accounting firm certifies financial statements with the SEC, its U.S. affiliate must have participated in conducting the audit and making the statements, BDO Seidman is liable for making the statements. Also, BDO Seidman argues that it merely acted as a Filing Reviewer pursuant to a PCAOB rule, and thus bore no responsibility for BDO McCabe's audit opinion. However, it is a question of fact whether BDO Seidman acted as a Filing Reviewer, or as a Supervisory or Assistant Auditor pursuant to other PCAOB rules. Moreover, even if BDO Seidman acted as a Filing Reviewer, the PCAOB rule that governs Filing Reviewers cannot determine whether an auditor's conduct violates the federal securities laws.

BDO Seidman incorrectly relies on *Wright* and *Lattanzio* in arguing it is not liable under § 10(b) because it did not make any false or misleading statements and because no misrepresentations were attributed to it at the time the misleading statements were disseminated.[3] *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998); *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 154-55 (2d Cir. 2007). However, in *Wright*, the alleged misleading statements were in a press release, not an annual report containing certified audited financial statements, as in the instant matter. 152 F.3d at 175-76. The Second Circuit stressed that the press release did not contain any audit opinion and was issued "without a whisper of [the defendant's] involvement." *Id.* In *Lattanzio*, the alleged misleading statements were in the company's quarterly financial statements, which also did not contain an audit opinion and did not indicate that the defendant accountant firm made any of the statements contained therein. 476 F.3d at 152. Thus, in both *Wright* and *Lattanzio* everyone knew the misleading statements clearly were not made by the respective defendant accountants.

---

[3] Plaintiffs are not alleging that BDO Seidman violated Rule 10b-5(a) or (c).

The factual circumstances in *Wright* and *Lattanzio* are inapposite because in the instant matter the misleading statements were found in CXTI's audited annual reports for each of years 2005 and 2006, which contained the audit opinions of BDO Seidman and BDO McCabe, which were signed by BDO McCabe. *See* ¶ 23 ("BDO Seidman actively participated in performing the audits of CXTI's financial statements for the fiscal years ended December 31, 2005 and December 31, 2006, which were contained in CXTI's annual reports filed with the SEC for those same fiscal years"); ¶ 314 ("BDO Seidman directed BDO McCabe in the conduct of the audits and gave specific direction to BDO McCabe as to how to test revenue of CXTI and how to record CXTI's revenue, including the Revenue Reported in CXTI's Annual and Quarterly Reports that was almost completely fraudulent"); ¶ 315 (BDO Seidman created the audit workpapers together with BDO McCabe); *see also*, *e.g.*, ¶ 315(b) (BDO Seidman "questioned the manner in which BDO McCabe was confirming the accuracy of invoices issued pursuant to the Jinjiang and Dehua e-government contracts and directed BDO McCabe to conduct additional procedures regarding revenue confirmation and recognition"); ¶ 318 (BDO Seidman "directs BDO McCabe to confirm the existence and content of certain records related to project costs for CXTI's e-Governments Contracts and directs BDO McCabe's conduct of the audit on other revenue recognition issues").

Moreover, it is implicit to investors that BDO Seidman participated in the conduct of the audit and in making the audit opinion signed by BDO McCabe because U.S. affiliates customarily participate in the audits of financial statements contained in annual reports filed with the SEC, where the opinions are signed by foreign affiliates of the same accounting organization. ¶ 25 ("BDO McCabe is a Chinese public accounting firm. Without the assistance and direction of BDO Seidman, BDO McCabe could not and would not have issued false and misleading audit opinions regarding the Company, nor could or would it have certified the Company's false and

8

misleading financial statements during the Class Period"); *see Wright*, 152 F.3d at 175 ("There is no requirement that the alleged violator directly communicate misrepresentations to [investors] for primary liability to attach") (quotations omitted). Indeed, as BDO Seidman admits, a U.S. accounting firm always participates in an audit that is also conducted by a foreign firm. MTD, p. 2. At a minimum, the U.S. affiliate accounting firm performs functions of a "Filing Reviewer," as set forth in Appendix K of the SECPS Reference Manual, which was adopted by the PCAOB. *See* Ex. B attached to Decl. of Gary A. Orseck supporting BDO Seidman's MTD.

However, the U.S. affiliate accounting firm may instead act as an "assistant" auditor, which the PCAOB defines as an "auditor." PCAOB AU 311.02 states in pertinent part: "The auditor with final responsibility for the audit may delegate portions of the planning and supervision of the audit to other firm personnel. For purposes of this section, (a) firm personnel other than the auditor with final responsibility for the audit are referred to as assistants and (b) the term auditor refers to either the auditor with final responsibility for the audit or assistants." *See* Decl. of Timothy W. Brown ("Brown Decl."), ¶ 3, Ex. 1. Frequently assistant auditors and supervisor auditors are not even mentioned in audit opinions signed by principal auditors. Indeed, AU 543.04 states:

> If the principal auditor is able to satisfy himself as to the independence and professional reputation of the other auditor . . . and takes steps he considers appropriate to satisfy himself as to the audit performed by the other auditor . . . , he may be able to express an opinion on the financial statements taken as a whole without making reference in his report to the audit of the other auditor. If the principal auditor decides to take this position, he should not state in his report that part of the audit was made by another auditor because to do so may cause a reader to misinterpret the degree of responsibility being assumed.

*See* Brown Decl., ¶ 4, Ex. 2 (citations omitted). Thus, the U.S. affiliate firm, whether it is conducting the audit as a supervisor or otherwise as an assistant, is an "auditor," but often not a signatory of the audit opinion in which the U.S. affiliate may not be mentioned. Public investors,

therefore, attribute audit opinions signed by foreign accounting firms to their U.S. affiliates. The Complaint alleges that BDO Seidman assisted in the audit. ¶ 25. Thus, under *Wright*, BDO Seidman made misleading statements because BDO Seidman participated in conducting the audit and the public attributed the audit opinion to BDO Seidman.

The Second Circuit relaxed the bright line rule established in *Wright* when it later decided *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir. 2001). *Scholastic* held that a company executive could be charged with primary liability for misleading disclosures even though the complaint did not attribute misleading disclosures to him because the complaint alleged "on information and belief" that he personally disseminated misleading statements, was "primarily responsible for Scholastic's communications with investors and industry analysts," and "was involved in the drafting, producing, reviewing and/or disseminating of the false and misleading statements issued by Scholastic. . ." *Id.* at 75-76. Courts have explained that *Scholastic* holds a defendant liable under 10b-5 for being responsible for making a misleading statement despite a lack of specific attribution. *See*, *e.g.*, *SEC v. Pimco Advisors Fund Mgmt. LLC*, 341 F.Supp.2d 454, 466-67 (S.D.N.Y. 2004) (finding under *Scholastic* that defendant was not primarily liable under § 10(b) because he was not alleged to have personally made misleading statements, to be responsible for communications with investors, or to have drafted misleading statements – but not because the misleading statements were not attributable to him); *In re Alstom SA Sec. Litig.*, 406 F.Supp.2d 433, 466 (S.D.N.Y. 2005) (stating that Second Circuit district courts have found *Scholastic* does not require allegations of the attribution element established in *Wright*); *In re Global Crossing, Ltd. Sec. Litig.*, 322 F.Supp.2d 319, 331 (S.D.N.Y. 2004) ("While *Scholastic* might indicate some relaxation of *Wright's* requirement, . . . it does not provide any guidance as to when a statement not attributed to a defendant might cross the line into a primary violation"). Thus, under *Scholastic*, BDO Seidman is liable under 10b-5 merely because it participated in the

audits of CXTI, and also assisted in and directed the audits and the preparation of the misleading statements, **regardless of whether defendants question whether public investors also attributed the misleading statements to BDO Seidman**.

While *Scholastic* does not require allegations of attribution, many district courts have reconciled *Scholastic* with *Wright* by finding that for 10b-5 liability, constructive attribution is enough. Only a few months ago in January of 2009, in *Pension Committee of University of Montreal Pension Plan v. Banc of America Securities, LLC*, this Court explained that:

> The prevailing rule in this Circuit is that a statement need not be publicly attributed to the defendant, [if] the defendant's participation is substantial enough that s/he may be deemed to have made the statement, and [if] investors are sufficiently aware of defendant's participation that they may be found to have relied on it as if the statement had been attributed to the defendant.

592 F.Supp.2d 608, 622 (S.D.N.Y. 2009) (quotations omitted). For example, in *In re Alstom SA Securities Litigation*, this Court acknowledged that the rule requiring a plaintiff to demonstrate that the public could "attribute a misleading statement (at least indirectly) to the secondary actor at the time it is issued . . . emphasizes *constructive*, rather than actual, attribution--a concept consistent with the Second Circuit's emphasis on reliance." 406 F.Supp.2d 433 (S.D.N.Y. 2005). Among the vast number of cases that follow *Scholastic* in finding constructive attribution suffices to hold a secondary actor liable for making misleading statements, *Global Crossing* is perhaps the most prominent. 322 F.Supp.2d 319.  In *Global Crossing* this Court allowed primary liability to attach to an auditor defendant where allegations that the defendant "'prepared, directed or controlled,' 'helped create' or 'materially assisted in' preparing false statements" in public financial reports that did not identify the auditor "place[d] its involvement well beyond the realm of 'aiding and abetting' liability precluded by *Central Bank*." *Id.* at 334.  *See also, In re Refco, Inc. Sec. Litig.*, 503 F.Supp.2d 611, 656, n.39 (S.D.N.Y. 2007) ("Allegations that an auditor 'prepared, directed or controlled,' 'helped create' or 'materially assisted in' preparing

false statements are sufficient to give rise to liability"); *In re LaBranche Sec. Litig.*, 405 F.Supp.2d 333, 352 (S.D.N.Y. 2005) (holding that specialist-subsidiary, LaBranche LLC, whose financial data was included in the financial statements of its parent, LaBranche & Co, was liable for making false statements under 10b-5 because the parents' statements could be "constructively attributed" to subsidiary "even though LaBranche & Co. failed to explicitly identify LaBranche LLC as the source of the information concerning revenue and earnings of its specialist operations*"); In re Salomon Analyst AT&T Litig.*, 350 F.Supp.2d 455, 474 (S.D.N.Y. 2004) ("It stretches neither the language of Rule 10b-5 nor the holding of *Central Bank* to treat a high-level executive who allegedly orchestrated and directly ordered a false representation as a primary violator along with the underling who actually mouthed or wrote the offending falsehood. Indeed, in *Global Crossing*, this Court found that, in highly unusual circumstances, even an outside professional who allegedly conceived and engineered, rather than merely abetted or turned a blind eye to, a fraudulent scheme could be liable as a primary violator on the same theory"); *Seippel v. Sidley, Austin, Brown & Wood, LLP*, 399 F. Supp. 2d 283, 295 (S.D.N.Y. 2005) ("defendants made misrepresentations, through Paul, that they knew or should have known that those misrepresentations would be communicated to potential purchasers of COBRA, and that those statements were indirectly attributable to them. These allegations are sufficient to survive a motion to dismiss. Whether defendants were in fact sufficiently responsible for Paul's statements to establish their liability as primary violators [of 10b-5] is a question that must be resolved on a motion for summary judgment or at trial"); *Menkes v. Stolt-Nielsen S.A.*, 2006 WL 1699603, at *7 (D. Conn. June 19, 2006) (finding officers of subsidiary whose anti-competitive conduct was not disclosed to investors primarily liable for making misleading statements **due to being in a position that they were able to render the misleading statements of the parent complete and truthful, but failed**, or due to conspiring with the parent; explaining "[d]espite

12

the apparent bright-line rule regarding primary liability, however, there have been circumstances where courts bound to follow the foregoing decisions have permitted claims against persons who did not actually utter the false or misleading statements but nevertheless may be deemed to have caused the statements to be uttered") (emphasis added).

Thus, consistent with the numerous Second Circuit decisions referred to above, this Court should find BDO Seidman primarily liable because it participated in making and drafting the misleading statements signed by BDO McCabe, because it conducted, directed and supervised the audit, and because, as explained above, the public must have known that as BDO McCabe's U.S. affiliate, it had to have done the audit and made the audit opinion with BDO McCabe.

If the U.S. accounting firm BDO Seidman, whose audit work and statements were necessary for CXTI to sell securities to the American public, is allowed to avoid liability by hiding behind BDO McCabe's signature, then American accounting firms would be encouraged to be reckless and act fraudulently whenever engaged with foreign affiliates in the audits of foreign companies. *See Lernout & Hauspie*, 230 F.Supp.2d 152, 168 (D. MA. 2002) ("Absolving an auditor who prepares, edits, and drafts a fraudulent financial statement knowing it will be publicly disseminated simply because [it was signed by another, affiliated auditor] would stretch *Central Bank's* holding too far"); *Global Crossing*, 322 F.Supp.2d at 333 (the "strict requirement of public attribution would allow those primarily responsible for making false statements to avoid liability by remaining anonymous and thus would place a premium on concealment and subterfuge rather than on compliance with the federal securities laws") (internal quotations omitted); *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 235 F.Supp.2d 549, 587 (S.D. Tex. 2002) (adopting SEC position that a strict requirement of public attribution would allow those primarily responsible for making false statements to avoid liability by remaining anonymous, and thus "would place a premium on concealment and subterfuge rather than on compliance with

13

the federal securities laws"); *In re Alstom Sa Sec. Litig.*, 406 F.Supp.2d at 467, n.30, quoting *In re Kidder Peabody Sec. Litig.*, 10 F.Supp.2d 398, 408 (S.D.N.Y. 1998) ("[H]olding a subsidiary immune from liability for statements communicated by its parent under these facts would lead to an anomalous result. A subsidiary could freely disseminate false information to the market through its parent, but investors relying on that information to their detriment would be left with no remedy: an action could not be brought against the subsidiary, and the parent would escape liability because it lacked scienter. This would lead to a result so bizarre that Congress could not have intended it").

BDO Seidman's argument that it merely acted as a "Filing Reviewer" bearing no responsibility for BDO McCabe's certification of CXTI's financial statements pursuant to a rule adopted by the PCAOB raises a question of fact that cannot be determined upon a motion to dismiss. "These arguments, however, raise in part questions of fact as to the circumstances of the agreement that cannot be dealt with on a motion to dismiss." *Lodge 743, Intern. Ass'n of Machinists, AFL-CIO v. United Aircraft Corp.*, 337 F.2d 5, 8 (2d Cir. 1964). The factual question is to what extent BDO Seidman participated in the audits of CXTI which were in name done by BDO McCabe. If the extent of BDO Seidman's participation in the audits was minimal, as BDO Seidman argues, then Appendix K, which describes the role and responsibilities of a "Filing Reviewer," applies. If the extent of BDO Seidman's participation in the audits was greater, which it was according to Plaintiffs, then PCAOB AU 311 and 543, which govern conduct of assistant, supervisory and principal auditors, apply. Merely because the rule exists, does not mean that it applies to BDO Seidman under these circumstances, as the Complaint alleges that BDO Seidman acted as much more than a Filing Reviewer. It acted as an auditor pursuant to PCAOB AU 311 and 543 and is therefore primarily liable. ¶¶ 23, 314-15, 318. This an intensely factual question, and Plaintiffs' allegations must be accepted as true for the purposes

14

of a motion to dismiss. "A Rule 12(b)(6) motion must be denied if the factual allegations "create

the possibility of a right to relief that is more than speculative." *Spool v. World Child Int'l*

*Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008).

   Additionally, even if the Court were to find <u>upon completion of discovery</u> that BDO

Seidman only acted as a Filing Reviewer (pursuant to Appendix K), and not as an assistant,

supervisory, or principal auditor (pursuant to AU 311 and 543), at that later stage in the litigation

the Court might still find BDO Seidman primarily liable. Just because a PCAOB rule, Appendix

K, states that an accounting firm acting as a Filing Reviewer is not responsible for the audit does

not mean the accounting firm is shielded from primary liability under § 10(b). Indeed, PCAOB

rules and SEC rules only set forth minimum standards and requirements, but do not establish

what conduct must be observed to avoid liability under the federal securities laws. *See U.S.*

*S.E.C. v. Fehn*, 97 F.3d 1276, 1291 (9th Cir. 1996) (finding defendants' reliance on disclosure

requirements as set forth in FASB 5 to contravene the stricter "securities-law standard for

determining the materiality of a corporate event that has not yet occurred" under *Basic Inc. v.*

*Levinson*, 485 U.S. 224, 238 (1988)); *Maldonado v. Flynn*, 597 F.2d 789, 797, n.9 (2d Cir. 1979)

(holding that the SEC rules governing disclosure set only minimum standards and that

compliance does not necessarily guarantee that the required full disclosure has been made); *In re*

*Metex Corp. Sec. Litig.*, 1993 WL 330596, at *2-3 (E.D.N.Y. July 08, 1993) (holding that a

proxy solicitation may comply with Schedule 14A and nonetheless be misleading or omit a

material fact); *In re Campbell Soup Company Sec. Litig.*, 145 F.Supp.2d 574, 591 (D. N.J. 2001)

("However, even absent Item 303, the Court has already held that Plaintiffs have sufficiently

pled violations as to the heretofore discussed statements. As such, the unavailability of Item 303

as an independent avenue does not frustrate Plaintiffs' allegations"); *Calderon v. Tower*

*Associates Intern., Inc.*, 1989 WL 29916, at *3 (D. Or. Mar. 28, 1989), citing *Zell v. Intercapital*

15

*Income Sec., Inc.*, 675 F.2d 1041, 1045 (9th Cir. 1982) ("Regulation S-K guidelines are intended only to describe the minimum of what must be disclosed, and a registrant must add other information if there is a substantial likelihood that a reasonable investor would consider it important in making his or her decision") (internal quotations omitted).[4]

### B.    Plaintiffs Sufficiently Alleged Facts That Give Rise to a Strong Inference of Scienter

#### 1.    Applicable Authority

The Private Securities Litigation Reform Act ("PSLRA") requires the complaint to "state with particularity facts giving rise to a strong inference" of scienter. *Novak v. Kasaks*, 216 F.3d 300, 306-07 (2d Cir. 2000) (quoting 15 U.S.C. § 78u-4(b)(1) and (b)(2)) (quotations omitted; emphasis omitted). Scienter can be pleaded "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Id.* at 307 (citations omitted); *see Tellabs v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2507 (2007). While motive is not required, its presence "can be a relevant consideration" that indicates a defendant acted with conscious misbehavior or recklessness. *Id.* at 2511.   The Court must read the allegations of conscious or reckless misconduct together with the motive allegations to determine whether the complaint gives rise to a compelling inference of scienter. *Id.* at 2511. "[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically," and to "accept all factual allegations in the complaint as true." *Id.* at 2509, 2511.

---

[4] Moreover Appendix K, a rule drafted by accountants to protect accountants, contradicts itself. Whereas Appendix K states that the Filing Reviewer is not responsible for a faulty audit, it also states that "if the filing or inspection reviewer and the audit partner-in-charge of the engagement have conflicting views as to the resolution of matters that came to the attention of the filing or inspection reviewer when performing the procedures for certain filings or inspection described above, that disagreement should be resolved in accordance with the applicable policy of the international organization or of the filing or inspection reviewer's firm." Thus, according to Appendix K, the filing reviewer is responsible for ensuring the audit complies with SEC rules.

When all of the factual allegations of the Complaint are read holistically and accepted as true, the only plausible inference is that BDO Seidman either knowingly or recklessly misled the investing public by performing none of the required audit procedures and falsely certifying as accurate CXTI's wholly fraudulent financial statements. BDO Seidman together with BDO McCabe, in essence, performed no audit at all." ¶ 6. Read holistically, the factual allegations in the Amended Comlpaint raise a strong inference of BDO Seidman's motive to defraud and its "conscious misbehavior or recklessness" -- that BDO Seidman "engaged in deliberately illegal behavior," "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor." *Novak*, 216 F.3d at 308, 311.

The Supreme Court articulated the measure to determine whether the complaint pleads facts that give rise to a strong inference of scienter, holding: "A complaint will survive . . . if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 127 S. Ct. at 2510 (footnote omitted). At a minimum, the allegations in the Complaint are certainly "at least as compelling as any opposing inference a reasonable person could draw from the facts alleged." *Id*. at 2510. Under *Tellabs*, that is sufficient for the Court to deny the motion to dismiss. *Id.*

As much as Plaintiffs have alleged facts that infer a strong inference of BDO McCabe's scienter, Plaintiffs have shown the same scienter for BDO Seidman. As discussed above, Plaintiffs have sufficiently alleged that BDO Seidman made the material false and misleading statements and actively conducted the audit and drafted the misleading statements, and thus acted as "auditors" in the work they did for CXTI. In what follows, Plaintiffs show that by dint of their engagement as auditors of CXTI, each of BDO Seidman and BDO McCabe, is primarily liable under § 10(b) for making the misleading statements recklessly or with fraudulent intent.

17

### 2.     BDO Seidman's Conscious Misbehavior and/or Recklessness

The Second Circuit has held that allegations of GAAP violations "or accounting irregularities, standing alone, are insufficient to state a securities fraud claim" against an independent accountant. *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000). "Only where such allegations are coupled with evidence of 'corresponding fraudulent intent,' might they be sufficient." *Id.* (citations omitted). The Second Circuit explained that the recklessness required to hold a "non-fiduciary accountant" liable for fraud "must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company." *Rothman v. Gregor*, 220 F.3d 81, 98 (2d Cir. 2000). This standard requires more than the auditor's "mere publication of inaccurate accounting figures, or a failure to follow GAAP." *Vladimir v. Deloitte & Touche LLP*, 1997 WL 151330, at *3 (S.D.N.Y. Mar. 31, 1997) (citing *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir. 1994)). Whereas allegations of a negligently performed audit do not establish scienter (*SEC v. Price Waterhouse*, 797 F.Supp. 1217, 1240 (S.D.N.Y. 1992)), allegations of a recklessly performed audit do approximate intent, and will thus suffice. *SEC v. KPMG LLP*, 412 F.Supp.2d 349, 378 (S.D.N.Y. 2006) (in determining scienter of auditor defendants, stating "The Second Circuit has long held that recklessness fulfills the standard of proof under Section 10(b)"). "Courts in this Circuit have recognized that scienter may be inferred where an auditor consciously disregards 'red flags,' or substantially ignores GAAS." *U.S. S.E.C. v. Gold*, 2006 WL 3462103, at *4 (E.D.N.Y. Aug. 18, 2006). The Second Circuit in *Rolf v. Blyth, Eastman Dillon & Co., Inc.* thus explained:

> [A] reckless misstatement, or an opinion based on grounds so flimsy as to lead to the conclusion that there was no genuine belief in its truth are ... sufficient upon which to base liability. A refusal to see the obvious, a failure to investigate the doubtful, if sufficiently gross, may furnish evidence leading to an inference of fraud so as to impose liability for losses suffered by those who rely on the balance sheet. In other words, heedlessness and reckless disregard of consequence may take the place of deliberate intention.

570 F.2d 38, 46 (2d Cir. 1978); *see also S.E.C. v. KPMG LLP*, 412 F.Supp.2d 349, 379 (S.D.N.Y 2006) ("a Section 10(b) plaintiff must [allege that] the audit amounted to no audit at all, [there was] an egregious refusal to see the obvious, or to investigate the doubtful, or . . . the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts").

Indeed, several courts examining allegations of recklessness against an auditor have concluded that conscious misbehavior or recklessness is shown where a plaintiff alleges that: (1) the accounting practices were so deficient that the audit amounted to no audit at all; (2) the audit amounted to an egregious refusal to see the obvious, or to investigate the doubtful; **or** (3) the auditor's accounting judgments were such that no reasonable accountant would have made the same decisions if confronted with the same facts. *See*, *e.g.*, *In re Complete Management Inc. Sec. Litig.*, 153 F.Supp.2d 314, 333-34 (S.D.N.Y. 2001) (citing *SEC v. Price Waterhouse*, 797 F.Supp. 1217, 1240 (S.D.N.Y. 1992); *In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F.Supp.2d 290, 295 (S.D.N.Y. 1999).

BDO Seidman and BDO McCabe are liable under this exact standard. This case is an extraordinary fraud and probably like nothing that has ever come before this Court. In fact, the fraud perpetrated by CXTI, BDO Seidman and BDO McCabe is exponentially more heinous than the most notorious cases of fraud that have afflicted public investors in the cases of Enron and WorldCom. In those cases, revenue was drastically inflated. Here, CXTI's business was a complete sham and BDO Seidman and BDO McCabe did no audit at all. 99% of all of CXTI's revenue and accounts receivable recognized for fiscal years 2005 and 2006 in annual reports filed with the SEC simply never existed. ¶ 225. BDO Seidman together with BDO McCabe audited CXTI's 2005 and 2006 annual reports filed with the SEC and certified them. ¶¶ 23-24.

19

BDO Seidman and BDO McCabe certified to American investors that CXTI recognized over $101 million in revenue during 2005 and 2006 supposedly earned pursuant to 16 contracts with 5 Chinese local governments. ¶¶ 6, 46, 221. BDO Seidman and BDO McCabe could have easily and inexpensively, as they were obligated under GAAS (¶ 39), confirmed the validity of the contracts, the revenue, and the accounts receivable related to work purportedly done for these 5 Chinese local governments. Instead, BDO Seidman and BDO McCabe performed none of the required audit procedures and falsely certified as accurate CXTI's wholly fraudulent financial statements. Thus, BDO Seidman and BDO McCabe, in essence, performed no audit at all. ¶ 6. Plaintiffs have made numerous allegations of GAAP and GAAS violations that do not merely recite accounting principles, but set forth facts detailing the deficiencies in CXTI's financial reporting and BDO Seidman's and BDO McCabe's audits of those financial reports. ¶¶ 225-71. These facts adequately particularize how BDO Seidman and BDO McCabe violated the enumerated auditing standards, to such an extent that they must have done no audit at all. *Id.*

Had BDO Seidman and BDO McCabe done any audit, then they obviously would have found documentation and financial records of CXTI and third parties, including the audits of financial statements of CXTI's operating subsidiary, Expert Network, filed with the local Chinese government showing only 2% of the revenue recognized in the annual reports BDO certified, indicating there was practically no revenue earned from the 16 contracts with the 5 Chinese local governments and that practically no business was even done with them. Had BDO Seidman and BDO McCabe done any audit at all, these red flags would have become obvious to them. ¶¶ 6, 46, 223. *In re WorldCom, Inc. Securities Litigation* is instructive:

> Had Andersen reviewed WorldCom's accounting systems and data, as it was obligated to do, it would have discovered the lack of documentation and the fraudulent accounting treatment. . . . The allegations identifying the steps Andersen should have taken and failed to take, and the fraud it would have discovered if it had taken those steps, create a strong inference that Andersen acted recklessly in conducting the WorldCom audits. . .

> Although the size of the fraud alone does not create an inference of scienter, the enormous amounts at stake coupled with the detailed allegations regarding the nature and extent of WorldCom's fraudulent accounting and Andersen's failure to conduct a thorough and objective audit create a strong inference that Andersen was reckless in not knowing that its audit opinions materially misrepresented WorldCom's financial state.

2003 WL 21488087, at *7 (S.D.N.Y. June 25, 2003). *See also Complete Mgmt.*, 153 F. Supp. 2d at 334, citing *Oxford Health Plans*, 51 F.Supp.2d 290, 295 (S.D.N.Y. 1999) ("Here, plaintiffs make the critical allegation that if Andersen were conducting any kind of audit at all, they would have seen the potential problems with the GMMS receivables and the need to investigate further. . . [S]uch allegations may be one of several 'red flags' that support an inference of scienter"); *In re Philip Services Corp. Sec. Litig.*, 383 F.Supp.2d 463, 475 (S.D.N.Y. 2004), quoting *In re Leslie Fay Cos. Sec. Litig.*, 871 F. Supp. 686, 699 (S.D.N.Y. 1995) ("'[B]ecause the red flags would be clearly evident to any auditor performing its duties, one could reasonably conclude that [Deloitte] must have noticed the red flags, but deliberately chose to disregard them to avoid antagonizing [Philip] and incidentally frustrating its fraudulent scheme'").

Moreover, there were obvious red flags that required BDO Seidman to carefully investigate CXTI's revenue, cash, and accounts receivable, where such red flags were apparent even before beginning the so-called audit. Had they heeded the red flags, there is no way BDO Seidman would not have discovered that 99% of CXTI's revenue did not exist. *See In re LaBranche Sec. Litig.*, 405 F.Supp.2d 333, 358, 359-62 (S.D.N.Y.2005) (holding that the red flag cases "stand for the proposition that non-conclusory allegations that a corporate officer ignored 'reasonably available data that would have indicated that [a company's] statements were false and misleading' are adequate to plead recklessness or conscious disregard," quoting *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F.Supp.2d 474, 491 (2004)). The red flags obvious to BDO Seidman were: **1)** CXTI's "business involves significant, unusual, or highly complex transactions," such as "significant operations located or conducted across international borders in

jurisdictions where differing business environments and cultures exist" (¶ 257, 261; AU 316.85, Appendix); **2)** CXTI applied POC accounting, which is highly risky, to all of its contracts (¶¶ 259-62; AU 316.41, 316.54, 316.29); **3)** accounts receivable grew substantially as a percentage of total assets each year to a high amount, and the increase in accounts receivable each year relative to the revenue recognized in the respective year was also high. ¶ 265-68; AU 316.70-72; *see also In re Winstar Communications*, 2006 WL 473885, at *11 (S.D.N.Y. Feb. 27, 2006) ("An auditor's reckless disregard of red flags, coupled with allegations of GAAP and GAAS violations, is sufficient to support a strong inference of scienter"); *Whalen v. Hibernia Foods PLC*, 2005 WL 1799370, at *3 (S.D.N.Y. Aug. 1, 2005) ("Plaintiffs allege . . . [Pricewaterhouse Cooper] knew about and ignored a wide variety of 'red flag' incidents or events, that should have put PwC on notice that fraud was afoot, and that taken together they are sufficient for the Court to find a strong inference of recklessness").

From the scale and obviousness of the fraud, it can be inferred either (1) that BDO Seidman and BDO McCabe actually knew of the fraud, in which case its certifications were false; or (2) that BDO Seidman and BDO McCabe didn't know of the fraud, which could only happen as a result of audit procedures that were so sub-standard that the auditors would have to have known they were sub-standard. *See Philip Services Corp.*, 383 F.Supp.2d at 475 ("The enormity of the fraud attributed to Philip makes this finding particularly appropriate"); *Leslie Fay*, 835 F.Supp. at 175 ("when tidal waves of accounting fraud are alleged, it may be determined that the accountant's failure to discover his client's fraud raises an inference of scienter on the face of the pleading"); *In re Royal Dutch/Shell Transport Sec. Litig.*, 380 F. Supp. 2d 509, 570 (D.N.J. 2005) (finding that magnitude of fraud coupled with specific GAAS and GAAP violations created strong inference of auditor's recklessness); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 651 (E.D. Va. 2000) (finding strong inference of auditor's

scienter could be inferred from magnitude and pervasiveness of MicroStrategy's GAAP violations; relative simplicity of the accounting principles violated; and importance of contracts involved); *see also S.E.C. v. KPMG LLP*, 412 F.Supp.2d 349, 378 (S.D.N.Y. 2006), quoting *McLean v. Alexander*, 599 F.2d 1190, 1198 (3d Cir. 1979) ("A showing of shoddy accounting practices amounting at best to a pretended audit, or of grounds supporting a representation so flimsy as to lead to the conclusion that there was no genuine belief back of it have traditionally supported a finding of liability in the face of repeated assertions of good faith. In such cases, the factfinder may justifiably conclude that despite those assertions the danger of misleading was so obvious that the actor must have been aware of it").

BDO Seidman's plea of ignorance fails to account for the fact that BDO Seidman was charged with responsibilities under GAAS that it repeatedly claimed to have followed – but did not. Even if the Court assumes, *arguendo*, that BDO Seidman did not have actual knowledge of the fraud, it must find BDO Seidman acted recklessly with regard to the accuracy of its audit reports. The claim of ignorance, therefore, does not exculpate BDO Seidman on a motion to dismiss. *Leslie Fay*, 835 F. Supp. at 698-99 (refusing to entertain, on motion to dismiss, an accounting firm's contention that it was as much the "victim" of fraudulent accounting as were the plaintiffs).

Additionally, BDO Seidman cannot claim that Plaintiffs claim fraud based on hindsight. BDO Seidman cannot claim that at the time it conducted the "audit," the cash CXTI earned was present, but that only after the fraud was disclosed did the money disappear. Indeed, Plaintiffs have alleged facts based on the findings of its private investigator, which were corroborated by several independent investigations, that practically every contract from which CXTI supposedly earned any revenue was completely fake and that none of the money from the phony contracts was ever received. ¶¶ 77-206.

23

BDO Seidman also had a motive to take advantage of the rare opportunity to be retained for audits of companies doing business in the rapidly burgeoning economy of China. As there is vast competition to audit U.S. companies in a market dominated by the Big Four accounting firms, doing the bidding of CXTI provided BDO Seidman a unique opportunity to increase its visibility and marketability to potential clients in China and other developing countries. Accordingly, Plaintiffs have sufficiently alleged BDO Seidman's motive to commit fraud based on CXTI's status as a unique client opportunity. *See*, *e.g.*, *In re Qwest Commc'ns Int'l, Inc.*, 396 F. Supp. 2d 1178, 1208 (D. Colo. 2004) ("[a] desire to retain the business of a client who paid fees [of nearly $8 million] could motivate an auditor to disregard a client's accounting machinations," and finding scienter adequately pleaded based on allegations of auditor's motive, knowledge of accounting improprieties, and magnitude of improprieties). Thus, the Complaint also alleges a concrete benefit of BDO Seidman, which considered in conjunction with the facts giving rise to the inference of BDO Seidman's conscious misbehavior or recklessness gives rise to a strong inference of scienter which is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 127 S. Ct. at 2505.

## II.    The Section 20(a) Claim Against BDO Seidman May Be Dismissed

Plaintiffs do not oppose BDO Seidman's motion to dismiss as to Plaintiffs' § 20(a) claim.

III.    **Plaintiffs Should Be Granted Leave to Amend**

Plaintiffs should be granted leave to amend if the Court grants BDO Seidman's motion to

dismiss in any respect. This Court has stated:

> It is often appropriate for a district court, when granting a motion to dismiss for failure to
> state a claim, to give the plaintiffs leave to file an amended complaint. . . . [A] court
> granting a 12(b)(6) motion should consider a dismissal without prejudice when a liberal
> reading of the complaint gives any indication that a valid claim might be stated. . . . In
> particular, regarding claims of fraud, "[p]laintiffs whose complaints are dismissed
> pursuant to Rule 9(b) are typically given an opportunity to amend their complaint."

*In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 596 (S.D.N.Y. 2007).

## CONCLUSION

For the foregoing reasons, BDO Seidman's motion to dismiss the Section 10(b) claim

should be denied.

Respectfully submitted,

Dated: July 2, 2009                    **THE ROSEN LAW FIRM, P.A.**


          /s/ Timothy W. Brown

Laurence M. Rosen, Esq. (LR 5733)
Timothy W. Brown, Esq. (TB 1008)
Phillip Kim, Esq. (PK 9384)
350 Fifth Avenue, Suite 5508
New York, New York 10118
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com
Email:  tbrown@rosenlegal.com

Lead Counsel for Plaintiffs and the Class

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of July, 2009, a true and correct copy of the foregoing PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO BDO SEIDMAN LLP'S MOTION TO DISMISS was served by CM/ECF to the parties registered to the Court's CM/ECF system.

Notice was provided via mail to:

China Expert Technology, Inc.,
C/O Registered Agent
Incorp Services, Inc.
3155 East Patrick Lane, Suite 1
Las Vegas, NV 89120-3481

BDO McCabe Lo Limited
25th Floor Wing On Centre
111 Connaught Road Central
Hong Kong
China

PKF Certified Public Accountants
26/F, Citicorp Centre
18 Whitfield Road
Causeway Bay
Hong Kong
China

/s/ Timothy W. Brown

26