UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------------X

CARLOS MUNOZ, INDIVIDUALLY AND               CASE No.: 07-CV-10531 (AKH)
ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,
                                             ECF

       Plaintiffs,

       vs.

CHINA EXPERT TECHNOLOGY, INC.;
PKF NEW YORK, CERTIFIED PUBLIC
ACCOUNTANTS, A PROFESSIONAL
CORPORATION, PKF HONG KONG,
CERTIFIED PUBLIC ACCOUNTANTS;
BDO MCCABE LO LIMITED
CERTIFIED PUBLIC ACCOUNTANTS,
BDO SEIDMAN, LLP,

       Defendants.
-------------------------------------------------------------------X

MEMORANDUM OF LAW IN OPPOSITION TO PKF CERTIFIED PUBLIC
ACCOUNTANTS, A PROFESSIONAL CORPORATION'S MOTION TO DISMISS

THE ROSEN LAW FIRM, P.A.

Laurence M. Rosen, Esq.  (LR 5733)
Email: lrosen@rosenlegal.com
Phillip Kim, Esq. (PK 9384)
Email: pkim@rosenlegal.com
Timothy W. Brown, Esq. (TB 1008)
Email: tbrown@rosenlegal.com
350 Fifth Avenue, Suite 5508
New York, New York 10118
Telephone: (212) 686-1060
Fax: (212) 202-3827

Lead Counsel for Plaintiffs and Class

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. ii

STATEMENT OF FACTS ................................................................................................... 1

ARGUMENT…………………….................................................................................................. 6

I.    PKF New York's Motion to Dismiss the Section 10(b) Claim Should Be Denied ............ 6

    A.    The Complaint Adequately Pleads That PKF New York Made False and Misleading Statements of Material Fact .................................................................. 6

    B.    Plaintiffs Sufficiently Alleged Facts That Give Rise to a Strong Inference of Scienter .......................................................................................................... 18

        1.    Applicable Authority ................................................................................... 18

        2.    PKF New York's Conscious Misbehavior and/or Recklessness .............. 20

        3.    PKF New York's Motive and Opportunity to Commit Fraud ................. 22

II.    The Section 20(a) Claim Against PKF New York May Be Dismissed ............................. 24

III.    Plaintiffs Should Be Granted Leave to Amend................................................................. 24

CONCLUSION ....................................................................................................................... 25

## **TABLE OF AUTHORITIES**

**Page(s)**

### **FEDERAL CASES**

*Alstom SA Sec. Litig.*,
    406 F.Supp.2d 433 (S.D.N.Y. 2005) ........................................................................12, 16

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ........................................................................................17

*Calderon v. Tower Associates Intern., Inc.*,
    1989 WL 29916 (D. Or. Mar. 28, 1989) ..........................................................18

*In re Campbell Soup Company Sec. Litig.*,
    145 F.Supp.2d 574 (D. N.J. 2001) ..................................................................18

*In re Complete Management Inc. Sec. Litig.*,
    153 F.Supp.2d 314 (S.D.N.Y. 2001) ..............................................................22

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
    235 F.Supp.2d 549 (S.D. Tex. 2002) ..............................................................16

*In re Global Crossing, Ltd. Sec. Litig.*,
    322 F.Supp.2d 319 (S.D.N.Y. 2004) ..............................................12, 13, 14, 15, 22

*In re IAC/InterActiveCorp Sec. Litig.*,
    478 F. Supp. 2d 574 (S.D.N.Y. 2007) ............................................................24

*In re Kidder Peabody Sec. Litig.*,
    10 F.Supp.2d 398 (S.D.N.Y. 1998) ................................................................16

*In re LaBranche Sec. Litig.*,
    405 F.Supp.2d 333 (S.D.N.Y. 2005) ..............................................................14

*Lattanzio v. Deloitte & Touche LLP*,
    476 F.3d 147 (2d Cir. 2007) ............................................................................7

*Lernout & Hauspie*,
    230 F.Supp.2d 152 (D. MA. 2002) ................................................................15

*Lodge 743, Intern. Ass'n of Machinists, AFL-CIO v. United Aircraft Corp.*,
    337 F.2d 5 (2d Cir. 1964) ..............................................................................9, 16, 24

*Maldonado v. Flynn*,
    597 F.2d 789 (2d Cir. 1979) ..........................................................................17

*Menkes v. Stolt-Nielsen S.A.*,
    2006 WL 1699603 (D. Conn. June 19, 2006).....................................................................14

*In re Metex Corp. Sec. Litig.*,
    1993 WL 330596 (E.D.N.Y. July 08, 1993)......................................................................18

*In re MicroStrategy, Inc. Sec. Litig.*,
    115 F. Supp. 2d 620 (E.D. Va. 2000) ..............................................................................24

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)......................................................................................18, 19

*Pension Committee of University of Montreal Pension Plan v. Banc of America Securities, LLC*,
    592 F.Supp.2d 608 (S.D.N.Y. 2009)................................................................................13

*In re Qwest Commc'ns Int'l, Inc.*,
    396 F. Supp. 2d 1178 (D. Colo. 2004).............................................................................23

*In re Refco, Inc. Sec. Litig.*,
    503 F.Supp.2d 611 (S.D.N.Y. 2007)................................................................................13

*In re Salomon Analyst AT&T Litig.*,
    350 F.Supp.2d 455 (S.D.N.Y. 2004)................................................................................14

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001)........................................................................................12, 13

*SEC v. Pimco Advisors Fund Mgmt. LLC*,
    341 F.Supp.2d 454 (S.D.N.Y. 2004)................................................................................12

*Seippel v. Sidley, Austin, Brown & Wood, LLP*,
    399 F. Supp. 2d 283 (S.D.N.Y. 2005).............................................................................14

*Spool v. World Child Int'l Adoption Agency*,
    520 F.3d 178 (2d Cir. 2008)............................................................................................17

*Tellabs v. Makor Issues & Rights, Ltd.*,
    127 S. Ct. 2499 (2007)......................................................................................19, 20, 24

*U.S. S.E.C. v. Fehn*,
    97 F.3d 1276 (9th Cir. 1996) ..........................................................................................17

*In re Williams Sec. Litig.*,
    339 F. Supp. 2d 1242 (N.D. Okla., 2003)........................................................................23

*Wright v. Ernst & Young LLP*,
   152 F.3d 169 (2d Cir. 1998)..............................................................................7, 9, 12, 13

*Zell v. Intercapital Income Sec., Inc.*,
   675 F.2d 1041 (9th Cir. 1982) ..........................................................................18

## FEDERAL STATUTES

15 U.S.C. § 78u-4(b)(1) .......................................................................................18

15 U.S.C. § 78u-4(b)(2) .......................................................................................18

## MISCELLANEOUS AUTHORITIES

PCAOB AU 150 .....................................................................................................5

PCAOB AU 326 .....................................................................................................5

PCAOB AU 330.04-09 ..........................................................................................5

PCAOB AU 311.02 .......................................................................................9, 16, 17

PCAOB AU 330.32 ................................................................................................5

PCAOB AU 330.34 ................................................................................................5

PCAOB AU 330.35 ................................................................................................5

PCAOB AU 543.04 .........................................................................................10, 17

Lead Plaintiffs Joseph Nunn, Basil Hantash, Bashar Hantash, Anna Hantash and Kenneth Price, and named plaintiff Carlos Munoz, individually and on behalf of all other persons similarly situated ("Plaintiffs"), respectfully submit this memorandum of law in opposition to the motion to dismiss filed by PKF Certified Public Accountants, A Professional Corporation.

### STATEMENT OF FACTS

The Amended Complaint ("Complaint") alleges causes of action for securities fraud against China Expert Technology, Inc. ("CXTI" or "China Expert") and its auditors arising out of their issuance of completely fraudulent financial statements for the fiscal years 2003, 2004, 2005 and 2006. CXTI is a Nevada corporation that maintained its headquarters in China at the time of the alleged fraud. ¶ 15. During the Class Period, CXTI issued financial statements claiming it had earned $134 million of revenue from 16 e-government contracts. ¶ 43. The Complaint alleges that 99% of CXTI's reported revenues for these fiscal years were completely fictitious. ¶ 225. The Complaint alleges that the auditors violated §10(b) and 20(a) of the Securities Exchange Act for preparing and certifying CXTI's financial statements without performing the most rudimentary auditing procedures to confirm that even one of the 16 contracts was genuine or that even a tiny portion of the $134 million of reported revenue had actually been earned.  ¶¶ 43, 302-06. CXTI was a complete fraud and the auditors were highly reckless in not confirming the existence of even 1% of the reported revenue.  Indeed, when investors and regulators got wind of the fraud in autumn 2007, CXTI and its management vanished into thin air.  ¶¶ 272-83.

PKF Certified Public Accountants is an accounting firm based in New York (referred to herein as "PKF New York"). ¶ 17. PKF Certified Public Accountants, Hong Kong is the Hong Kong-based affiliate of PKF New York (referred to herein as "PKF Hong Kong"). ¶ 16. The

Complaint alleges that both PKF New York and PKF Hong Kong provided audit services for the 2003 and 2004 audits of CXTI's financial statements. ¶¶ 16-17. PKF New York and PKF Hong Kong are separate legal entities, but frequently provide their services and represent themselves under the same moniker "PKF Certified Public Accountants." Often they both simply referred to themselves publicly as "PKF." ¶¶ 17-18, 20.

The class period for this lawsuit begins on March 16, 2006 when CXTI filed with the SEC its fiscal 2005 annual report on form 10-KSB, which included audited financial statements for the fiscal years 2003, 2004 and 2005 ("2005 Annual Report"). ¶ 49. PKF audited and certified the 2003 and 2004 financial statements and BDO Seidman LLP ("BDO Seidman") together with BDO McCabe Lo Limited ("BDO McCabe") audited and certified the 2005 financial statements that were included in the 2005 Annual Report. ¶¶ 50-51. CXTI's fraudulent 2003 and 2004 financial statements were also disseminated to investors in a June 16, 2006 amended annual report for fiscal 2004. ¶ 56. The fraudulent 2004 financial statements were further disseminated to investors in CXTI's 2006 Annual Report filed with the SEC on April 12, 2007. ¶ 63. This memorandum of law will focus only on the 2003 and 2004 financial statements audited and certified by PKF. The 2005 and 2006 financial statements, audited and certified by BDO, are the subject of a separate motion to dismiss by BDO Seidman and are addressed by Plaintiffs in a separate memorandum of law in opposition thereto.

CXTI's 2003 and 2004 financial statements reported revenue of $5.7 million and $26.8 million, and net income of $1.2 million and $4.8 million, respectively. ¶ 52. The 2003 revenue of $5.7 million was reported to have been earned from a single e-government contract entered into by CXTI's main operating subsidiary, Expert Network (Shenzhen) Limited ("Expert Network") and the Jinjiang municipal government. ¶ 54. The $26.8 million of 2004 revenue was reportedly

2

earned from the same initial Jinjiang e-government contract (earning $17.8 million) and a new contract with Dehua municipal government (earning $8.9 million). Thus, CXTI's 2004 revenue was supposedly earned from only two contracts. ¶ 54.

On July 19, 2007, CXTI announced its Chief Financial Officer, Simon Fu, inexplicably resigned. ¶ 284. On August 14, 2007, CXTI announced it would file its quarterly report for the period ended June 30, 2007 with the SEC late. ¶ 285. Shortly thereafter rumors began spreading that CXTI's business was a fraud. ¶ 287. On September 27, 2007, CXTI announced it had dismissed auditor BDO. ¶ 288. On October 1, 2007 the SEC issued an order halting trading of China Expert's stock because there "is a lack of current and accurate information concerning the securities of China Expert . . . [and] questions regarding the adequacy and accuracy of publicly disseminated information concerning [its] (1) financial performance and business prospects and (2) current financial condition. The . . . public interest and the protection of investors require a suspension of trading in the securities . . ." ¶ 290. Between July 19, 2007 when CXTI's CFO resigned and the SEC's suspension of trading on October 1, 2007, CXTI's stock price dropped from nearly $7.0/share to less than $0.20/share – devastating investors. ¶¶ 284-91.

None of Defendants contests the detailed allegations in the Complaint demonstrating CXTI's financial statements were wholly fraudulent. The Complaint describes in depth Plaintiffs' investigator's conversations with Chinese government agencies whose representatives stated that the agencies did not enter into e-government contracts with Expert Network and that the purported revenue earned by CXTI was fake. ¶¶ 84-99, 117-41, 157-70, 177-89. Also, two other investigations corroborated Plaintiffs' investigator's findings. ¶¶ 198-206.

Indeed, CXTI's operating subsidiary, Expert Network, from which CXTI earned over 99% of its revenue, was required to file audited financial statements with the regional Shenzhen

government; they show only a tiny fraction of the revenue reported in the financial statements audited and certified by PKF. ¶¶ 43, 221. In its 2004 audited financial statements filed with the Shenzhen government, Expert Network reported revenue of $1.46 million, which stands in stark contrast to CXTI's 2004 financial statements, certified by PKF, which reported revenue of $26.8 million. ¶¶ 217, 221.

Having established that China Expert was an absolute fraud at its core, Plaintiffs charged its auditors PKF with securities fraud for auditing, preparing and certifying China Expert's 2003 and 2004 financial statements. These fraud allegations are grounded on PKF's failure to perform the most basic audit procedures, violation of most fundamental auditing standards, and ignoring red flags. Only an auditor that had willfully turned a blind eye would have missed the red flags revealed by documentation and financial records of CXTI and third parties, including financial statements Expert Network filed with the Shenzen government, that show during 2003 and 2004 CXTI earned almost no revenue from the 2 contracts with the 2 Chinese local governments and that CXTI did hardly any business with them at all.

## PKF's Reckless Audit Amounted to No Audit At All

Generally Accepted Auditing Standards ("GAAS"), which mandate the procedures an auditor must implement in auditing a publicly traded company, are promulgated by the Public Company Accounting Oversight Board ("PCAOB").[1] PKF stated in its audit opinion that "[w]e conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board." ¶ 231. GAAS required PKF to obtain competent evidence that China Expert truly entered into two valid e-government contracts and had actually earned $4.7 million of revenue in 2003 and $26.7 million in 2004 pursuant to those two contracts. ¶¶ 221, 232-37, 270

---

[1] The PCAOB was established pursuant to the Sarbanes-Oxley Act in the wake of unprecedented financial scandals of the internet boom and bust.

(citing PCAOB AU 150). In addition, PKF was obligated to confirm the existence of the $4.4 million of accounts receivable at year-end 2004. ¶¶ 43, 247 (citing AU 330.34, 330.35). Given CXTI's $26.8 million of reported revenue in 2004, and $4.4 million of accounts receivable at year-end 2004 (which grew from $0 at the beginning of 2004), PKF was required to confirm that CXTI actually received the $22.4 million of cash in 2004. ¶¶ 239-48, 263, 269 (citing AU 326, 330.04-09, 330.32). PKF obviously failed to perform any audit at all on the $26.8 million in revenue all of which CXTI claimed it earned during 2004 from 2 contracts with Jinjiang Municipality and Dehua Municipality, given that (a) Jinjiang municipality stated that it completed its sole contract with CXTI after paying CXTI a total of only $600,000 (¶¶ 132, 142), and that (b) Dehua municipality stated it terminated its only contract with CXTI in 2004 and paid them only $12,160. ¶ 228. Thus, nearly all of CXTI's reported revenue was fake. If PKF had preformed any of the required audit procedures by confirming the revenue, contracts or accounts receivable with third parties, it would have discovered that the contracts with CXTI did not exist or had been terminated, that CXTI had earned only about $600,000 in revenue in total – not the $32.5 million reported as earned during 2003 and 2004, and that the $4.4 million of accounts receivable reported at year-end 2004 was fraudulent. PKF abrogated its most basic audit responsibilities failing to obtain <u>any</u> competent evidential matter to support its audit opinion.

**PKF New York's Motion to Dismiss the Amended Complaint**

PKF New York moves to dismiss the Complaint on the ground that PKF New York's Hong Kong affiliate, PKF Hong Kong, signed the audit opinions for CXTI and that PKF New York merely reviewed and advised the PKF Hong Kong office about proper U.S. audit procedures and accounting principles, and therefore could not have known that the audit was done recklessly or with fraudulent intent. First, PKF New York's motion fails because PKF New

York substantially conducted and directed the planning and performance of the audit, and substantially participated in the preparation of CXTI's fraudulent financial statements. ¶¶ 16-18, 319-28. Also, the investing public attributed the audit opinions to PKF New York for two reasons: 1) the investing public knows that when a foreign accounting firm certifies financial statements with the SEC, its U.S. affiliate must have participated in conducting the audit and making the statements; and 2) because CXTI's 2004 annual report and financial statements attribute the audit to "PKF Certified Public Accountants" and to "PKF," a reasonable investor would have attributed the audited financial statements to PKF New York to the same extent as to PKF Hong Kong. For these reasons, as set forth below, the Court should deny PKF New York's motion to dismiss.

## ARGUMENT

**I.    PKF New York's Motion to Dismiss the Section 10(b) Claim Should Be Denied**

### A.    The Complaint Adequately Pleads That PKF New York Made False And Misleading Statements of Material Fact

PKF New York does not dispute that CXTI's financial statements certified by PKF Hong Kong and filed with the SEC are materially false and misleading. Indeed, the magnitude and brazenness of the fraud makes it impossible for PKF Hong Kong to deny that CXTI's financial statements are wholly fraudulent. Rather, PKF New York attempts to escape all liability by claiming that because it did not sign the audit opinions it is not liable. However, because PKF New York participated in conducting the audit and in drafting the misleading statements, and because the investing public knows that when a foreign accounting firm certifies financial statements with the SEC, its U.S. affiliate must have participated in conducting the audit and making the statements, and because the public attributes the audit opinions of PKF as much to PKF New York as to PKF Hong Kong due to their using the same nomenclature, PKF New York

6

is liable for making the statements. Also, PKF New York argues that it merely acted as a consultant to PKF Hong Kong in conducting its audits of CXTI, and thus had no responsibility for the audit opinion signed by PKF Hong Kong. However, it is a question of fact whether PKF New York acted as merely a "consultant" to PKF Hong Kong, or as a Supervisory or Assistant Auditor pursuant to certain PCAOB rules. Moreover, even if PKF New York's role was that of a consultant, which is similar to that of a "Filing Reviewer," as set forth in the PCAOB rule cited by Defendant BDO Seidman in their motion to dismiss (p. 2), PCAOB rules that govern Filing Reviewers cannot determine whether an auditor's conduct violates the federal securities laws.

PKF New York incorrectly relies on *Wright* in arguing it is not liable under § 10(b) because it did not make any false or misleading statements and because no misrepresentations were attributed to it at the time the misleading statements were disseminated. *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998). However, in *Wright*, the alleged misleading statements were in a press release, not an annual report containing certified audited financial statements, as in the instant matter. 152 F.3d at 175-76. The Second Circuit stressed that the press release did not contain any audit opinion and was issued "without a whisper of [the defendant's] involvement." *Id.* In another case cited in BDO Seidman's motion to dismiss, *Lattanzio v. Deloitte & Touche LLP*, the alleged misleading statements not attributed to the auditor were in the company's quarterly financial statements, which also did not contain an audit opinion and did not indicate that the defendant accountant firm made any of the statements contained therein. 476 F.3d 147, 152, 154-55 (2d Cir. 2007). Thus, in both *Wright* and *Lattanzio* everyone knew the misleading statements clearly were not made by the defendant accountants.

The factual circumstances in *Wright* and *Lattanzio* are inapposite because in the instant matter the misleading statements were found in CXTI's audited financial statements for each of

7

years 2003 and 2004, which contained the audit opinions of PKF New York and PKF Hong Kong, which were signed by PKF Hong Kong. Indeed, the Complaint alleges the following facts about PKF New York's conducting the audit:

- PKF directed and actively participated together with PKF Hong Kong in the defective audits of CXTI. ¶ 18.
- PKF New York gave instructions to PKF Hong Kong as to how to ensure that US GAAS, GAAP and SEC rules were followed in connection with the audits of CXTI. ¶ 18.
- PKF New York directed, participated in, and reviewed the audit work and audit procedures for the audits of CXTI for fiscal years 2003 and 2004. ¶ 18.
- PKF New York consulted with PKF Hong Kong to ensure that GAAS and SEC rules were followed in connection with the CXTI audits. ¶ 323.
- PKF New York attended meetings at which the audits were reviewed and discussed, and at which PKF Hong Kong, CXTI management and CXTI's attorneys were present. ¶ 324.
- PKF New York directed and reviewed PKF Hong Kong's procedures for conducting the audits of CXTI. ¶ 325.
- PKF New York reviewed the actual audits of CXTI. ¶ 326.
- PKF New York reviewed the amounts of money accounted for in the audits of CXTI. ¶ 328
- PKF exercised direct and supervisory involvement in the day-to-day audits of CXTI and the false and misleading financial statements giving rise to the securities violations ¶ 331.

PKF New York provides a letter agreement between PKF New York and PKF Hong Kong as evidence that PKF New York had only a limited role in the preparation and certification of CXTI's 2003 and 2004 financial statements. MTD, p. 11; Freire Decl., Ex. 1. However, the audit opinion in CXTI's 2005 Annual Report is dated February 22, 2005, and the engagement letter referenced by PKF New York in its Motion to Dismiss is dated July 5, 2005. It is impossible for the July 5, 2005 engagement letter to govern the role of PKF New York in auditing and certifying CXTI's financial statements for an audit that was completed and attested to by PKF on February 22, 2005. Either PKF New York's description of its role in auditing CXTI's fiscal 2003 and 2004 financial statements is mistaken or the proffered engagement letter is not genuine. Regardless, PKF New York has not provided any evidence to dispute the well-pleaded

allegations of the Complaint that PKF New York actively participated in conducting the audit of CXTI's fraudulent financial statements. Notwithstanding that PKF New York has not refuted Plaintiffs' allegations that PKF New York actively engaged in CXTI's audits, Plaintiffs' allegations must be accepted for purposes of this motion to dismiss. *Lodge 743, Intern. Ass'n of Machinists, AFL-CIO v. United Aircraft Corp.*, 337 F.2d 5, 8 (2d Cir. 1964) ("These arguments, however, raise in part questions of fact as to the circumstances of the agreement that cannot be dealt with on a motion to dismiss").

Moreover, it is implicit to investors that PKF New York participated in the conduct of the audit and in making the audit opinion signed by PKF Hong Kong because U.S. affiliates customarily participate in the audits of financial statements contained in annual reports filed with the SEC, where the opinions are signed by foreign affiliates of the same accounting organization. *See Wright*, 152 F.3d at 175 ("There is no requirement that the alleged violator directly communicate misrepresentations to [investors] for primary liability to attach") (quotations omitted). Indeed, as Defendant BDO Seidman admits, a U.S. accounting firm always participates in an audit that is also conducted by a foreign firm. BDO Seidman's MTD, p. 2. At a minimum, the U.S. affiliate accounting firm performs functions of a "Filing Reviewer," as set forth in Appendix K of the SECPS Reference Manual, which was adopted by the PCAOB. *See* Ex. B attached to Decl. of Gary A. Orseck supporting BDO Seidman's MTD.

However, the U.S. affiliate accounting firm may instead act as an "assistant" auditor, which the PCAOB defines as an "auditor." PCAOB AU 311.02 states in pertinent part: "The auditor with final responsibility for the audit may delegate portions of the planning and supervision of the audit to other firm personnel. For purposes of this section, (a) firm personnel other than the auditor with final responsibility for the audit are referred to as assistants and (b)

9

the term auditor refers to either the auditor with final responsibility for the audit or assistants."
*See* Decl. of Timothy W. Brown ("Brown Decl."), ¶ 3, Ex. 1. Frequently assistant auditors and supervisor auditors are not even mentioned in audit opinions signed by principal auditors. Indeed, AU 543.04 states:

> If the principal auditor is able to satisfy himself as to the independence and professional reputation of the other auditor . . . and takes steps he considers appropriate to satisfy himself as to the audit performed by the other auditor . . . , he may be able to express an opinion on the financial statements taken as a whole without making reference in his report to the audit of the other auditor. If the principal auditor decides to take this position, he should not state in his report that part of the audit was made by another auditor because to do so may cause a reader to misinterpret the degree of responsibility being assumed.

*See* Brown Decl., ¶ 3, Ex. 2 (citations omitted). Thus, the U.S. affiliate firm, whether it is conducting the audit as a supervisor or otherwise as an assistant, is an "auditor," but often not a signatory of the audit opinion in which the U.S. affiliate may not be mentioned. Public investors, therefore, attribute audit opinions signed by foreign accounting firms to their U.S. affiliates. The Complaint alleges that PKF New York assisted in the audits. ¶ 18. Thus, under *Wright*, PKF New York made misleading statements because PKF New York participated in conducting the audits and the public attributed the audit opinions to PKF New York.

A second reason it is implicit to investors that PKF New York participated in the conduct of the audit and in making the audit opinion signed by PKF Hong Kong is that PKF Hong Kong refers to itself in the public domain, such as in its SEC filings and annual reports, with the same name to which PKF New York is referred. As PKF New York points out in its opening brief, its legal name is "PKF, Certified Public Accountants." MTD, p. 1; *see also* ¶ 17. This is also the same name that the Hong Kong office uses. ¶ 16 ("PKF Hong Kong conducts business under the following names: (i) PKF, Certified Public Accountants . . ."). Indeed both PKF New York and PKF Hong Kong both do business as simply "PKF". ¶¶ 16, 17, 20. For example, CXTI's 2004

Annual Report filed with the SEC refers to CXTI's auditors simply as "PKF Certified Public Accountants":

> **Audit Fees**
>
> \* \* \*
>
> The aggregate fees billed by PKF Certified Public Accountants, China Expert's previous independent auditors, for the audit of the Company's annual consolidated financial statements and reviews of quarterly financial statements for the years ended December 31, 2005 and 2004 were $7,712 and $119,537 respectively.
>
> **Tax Fees**
>
> The aggregate fees billed and billable by PKF Certified Public Accountants, China Expert's principal accountants for tax compliance, advice, and planning, were $2,000 and $2,000 for the years ended December 31, 2005 and 2004, respectively.

CXTI's 2004 Annual Report on Form 10-KSB filed with the SEC, p. 43 (Brown Decl. ¶ 5; Ex. 3). Interestingly, the 2004 Annual Report states that "PKF Certified Public Accountants" are CXTI's auditors. It also says that "PKF Certified Public Accountants" are CXTI's principal accountants for tax compliance, advice and planning. Thus, the annual report shows that the auditor and the tax advice provider are the same entity. PKF New York's office specifically entered into a contract with China Expert to provide tax compliance. See Brown Decl. ¶ 6; Ex. 4. PKF New York cannot deny that it was the principal accountant providing tax advice. The annual report indicates that the auditor and the tax accountants are the same entity – "PKF Certified Public Accountants" – which is precisely the name that PKF New York does business under. As both PKF Hong Kong and PKF New York operate under the name "PKF Certified Public Accountants" and the name "PKF" without any meaningful distinction between the offices, why should investors find that the audit letter refers to audit work performed solely by

the Hong Kong office, when all the publicly disseminated documentation leads to the conclusion that the New York office of PKF was significantly involved in directing the audit? ¶ 20.

The Second Circuit relaxed the bright line rule established in *Wright* when it later decided *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir. 2001). *Scholastic* held that a company executive could be charged with primary liability for misleading disclosures even though the complaint did not attribute misleading disclosures to him because the complaint alleged "on information and belief" that he personally disseminated misleading statements, was "primarily responsible for Scholastic's communications with investors and industry analysts," and "was involved in the drafting, producing, reviewing and/or disseminating of the false and misleading statements issued by Scholastic. . ." *Id.* at 75-76. Courts have explained that *Scholastic* holds a defendant liable under 10b-5 for being responsible for making a misleading statement despite a lack of specific attribution. *See, e.g.*, *SEC v. Pimco Advisors Fund Mgmt. LLC*, 341 F.Supp.2d 454, 466-67 (S.D.N.Y. 2004) (finding under *Scholastic* that defendant was not primarily liable under § 10(b) because he was not alleged to have personally made misleading statements, to be responsible for communications with investors, or to have drafted misleading statements – but not because the misleading statements were not attributable to him); *In re Alstom SA Sec. Litig.*, 406 F.Supp.2d 433, 466 (S.D.N.Y. 2005) (stating that Second Circuit district courts have found *Scholastic* does not require allegations of the attribution element established in *Wright*); *In re Global Crossing, Ltd. Sec. Litig.*, 322 F.Supp.2d 319, 331 (S.D.N.Y. 2004) ("While *Scholastic* might indicate some relaxation of *Wright's* requirement, . . . it does not provide any guidance as to when a statement not attributed to a defendant might cross the line into a primary violation"). Thus, under *Scholastic*, PKF New York is liable under 10b-5 merely because it participated in the audits of CXTI, and also assisted in and directed the audits and the preparation of the

12

misleading statements, **regardless of whether defendants question whether public investors also attributed the misleading statements to PKF New York**.

While *Scholastic* does not require allegations of attribution, many district courts have reconciled *Scholastic* with *Wright* by finding that for 10b-5 liability, constructive attribution is enough. Only a few months ago in January of 2009, in *Pension Committee of University of Montreal Pension Plan v. Banc of America Securities, LLC*, this Court explained that:

> The prevailing rule in this Circuit is that a statement need not be publicly attributed to the defendant, [if] the defendant's participation is substantial enough that s/he may be deemed to have made the statement, and [if] investors are sufficiently aware of defendant's participation that they may be found to have relied on it as if the statement had been attributed to the defendant.

592 F.Supp.2d 608, 622 (S.D.N.Y. 2009) (quotations omitted). For example, in *In re Alstom SA Securities Litigation*, this Court acknowledged that the rule requiring a plaintiff to demonstrate that the public could "attribute a misleading statement (at least indirectly) to the secondary actor at the time it is issued . . . emphasizes *constructive*, rather than actual, attribution--a concept consistent with the Second Circuit's emphasis on reliance." 406 F.Supp.2d 433 (S.D.N.Y. 2005). Among the vast number of cases that follow *Scholastic* in finding constructive attribution suffices to hold a secondary actor liable for making misleading statements, *Global Crossing* is perhaps the most prominent. 322 F.Supp.2d 319.  In *Global Crossing* this Court allowed primary liability to attach to an auditor defendant where allegations that the defendant "'prepared, directed or controlled,' 'helped create' or 'materially assisted in' preparing false statements" in public financial reports that did not identify the auditor "place[d] its involvement well beyond the realm of 'aiding and abetting' liability precluded by *Central Bank*." *Id.* at 334. *See also In re Refco, Inc. Sec. Litig.*, 503 F.Supp.2d 611, 656, n.39 (S.D.N.Y. 2007) ("Allegations that an auditor 'prepared, directed or controlled,' 'helped create' or 'materially assisted in' preparing

false statements are sufficient to give rise to liability"); *In re LaBranche Sec. Litig.*, 405 F.Supp.2d 333, 352 (S.D.N.Y. 2005) (holding that specialist-subsidiary, LaBranche LLC, whose financial data was included in the financial statements of its parent, LaBranche & Co, was liable for making false statements under 10b-5 because the parents' statements could be "constructively attributed" to subsidiary "even though LaBranche & Co. failed to explicitly identify LaBranche LLC as the source of the information concerning revenue and earnings of its specialist operations*"); In re Salomon Analyst AT&T Litig.*, 350 F.Supp.2d 455, 474 (S.D.N.Y. 2004) ("It stretches neither the language of Rule 10b-5 nor the holding of *Central Bank* to treat a high-level executive who allegedly orchestrated and directly ordered a false representation as a primary violator along with the underling who actually mouthed or wrote the offending falsehood. Indeed, in *Global Crossing*, this Court found that, in highly unusual circumstances, even an outside professional who allegedly conceived and engineered, rather than merely abetted or turned a blind eye to, a fraudulent scheme could be liable as a primary violator on the same theory"); *Seippel v. Sidley, Austin, Brown & Wood, LLP*, 399 F. Supp. 2d 283, 295 (S.D.N.Y. 2005) ("defendants made misrepresentations, through Paul, that they knew or should have known that those misrepresentations would be communicated to potential purchasers of COBRA, and that those statements were indirectly attributable to them. These allegations are sufficient to survive a motion to dismiss. Whether defendants were in fact sufficiently responsible for Paul's statements to establish their liability as primary violators [of 10b-5] is a question that must be resolved on a motion for summary judgment or at trial"); *Menkes v. Stolt-Nielsen S.A.*, 2006 WL 1699603, at *7 (D. Conn. June 19, 2006) (finding officers of subsidiary whose anti-competitive conduct was not disclosed to investors primarily liable for making misleading statements **due to being in a position that they were able to render the misleading statements of the parent**

**complete and truthful, but failed**, or due to conspiring with the parent; explaining "[d]espite the apparent bright-line rule regarding primary liability, however, there have been circumstances where courts bound to follow the foregoing decisions have permitted claims against persons who did not actually utter the false or misleading statements but nevertheless may be deemed to have caused the statements to be uttered") (emphasis added). Thus, consistent with the numerous Second Circuit decisions referred to above, this Court should find PKF New York primarily liable for the following reasons: a) it participated in making and drafting the misleading statements signed by PKF Hong Kong, b) it conducted, directed and supervised the audit, and c) the public must have attributed to the audit opinions to PKF New York because PKF's New York and Hong Kong offices use the same name in the public domain, and because investors know that as PKF Hong Kong's U.S. affiliate, it had to have done the audit and made the audit opinion with PKF Hong Kong

If the U.S. accounting firm PKF New York, whose audit work and statements were necessary for CXTI to sell securities to the American public, is allowed to avoid liability by hiding behind PKF Hong Kong's signature, then American accounting firms would be encouraged to be reckless and act fraudulently whenever engaged with foreign affiliates in the audits of foreign companies. *See Lernout & Hauspie*, 230 F.Supp.2d 152, 168 (D. MA. 2002) ("Absolving an auditor who prepares, edits, and drafts a fraudulent financial statement knowing it will be publicly disseminated simply because [it was signed by another, affiliated auditor] would stretch *Central Bank's* holding too far"); *Global Crossing*, 322 F.Supp.2d at 333 (the "strict requirement of public attribution would allow those primarily responsible for making false statements to avoid liability by remaining anonymous and thus would place a premium on concealment and subterfuge rather than on compliance with the federal securities laws") (internal

quotations omitted); *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 235 F.Supp.2d 549, 587 (S.D. Tex. 2002) (adopting SEC position that a strict requirement of public attribution would allow those primarily responsible for making false statements to avoid liability by remaining anonymous, and thus "would place a premium on concealment and subterfuge rather than on compliance with the federal securities laws"); *In re Alstom Sa Sec. Litig.*, 406 F.Supp.2d at 467, n.30, quoting *In re Kidder Peabody Sec. Litig.*, 10 F.Supp.2d 398, 408 (S.D.N.Y. 1998) ("[H]olding a subsidiary immune from liability for statements communicated by its parent under these facts would lead to an anomalous result. A subsidiary could freely disseminate false information to the market through its parent, but investors relying on that information to their detriment would be left with no remedy: an action could not be brought against the subsidiary, and the parent would escape liability because it lacked scienter. This would lead to a result so bizarre that Congress could not have intended it").

PKF New York's argument that it merely acted as a consultant to PKF Hong Kong for its audits of CXTI bearing no responsibility for PKF Hong Kong's certification of CXTI's financial statements raises a question of fact that cannot be determined upon a motion to dismiss. "These arguments, however, raise in part questions of fact as to the circumstances of the agreement that cannot be dealt with on a motion to dismiss." *Lodge 743, Intern. Ass'n of Machinists, AFL-CIO v. United Aircraft Corp.*, 337 F.2d 5, 8 (2d Cir. 1964). The factual question is to what extent PKF New York participated in the audits of CXTI which were in name done by PKF Hong Kong. If the extent of PKF New York's participation in the audits was minimal, as PKF New York argues, then PCAOB rule Appendix K, which describes the role and responsibilities of a "Filing Reviewer," similar to those of a consultant, may apply. If the extent of PKF New York's participation in the audits was greater, which it was according to Plaintiffs, then PCAOB AU 311

and 543, which govern conduct of assistant, supervisory and principal auditors, apply. Merely because the rule governing Filing Reviewers exists, does not mean it applies to PKF New York under these circumstances, as the Complaint alleges PKF New York acted as much more than a Filing Reviewer. It acted as an auditor pursuant to PCAOB AU 311 and 543 and is thus primarily liable. ¶¶ 18, 323-26, 328, 331. This is an intensely factual question, and Plaintiffs' allegations must be accepted as true for the purposes of a motion to dismiss. "A Rule 12(b)(6) motion must be denied if the factual allegations "create the possibility of a right to relief that is more than speculative." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008).

Additionally, even if the Court were to find <u>upon completion of discovery</u> that PKF New York only acted as a consultant or Filing Reviewer (pursuant to Appendix K), and not as an assistant, supervisory, or principal auditor (pursuant to AU 311 and 543), at that later stage in the litigation the Court might still find PKF New York primarily liable. Just because a PCAOB rule, Appendix K, states that an accounting firm acting as a Filing Reviewer is not responsible for the audit does not mean the accounting firm is shielded from primary liability under § 10(b). Indeed, PCAOB rules and SEC rules only set forth minimum standards and requirements, but do not establish what conduct must be observed to avoid liability under the federal securities laws. *See U.S. S.E.C. v. Fehn*, 97 F.3d 1276, 1291 (9th Cir. 1996) (finding defendants' reliance on disclosure requirements as set forth in FASB 5 to contravene the stricter "securities-law standard for determining the materiality of a corporate event that has not yet occurred" under *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)); *Maldonado v. Flynn*, 597 F.2d 789, 797, n.9 (2d Cir. 1979) (holding that the SEC rules governing disclosure set only minimum standards and that

compliance does not necessarily guarantee that the required full disclosure has been made).[2] Moreover Appendix K, a rule drafted by accountants to protect accountants, contradicts itself. Whereas Appendix K states that the Filing Reviewer is not responsible for a faulty audit, it also states that "if the filing or inspection reviewer and the audit partner-in-charge of the engagement have conflicting views as to the resolution of matters that came to the attention of the filing or inspection reviewer when performing the procedures for certain filings or inspection described above, that disagreement should be resolved in accordance with the applicable policy of the international organization or of the filing or inspection reviewer's firm." Thus, according to Appendix K, the filing reviewer is responsible for ensuring the audit complies with SEC rules.

### B.    Plaintiffs Sufficiently Alleged Facts That Give Rise To A Strong Inference Of Scienter

#### 1.    Applicable Authority

The Private Securities Litigation Reform Act ("PSLRA") requires the complaint to "state with particularity facts giving rise to a strong inference" of scienter. *Novak v. Kasaks*, 216 F.3d 300, 306-07 (2d Cir. 2000) (quoting 15 U.S.C. § 78u-4(b)(1) and (b)(2)) (quotations omitted; emphasis omitted). Scienter can be pleaded "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."' *Id.* at 307 (citations

---

[2] *See also In re Metex Corp. Sec. Litig.*, 1993 WL 330596, at *2-3 (E.D.N.Y. July 08, 1993) (holding that a proxy solicitation may comply with Schedule 14A and nonetheless be misleading or omit a material fact); *In re Campbell Soup Company Sec. Litig.*, 145 F.Supp.2d 574, 591 (D. N.J. 2001) ("However, even absent Item 303, the Court has already held that Plaintiffs have sufficiently pled violations as to the heretofore discussed statements. As such, the unavailability of Item 303 as an independent avenue does not frustrate Plaintiffs' allegations"); *Calderon v. Tower Associates Intern., Inc.*, 1989 WL 29916, at *3 (D. Or. Mar. 28, 1989), citing *Zell v. Intercapital Income Sec., Inc.*, 675 F.2d 1041, 1045 (9th Cir. 1982) ("Regulation S-K guidelines are intended only to describe the minimum of what must be disclosed, and a registrant must add other information if there is a substantial likelihood that a reasonable investor would consider it important in making his or her decision") (internal quotations omitted).

omitted); *see Tellabs v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2507 (2007). While motive is not required, its presence "can be a relevant consideration" that indicates a defendant acted with conscious misbehavior or recklessness. *Id.* at 2511. The Court must read the allegations of conscious or reckless misconduct together with the motive allegations to determine whether the complaint gives rise to a compelling inference of scienter. *Id.* at 2511. "[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically," and to "accept all factual allegations in the complaint as true." *Id.* at 2509, 2511.

When all of the factual allegations of the Complaint are read holistically and accepted as true, the only plausible inference is that PKF New York either knowingly or recklessly misled the investing public by performing none of the required audit procedures and falsely certifying as accurate CXTI's wholly fraudulent financial statements. PKF New York together with PKF Hong Kong, in essence, performed no audit at all." ¶ 6. Read holistically, the factual allegations in the Amended Comlpaint raise a strong inference of PKF New York's motive to defraud and its "conscious misbehavior or recklessness" -- that PKF New York "engaged in deliberately illegal behavior," "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor." *Novak*, 216 F.3d at 308, 311.

The Supreme Court articulated the measure to determine whether the complaint pleads facts that give rise to a strong inference of scienter, holding: "A complaint will survive . . . if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 127 S. Ct. at 2510 (footnote omitted). At a minimum, the allegations in the Complaint are certainly "at least as compelling as

any opposing inference a reasonable person could draw from the facts alleged." *Id.* at 2510. Under *Tellabs*, that is sufficient for the Court to deny the motion to dismiss. *Id.*

As much as Plaintiffs have alleged facts that infer a strong inference of PKF Hong Kong's scienter, Plaintiffs have shown the same scienter for PKF New York. As discussed above, Plaintiffs have sufficiently alleged that PKF New York made the material false and misleading statements and actively conducted the audit and drafted the misleading statements, and thus acted as "auditors" in the work they did for CXTI. In what follows, Plaintiffs show that by dint of their engagement as auditors of CXTI, each of PKF New York and PKF Hong Kong, is primarily liable under § 10(b) for making the misleading statements recklessly or with fraudulent intent.

### 2.    PKF New York's Conscious Misbehavior and/or Recklessness

The fraud perpetrated by CXTI, PKF New York and PKF Hong Kong is exponentially more heinous than the most notorious cases of fraud that have afflicted public investors in the cases of Enron and WorldCom. In those cases, revenue was drastically inflated. This case is extraordinary and probably like nothing that ever came before this Court because in this case CXTI's business was a complete sham and PKF New York and PKF Hong Kong did no audit at all. 99% of all of CXTI's revenue and accounts receivable recognized for fiscal years 2003 and 2004 in annual reports filed with the SEC simply never existed. ¶ 225. PKF New York together with PKF Hong Kong audited CXTI's 2003 and 2004 annual reports filed with the SEC and certified them. ¶ 17. PKF New York and PKF Hong Kong certified to American investors that CXTI recognized over $32.5 million in revenue during 2003 and 2004 supposedly earned pursuant to 2 contracts with 2 Chinese local governments. ¶ 54. PKF New York and PKF Hong Kong could have easily and inexpensively, as they were obligated under GAAS (¶ 39),

confirmed the validity of the contracts, the revenue, and the accounts receivable related to work purportedly done pursuant to only these 2 contracts. Instead, PKF York and PKF Hong Kong performed none of the required audit procedures and falsely certified as accurate CXTI's wholly fraudulent financial statements. Thus, PKF New York and PKF Hong Kong, in essence, performed no audit at all. ¶ 6. Plaintiffs made numerous allegations of GAAP and GAAS violations that do not merely recite accounting principles, but set forth facts detailing the deficiencies in CXTI's financial reporting and PKF New York's and PKF Hong Kong's audits of those financial reports. ¶¶ 225-71. These facts adequately particularize how PKF New York and PKF Hong Kong violated the enumerated auditing standards, to such an extent that they must have done no audit at all. *Id.*

Had PKF New York and PKF Hong Kong done any audit, then they obviously would have found documentation and financial records of CXTI and third parties, including the audit of financial statements of CXTI's operating subsidiary, Expert Network, for fiscal year 2004 filed with the local Chinese government showing only 5% of the revenue recognized in the annual report PKF certified, indicating there was almost no revenue earned from the 2 contracts with the 2 Chinese local governments and that hardly any business was even done with them. ¶¶ 217, 221. Had PKF New York and PKF Hong Kong done any audit at all, these red flags would have become obvious to them.

Moreover, there were obvious red flags that required PKF New York to carefully investigate CXTI's revenue, cash, and accounts receivable, where such red flags were apparent even before beginning the so-called audit. Had they heeded the red flags, there is no way PKF New York would not have discovered that 99% of CXTI's revenue did not exist. The red flags obvious to PKF New York were: **1)** CXTI's "business involves significant, unusual, or highly

21

complex transactions," such as "significant operations located or conducted across international borders in jurisdictions where differing business environments and cultures exist" (¶ 257, 261; AU 316.85, Appendix); **2)** CXTI applied POC accounting, which is highly risky, to all of its contracts (¶¶ 259-62; AU 316.41, 316.54, 316.29); **3)** accounts receivable grew substantially as a percentage of total assets each year to a high amount, and the increase in accounts receivable each year relative to the revenue recognized in the respective year was also high. ¶ 265-68; AU 316.70-72.

In support of Plaintiffs' argument that the facts alleged in the Complaint show the conscious misbehavior or recklessness of PKF New York, Plaintiffs herein incorporate by reference Section I.B.2. of the Argument as set forth in Plaintiffs' memorandum of law in opposition to BDO Seidman's motion to dismiss, entitled "BDO Seidman's Conscious Misbehavior and/or Recklessness."

### 3.     PKF New York's Motive And Opportunity To Commit Fraud

PKF New York had the specific motive to relegate its duty as an independent auditor for the purpose of maintaining and building its relationship with CXTI as its consultant for tax compliance, advice and planning. *See* Brown Decl., ¶¶ 5-6, Ex. 3-4. Indeed, courts in this Circuit have repeatedly held that plaintiffs are able to adequately plead motive against an auditor sufficient to survive Rule 12(b)(6) motions in cases where the auditing company plays a dual role with respect to the client, collecting nonaudit fees in addition to its auditing fees. *See Global Crossing*, 322 F. Supp. 2d at 345 (the court found plaintiffs' allegations that Arthur Andersen's motive to make profit through consulting fees led it to "abandon its obligations as an independent auditor"); *see also In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 334 (S.D.N.Y. 2001) (payment of auditor for auditing services and consulting services gave rise to

allegation for motive or opportunity; these inferences coupled with other red flags established scienter); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 654 (E.D. Va. 2000) (noting that in dual role situations, an auditor may take on "a vested interest in the performance and profitability" of its client, and consequently "weaken[ ] its ability to rely on its reputation in countering as "irrational allegations that it participated in a client's fraud"). Where the presence of non-auditing fees are coupled with allegations of GAAP and GAAS violations, and red flags, the allegations of a strong profit motive to defraud becomes even more significant. *See*, *e.g.*, *In re Williams Sec. Litig.*, 339 F. Supp. 2d 1242, 1265 (N.D. Okla., 2003) (holding that motive to collect consulting fees, coupled with allegations that Ernst & Young violated GAAP and GAAS and disregarded numerous red flags, was enough to plead scienter).

PKF New York also had a motive to take advantage of the rare opportunity to be retained for audits of companies doing business in the rapidly burgeoning economy of China. As there is vast competition to audit U.S. companies in a market dominated by the Big Four accounting firms, doing the bidding of CXTI provided PKF New York a unique opportunity to increase its visibility and marketability to potential clients in China and other developing countries. Accordingly, Plaintiffs have sufficiently alleged PKF New York's motive to commit fraud based on CXTI's status as a unique client opportunity. *See*, *e.g.*, *In re Qwest Commc'ns Int'l, Inc.*, 396 F. Supp. 2d 1178, 1208 (D. Colo. 2004) ("[a] desire to retain the business of a client who paid fees [of nearly $8 million] could motivate an auditor to disregard a client's accounting machinations," and finding scienter adequately pleaded based on allegations of auditor's motive, knowledge of accounting improprieties, and magnitude of improprieties).

PKF New York's argument that it lacked motive and opportunity to commit fraud because it only worked for 25 hours on CXTI's audit fails because, as explained above, the

engagement letter proffered by PKF New York must be mistaken or fake. Moreover, this line of defense presents a question of fact, which must not be entertained on a motion to dismiss. "These arguments raise in part questions of fact as to the circumstances of the agreement that cannot be dealt with on a motion to dismiss." *Lodge 743, Intern. Ass'n of Machinists, AFL-CIO v. United Aircraft Corp.*, 337 F.2d 5, 8 (2d Cir. 1964).

Thus, the Complaint also alleges a concrete benefit of PKF New York, which considered in conjunction with facts giving rise to the inference of PKF New York's conscious misbehavior or recklessness gives rise to a strong inference of scienter which is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 127 S. Ct. at 2505.

## II.   The Section 20(a) Claim Against PKF New York May Be Dismissed

Plaintiffs do not oppose PKF New York's motion to dismiss as to Plaintiffs' § 20(a) claim.

## III.   Plaintiffs Should Be Granted Leave To Amend

Plaintiffs should be granted leave to amend if the Court grants PKF New York's motion to dismiss in any respect. This Court has stated:

> It is often appropriate for a district court, when granting a motion to dismiss for failure to state a claim, to give the plaintiffs leave to file an amended complaint. . . . [A] court granting a 12(b)(6) motion should consider a dismissal without prejudice when a liberal reading of the complaint gives any indication that a valid claim might be stated. . . . In particular, regarding claims of fraud, "[p]laintiffs whose complaints are dismissed pursuant to Rule 9(b) are typically given an opportunity to amend their complaint."

*In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 596 (S.D.N.Y. 2007).

## CONCLUSION

For the foregoing reasons, PKF New York's motion to dismiss the Section 10(b) claim should be denied.

24

Respectfully submitted,

Dated: July 2, 2009                    **THE ROSEN LAW FIRM, P.A.**


          /s/ Timothy W. Brown

Laurence M. Rosen, Esq. (LR 5733)
Timothy W. Brown, Esq. (TB 1008)
Phillip Kim, Esq. (PK 9384)
350 Fifth Avenue, Suite 5508
New York, New York 10118
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com
Email:  tbrown@rosenlegal.com

Lead Counsel for Plaintiffs and the Class

**CERTIFICATE OF SERVICE**


I hereby certify that on this 2nd day of July, 2009, a true and correct copy of the foregoing PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO PKF CERTIFIED PUBLIC ACCOUNTANTS, A PROFESSIONAL CORPORATION'S MOTION TO DISMISS was served by CM/ECF to the parties registered to the Court's CM/ECF system.

Notice was provided via mail to:


China Expert Technology, Inc.,
C/O Registered Agent
Incorp Services, Inc.
3155 East Patrick Lane, Suite 1
Las Vegas, NV 89120-3481


BDO McCabe Lo Limited
25th Floor Wing On Centre
111 Connaught Road Central
Hong Kong
China


PKF Certified Public Accountants
26/F, Citicorp Centre
18 Whitfield Road
Causeway Bay
Hong Kong
China


/s/ Timothy W. Brown