UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CARLOS MUNOZ, et al.,

                Plaintiffs,

                vs.

CHINA EXPERT TECHNOLOGY, INC.; PKF
NEW YORK, CERTIFIED PUBLIC
ACCOUNTANTS, A PROFESSIONAL CORP.;
PKF HONG KONG, CERTIFIED PUBLIC
ACCOUNTANTS; AND BDO MCCABE LO
LTD., CERTIFIED PUBLIC ACCOUNTANTS,

                Defendants.

07-CV-10531 (AKH)

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT BDO LIMITED'S
MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ..............................................................................1

II.   STATEMENT OF FACTS .................................................................................4

    A.     CXTI's Background And Events Of 2007.............................................4
    B.     CXTI's Outside Auditors.......................................................................6
    C.     Procedural History. ...............................................................................7

III.  THE COMPLAINT FAILS TO PROPERLY STATE A SECTION 10(B) CLAIM AGAINST BDO...................................................................................8

    A.     Standard Of Review................................................................................8
    B.     Plaintiffs Fail To Plead With Particularity A False Statement By BDO. ...............9

        1.     Plaintiffs Fail To Allege With Particularity That BDO's Audit Opinions For 2005 And 2006 Were "False Statements." ..........................10

        2.     Statements By Random Chinese Government Employees Do Not Satisfy The Heightened Pleading Standards Of The PSLRA. ...................11

        3.     Plaintiffs Fail To Allege Facts Suggesting That BDO's Audit Opinions Violated GAAS. ....................................................................13

    C.     Plaintiffs Fail To Plead BDO's Scienter.............................................15

        1.     The Scienter Pleading Requirement............................................15

        2.     Plaintiffs Fail To Plead Particularized Facts Creating A Strong Inference Of Scienter Against BDO. .........................................16

            a.     Allegations Of GAAS Violations Do Not Establish A Strong Inference Of Fraudulent Intent...........................................17

            b.     The Alleged "Red Flags" Fail To Support A Strong Inference Of Scienter. ......................................................18

            c.     Plaintiffs' Hindsight Allegations Cannot Establish A Strong Inference Of Scienter. ......................................................19

    D.     Plaintiffs' Do Not Adequately Plead Loss Causation...........................20

        1.     The Loss Causation Pleading Requirement. ................................20

        2.     Plaintiffs Cannot Point To Any "Corrective Disclosures" Or Stock Drop Losses Linked To BDO's Audit Opinions.......................................21

            a.     The July And August 2007 Resignation And Delayed Filing. ................................................................21

            b.     The September 2007 "Blogs" And Articles.................................22
            c.     The October 1, 2007 SEC Order Halting Trading. ........................23

IV.  CONCLUSION...................................................................................................24

## TABLE OF AUTHORITIES

<u>**Page**</u>

## CASES

*Chill v. General Electric Co.*,
    101 F.3d 263 (2d Cir. 1996) ............................................................................... 17, 18, 19

*Decker v. Massey-Ferguson, Ltd.*,
    681 F.2d 111 (2d Cir. 1982) ............................................................................................. 8, 17

*Deephaven Private Placement Trading, Ltd. v. Grant Thornton & Co.*,
    454 F.3d 1168 (10th Cir. 2006) ...................................................................................... 7

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ...................................................................................... 3, 8, 20, 23

*ECA and Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) ............................................................................................. 16

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000) ............................................................................................. 14

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
    381 F. Supp. 2d 192 (S.D.N.Y. 2004) ....................................................................... 18

*In re Complete Mgmt. Inc. Sec. Litig.*,
    153 F. Supp. 2d 314 (S.D.N.Y. 2001) ....................................................................... 17

*In re Doral Fin. Corp. Sec. Litig.*,
    563 F. Supp. 2d 461 (S.D.N.Y. 2008) ................................................................... 8, 9, 17

*In re Gilat Satellite Networks, Ltd.*,
    No. CV-02-1510, 2005 U.S. Dist. LEXIS 41996 (E.D.N.Y. Sept. 19, 2005) .......................... 11

*In re Ikon Office Solutions, Inc.*,
    277 F.3d 658 (3d Cir. 2002) ......................................................................................... 7

*In re IMAX Sec. Litig.*,
    587 F. Supp. 2d 471 (S.D.N.Y. 2008) ...................................................................... 2, 9, 16, 18

*In re Livent, Inc. Sec. Litig.*,
    78 F. Supp. 2d 194 (S.D.N.Y. 1999) ......................................................................... 18

*In re Marsh & McLennan Cos. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006) ....................................................................... 16

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    568 F. Supp. 2d 349 (S.D.N.Y. 2008) ........................................................................ 23

*In re Omnicom Group Inc. Securities Litigation*,
    541 F. Supp. 2d 546 (S.D.N.Y. 2008) ................................................................... 21, 22

*In re Pall Corp.*,
    No. 07-CV-3359, 2009 U.S. Dist. LEXIS 88240 (E.D.N.Y. Sept. 21, 2009) .................... 11, 13

*In re Sierra Wireless, Inc. Sec. Litig.*,
    482 F. Supp. 2d 365 (S.D.N.Y. 2007) ......................................................................... 8

*In re Take-Two Interactive Sec. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008) ................................................................... 10, 24

*JPMorgan Chase Bank, N.A. v. IDW Group, LLC*,
    No. 08 Civ. 9116, 2009 U.S. Dist. LEXIS 9207 (S.D.N.Y. Feb. 9, 2009) ........................... 4

*Lattanzio v. Deloitte & Touche LLP*,
    476 F.3d 147 (2d Cir. 2007) ........................................................................ 9, 20, 23

*Lentell v. Merrill Lynch*,
    396 F.3d 161 (2d Cir. 2005) ...................................................................... 20, 21, 23

*Loftin v. Bande* (*In re Flag Telecom Holdings, Ltd. Sec. Litig.*),
    574 F.3d 29 (2d Cir. 2009) ........................................................................... 4, 21

*Malin v. XL Capital Ltd.*,
    499 F. Supp. 2d 117 (D. Conn. 2007) ................................................................. 11, 13

*Nappier v. PricewaterhouseCoopers, LLP*,
    227 F. Supp. 2d 263 (D.N.J. 2002) ........................................................................ 18

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) .......................................................................... passim

*Robbins v. Koger Properties, Inc.*,
    116 F.3d 1441 (11th Cir. 1997) ............................................................................ 21

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000) ................................................................................. 16

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*,
    75 F.3d 801 (2d Cir. 1996) ................................................................................. 9

*Shalala v. Guernsey Mem'l. Hosp.*,
    514 U.S. 87 (1995) ......................................................................................... 14

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*,
  128 S. Ct. 761 (2008) ........................................................................................ 10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ............................................................................... 8, 10, 16

*Thor Power Tool Co. v. Commissioner of Internal Revenue*,
  439 U.S. 522 (1979) ........................................................................................ 14

*Van de Velde v. Coopers & Lybrand*,
  899 F. Supp. 731 (D. Mass. 1995) ................................................................. 18

*Wright v. Ernst & Young LLP*,
  152 F.3d 169 (2d Cir. 1998) ............................................................................. 9

## STATUTES

15 U.S.C. § 78u-4(b)(1) .......................................................................................... 10

15 U.S.C. § 78u-4(b)(2) .......................................................................................... 16

## RULES

Fed. R. Civ. P. 12(b)(6)............................................................................................ 1

Fed. R. Civ. P. 4 ...................................................................................................... 7

Fed. R. Civ. P. 9(b) ......................................................................................... passim

## OTHER AUTHORITIES

SEC Staff Accounting Bulletin No. 101 – Revenue Recognition in Financial Statements,
  64 Fed. Reg. 68936 (1999) ............................................................................... 15

## DECLARATION AND EXHIBITS FILED IN SUPPORT OF MOTION

Declaration of Elizabeth H. Hickey

Exhibit A:    Second Amended Complaint (dated October 29, 2009).

Exhibit B:    CXTI's Form 10-K (filed April 12, 2007 for the period ending December 31, 2006).

Exhibit C:    CXTI's Form 10-KSB (filed March 31, 2006 for the period ending December 31, 2006).

Exhibit D:    Exhibit 10.18 to CXTI's Form SB-2 (filed December 29, 2005).

Exhibit E:    Exhibit 10.19 to CXTI's Form SB-2 (filed December 29, 2005).

Exhibit F:      Public Company Accounting Oversight Board AU Section 316.

Exhibit G:      Financial Accounting Standard Board Section 605-35-25-57.

Exhibit H:      CXTI stock price for August 14, 2007, September 6, 2007, September 18, 2007, and September 27, 2007.

Exhibit I:      Blog entry dated September 6, 2007 by Cabeza Howe titled "Critical Moment for China Expert Technology."

Exhibit J:      Blog entry dated September 18, 2007 by J. Brenner titled "Exclusive and Candid interview with Simon Fu, former CFO of China Expert Technology."

Defendant BDO Limited (f/k/a BDO McCabe Lo Ltd.) ("BDO") respectfully submits this Memorandum of Law in Support of its Motion to Dismiss Plaintiffs'[1] Second Amended Complaint ("SAC," cited "¶_" and attached as Ex. A)[2] pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA").[3]

## I.    PRELIMINARY STATEMENT

Plaintiffs' SAC fails to state a claim against BDO for three primary reasons.  The SAC fails to allege: 1) the falsity of BDO's audit opinions with sufficient particularity to satisfy Rule 9(b) of the Federal Rules of Civil Procedure; 2) a strong inference of scienter as to BDO, essentially equivalent to showing that BDO performed no audit at all; and 3) loss causation, or a corrective disclosure of the alleged "truth" revealing the falsity of the company's prior financial statements and BDO's opinions on those statements.

First, the SAC fails to allege falsity with the requisite particularity regarding any statement made by BDO.  As an auditor, BDO's only statement at issue is its opinion that China Expert Technology, Inc. ("CXTI")'s financials were fairly presented, in all material respects, consistent with GAAP.  BDO cannot be responsible for the myriad statements recounted in the SAC regarding various quarterly statements made by CXTI and its officers.  In addition, the SAC incorrectly confuses volume and innuendo for particularized fraud allegations.  The SAC simply assumes that CXTI's revenue in 2005 and 2006 was improperly recognized because the

---

[1]    The term "Plaintiffs" shall mean lead plaintiffs Joseph Nunn, Basil Hantash, Anna Hantash and Kenneth Price, and named plaintiff Carlos Munoz, individually and on behalf of all other persons similarly situated in this purported class action.

[2]    Citations to "Ex. _" refer to particular exhibits attached to the Declaration of Elizabeth H. Hickey filed and served concurrently herewith.

[3]    BDO notes that this Court need not reach this motion if the Court grants defendants' separate Joint Motion to Dismiss on grounds of *Forum Non Conveniens*.

company dissolved in the latter half of 2007.  But pointing to the company's 2007 dissolution

does not satisfy Plaintiffs' burden to plead particularized facts establishing that CXTI's prior

period financial statements or BDO's opinions on those statements were false, particularly where

there has been no restatement of those earlier financial statements.  Such speculation and

hindsight repeatedly have been rejected by this Court as insufficient.  The SAC relies on a

number of unidentified witnesses whose purported testimony must be discounted under the

Second Circuit's ruling in *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000), given that none of

them is described with sufficient detail for the Court to infer their personal knowledge.  In fact,

the random assortment of unnamed Chinese government employees relied upon in the SAC

appears to constitute nothing more than a recitation of the people who answered telephone calls

from plaintiffs' investigator.  The unremarkable fact that Plaintiffs' investigator can call a

handful of local Chinese government employees, whose sole contribution is that they were

unfamiliar with CXTI or its subsidiary, does not satisfy the particularity requirements under Rule

9(b) and the PSLRA, which mandate that the complaint describe in detail facts demonstrating the

falsity of the company's prior period financial statements and BDO's opinions on those

statements.

    Second, the SAC does not satisfy the high standard for pleading scienter against an

outside auditor.  In the Second Circuit, a complaint must allege facts giving rise to a strong

inference of scienter, establishing that "the accounting practices were so deficient that the audit

amounted to no audit at all, or an egregious refusal to see the obvious, or investigate the

doubtful, or that the accounting judgments which were made were such that no reasonable

accountant would have made the same decisions if confronted with the same facts."  *In re IMAX

Sec. Litig.*, 587 F. Supp. 2d 471, 483 (S.D.N.Y. 2008) (citing cases).  The SAC offers no details

about BDO or its audit – despite the remarkable opportunity that Plaintiffs had to conduct some discovery of the U.S. accounting firms before the SAC was filed.  Indeed, the vast majority of the SAC actually contradicts an inference of scienter as to BDO, alleging that CXTI perpetrated an elaborate fraud through "forged," "faked" and "falsified" documents that were designed to conceal its collusive fraud and circumvent a properly performed audit.  (¶¶ 17, 131(e), 133(c), 173(f), 202(i), 221(f), 260, 335-341.)  If Plaintiffs' allegations are true, then BDO and CXTI's prior auditor were deceived along with its shareholders.  The controlling standards make clear that such a collusive fraud can (and frequently does) go undetected by a properly performed audit.  Thus, the SAC fails even to allege BDO's GAAS failure, let alone its participation in a fraud.

Third, Plaintiffs have not adequately alleged loss causation.  They have not alleged a single corrective disclosure revealing the falsity of CXTI's prior period financial statements, let alone BDO's opinions on those statements.  Plaintiffs assert that loss causation is established by the disclosures that: (1) CXTI's CFO resigned for personal reasons in July 2007, and accordingly, CXTI's Form 10-Q would not be timely filed in August 2007; (2) in September 2007, there were "blogs" and articles speculating about CXTI; and (3) on October 1, 2007, the SEC halted trading in CXTI's stock, based on its then "current financial condition" and "business prospects."  But the publication of this information does not reveal that CXTI's financial statements for fiscal years 2005 and 2006 were misstated.  Rather, Plaintiffs simply speculate that CXTI's dissolution in the latter half of 2007 is tantamount to a market disclosure that its prior period financial statements were a fraud.  This attempt to plead loss causation by innuendo has been soundly rejected by the courts, and cannot satisfy the linkage requirement mandated by the Supreme Court in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347-48

(2005). *See also Loftin v. Bande* (*In re Flag Telecom Holdings, Ltd. Sec. Litig.*), 574 F.3d 29, 40-41 (2d Cir. 2009).

These failures, individually and collectively, compel the dismissal of Plaintiffs' Section 10(b) claim against BDO.

## II.    STATEMENT OF FACTS[4]

### A.    CXTI's Background And Events Of 2007.

CXTI is a Nevada corporation that was first incorporated in 1990 as QQQ-Huntor Associates, Inc. (CXTI Form 10-K at 1 (filed April 12, 2007 for period ending December 31, 2006) ("2006 10-K"), Ex. B.) In August 1999, the company "voluntarily filed a registration statement on Form 10-SB, in order to make information concerning itself more readily available to the public by becoming subject to the reporting requirements under the Securities Exchange Act of 1934." (*Id*., Ex. B.)

On February 9, 2004, the company completed a share exchange with the stockholders of China Expert Network Company Limited ("CEN"). (*See id*., Ex. B.) On April 12, 2004, following the completion of the share exchange transaction, the company changed its name to CXTI and CEN became a wholly owned subsidiary of CXTI. (*See id*. at 1-2, Ex. B.) CXTI conducted its principal business operations through CEN's wholly owned subsidiary, Expert Network (Shenzhen) Co. Ltd. ("Expert Network"), which was established in 1999. (*See id*. at 2,4, Ex. B.) During the time period contemplated by the SAC, CXTI's principle executive office was in Hong Kong and Expert Network was headquartered in the People's Republic of China.

---

[4]      For purposes of this Motion to Dismiss, BDO assumes the truth of the allegations in Plaintiffs' SAC. *See JPMorgan Chase Bank, N.A. v. IDW Group*, *LLC*, No. 08 Civ. 9116, 2009 U.S. Dist. LEXIS 9207, at *31 (S.D.N.Y. Feb. 9, 2009) ("Only discovery will reveal whether [plaintiff] can prove these allegations, but they must be accepted as true at this stage of the litigation.").

(¶ 331-333.)  CXTI's common stock was traded on the NASDAQ OTC Bulletin Board under the ticker "CXTI."  (¶ 17.)

Expert Network obtained contracts to provide "large-scale e-government infrastructure construction and consulting services for community and municipal governments in the People's Republic of China." (2006 10-K at 2, Ex. B.)  Revenue for these contracts, net of sales taxes, is recognized under the percentage-of-completion method in accordance with the American Institute of Certified Public Accountants Statement of Position 81-1, "Accounting for Performance of Construction-Type and Certain Production-Type Contracts."  (*Id.* at 34, Ex. B.)  Under this method, "management estimates the percentage-of-completion based upon costs incurred as a percentage of the total estimated costs to the customer."  (*Id.*, Ex. B.)  When total cost estimates exceeded revenues, CXTI accrued for the estimated losses immediately.  CXTI's Form 10-K disclosed that "[t]he use of the percentage-of-completion method requires significant judgment relative to estimating total contract revenues and costs, including assumptions relative to the length of time to complete the project, the nature and complexity of the work to be performed, and anticipated changes in estimated costs."  (*Id.*, Ex. B.)

CXTI's 2006 Form 10-K also disclosed, among other things, that (1) CXTI's major customers were the city governments of different cities within the Fujian province in China, and that if the company could not obtain new e-government contracts, then CXTI's revenue would decline and CXTI would be forced to curtail or cease its business operations; (2) CXTI's operations and management were located outside the United States and it "might be difficult to serve us with legal process or enforce judgments against our management or us"; and (3) during the initial stage of a new e-government project, CXTI "will make prepayment to supplier[s] for the procurement of hardware and down payments to sub-contractors for the development of

systems before receiving payment which may create cash flow problems … [for] the company."
(*Id.* at 15, Ex. B.)

According to the SAC, CXTI's alleged fraud first began to surface after the market
closed on July 19, 2007, when CXTI announced that its Chief Financial Officer, Fu Wan Chung,
had suddenly resigned.  (¶ 342.)  On August 14, 2007, the company announced that it had
submitted to the SEC an automatic five-day filing extension request for its report for its second
quarter report ending June 30, 2007, stating that "the delay was caused by the resignation of
CXTI CFO Fu."  (¶ 343.)  After these announcements, articles were published by financial
commentators "calling into question CXTI's financials, its e-Government Contracts, and its
credibility," which Plaintiffs allege caused CXTI's stock to further decline.  (¶ 345.)  On
September 27, 2007, CXTI filed a Form 8-K announcing that it had dismissed BDO on August
17, 2007.  (¶ 346.)  On October 1, 2007, the SEC issued an order halting trading of CXTI's stock
from October 1, 2007 through October 12, 2007, which stated that the suspension was due
"among other things" to CXTI's "(1) financial performance and business prospects and
(2) current financial condition."  (¶ 348.)

### B.      CXTI's Outside Auditors.

PKF Hong Kong ("PKF HK") and BDO have been named as defendants solely in their
capacity as the outside auditors of CXTI's financial statements.  (¶¶ 23, 18.)  PKF HK audited
CXTI's annual financial statements for the years ending December 31, 2003 and 2004, and
issued unqualified opinions in both years, which were included in CXTI's annual reports filed
with the Securities and Exchange Commission ("SEC").  (¶ 18.)  BDO audited CXTI's annual
financial statements for the years ending December 31, 2005 and 2006, and issued unqualified
opinions in both years, which were included in CXTI's annual reports filed with the SEC for
2005 and 2006.  (¶¶ 23, 83, 97.)  The issuance of an unqualified audit opinion by an auditor

"does not guarantee that a client's accounts and financial statements are correct," but "certifies only that [the auditor] exercised appropriate, not flawless, levels of professional care and judgment" in conducting the audit in accordance with GAAS.  *In re Ikon Office Solutions, Inc.*, 277 F.3d 658, 673 (3d Cir. 2002); *see also Deephaven Private Placement Trading, Ltd. v. Grant Thornton & Co.*, 454 F.3d 1168, 1176 (10th Cir. 2006) (same).  CXTI was not required to have, nor was BDO engaged to perform, an audit of CXTI's internal control over financial reporting, and BDO's audit report contained no such opinion.  (*See* 2006 10-K at F-1, Ex. B; CXTI Form 10-KSB at F-1 (filed March 31, 2006 for period ending December 31, 2005) ("2005 10-KSB"), Ex. C.)

###    C.    Procedural History.

Plaintiffs commenced this action over two years ago, on November 21, 2007.  At that time, none of the Defendants currently pursued in this case were named.  Plaintiffs' original complaint asserted claims against CXTI and its executives.  Plaintiffs thereafter reinvented their claims and asserted that the accounting firms were responsible for CXTI's alleged fraud.  Plaintiffs obtained a default judgment against CXTI on January 22, 2008 and voluntarily dismissed all of the CXTI executives on March 17, 2008.  Plaintiffs filed their Amended Complaint on March 27, 2009 – nearly one year later.  Plaintiffs did not serve a copy of the summons and complaint on BDO for 181 days, until August 27, 2009.[5]  Between April 2009 and July 2009, the U.S.-based accounting firms briefed their motions to dismiss, which were originally set for hearing on August 31, 2009, and later moved at Plaintiffs' request to September 29, 2009.  At the September 29, 2009 hearing, the Court granted both US-based accounting

---

[5]    The August 27, 2009 service on BDO was not made according to the terms of Rule 4 of the Federal Rules of Civil Procedure and is therefore deficient.

firms' motions, dismissing BDO Seidman with prejudice and dismissing PKF New York ("PKF NY") without prejudice.  Plaintiffs filed the SAC on October 29, 2009.

## III.    THE COMPLAINT FAILS TO PROPERLY STATE A SECTION 10(B) CLAIM AGAINST BDO

### A.    Standard Of Review.

To state a securities fraud claim under Section 10(b), Plaintiffs must allege that a defendant made a misrepresentation or omission of material fact, with scienter, which caused the Plaintiffs' loss.  *See Dura Pharms. Inc.*, 544 U.S. at 341-42.  Such claims are subject to rigorous pleading requirements under the PSLRA and Rule 9(b).  *See In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 372 (S.D.N.Y. 2007) ("Complaints alleging securities fraud must also comply with the heightened pleading requirements of Fed. R. Civ. P. 9(b) and the … PSLRA.") (internal citations omitted); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) ("Exacting pleading requirements are among the control measures Congress included in the PSLRA.").  Accordingly, to survive a motion to dismiss, a securities fraud complaint must plead with "particularity sufficient facts" to support its claims.  *Novak*, 216 F.3d at 313-14; *see also* Fed. R. Civ. P. 9(b).

Where, as here, the defendant is an independent accountant "the [auditor's] failure … to identify problems with the defendant-company's internal controls and accounting practices does not constitute reckless conduct sufficient for § 10(b) liability."  *Novak*, 216 F.3d at 309; *see also Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 120 (2d Cir. 1982).  Similarly, "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim."  *Novak*, 216 F.3d at 309; *see also In re Doral Fin. Corp. Sec. Litig.*, 563 F. Supp. 2d 461, 464-465 (S.D.N.Y. 2008), *aff'd sub. nom., West Virginia Inv. Mgmt. Bd. v. Doral Fin. Corp.*, No. 08-3867-cv, 2009 WL 2779119 (2d Cir. Sept. 3, 2009) (summary order).  "Only

where such allegations are coupled with evidence of 'corresponding fraudulent intent,' might they be sufficient." *Novak*, 216 F.3d at 309; *see also In re Doral Fin Corp. Sec. Litig.*, 563 F. Supp. 2d at 465. In other words, Plaintiffs must allege particularized facts establishing that "the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." *In re IMAX Sec. Litig.*, 587 F. Supp. 2d at 483 (citing cases).

### B.    Plaintiffs Fail To Plead With Particularity A False Statement By BDO.

Because there has been no restatement of CXTI's financial statements, Plaintiffs try to manufacture a "false statement" against BDO by alleging that CXTI's financial statements for years earlier were fraudulently misstated – based solely on the fact that the company later dissolved. Plaintiffs' allegations, however, fail to "provide sufficient facts to give rise to an inference of their falsity." *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 814 (2d Cir. 1996) (dismissing Section 10(b) claim under Fed. R. Civ. P. 9(b) for lack of false statement).

The SAC is replete with recitations of statements made by CXTI. As to BDO, however, the only relevant statements are BDO's audit opinions for 2005 and 2006. *See Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 154-155 (2d Cir. 2007) (holding that auditor could not be liable under Section 10(b) for its role in the drafting of its audit client's quarterly financial filings with the SEC because these financial reports "did not purport to be audited by Deloitte, did not contain an audit opinion by Deloitte, and were not attributed to Deloitte when they were disseminated."); *see also Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998) (dismissing a Section 10(b) claim against an auditor based on an allegedly false press release that was not made by, or attributed to, the auditor). Accordingly, Plaintiffs' allegations regarding

statements made by others in CXTI's year-end public filings must be disregarded as to BDO. (*See, e.g.*, ¶¶ 103, 105, 106.)[6] Similarly, the SAC's discussion of quarterly events, quarterly financial results, and various press releases issued by the company are irrelevant as to BDO.[7]

### 1. Plaintiffs Fail To Allege With Particularity That BDO's Audit Opinions For 2005 And 2006 Were "False Statements."

To plead falsity, a plaintiff must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." *Tellabs*, 551 U.S. at 321 (citing 15 U.S.C. § 78u-4(b)(1)) (internal citations omitted). In order to satisfy Federal Rule of Civil Procedure 9(b), "a securities fraud complaint premised upon material misstatements 'must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 259 (S.D.N.Y. 2008) (citing cases).

Here, there is a complete lack of particularity as to falsity. Plaintiffs simply assume that because of CXTI's dissolution in late 2007, all of its contracts and financial statements were false – and that BDO's audit opinions on those statements were false. Such conclusory pleading

---

[6]     Plaintiffs allege that BDO (along with CXTI, PKF HK, and PKF NY) "employed devices, schemes and artifices to defraud … in an effort to assure investors of CXTI's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about CXTI" not misleading. (¶ 358.) The Supreme Court's decision in *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761 (2008), precludes an action seeking to hold BDO liable for the misstatement of another on the theory that BDO helped to enable the misstatement by participating in a "scheme" to defraud. *Id.* at 770-771.

[7]     Since Plaintiffs voluntarily dismissed all of CXTI's officers and have a default judgment as to CXTI, these allegations relating to quarterly events and the company's press releases should be stricken from the SAC because they are not actionable against any of the Defendants remaining in the case.

does not satisfy Plaintiffs' burden under the PSLRA, to allege particularized facts establishing the falsity of BDO's prior statements.

> **2.    Statements By Random Chinese Government Employees Do Not Satisfy The Heightened Pleading Standards Of The PSLRA.**

In light of the PSLRA's heightened pleading standards, *Novak* requires "an examination of the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *In re Gilat Satellite Networks, Ltd.*, No. CV-02-1510, 2005 U.S. Dist. LEXIS 41996, at *26 (E.D.N.Y. Sept. 19, 2005) (citing *Novak*, 216 F.3d at 314).[8]  Bald, conclusory assertions from confidential informants or other witnesses are plainly insufficient. *See In re Pall Corp.*, No. 07-CV-3359, 2009 U.S. Dist. LEXIS 88240, at *17-18 (E.D.N.Y. Sept. 21, 2009); *and see Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 140 (D. Conn. 2007), *aff'd*, 312 Fed. Appx. 400 (2d Cir. 2009) (citation omitted) (Plaintiffs' "generic and conclusory allegations based upon rumor or conjecture are undisputedly insufficient to satisfy the heightened pleading standard" of the PSLRA).  Here, the vaguely described allegations of falsity fall far short of the heightened pleading standard established by the PSLRA.

Plaintiffs attempt to create the illusion of particularity by noting their private investigator's phone conversations with random unidentified members of various Chinese local governments.  These recitations establish nothing more than the unremarkable fact that randomly called employees may not have heard of a particular contract, which may have been executed years earlier or by others with direct responsibility for such contracts.  Without sufficient

---

[8]    While *Novak* and its progeny address the pleading requirements with respect to confidential witnesses specifically, there is no reason, given the particularity requirements mandated by the PSLRA, why such pleading requirements should not apply to witness statements generally.

allegations demonstrating why the cited employees would know about these transactions, there is obviously no inference of falsity created by their lack of knowledge concerning them.

The allegations regarding the Nan'an contracts are illustrative.  (¶¶ 109-133.)  In an attempt to plead that CXTI's financial statements were false because the Nan'an contracts were "forgeries," Plaintiffs allege that their private investigator spoke to (1) "an employee of the Nan'an Municipality Office" who stated that his Office was not in charge of e-government contracts (¶¶ 116, 118); (2) "an employee of the Network Office of Nan'an Municipality" who stated that his Office dealt solely with website construction and was not in charge of multi-faceted e-government contracts like the ones alleged with Expert Network (¶¶ 119, 124); and (3) "an employee, named Mr. Ye, of the Administrative Service Center of Nan'an Municipality" who was never even identified as someone who reviewed, entered into, or approved Nan'an e-government contracts or otherwise held a position that would give him knowledge of the contracts' existence.  (¶ 125.)  Plaintiffs' other alleged sources concerning the remaining contracts are all "employees" who told Plaintiffs' private investigator that they were not involved with e-government contracts (¶¶ 149, 151, 189-190, 209, 211), or "employees" who were never alleged by Plaintiffs to be individuals who reviewed, entered into, or approved e-government

contracts. (¶¶ 152-154, 192, 212.)[9]  Given the complete lack of detail regarding the sources' bases of knowledge concerning the contracts, these allegations are clearly insufficient to satisfy Plaintiffs' pleading burden. *Novak*, 216 F.3d at 314; *In re Pall Corp.*, 2009 U.S. Dist. LEXIS 88240, at *17-18; *Malin*, 499 F. Supp. 2d at 140.

### 3.  Plaintiffs Fail To Allege Facts Suggesting That BDO's Audit Opinions Violated GAAS.

Throughout the SAC, Plaintiffs continually assert that CXTI, Expert Network, and its management team were involved in a massive fraud pursuant to which they "forged," "faked" and "falsified" the e-government contracts between Expert Network and the local Chinese governments. (¶¶ 17, 131(e), 133(c), 173(f), 202(i), 221(f), 260, 335-341.)  Plaintiffs claim that BDO violated provisions of the Public Company Accounting Oversight Board ("PCAOB") because it failed to detect the fraud, but Plaintiffs' own allegations contradict this conclusion.

According to PCAOB AU Section 316.09, an issuer's employees engaged in fraud may "take steps to conceal the fraud from the auditors and others within and outside the organization" and this concealment may take the form of "falsifying documentation."  (PCAOB AU § 316.09,

---

[9]      Plaintiffs allege that an employee of the People's Government of Dehua County named Mr. Wang was "responsible, on behalf of Network Office of the People's Government of Dehua County, for managing e-government construction projects for Dehua County." (¶ 191.) However, Mr. Wang apparently agreed that there was a contract with Expert Network to perform work in connection with the implementation of an e-government computer system and paid Expert Network some money with respect to that contract, thereby undermining the other allegations in the SAC that Express Network's services were entirely fictional. (¶ 194.)  Mr. Wang is alleged to have said he has no knowledge of the entity that signed later phase contracts for Dehua County, the "Dehua County Electronic Administration and Contraction Management Company Limited." (¶ 198.)  But again, Plaintiffs' allegations are internally inconsistent.  The Phase 1 contract, alleged in the SAC to have been properly authorized, as well as the Phase 2 contract, were signed by the "Dehua County Electronic Administration Management Company, Limited" and contemplate that the Dehua County government will designate a representative or supervisor to act on the government's behalf in connection with this project.  (*See* CXTI Form SB-2 at Ex. 10.18, p. 2 (Clause 1, ¶1.4), p. 5 (Clause 6, ¶A.2), p. 6 (Clause 6, ¶A.10-11) (filed December 29, 2005), Ex. D; *see also* Ex. 10.19, p. 2 (Clause 4, ¶A.2, A.6), Ex. E.)

Ex. F.)  Audits conducted in accordance with GAAS "rarely" involve the authentication of

documentation, and auditors are not "trained as or expected to be experts in such authentication."

(*Id.*, Ex. F.)  While an auditor must plan and perform the audit in a manner designed to obtain

reasonable assurance about whether the financial statements are free of material misstatement,

"absolute assurance is not attainable and thus even a properly planned and performed audit may

not detect a material misstatement resulting from fraud."  (PCAOB AU § 316.12, Ex. F.)

Furthermore, where fraud is concealed through management collusion, such collusion "may

cause the auditor who has properly performed the audit to conclude that evidence provided is

persuasive when it is, in fact false."  (PCAOB AU § 316.10, Ex. F.)

 Plaintiffs cite to various GAAP and GAAS standards in an attempt to establish the falsity

of BDO's opinions.  As the Supreme Court has noted, however, "GAAP is not the lucid or

encyclopedic set of preexisting rules that [it might be perceived] to be.  … GAAP changes and,

even at any one point, is often indeterminate."  *Shalala v. Guernsey Mem'l. Hosp.*, 514 U.S. 87,

100 (1995).  GAAP principles "tolerate a range of reasonable treatments, leaving the choice

among alternatives to management."  *Thor Power Tool Co. v. Commissioner of Internal

Revenue*, 439 U.S. 522, 544 (1979) (internal citations omitted); *see also Ganino v. Citizens Utils.

Co.*, 228 F.3d 154, 160 (2d Cir. 2000) (same).

 Furthermore, contrary to Plaintiffs' assertion that CXTI's revenue was improperly

recognized, the accounting principles relied on by Plaintiffs actually support the recognition of

this revenue.  (¶ 257.)  In general, a company may recognize revenue when: "[(1)] Persuasive

evidence of an arrangement exists, [(2)] Delivery has occurred or services have been rendered,

[(3)] The seller's price to the buyer is fixed or determinable, and [(4)] collectibility is reasonably

assured."  SEC Staff Accounting Bulletin No. 101 – Revenue Recognition in Financial

Statements, 64 Fed. Reg. 68936, 68937 (1999); *see also* FASB § 605-35-25-57, Ex. G.) Even from the SAC's own allegations, there appears to be evidence with respect to each of these factors.

Each of Expert Network's written executed contracts were attached to CXTI's financial filings. (*See, e.g.*, ¶ 206.) Plaintiffs never allege that certain contracts were missing, only that the existing contracts were "forged." (*See, e.g.*, ¶ 221(f).) Nor do Plaintiffs dispute that the contracts attached to CXTI's financial filings contained a determinable price. (*See, e.g.*, ¶ 221(f).) Furthermore, there is evidence that Expert Network provided services according to its e-government contracts and that collectibility was reasonably assured because CXTI's financial statements evidenced that it was receiving cash. In 2006, for example, CXTI had "cash and cash equivalents" of $10,073,823. (*See* 2006 10-K at F-3, Ex. B; *see also* 2005 10-KSB at F-3, Ex. C.) Indeed, even the evidence that Plaintiffs allege contradicted CXTI's financial statements – the Expert Network annual report filed in China by a different accounting firm for fiscal year end 2006 – purportedly reported that Expert Network's operations generated nearly $10 million in cash during 2006. (¶ 242 (alleging an increase in Expert Network's cash during 2006 from approximately $210,000 to $9,963,246).) Plaintiffs never allege that this cash was fraudulently received or reported. Thus, based on Plaintiffs' own allegations, there is evidence supporting CXTI's revenue recognition.

### C. Plaintiffs Fail To Plead BDO's Scienter.

#### 1. The Scienter Pleading Requirement.

The scienter element of a Section 10(b) claim is only satisfied where a plaintiff "state[s] with particularity facts giving rise to a *strong* inference that the defendants acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). In order for an inference of scienter to be "strong," the inference "must be more than merely plausible or reasonable – it

must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. A plaintiff may satisfy this pleading requirement by alleging facts to show "strong circumstantial evidence of conscious misbehavior or recklessness." *ECA and Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).[10] This pleading requirement is formidable – the "recklessness" required to hold an auditor liable for fraud "must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company." *Rothman v. Gregor*, 220 F.3d 81, 98 (2d Cir. 2000); *see also In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 488 (S.D.N.Y. 2006) (holding that the standard for pleading scienter against an auditor is "demanding" and dismissing § 10(b) claims against auditor because of insufficient allegations of scienter). Plaintiffs must allege particularized facts establishing that BDO's audit was so deficient that it amounted to "no audit at all, or an egregious refusal to see the obvious." *In re IMAX Sec. Litig.*, 587 F. Supp. 2d at 483 (citing cases). Plaintiffs have failed to plead facts meeting this stringent standard.

### 2. Plaintiffs Fail To Plead Particularized Facts Creating A Strong Inference Of Scienter Against BDO.

Plaintiffs' allegations, taken as a whole and assumed to be true, show at most that BDO was deceived by CXTI's elaborate fraud. Plaintiffs' allegations of "forged," "faked" and "falsified" documents, which were designed to conceal this fraud and would have circumvented a properly performed audit, directly contradict – and certainly do not give rise to – a strong inference of BDO's scienter.

---

[10] Alternatively, a plaintiff may allege facts to show "that defendants had the motive and opportunity to commit fraud" (*ECA and Local 134 IBEW Joint Pension Trust of Chicago*, 553 F.3d at 198) by pleading that a defendant "benefited in some concrete and personal way from the purported fraud." *Novak*, 216 F.3d at 307-08. Plaintiffs' SAC makes no attempt to allege that BDO had the motive and opportunity to commit fraud or that BDO benefited in some concrete and personal way from CXTI's fraud.

a.    **Allegations Of GAAS Violations Do Not Establish A Strong Inference Of Fraudulent Intent.**

"It is unambiguously the law that allegations of a violation of GAAP and GAAS are, without more, insufficient to survive a motion to dismiss."  *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 334 (S.D.N.Y. 2001); *see also Chill v. General Electric Co.*, 101 F.3d 263, 270 (2d Cir. 1996) ("Allegations of a violation of GAAP provisions …, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim.").  Plaintiffs allege that BDO violated "at a minimum . . . the third General Standard and the third Standard of Field Work" of GAAS by failing to "confirm the existence of even one of Expert Network's significant e-Government Contracts or the accounts receivable derived therefrom," but Plaintiffs' allegations are contradicted by the more cogent and compelling inference that BDO was unaware of CXTI's deception, just like the investing public.  (¶¶ 265, 298, 320.)

Case law and common sense hold that where fraud is concealed from the auditor, the auditor cannot have the requisite state of mind.  *See Decker*, 681 F.2d at 120 ("When records of a company's improper payments are hidden from its auditor, the auditor should not be held responsible because … the auditor lent its 'imprimatur' to the company's financial statement.").  Here, Plaintiffs allege that Expert Network's e-government Contracts were "forged," "falsified" and "faked" and that CXTI  "disappeared into the ether" after the fraud was uncovered.  (¶¶ 17, 131(e), 133(c), 173(f), 202(i), 221(f), 260, 335-341.)  Given that Plaintiffs have failed to allege particularized facts demonstrating that BDO knew about and/or acted in a way suggesting its intent to aid this fraud, the only rational explanation is that CXTI and its management also concealed the fraud from BDO.  *See In re Doral Fin. Corp. Sec. Litig.*, 563 F. Supp. 2d at 466 ("[I]n view of the Complaint's own allegations about the secretive and manipulative manner in which [the company] accomplished its fraud, it is impossible to draw a strong inference of [the

-17-

auditor's] scienter … because the competing inference that [the auditor] was also tricked … is far more compelling").[11]

          **b.**      **The Alleged "Red Flags" Fail To Support A Strong Inference Of Scienter.**

Plaintiffs allege that CXTI's "rapid increases in revenue and accounts receivable – and the increasing ratio of accounts receivable to revenue were bright red flags for fraud and required the Auditors to investigate the legitimacy of these accounts." (¶ 293.) A "red flag" is something that "would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors." *In re IMAX Sec. Litig.*, 587 F. Supp. 2d at 483 (internal quotation marks and citation omitted). To raise a strong inference of scienter, these alleged "red flags" must demonstrate "[a]n egregious refusal to see the obvious, or to investigate the doubtful" (*Chill*, 101 F.3d at 269 (internal quotation marks and citation omitted)) and "must be closer to smoking guns than mere warning signs." *Nappier v. PricewaterhouseCoopers, LLP*, 227 F. Supp. 2d 263, 278 (D.N.J. 2002) (quotation omitted); *see also In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 240 (S.D.N.Y. 2004) (defining "red flags" as "sufficiently attention-grabbing to have alerted a reasonable auditor to the audited company's shenanigans.") (citing *Van de Velde v. Coopers & Lybrand*, 899 F. Supp. 731, 735-36 (D. Mass. 1995)). Plaintiffs' purported "bright red flags" fail to support an inference of scienter.

First, the fact that BDO did not equate CXTI's increases in revenue with misconduct does not support an inference of scienter. "Successfully managed enterprises can earn record (and therefore 'extraordinary') profits at any given point in time and a well managed business that is

---

[11]    Plaintiffs make much hay from the alleged size of the fraud. (¶¶ 106, 107, 293, 299, 300.) But where, as here, "'the magnitude of the fraud was accompanied by the thoroughness of its concealment,' scienter will not be inferred on the part of the auditor." *In re Livent, Inc. Sec. Litig.*, 78 F. Supp. 2d 194, 217 (S.D.N.Y. 1999).

growing should post 'record' profits on a regular basis." *See Chill*, 101 F.3d at 270 (holding that defendant's failure to suspect that $350 million in increased profits were the result of misconduct was not reckless); *see also Novak*, 216 F.3d at 309 ("the failure of a parent company to interpret extraordinarily positive performance by its subsidiary – specifically, the 'unprecedented and dramatically increasing profitability' of a particular form of trading – as a sign of problems and thus to investigate further does not amount to recklessness under the securities laws").  Simply put, CXTI's nearly $8 million increase in revenue in 2005 and $30 million increase in revenue in 2006 fails to raise an inference of BDO's fraudulent intent.

Second, the mere fact that CXTI's accounts receivable increased along with its profits, and that the ratio of accounts receivable to revenue also increased, does not show auditor fraud. As Plaintiffs freely note, GAAS Standards anticipate that a company will have accounts receivable balances and provide guidance on how those balances should be audited.  (¶ 279.) Plaintiffs do not dispute that CXTI claimed to earn revenue on Expert Networks e-government contracts and CXTI's financials make clear that CXTI received a steady infusion of cash from some outside source.  (*See* 2006 10-K at F-3 (showing cash amounts of over $10 million for fiscal year 2006 and over $7 million for fiscal year 2005), Ex. B.)[12]  The existence of these receivables, without more, cannot sustain Plaintiffs' claim.

### c.    Plaintiffs' Hindsight Allegations Cannot Establish A Strong Inference Of Scienter.

Plaintiffs' conclusory claim that BDO "clearly did not obtain sufficient evidence or perform satisfactory substantive tests to confirm the existence of these contracts and the reported revenue CXTI claimed to have earned therefrom" because "13 of the 16 contracts were

---

[12]    Indeed, Plaintiffs allege that even the Expert Network annual report prepared by a different accounting firm and filed in China for fiscal year 2006 show that Expert Network had a beginning cash balance of $210.651 and an ending cash balance of $9,963,246.  (¶ 242.)

completely fraudulent" cannot, as a matter of law, create a strong inference of scienter as to the outside auditor. (¶ 305; *see also* ¶ 261 (same).) A plaintiff cannot maintain a claim for securities fraud where the complaint rests on nothing more than conclusory allegations of "fraud by hindsight." *Novak*, 216 F.3d at 309 ("allegations that defendants should have anticipated future events … do not suffice to make out a claim of securities fraud."). Plaintiffs' *post hac* assertions of scienter based on evidence of fraud discovered after CXTI disbanded fail to sustain Plaintiffs' 10(b) claim against BDO.[13]

**D.    Plaintiffs' Do Not Adequately Plead Loss Causation.**

**1.    The Loss Causation Pleading Requirement.**

To establish loss causation at the pleading stage, a plaintiff must satisfactorily allege "a causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc.*, 544 U.S. at 342 (holding that to "'touch upon' a loss is not to *cause* a loss, and it is the latter that the law requires."). Plaintiff must plead "that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered, i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch*, 396 F.3d 161, 173 (2d Cir. 2005) (emphasis in original) (internal citations omitted); *see also Lattanzio v. Deloitte & Touche LLP*, 476 F.3d at 157 (holding that plaintiffs had not alleged loss causation where they had failed to allege facts showing that the auditor's misstatements "were the proximate cause of plaintiffs' loss … [or facts that] would

---

[13]    The allegations regarding the Expert Network annual report filed in China by a different accounting firm with the Industry and Commerce Administrative Bureau of Shenzhen City for fiscal year end 2006 are irrelevant to Plaintiffs' claims against BDO. That report was issued April 19, 2007, after BDO issued its 2006 audit report on April 12, 2007. (¶¶ 96, 241.) The SAC does not allege that BDO ever received a copy of this annual report. It would have been impossible for BDO to note any of the alleged discrepancies between the Expert Network financials and the CXTI financials during the course of BDO's audit when those purported discrepancies did not come to light until after BDO had completed its audit and issued its opinion.

allow a fact-finder to ascribe some rough proportion of the whole loss to … [the auditor's] misstatements.") (internal citations omitted); *Loftin*, 574 F.3d at 40-41 (2d Cir. 2009).

<b>2.    Plaintiffs Cannot Point To Any "Corrective Disclosures" Or Stock Drop Losses Linked To BDO's Audit Opinions.</b>

Given that the nine paragraphs Plaintiffs have dedicated to loss causation (as well as the SAC as a whole) fail to cite a single corrective disclosure regarding CXTI's financial statements, Plaintiffs' 10(b) claim against BDO fails as a matter of law.  (¶¶ 342-350.)  *See Lentell*, 396 F.3d at 175 (the failure to allege a corrective disclosure is "fatal under Second Circuit precedent"); *see also Robbins v. Koger Properties, Inc.*, 116 F.3d 1441, 1448 (11th Cir. 1997) (granting defendant auditor's motion for judgment as a matter of law holding that plaintiffs had not adequately pled loss causation because they had offered no evidence of a connection between the auditor's misrepresentations and the decline in stock price).  Plaintiffs rely on a) the July and August announcements of an executive departure and a late Form 10-Q filing; b) a handful of unspecified articles in September; and c) the SEC's order terminating trading in CXTI stock on October 1, to establish loss causation.  However, an examination of these events and corresponding stock price movements demonstrates that Plaintiffs have failed to allege an actionable corrective disclosure – and thus, have failed to allege loss causation.

<b>a.    The July And August 2007 Resignation And Delayed Filing.</b>

Plaintiffs allege that CXTI announced that its CFO's resignation on July 19, 2007 (¶ 342) and on August 14, 2007, its request for a five-day filing extension for the second quarter. (¶ 343.)  Neither the resignation nor the delayed filing called into question CXTI's prior period financial statements, let alone revealed that CXTI's financial statements were false or misleading.  *See In re Omnicom Group Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 552 (S.D.N.Y. 2008) ("[W]here a disclosure does not reveal the falsity of the alleged misstatements, it does not

-21-

qualify as 'corrective.'").  These announcements may well have been viewed negatively by investors and caused the CXTI stock price to decline,[14] but they do not establish loss causation with respect to BDO because there is no disclosure that BDO's audit reports on CXTI's prior period financial statements were false.

### b.    The September 2007 "Blogs" And Articles.

Plaintiffs' reliance on unspecified articles that were published in September 2007 is similarly unavailing.  (¶ 345.)  Assuming that Plaintiffs are relying on the same handful of articles discussed in other portions of the SAC, Plaintiffs' own allegations and the content of those articles illustrate that they did not make any corrective disclosure as to statements made by BDO; instead, they simply raised questions in response to CXTI's July and August announcements concerning the CFO's resignation and the delay in Form 10-Q filing.  This admitted speculation about facts already known to the market cannot be tied to Plaintiffs' losses. *See Omnicom*, 541 F. Supp. 2d at 552 (holding that the opinion of one professor that a company's accounting treatment raised a red flag and the skepticism expressed by a second professor regarding the value of certain investments were insufficient to qualify as corrective disclosures because these were not disclosures of new facts and were observations based on facts already in the market).  Moreover, the blogs and articles themselves confirm there was no disclosure that CXTI's prior period financial statements were false.  Indeed, they reflect speculation about the company's status based on its recent lack of communication following the July and August developments.  (*See* Cabeza Howe blog entry dated Sept. 6, 2007 (the author states: "That said, I was just raising my concern. It is not an accusation or conclusion.  Just some phone calls.  My point was for the company to be doing a better job at shareholder

---

[14]    CXTI stock price actually ***rose*** over 30% on August 14, 2007, further undermining Plaintiff's reliance on this announcement to demonstrate loss causation.  (Ex. H.)

communication. That's all. Thanks for the discussion."), Ex. I; *see also* Jeff Brenner blog entry

dated Sept. 18, 2007 ("My recent interview with former China Expert Technology CFO Simon

Fu may help to shed some light on the origins of the recent collapse of the company's stock price

. . . and help us to begin to comprehend the string of resignations and/or departures ranging from

the COO, to the auditor, to the company's PR company, all in a matter of weeks. . . . Perhaps in

the end, we have still more questions than answers, but Simon Fu has certainly helped shine

some light into that vast black vacuum of information left by China Expert Technology."), Ex.

J.)

       In addition, none of the September 6, September 18 and September 27 blogs or articles

had a negative impact on the stock. To the contrary, the stock did not lose one penny of value on

September 6, and actually went up 33% on September 18 and 148% on September 27. (Ex. H.)

In pointing to these blogs and articles, Plaintiffs fail to separate out the "tangle of [other] factors"

that had already affected CXTI's stock price from the July and August announcements, which

did not reveal any misstatement in CXTI's financials or BDO's audit opinions. *Dura*, 544 U.S.

at 343; *Lentell*, 396 F.3d at 177; *Lattanzio*, 476 F.3d at 158. Plaintiffs fail to allege any facts

demonstrating that the stock price decline in September was "attributable to the alleged fraud,

rather than simply a continuation of the loss in value" that occurred in July and August. *In re*

*Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F. Supp. 2d 349, 364 (S.D.N.Y. 2008).

### c.    The October 1, 2007 SEC Order Halting Trading.

       The SEC order halting trading of CXTI stock on October 1, 2007 cannot be a corrective

disclosure because the termination of trading precluded any further decline in the stock's value.

Moreover, the SEC's order itself undermines rather than supports Plaintiffs' theory that CXTI's

historic financial statements were misstated. The SEC order states that the SEC took action due

to "a lack of current and accurate information" and "questions regarding" CXTI's "financial

performance and business prospects" and "current financial condition." (¶ 348.) The SEC's

order does not indicate that CXTI's prior period financial statements were misstated. *See In re

Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d at 285 (holding that the disclosure of a

company's receipt of a grand jury subpoena was not a corrective disclosure because it did not

mention security law violations and "investors could not plausibly have understood the …

[d]isclosure to reveal any part of the falsity of Defendants' alleged misrepresentations.").

Instead, the SEC's order raises questions about CXTI's ability to continue as a going concern.

This clearly fails to satisfy Plaintiffs' loss causation requirement with respect to the alleged

falsity of CXTI's earlier period financial statements, much less with respect to opinions

expressed by BDO about those financial statements.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' claims against BDO should be dismissed with

prejudice.

Dated: December 14, 2009                           Respectfully Submitted,

                                                    LATHAM & WATKINS LLP


                                      By:    /s/ Elizabeth H. Hickey
                                             Peter A. Wald (*pro hac vice* pending)
                                             James J. Farrell (*pro hac vice* pending)
                                             Elizabeth H. Hickey
                                             885 Third Ave.
                                             New York, New York 10022
                                             Telephone: (212) 906-1200
                                             Facsimile: (212) 751-4864

                                             *Attorneys for BDO Ltd.*