UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------------X

CARLOS MUNOZ, INDIVIDUALLY AND                    CASE No.: 07-CV-10531 (AKH)
ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

                                                  ECF

       Plaintiffs,

       vs.

CHINA EXPERT TECHNOLOGY, INC.;
PKF NEW YORK, CERTIFIED PUBLIC
ACCOUNTANTS, A PROFESSIONAL
CORPORATION, PKF HONG KONG,
CERTIFIED PUBLIC ACCOUNTANTS;
AND BDO MCCABE LO LIMITED
CERTIFIED PUBLIC ACCOUNTANTS,

       Defendants.

--------------------------------------------------------------------X

MEMORANDUM OF LAW IN OPPOSITION TO BDO MCCABE LO LIMITED'S
MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

THE ROSEN LAW FIRM, P.A.

Laurence M. Rosen, Esq.  (LR 5733)
Email: lrosen@rosenlegal.com
Timothy W. Brown, Esq. (TB 1008)
Email: tbrown@rosenlegal.com
Julie Kamps, Esq. (JK 6041)
Email: jkamps@rosenlegal.com
Phillip Kim, Esq. (PK 9384)
Email: pkim@rosenlegal.com
350 Fifth Avenue, Suite 5508
New York, New York 10118
Telephone: (212) 686-1060
Fax: (212) 202-3827

Lead Counsel for Plaintiffs and Class

## TABLE OF CONTENTS

Page

STATEMENT OF FACTS………………………………………………………....2

ARGUMENT……………………………………………………………………...7

    A.  The Complaint Adequately Pleads That BDO Made False and Misleading Statements of Material Fact……………………………………………….7

      1.  BDO'S  False and Misleading Statements Are Well-Pled……………….....8

      2.  Allegations in the Complaint that Employees of Government Agencies Stated the Contracts With CXTI Were Fake And the Revenue Was False Satisfy Rule 9(b)'s and the PSLRA's Heightened  Pleading Requirements……………………………………………………………...10

          i.  Allegations of Statements Made by Chinese Municipality Employees That Contracts Were Fake Are Made With Sufficient Particularity……………………………………………………..10

          ii.  Statements Made by Chinese Municipality Employees That Contracts Were Fake Are Not Conclusory…………………………..17

      3.  The Complaint Particularly Alleges That BDO Violated GAAS And GAAP………………………………………………………………...19

          i.  BDO Violated GAAS By Not Confirming With Third Parties And Sources Independent of CXTI the Contractual Relationships Between Expert Network And Its Five Customers…………………..19

          ii.  BDO Violated GAAS By Not Confirming With Third Parties to Assure that CXTI Recognized Revenue Properly……………….…22

          iii.  BDO Violated GAAS By Not Confirming Customers Could Pay Despite CXTI's Use of the Percentage of Completion Method for Recognition of Revenue…………………………………………..23

    B.  BDO Acted Knowingly or Severely Recklessly…………………………………..25

      1. Scienter Pleading Standard Under *Tellabs*…………………………………25

      2.  BDO's Conscious Misbehavior and/or Recklessness……………………….26

          i. BDO's Recklessness Was So Egregious that BDO Did Not Merely Commit a Few GAAP And GAAS Violations, BDO Did No Audit At All...……………………………………26

   ii. BDO Recklessly Ignored Red Flags…………………………....…32

   iii. The Complaint Does Not Allege "Fraud by Hindsight"………..……34

  C. The Complaint Pleads Loss Causation………………………………………………35

  D. Plaintiffs Should Be Granted Leave to Amend………………………………………41

CONCLUSION…………………………………………..………………………………………41

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## CASES

*Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*,
   394 F.3d 126 (3d Cir. 2004)......................................................................11 n.6

*Danis v. USN Communs., Inc.*,
   73 F. Supp. 2d 923 (N.D. Ill. 1999) ..................................................................40

*Decker v. Massey-Ferguson, Ltd.*,
   681 F.2d 111 (2d Cir. 1982)..............................................................31, 32 n.12

*Dura Pharmaceuticals, Inc. v. Broudo*,
   554 U.S. 336 (2005).................................................................................. passim

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
   324 F.Supp.2d 474 (2004) .................................................................................32

*In re BearingPoint, Inc. Sec. Litig.*,
   232 F.R.D. 534 (E.D. Va. 2006) .......................................................................38

*In re Bradley Pharms., Inc. Sec. Litig.*,
   421 F.Supp.2d 822 (D.N.J. 2006) .....................................................................37

*In re Complete Management Inc. Sec. Litig.*,
   53 F.Supp.2d 314 (S.D.N.Y. 2001)..............................................................27, 29

*In re Doral Financial Corp. Sec. Litig.*,
   563 F. Supp. 2d 461 (S.D.N.Y. 2008).......................................................32 n.12

*In re eSpeed, Inc. Sec. Litig.*,
   457 F.Supp.2d 266 (S.D.N.Y. 2006)..................................................................38

*In re Gilat Satellite Networks, Ltd*,
   2005 WL 2277476 (E.D.N.Y. Sept. 19, 2005) ..........................................11 n.6

*In re GeoPharma, Inc. Sec. Litig.*,
   399 F. Supp. 2d 432 (S.D.N.Y. 2005)................................................................40

*In re IAC/InterActiveCorp Sec. Litig.*,
   478 F. Supp. 2d 574 (S.D.N.Y. 2007)................................................................41

*In re LaBranche Sec. Litig.*,
   405 F.Supp.2d 333 (S.D.N.Y. 2005)..................................................................32

*In re Leslie Fay Cos. Sec. Litig.*,
    871 F. Supp. 686 (S.D.N.Y. 1995)........................................................29, 30, 31

*In re Livent, Inc. Sec. Litig.*,
    78 F. Supp. 2d 194, 217 (S.D.N.Y. 1999)................................................32 n.12

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    568 F. Supp. 2d 349 (S.D.N.Y. 2008)..................................................35

*In re MicroStrategy, Inc. Sec. Litig.*,
    115 F. Supp. 2d 620 (E.D. Va. 2000) ..................................................30

*In re NTL, Inc. Sec. Litig.*,
    2006 WL 330113 (S.D.N.Y. Feb. 14, 2006)..........................................38

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    1 F.Supp.2d 290 (S.D.N.Y. 1999)........................................................27, 29

*In re Pall Corp.*,
    2009 WL 3111777 (E.D.N.Y. Sept. 21, 2009) .....................................18 n.8

*In re Parmalat Sec. Litig.*,
    375 F. Supp. 2d 278 (S.D.N.Y. 2005)..................................................37

*In re Philip Services Corp. Sec. Litig.*,
    83 F.Supp.2d 463 (S.D.N.Y. 2004)......................................................29, 30

*In re Public Offering Sec. Litig.*,
    399 F.Supp.2d 298 (S.D.N.Y. 2005)....................................................35

*In re Royal Dutch/Shell Transport Sec. Litig.*,
    380 F. Supp. 2d 509 (D.N.J. 2005) .....................................................30

*In re Take-Two Interactive Sec. Litig*,
    551 F. Supp. 2d (S.D.N.Y. 2008).........................................................7, 37

*In re Tycom Sec. Litig.*,
    2005 WL 2127674 (D.N.H. Sept. 2, 2005).........................................40

*In re Winstar Communications*,
    2006 WL 473885 (S.D.N.Y. Feb. 27, 2006).......................................33

*In re WorldCom, Inc. Sec. Litig*,
    2003 WL 21488087 (S.D.N.Y. June 25, 2003) ..................................29, 38

*In re Worlds of Wonder Sec. Litig,*
    35 F.3d 1407, 1426 (9th Cir. 1994) ...........................................................26

*Lentell v. Merrill Lynch & Co., Inc.,*
    396 F.3d 161 (2d Cir. 2005).......................................................................35

*Malin v. XL Capital Ltd,*
    499 F.Supp.2d 117 (D. Conn. 2007).........................................................17

*McLean v. Alexander*,
    599 F.2d 1190 (3d Cir. 1979).....................................................................30

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000).............................................................. passim

*Rolf v. Blyth, Eastman Dillon & Co., Inc.,*
    570 F. 2d 38 (2d Cir. 1978).......................................................................27

*Ross v. Bolton*,
    904 F.2d 819 (2d Cir. 1990)........................................................................7

*SEC v. Gold*,
    2006 WL 3462103 (E.D.N.Y. Aug. 18, 2006)..........................................27

*SEC v. KPMG LLP*,
    412 F. Supp. 2d 349 (S.D.N.Y. 2006)..................................................27, 30

*SEC v. Price Waterhouse*,
    797 F.Supp. 1217 (S.D.N.Y. 1992)...........................................................27

*Swack v. Credit Suisse First Boston*,
    383 F. Supp. 2d 223 (D. Mass. 2004) .......................................................40

*Tellabs v. Makor Issues & Rights, Ltd*,
    127 S. Ct. 2499 (2007)..........................................................................25, 26

*Vladimir v. Deloitte & Touche LLP*,
    997 WL 151330 (S.D.N.Y. Mar. 31, 1997). .............................................26

*Whalen v. Hibernia Foods PLC*,
    2005 WL 1799370 (S.D.N.Y. Aug. 1, 2005)............................................33

## STATUTES AND RULES

§ 10330.23..................................................................................................................24
15 U.S.C. § 78u-4(b)(1)...............................................................................8, 11, 25
15 U.S.C. § 78u-4(b)(2)...........................................................................................25
15 U.S.C. § 78u-4(b)(4)...........................................................................................35
PCAOB AU 150............................................................................................................5
PCAOB AU 316.29......................................................................................................33
PCAOB AU 316.41......................................................................................................33
PCAOB AU 316.54......................................................................................................33
PCAOB AU 316.70-72................................................................................................33
PCAOB AU 316.85......................................................................................................33
PCAOB AU 326.......................................................................................................6, 21
PCAOB AU 326.02-08................................................................................................21
PCAOB AU 326.21(a)................................................................................................21
PCAOB AU 330.04......................................................................................................21
PCAOB AU 330.04-09..................................................................................................6
PCAOB AU 330.06......................................................................................................21
PCAOB AU 330.09......................................................................................................21
PCAOB AU 330.32........................................................................................................6
PCAOB AU 330.34...................................................................................................6, 21
PCAOB AU 330.35...................................................................................................6, 21
PCAOB AU 350.....................................................................................................22 n.10
Federal Rule of Civil Procedure 9(b).............................................................7, 8, 10

Lead Plaintiffs Joseph Nunn, Basil Hantash, Bashar Hantash, Anna Hantash and Kenneth Price, and named plaintiff Carlos Munoz, individually and on behalf of all other persons similarly situated ("Plaintiffs"), respectfully submit this memorandum of law in opposition to the motion to dismiss Plaintiffs' Second Amended Complaint ("Complaint")[1] filed by BDO McCabe Lo Limited ("BDO").

The Complaint alleges causes of action for securities fraud against China Expert Technology, Inc. (the "Company" or "CXTI") and its auditors arising out of the Company's issuance, and the auditors' certification, of entirely fraudulent financial statements for fiscal years 2003 to 2006. This memorandum of law focuses only on the 2005 and 2006 financial statements audited and certified by BDO. The 2003 and 2004 financial statements, which were audited and certified by PKF, Certified Public Accountants are the subject of separate motions to dismiss by PKF Hong Kong, Certified Public Accountants ("PKF HK") and PKF New York, Certified Public Accountants ("PKF NY") (collectively "PKF") and are addressed by Plaintiffs in separate memorandums of law filed herewith.

Having established that CXTI was an absolute fraud at its core, Plaintiffs charged its auditor BDO with securities fraud for auditing, preparing and certifying CXTI's 2005 and 2006 financial statements. These fraud allegations are grounded on BDO's failure to perform the most basic audit procedures, violation of the most fundamental auditing standards, and ignoring red flags. Only an auditor that willfully turned a blind eye would have missed the red flags revealed by documentation and financial records of CXTI and third parties, including financial statements Expert Network filed with the Shenzen government and the registration documents filed by Jinjiang Gongcheng Management Services Co., Ltd., that show during 2005 and 2006 CXTI

---

[1] Citations to the Second Amended Complaint will be referred to herein as "¶" followed by the numeral corresponding to the specific paragraph(s) cited therein.

earned practically no revenue from the sixteen contracts with the five Chinese local governments and that CXTI practically did no business with them at all.

## STATEMENT OF FACTS

CXTI is a Nevada corporation that maintained its headquarters and operations in China at the time of the alleged fraud.  ¶ 17.  BDO is an accounting firm based in Hong Kong.  ¶ 23. BDO provided audit services for the 2005 and 2006 audits of CXTI's financial statements.  *Id.*

The class period begins on March 16, 2006 ("Class Period"), when CXTI filed with the SEC its fiscal 2005 annual report on Form 10-KSB, which included audited financial statements for the fiscal years 2003, 2004 and 2005 ("2005 Annual Report").  ¶ 82.

### *CXTI'S BUSINESS WAS A SHAM*

During the class period, CXTI issued financial statements claiming it had earned $134 million of revenue from sixteen e-government contracts.  ¶ 76.  Fully 99% of CXTI's reported revenue for these fiscal years was completely fictitious.  ¶ 257.  CXTI's auditors, including BDO, prepared and certified CXTI's financial statements without performing the most rudimentary auditing procedures to confirm that even one of the sixteen contracts was genuine or that even a tiny portion of the $134 million of reported revenue had actually been earned.  ¶¶ 76, 359-63.  CXTI was a complete fraud and the auditors were highly reckless in not confirming the existence of even 1% of the reported revenue.  Indeed, when investors and regulators got wind of the fraud in Autumn 2007, CXTI and its management vanished into thin air.  ¶¶ 330-41.

CXTI's 2005 and 2006 financial statements reported revenue of $35.6 million and $66.1 million, and net income of $6.5 million and $7.8 million, respectively.  ¶ 99.  The 2005 revenue of $35.6 million was reported to have been earned from five e-government contracts all entered into by CXTI's only operating subsidiary, Expert Network (Shenzhen) Limited ("Expert

Network"), and only two Chinese municipal governments, the Jinjiang and Dehua municipal governments. ¶ 100. The $66.1 million of 2006 revenue was reportedly earned from thirteen e-government contracts all entered into by Expert Network and a total of five Chinese municipal governments, the Jinjiang, Dehua, Nan'an, Huian, and Yinzhou municipal governments. *Id.* Of the five Chinese municipal governments with which Expert Network reportedly entered into contracts and earned revenue from in 2006, two were the same municipal governments CXTI supposedly earned revenue from in 2005, the Jinjiang and the Dehua municipal governments. *Id.*

## THE TRUTH SLOWLY EMERGES

On July 19, 2007, CXTI announced its Chief Financial Officer, Simon Fu, inexplicably resigned. ¶ 342. On August 14, 2007, CXTI announced it would file its quarterly report for the period ended June 30, 2007 with the SEC late. ¶ 343. Shortly thereafter rumors began spreading that CXTI's business was a fraud. ¶ 345. On September 27, 2007, CXTI announced it dismissed its auditor, BDO. ¶ 346. On October 1, 2007, the SEC issued an order halting trading of CXTI's stock because there "is a lack of current and accurate information concerning the securities of China Expert . . . [and] questions regarding the adequacy and accuracy of publicly disseminated information concerning [its] (1) financial performance and business prospects and (2) current financial condition. The . . . public interest and the protection of investors require a suspension of trading in the securities . . . ." ¶ 348. Between July 19, 2007 when CXTI's CFO resigned and the SEC's suspension of trading on October 1, 2007, CXTI's stock price dropped from nearly $7.0/share to less than $0.20/share, devastating investors. ¶¶ 342-49.

The Complaint contains detailed allegations that demonstrate that CXTI's financial statements were wholly fraudulent. The Complaint describes in depth Plaintiffs' investigator's conversations with Chinese government agencies whose representatives stated that the agencies did not enter into e-government contracts with Expert Network and that the purported revenue

earned by CXTI was fake.  ¶¶ 109-222.  Also, two other investigations corroborated Plaintiffs' investigator's findings.  ¶¶ 230-38.

CXTI purportedly earned over 99% of its revenue from CXTI's operating subsidiary, Expert Network.  Audited financial statements that Expert Network filed with the regional Shenzhen government show only a tiny fraction of the revenue reported in the financial statements audited and certified by BDO.  In its 2005 and 2006 audited financial statements filed with the Shenzhen government, Expert Network reported revenue of $855 thousand and $1.05 million, respectively, which stands in stark contrast to CXTI's 2005 and 2006 respective financial statements, certified by BDO, which reported revenue of $35.3 million and $65.4 million.  ¶¶ 244, 252-56.  Also, public registration records in the Industry and Commerce Administrative Bureau of Jinjiang City show that one of Expert Network's main customers, Jinjiang Gongcheng Management Services Co., Ltd., lost its business license in 2002, whereas Expert Network supposedly entered six contracts with it between 2003 and 2005, from which CXTI claimed to have earned $33 million during 2005 and 2006.  ¶¶ 79, 141-46, 166-71.

### BDO'S SEVERELY RECKLESS "AUDIT"

BDO audited and certified the 2005 financial statements that were included in the 2005 Annual Report.  ¶¶ 83-84.  On April 12, 2007, CXTI filed with the SEC its fiscal 2006 annual report on Form 10-KSB, which included audited financial statements for the fiscal years 2004, 2005 and 2006 ("2006 Annual Report").  ¶ 96.  BDO audited and certified the 2005 and 2006 financial statements, and PKF audited and certified the 2004 financial statements, each of which were included in the 2006 Annual Report.  ¶¶ 97-98.  BDO stated in its audit opinion, dated April 3, 2007:

> We have audited the accompanying consolidated balance sheets of China Expert Technology, Inc. and subsidiaries (the "Company") as of December 31, 2006 and 2005 and the related consolidated statements of income and comprehensive income,

4

stockholders' equity and cash flows for each of the two years in the period ended December 31, 2006. . .

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). <u>Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. . . An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements</u>, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of China Expert Technology, Inc. and subsidiaries as of December 31, 2006 and 2005, and the consolidated results of their operations and their cash flows for each of the two years in the period ended December 31, 2006, in conformity with accounting principles generally accepted in the United States of America.

Exhibit B, at p. F-1, to Declaration of Elizabeth Hickey made in support of BDO's Motion to Dismiss Plaintiffs' Second Amended Complaint; ¶ 263 (emphasis added).

Generally Accepted Auditing Standards ("GAAS"), which mandate the procedures an auditor must implement in auditing a publicly traded company, are promulgated by the Public Company Accounting Oversight Board ("PCAOB"). GAAS consists of ten standards. ¶¶ 264-65. The third General Standard is "Due professional care is to be exercised in the planning and performance of the audit and the preparation of the report." ¶ 266. The third Standard of Field Work is "Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit." ¶ 269.

GAAS required BDO to obtain competent evidence that China Expert truly entered into sixteen valid e-government contracts and had actually earned $35.3 million in 2005 and $65.4 million in 2006 pursuant to those sixteen contracts with five municipal governments. ¶¶ 264-69, 304 (citing PCAOB AU 150). BDO was obligated to ***confirm* with sources independent of**

5

**China Expert** the existence of the $15.4 million of accounts receivable at year-end 2005, and $33.6 million of accounts receivable at year-end 2006.  ¶¶ 76, 279 (citing AU 330.34, 330.35). Given CXTI's $35.6 million of reported revenue in 2005, and $15.4 million of accounts receivable at year-end 2005 (which grew from $4.4 million at the beginning of 2005), BDO was required to confirm that CXTI actually received $24.6 million of cash in 2005; similarly, given CXTI's $66.1 million of reported revenue in 2006, and $33.6 million of accounts receivable at year-end 2006 (which grew from $15.4 million at the beginning of 2006), BDO was required to confirm that CXTI actually received $47.9 million of cash in 2006.  ¶¶ 271-81, 297, 303 (citing AU 326, 330.04-09, 330.32).

BDO failed to perform any audit at all on the $101.4 million in revenue CXTI earned during 2005 and 2006, given that of the sixteen e-government contracts with five Chinese municipal governments from which China Expert claimed to have earned a total of $101.4 million in revenue during 2005 and 2006, (a) Jinjiang municipality stated that it terminated its sole contract with CXTI after paying CXTI a total of only $600,000 (¶¶ 173-74); (b) Dehua municipality terminated its only contract with China Expert in 2004 and paid them only $12,160 (¶¶ 189-97); and (c) no money was earned from the other fourteen contracts, which were fake.[2] Thus, nearly all of CXTI's reported revenue was fake.  If BDO had performed any of the required audit procedures by confirming the revenue, contracts, or accounts receivable with third parties, it would have discovered that the contracts with Expert Network did not exist or had been terminated, that CXTI had earned only about $600,000 in revenue in total (not the $101.4 million reported as earned during 2005 and 2006), and that the $15.4 million of accounts

---

[2] Plaintiffs' private investigator did not investigate one of the sixteen e-government contracts -- with Yinzhou, from which CXTI recognized an immaterial $300,000 in revenue in 2006.  ¶¶ 100, 228.

receivable reported at year-end 2005 and the $33.6 million of accounts receivable reported at year-end 2006 were fraudulent.

## ARGUMENT

### A.  The Complaint Adequately Pleads That BDO Made False and Misleading Statements of Material Fact

BDO claims that Plaintiffs' Complaint does not adequately plead that BDO made a false statement.  *See* Memorandum of Law In Support of Defendant BDO's Motion to Dismiss Plaintiffs' Second Amended Complaint ("BDO Mem.") at pp. 9-15.  BDO makes three arguments in support of this ground, each of which fails.  First, the allegations are particularized and satisfy the requirements of Federal Rule of Civil Procedure 9(b).  Second, statements made by Chinese municipal government officials satisfy the requirements of the PSLRA.  Third, Plaintiff has sufficiently alleged that BDO violated GAAS.  The Court should reject BDO's contentions and find that Plaintiffs have adequately pled that BDO made actionable false statements.

To satisfy Federal Rule of Civil Procedure 9(b), "a securities fraud complaint premised upon material misstatements 'must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"  *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 259 (S.D.N.Y. 2008).  Plaintiffs' allegations fulfill the purpose of such heightened pleading requirements.  Indeed, "[t]he primary purpose of Rule 9(b) is to afford defendant fair notice of the plaintiff's claim and the factual ground upon which it is based." *Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir. 1990).  "The PSLRA imposed an additional requirement: whenever plaintiffs allege, on information and belief, that defendants made material misstatements or

omissions, the complaint must 'state with particularity all facts on which that belief is formed.'"

*Novak v. Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000) (quoting 15 U.S.C. § 78u-4(b)(1)).

### 1.  BDO'S  False and Misleading Statements Are Well-Pled

BDO's contention that the Complaint fails to allege sufficiently that BDO made false statements in certifying CXTI's 2005 and 2006 year-end financial statements (*see* BDO Mem. at pp. 10-11) is wrong.[3]  BDO argues that the Complaint assumes that in the year-end 2005 and 2006 financial statements revenue was improperly recognized and the contracts were false only because CXTI dissolved in the latter half of 2007.  *See* BDO Mem. at p. 10.  However, the Complaint alleges that virtually all of CXTI's e-government contracts were fake and that the revenue Defendants claim CXTI derived from the contracts did not exist based on at least four factual, particularized allegations that more than satisfy the pleading requirements of Federal Rule of Civil Procedure 9(b).

First, Plaintiffs allege that the government agencies with which CXTI claimed to have signed sixteen contracts, and from which CXTI claimed it had earned its revenue, told Plaintiffs' private investigator that the contracts either did not exist at all, or to the extent a contract may have existed, that the true contract price and revenue earned were only a tiny fraction of what CXTI reported in its financial statements.[4]  ¶¶ 79-80.  Thus, according to the Complaint, more

---

[3] Indeed, Defendants PKF HG and PKF NY do not make such a baseless argument, moving to dismiss only on the ground that the Complaint does not sufficiently allege scienter.  *See* Memorandum of Law In Support of Defendant PKF HK's Motion to Dismiss Plaintiffs' Second Amended Complaint, Docket # 70 ("PKF HK Mem."); Memorandum of Law In Support of Defendant PKF NY's Motion to Dismiss Plaintiffs' Second Amended Complaint, Docket # 95 ("PKF NY Mem.").

[4] Plaintiffs' private investigator did not investigate one of the sixteen e-government contracts -- with Yinzhou, from which CXTI recognized an immaterial $300,000 in revenue in 2006.

than 98% of the revenue recognized by CXTI and recorded in its annual reports during the Class Period never existed.  ¶ 81.  *See also* ¶¶ 107-229.

Second, several independent investigations have corroborated the findings of Plaintiffs' private investigator that the sixteen contracts entered into by CXTI were fake and that CXTI's purported revenue from those contracts never existed.  ¶¶ 230-38.

Third, CXTI's main subsidiary, Expert Network, filed audited financial statements with the Industry and Commerce Administrative Bureau of Shenzhen City ("Shenzhen Government") that contradict CXTI's audited financial statements.  ¶¶ 239-56.  The difference between the revenue reported by Expert Network in its audited financial statements and the amounts reported in CXTI's U.S. financial statements is extraordinary.  For 2005 and 2006, Expert Network reported only 2% of the revenue amount that CXTI reported.  ¶ 255.[5]

Also, Plaintiffs located public registration records in the Industry and Commerce Administrative Bureau of Jinjiang City that show that Jinjiang Gongcheng Management Services Co., Ltd. lost its business license in 2002, whereas Expert Network supposedly entered six contracts with it between 2003 and 2005, from which CXTI claimed to have earned $33 million during 2005 and 2006.  ¶¶ 79, 141-46, 166-71.  The Complaint thus alleges with particularity that the revenue CXTI derived from six of the seven contracts for work to be done for the Jinjiang Municipality was never earned, and that those six contracts were fake.

While the fact that CXTI and its management vanished into thin air in 2007 despite having reported revenue of $145 million from 2003 through March 2007 is a fact that <u>supports</u>

---

[5] False statements alleged in the Complaint other than in CXTI's 2005 and 2006 annual reports are not irrelevant and cannot be stricken from the record because they support the allegations that BDO's statements made in its certifications of the 2005 and 2006 annual reports are false -- and that BDO was reckless in making those false statements.

Plaintiffs' allegations that the CXTI's e-government contracts and revenue were fake, it is not, as BDO wrongly claims, the only fact Plaintiffs allege. ¶¶ 17, 74.

> **2.    Allegations in the Complaint that Employees of Government Agencies Stated the Contracts With CXTI Were Fake And the Revenue Was False Satisfy Rule 9(b)'s and the PSLRA's Heightened Pleading Requirements**

BDO's assertion that the Chinese witness statements are deficient (*see* BDO Mem. at p. 11-13) is mistaken. Each allegation in the Complaint pertaining to statements made by employees of government agencies with which CXTI entered contracts states with particularity the basis for Plaintiffs' belief that the employees knew that the contracts and revenue were false, and satisfies the "who," "what," "where," "when," and "why" requirements of both the PSLRA and Rule 9(b).  Moreover, additional factual allegations that each would satisfy the applicable pleading standards independently corroborate the witnesses' statements.  BDO's claim must therefore be rejected.

> **i.    Allegations of Statements Made by Chinese Municipality Employees That Contracts Were Fake Are Made With Sufficient Particularity**

BDO's reliance on the case law concerning confidential witness statements (*see* BDO Mem. at pp. 11-12) is misplaced.  As BDO admits, Plaintiffs do not rely on any confidential witnesses.  Thus, the law's concern with ensuring the reliability of unnamed witnesses is not implicated here, as the identities of the witnesses are revealed.  As shown below, in addition to identifying each witness, the Complaint specifies for each purported e-government contract both for which department of the municipality the employee works and the basis for each employee's knowledge about that municipality's e-government contracts.  Thus, even if the pleading requirements pertaining to confidential witnesses applied to the instant matter, the Complaint

meets them.[6]   As to pleading confidential witness statements, *Novak v. Kasaks*, holds that "paragraph (b)(1) [15 U.S.C. § 78u-4(b)(1)] does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based.  Rather, plaintiffs need only plead with particularity sufficient facts to support those beliefs."  216 F.3d at 313-14.  Thus, *Novak* requires that an assertion made by a confidential witness be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  *Id.* at 313.   Plaintiffs' allegations satisfy these requirements.

Indeed, the Complaint provides substantial   information about Plaintiffs' private investigator's interviews with employees of four municipalities in China -- Nan'an, Jinjiang, Dehua, and Huian -- with which CXTI through Expert Network claimed to enter contracts and from which it claimed to have derived 99.7% of its revenue in 2005 and 2006.  ¶ 79.  The statements made by these employees (which are corroborated by other allegations in the Complaint, as explained above) reveal that $99.8 million out of the $100.7 million in revenue CXTI recognized in its 2005 and 2006 annual reports combined never existed at all.  ¶ 79.

### Nan'an Contracts

As to the two Nan'an contracts, the Complaint states that an employee of the Network Office of Nan'an Municipality stated on June 11, 2008 that his office was in charge of website

_____

[6] It should be noted that an unpublished decision in the Eastern District of New York and a Third Circuit decision misrepresent what the Second Circuit explained in *Novak v. Kasaks*. *In re Gilat Satellite Networks, Ltd.*, 2005 WL 2277476, at *9 (E.D.N.Y. Sept. 19, 2005); *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004).  Nowhere does *Novak v. Kasaks* state that it requires "an examination of the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia."  *Gilat*, 2005 WL 2277476, at *9 (quoting *Cal. Pub. Employees'*, 394 F.3d at 147).

construction for Nan'an Municipality, that Nan'an Municipality did not enter a contract with Expert Network, and that he had never heard of Expert Network.  ¶¶ 79, 122, 124.  The employee further stated that the only companies ever hired to do e-government Construction Projects for Nan'an Municipality were companies based in Nan'an City, whereas Expert Network was based in Shenzen City.  ¶ 121.  On June 11, 2008, an employee of the Nan'an Municipality Office confirmed that the Network Office of Nan'an Municipality is in charge of e-government construction projects for Nan'an Municipality.  ¶¶ 116, 118.  The employee of the Network Office of Nan'an Municipality stated that while it is in charge of one type of e-government construction projects for Nan'an Municipality -- website construction, the Administrative Service Center of Nan'an Municipality is in charge of all other types of e-government construction projects.  ¶ 124.  An employee of the Administrative Service Center of Nan'an Municipality, named Mr. Ye, confirmed on June 11, 2008 that the Administrative Service Center of Nan'an Municipality was in charge of e-government construction projects for Nan'an Municipality, and that all e-government Construction Projects for Nan'an Municipality are signed by the Administrative Service Center of Nan'an Municipality.  ¶¶ 125-26.  Mr. Ye also stated that if a company were authorized by Nan'an Municipality to hire (on Nan'an Municipality's behalf) other companies to do e-government Construction Projects, any contracts entered into among those parties would have to be submitted to Nan'an Municipality for review and approval.  ¶ 129.  Mr. Ye reviewed the two Nan'an contracts that CXTI filed with the SEC and stated that he had never seen them before and that Nan'an Municipality never entered into a contract with Expert Network.  ¶¶ 127-28.  Thus, the Complaint has pleaded substantial particularized information providing a factual basis for the statements made by employees of different departments of Nan'an Municipality that the two purported Nan'an contracts were fake.

**Jinjiang Contracts**

The Complaint also pleads far more than sufficient information setting forth a factual basis for the statements made by employees of different departments of Jinjiang Municipality concerning six fraudulent Jinjiang contracts. ¶ 79. On June 11, 2008, an employee of the Jinjiang Municipality Office stated that the e-government Office of Jinjiang Municipality is in charge of e-government construction projects for Jinjiang Municipality. ¶¶ 149, 151. On June 11, 2008, an employee of the e-government Office of Jinjiang Municipality, named Mr. Chen, confirmed that his office is in charge of e-government construction projects for Jinjiang Municipality. ¶¶ 152-54. Mr. Chen confirmed that Jinjiang City E-Government Project Construction Command Bureau, of which his office is a part, only entered into the seventh of the seven contracts that CXTI entered into for work to be done for the Jinjiang Municipality. ¶¶ 152-57.

Mr. Chen was very familiar with Expert Network. Indeed, he referred to two senior executives of Expert Network who managed the "seventh" project, namely Mr. Zhu and Mr. Song Feng. Mr. Chen also referred to Expert Network's project manager for the "seventh" project, namely Jiang Shaoheng. ¶ 160. Mr. Chen mentioned further that the work Expert Network did on the "seventh" project was not good, and that Expert Network would not be hired for any other projects by the Jinjiang Municipality Office. ¶ 161. Mr. Chen also stated that Expert Network subcontracted all of the work to other companies, including Shenzen Yingyuan Science and Technology Co., Ltd. and Sinosoft Co., Ltd. CXTI claims Expert Network earned revenue for work done for the Jinjiang Municipality pursuant to six contracts with Jinjiang Gongcheng Management Services Co., Ltd., Mr. Chen stated that the Jinjiang City E-Government Project Construction Command Bureau did not authorize Jinjiang Gongcheng

13

Management Services Co., Ltd. to hire on its behalf any company to do e-government projects. ¶ 155.

Even if Plaintiffs' highly detailed allegations did not provide a sufficient basis for the statements of the employees' of the Jinjiang Municipality, which they do, the Complaint independently satisfies the heightened pleading requirements in alleging the falsity of the Jinjiang contracts and the revenue CXTI claimed to have derived therefrom. Indeed, Plaintiffs' private investigator was not only unable to contact or locate Jinjiang Gongcheng Management Services Co., Ltd., but Plaintiffs located public registration records in the Industry and Commerce Administrative Bureau of Jinjiang City that show that Jinjiang Gongcheng Management Services Co., Ltd. lost its business license in 2002, whereas Expert Network supposedly entered six contracts with it between 2003 and 2005. ¶¶ 166-71. The Complaint thus alleges with particularity that the revenue CXTI claimed to have derived from six of the seven contracts for work to be done for the Jinjiang Municipality during 2005 and 2006 was never earned, and that those six contracts were fake.

### Dehua Contracts

The Complaint amply describes the factual basis for Plaintiffs' allegations that the Dehua contracts were fake and the $37.6 million in revenue -- out of the $100.7 million in revenue CXTI recognized in its 2005 and 2006 annual reports combined – for work done pursuant to contracts CXTI claimed Expert Network entered with Dehua County Municipality was phantom. Plaintiffs describe with great specificity the identity of an employee of the Network Office of the People's Government of Dehua County, Mr. Wang, and details about his knowledge of e-government contracts entered into by his office on behalf of Dehua County. The Complaint alleges that Mr. Wang was "responsible, on behalf of Network Office of the People's

Government of Dehua County, for managing e-government construction projects for Dehua County." ¶ 191.

On August 14, 2008, Mr. Wang said that the only contract Dehua County Municipality entered with Expert Network was terminated in 2004 and that it did not enter any other contracts with Expert Network. ¶¶ 79, 192, 195. Mr. Wang explained that he had detailed information about Dehua County Municipality's contractual relationship with Expert Network, stating that it paid Expert Network $12,000. ¶ 194. Mr. Wang provided further specific information establishing his knowledge of Dehua County Municipality's relationship with Expert Network, stating that the contract with Expert Network was planned to be completed in 2006, but that it was terminated because of Dehua County Municipality's insufficient funds. ¶ 194. The Complaint thus alleges with particularity that all revenue CXTI claimed to have derived from the three contracts for work to be done for the Dehua County Municipality during 2005 and 2006 was never earned, and that those three contracts were fake.[7]

---

[7] BDO makes some arguments pertaining to the allegations made by Mr. Wang that Plaintiffs simply cannot understand, but will nonetheless attempt to refute. First, that Expert Network entered into a contract with Dehua County Municipality and got paid $12,000 does not undermine the Complaint because the Complaint *does recognize* that Expert Network did earn a tiny amount of revenue from e-government contracts. *See* ¶ 77 ("More than 98% of CXTI's reported revenue for the annual and quarterly periods from 2003 through 2006 was fictitious. In short, CXTI fabricated nearly all of its reported revenue for these four fiscal years"). It also goes without saying that if a company makes materially misleading statements, it should not be inferred that that company never makes any statements that are not false. Second, that a contract that CXTI claims was entered by Expert Network and Dehua County Electronic Administration Management Company states that the latter may appoint a representative or advisor does not contradict that Mr. Wang never heard of entities that CXTI claims Expert Network entered subsequent contracts with: Dehua County Electronic Administration and Contraction [sic] Management Company Limited and Dehua County E-Government Construction Project Management Company Limited. If it is true that Dehua County Municipality may appoint a supervisor for representing it as to its rights and duties pursuant to a particular contract, it does not follow that it may appoint a supervisor to sign on its behalf future contracts. A contract only

15

**Huian Contract**

The Complaint also pleads far more than sufficient information setting forth a factual basis for the statements made by employees of different departments of Huian Municipality about the falsity of the contract CXTI claimed to have entered through Expert Network and the $9 million in revenue CXTI claimed to have derived therefrom out of the $100.7 million in revenue CXTI recognized in its 2005 and 2006 annual reports combined. ¶ 79. On August 14, 2008, both an employee of the Duty Room of the People's Government of Huian County and an employee of the Network Engineering Management Center of Huian County, Mr. Wu, said that the Network Engineering Management Center of Huian County is in charge of network system projects and e-government construction projects for the People's Government of Huian County; on August 14, 2008. ¶¶ 209-14. Mr. Wu stated that the People's Government of Huian County never entered into any contract for an e-government construction project or network system project with Expert Network. ¶ 215. Mr. Wu demonstrated that he had detailed information about all of Huian County Municipality's contractual relationships pertaining to e-government construction projects, explaining that that the network system of the People's Government of Huian County consisted of an office automation system, which the Lanwei Company was hired to build, and the official website of the People's Government of Huian County, which the Zhaoheng Company was hired to build. ¶¶ 216-18. The Complaint thus alleges with particularity the basis for the employee's knowledge that the revenue CXTI claimed to have

---

governs the exchange of money for services as set forth in that contract. Regardless, Mr. Wang stated that he never heard of the parties that supposedly signed the later contracts, and as the person responsible for such contracts for Dehua Municipality, obviously he must know of them, if they signed any other contracts. ¶ 202.

derived from the single contract for work to be done for the Huian Municipality during 2005 and 2006 was never earned, and that this contract was fake.

### ii. Statements Made by Chinese Municipality Employees That Contracts Were Fake Are Not Conclusory

BDO's argument that the witnesses' statements are conclusory is likewise unavailing. Contrary to BDO's suggestion, the statements alleged here are based on particularized facts attributed to identified witnesses whose statements establish that each witness has a reliable and trustworthy basis for his statements.

Comparing the statements at issue in BDO's cited authority shows that BDO's motion to dismiss must be denied because the statements here are dissimilar to the conclusory statements rejected by other courts. In *Malin v. XL Capital Ltd.*, 499 F.Supp.2d 117, 140 (D. Conn. 2007), the court found statements such as the following to be conclusory: "[the company's] accounting deficiencies were 'well known' in the industry" (*id.*); "accounting department was considered a 'joke and an embarrassment;' and that 'any carrier who did business with [the company]' knew of its accounting deficiencies" (*id.* at 140-41); "'[defendant] did not do the due diligence that needed to be done' when it acquired [the company] in 1999, and 'did not look a heck of a lot' at [the company's] claims history." *Id.* at 139. Apart from the fact that these statements were made by confidential, not identified, witnesses, the statements in the Complaint do not concern conclusions about the Company's accounting or BDO's audit, but rather concern the factual bases for establishing that the underlying revenue was phantom and the contracts fraudulent. For instance, the Complaint alleges that the contracts simply never existed and that many employees stated that they know about the existence of e-government contracts entered into with

the respective municipalities.[8]  The specific underlying fact is that the contracts did not exist. Based on that (and other factual allegations consistent with the witnesses' statements), Plaintiffs allege that CXTI committed fraud by misrepresenting that the contracts existed and that CXTI derived revenue from work done pursuant to the contracts and that BDO, PKF HK, and PKF NY acted recklessly in effectively conducting no audit at all.

In addition, the Complaint contains additional allegations that corroborate the witnesses' statements.  For example, Plaintiffs allege that for 2005 and 2006 the revenue amounts reported by Expert Network to PRC regulators were only 2% of the amounts reported in CXTI's financial statements submitted to the SEC for those periods.  This allegation independently sufficiently provides a factual basis for Plaintiffs' claim that there was no basis for the revenue CXTI recognized in its 2005 and 2006 annual reports, which BDO certified.  ¶ 255.  Also, allegations that Jinjiang Gongcheng Management Services Co., Ltd.'s registration records filed with PRC regulators, which show that it lost its business license in 2002, independently sufficiently allege that CXTI falsely claimed revenue for 2005 and 2006 in the amount of $33 million because CXTI recognized $33 million in revenue derived from work done during 2005 and 2006 pursuant to six contracts with Jinjiang Gongcheng Management Services Co., Ltd. entered into between 2003 and 2005.  ¶¶ 79, 141-46, 166-71.  BDO does not dispute that these allegations as to documents filed with the local Chinese governments sufficiently plead the falsity of BDO's statements in CXTI's annual reports filed with the SEC.

As to Plaintiffs' allegations that BDO made false statements, the motion to dismiss must be denied.

---

[8] The allegations of statements made in *In re Pall Corp.*, which for some reason BDO relies on, were actually held to satisfy the PSLRA and not to be conclusory because they were specific and supported by facts, as in the instant matter. 2009 WL 3111777, * 6-7 (E.D.N.Y. Sept. 21, 2009).

### 3.  The Complaint Particularly Alleges  That BDO Violated GAAS And GAAP

BDO's argument that Plaintiffs fail to allege that BDO violated GAAS and GAAP, (*see* BDO Mem. at 13-15), is specious.  Plaintiffs have made numerous allegations of GAAP and GAAS violations that do not merely recite accounting principles, but set forth facts detailing the deficiencies in CXTI's financial reporting and BDO's audits of those financial reports.  ¶¶ 257-305.  These facts adequately particularize how BDO violated the enumerated auditing standards, to such an extent that they must have done no audit at all.  ¶¶ 257-305.  BDO makes the following four arguments:  (i) auditors do not authenticate documents; (ii) management can conceal a fraud from the auditor; (iii) GAAP is fluid; and (iv) the revenue was properly recognized.  Each of BDO's arguments fails.

### i.  BDO Violated GAAS By Not Confirming With Third Parties And Sources Independent of CXTI the Contractual Relationships Between Expert Network And Its Five Customers

BDO's first three arguments, that auditors do not authenticate documents, that management can conceal a fraud from an auditor, and that GAAP is fluid, are off the mark. Here, Plaintiffs allege that BDO abrogated its most basic audit responsibilities by failing to obtain any competent evidential matter to support its audit opinion.  Whereas BDO certified to American investors that CXTI recognized over $101 million in revenue during 2005 and 2006 supposedly earned pursuant to sixteen contracts with five Chinese local governments, the Complaint contends that BDO could have easily and inexpensively, as they were obligated under GAAS, confirmed the validity of the contracts, the revenue, and the accounts receivable related to work purportedly done for these five Chinese local governments.  ¶¶ 8, 72, 79, 253.  Instead, BDO performed none of the required audit procedures and falsely certified as accurate CXTI's wholly fraudulent financial statements.  Thus, BDO, in essence, performed no audit at all.  ¶ 8.

19

BDO curiously argues that because independent auditors are not trained in the art of recognizing whether signatures are forged or authentic, they are not liable for failing to confirm the validity of the contracts, and the revenue and accounts receivable purportedly derived therefrom.  By doing so, BDO ignores the central allegation in the Complaint that BDO failed to obtain evidence from any third party or source independent of their client that their client's financial statements were truthful and non-fraudulent.  While it is *possible* for an independent auditor to be fooled by the company it is paid to audit, the Complaint alleges that the only reason BDO could have been "fooled" was that BDO did not do its job at all, failing to confirm with any third parties whether CXTI's representations were true or false,  to check documents filed with the local Chinese governments, including CXTI's operating subsidiary's audit reports, (which stated CXTI earned at most 2% of the revenue it claimed in annual reports filed with the SEC), or to check  Jinjiang Gongcheng Management Services Co., Ltd.'s registration documents – (which indicated it had no license to do business).

The Complaint explains that at a minimum BDO violated the third General Standard and the third Standard of Field Work.  ¶¶ 264-65.  The third General Standard is "Due professional care is to be exercised in the planning and performance of the audit and the preparation of the report."  ¶ 266.  The third Standard of Field Work is "Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit."  ¶ 269.  While GAAP and GAAS may be a fluid set of standards, BDO cannot contest the basic duties of the auditor set forth in these Standards to obtain competent evidential matter through confirmations.

Most of the independent auditor's work in forming his or her opinion on financial statements consists of obtaining and evaluating evidential matter concerning management's assertions concerning the financial statements, such as the existence of contracts, revenue and

accounts receivable. AU 326.02-08; ¶ 271. When evidential matter can be obtained from independent sources outside an entity, it provides greater assurance of reliability for the purposes of an independent audit than that secured solely within the entity. AU 326.21(a); ¶ 274. Thus, auditors are required to obtain audit evidence supporting management's assertions from independent third parties. This includes obtaining evidence confirming the existence of contracts, revenue, and accounts receivable upon which management bases assertions in the financial statements. ¶ 275. Confirmation is the process of obtaining and evaluating a direct communication from a third party in response to a request for information about a particular item affecting the financial statements. AU 330.04. Confirmation is undertaken to obtain evidence from third parties about financial statement assertions made by management because evidence from independent third parties is presumed to be more reliable. AU 330.06; AU 326; ¶ 276. In some instances, third party confirmations are insufficient to reduce audit risk to an acceptably low level and the auditor is required to perform additional substantive procedures and tests of financial statement assertions. AU 330.09; ¶ 277.

Moreover, AU Section 330.34 requires an auditor to confirm accounts receivable balances. Confirmation of accounts receivable balances is mandatory unless the auditor documents the existence and applicability of one of three exceptions, none of which existed for and/or applied to CXTI.[9] AU 330.35; ¶ 279.

In CXTI's case, nearly all of the Company's revenue and accounts receivable were reported to have been earned for work done for five Chinese local governments pursuant to sixteen contracts. With so few contracts and customers representing all of CXTI's revenue and

---

[9] The exceptions are: (i) use of confirmations would be ineffective, (ii) audit risk can be reduced to an acceptably low level by other analytical procedures besides confirmations, and (iii) accounts receivable are immaterial to the financial statements.

accounts receivable, GAAS requires an auditor to obtain sufficient evidential matter demonstrating the validity of the contracts, revenue, and accounts receivable claimed by the Company.  In this situation, BDO was required to contact customers directly to confirm the validity of the contracts, the revenue recognized, and the accounts receivable balance.  With only a handful of customers, direct confirmation was the only appropriate method of confirmation.

There was no reason for the auditors to "sample," i.e., to confirm the contracts or accounts receivable with just a small portion of the total customers, as the total number of customers was under 10.[10]   ¶ 280.  BDO should have also tried to confirm that CXTI's representations were true by checking publicly available documents filed with the local Chinese governments including Expert Network's audit reports and the registration documents of Expert Network's customer Jinjiang Gongcheng Management Services Co., Ltd.  ¶¶ 166-71, 239-56.

### ii.  BDO Violated GAAS By Not Confirming With Third Parties to Assure that CXTI Recognized Revenue Properly

BDO's fourth argument, that CXTI's revenue was recognized properly because the financial statements that CXTI itself provided BDO indicate that,—(a) there were contracts; (b) that there was a fixed price; (c) that services were done according to the contracts; and (d) that collectability was reasonably assured, similarly fails.  This argument misses the essence of the Complaint and the law.

As set forth above, BDO was required under GAAS to <u>confirm with third parties</u>, including Expert Network's purported customers (and should have also looked at audit opinions

---

[10] PCAOB AU Section 350 requires auditors to "sample" account balances and transactions to ensure accuracy and detect material misstatements. Audit "sampling" is application of an audit procedure, such as confirming account balances with third parties, to less than 100 percent of the items with an account balance or class of transactions.  Audit sampling provides necessary audit evidence upon which an auditor may base its opinion on a company's financial statements.

and registration documents filed with local Chinese governments), that the contracts existed, that

the cash was paid, that the services were done, and that the customers were capable of paying.

Just because the financial statements that CXTI prepared stated CXTI received a certain amount

of cash obviously cannot mean to any genuine auditor that CXTI actually received the cash.[11]

No reasonable auditor would have accepted the contracts without taking a single step to confirm

them.

### iii. BDO Violated GAAS By Not Confirming Customers Could Pay Despite CXTI's Use of the Percentage of Completion Method for Recognition of Revenue

In addition to the shortcomings described above, BDO's argument that it did not violate

GAAS in certifying CXTI's financial statements also ignores numerous other GAAS violations

alleged in the Complaint.

---

[11] While BDO does not explicitly state it confirmed with a third party or source independent of CXTI that CXTI's cash increased during 2006 in the amount stated in CXTI's 2006 annual report filed with the SEC, BDO suggests that evidence -- that Expert Network's 2006 audit report filed with the local Chinese government, which also shows an increase in cash during 2006 -- proves that CXTI recognized revenue properly. The Complaint, however, alleges that because the financial information in the audit reports filed with the local Chinese government drastically contradict that in the annual reports filed with the SEC, BDO either recklessly failed to look at the annual reports filed with the local Chinese government or intentionally disregarded them. Indeed, the difference between the <u>revenue</u> reported by Expert Network in its audited financial statements submitted to the Industry and Commerce Administrative Bureau of Shenzhen City and the amounts reported in CXTI's U.S. financial statements is extraordinary. For 2005 and 2006, the revenue amounts reported by Expert Network to PRC regulators were only 2% of the amounts reported in CXTI's financial statements submitted to the S.E.C. for those periods. ¶ 255. Thus, if BDO looked at the annual report filed with the local Chinese government to confirm the cash increase stated in the annual report filed with the SEC, it would have been impossible for BDO not to have discovered that the revenue stated in the annual report filed with the SEC was false. As BDO is only arguing about evidence of an increase in cash during 2006 <u>in order to prove that CXTI's recognition of revenue</u> was proper, BDO's argument here fails pathetically.

One gross GAAS violation that BDO does not address is that BDO certified the financial statements despite that CXTI used the percentage of completion method for recognition of revenue ("POC") -- as Defendant PKF HK admits.  PKF HK Mem. at p. 5, n.6; ¶ 259.  Under GAAP, one of the 4 conditions that must be met in order to use POC is that the purchaser is able to perform its obligations under the contract, i.e., to pay.  ¶ 259; *see also* Declaration of Timothy W. Brown ("Brown Decl."), ¶ 3; Ex. 1; SOP 81-1 (§ 10330.23), p. 18878.  The Complaint alleges that this condition, among others, was not satisfied.  ¶¶ 260-61.  BDO was thus required to study the financial position of Expert Network's five customers and confirm with them that they were able to pay for the services they agreed to pay for pursuant to the sixteen purported contracts.  BDO did not confirm with <u>any</u> of Expert Network's five customers that they were able to pay.  If BDO had confirmed the customers' ability to pay, BDO would have discovered that CXTI never earned the revenue it claimed in the annual reports filed with the SEC and that the contracts between Expert Network and the Chinese local governments were fake.

The facts that by the end of 2004 Dehua County Municipality had only paid Expert Network $12,000 out of a $15 million contract and terminated the contract because Dehua County Municipality lacked sufficient funds further supports Plaintiffs' allegation that BDO did not attempt to determine whether the five customers were capable of paying Expert Network.  ¶ 194.  Tellingly, PKF HK admits that Dehua County Municipality lacked sufficient funds.  *See* PKF HK Mem at pp. 12-13.

BDO's audit opinions were thus false statements because CXTI's financial statements recorded revenue using the POC method despite that BDO did not confirm any of the five customers' ability to pay.

### B.  BDO Acted Knowingly or Severely Recklessly

####      1.        Scienter Pleading Standard Under *Tellabs*

The Private Securities Litigation Reform Act ("PSLRA") requires the complaint to "state with particularity facts giving rise to a strong inference" of scienter.  *Novak v. Kasaks*, 216 F.3d 300, 306-07 (2d Cir. 2000) (quoting 15 U.S.C. § 78u-4(b)(1) and (b)(2)) (quotations omitted; emphasis omitted).  Scienter can be pleaded "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'"  *Id.* at 307 (citations omitted); *see Tellabs v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2507 (2007).  Motive is not required to allege facts that give rise to a strong inference of scienter.  *Id.* at 2511.  "[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically," and to "accept all factual allegations in the complaint as true."  *Id.* at 2509, 2511.

When all allegations of the Complaint are read holistically and accepted as true, the only plausible inference is that BDO knowingly or recklessly misled the investing public by performing none of the required audit procedures and falsely certifying as accurate CXTI's wholly fraudulent financial statements.  BDO, in essence, performed "no audit at all."  ¶ 6.  Read holistically, the allegations in the Complaint raise a strong inference of BDO's "conscious misbehavior or recklessness," that BDO "engaged in deliberately illegal behavior," "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor."  *Novak*, 216 F.3d at 308, 311.

The Supreme Court articulated the measure to determine whether the complaint pleads facts that give rise to a strong inference of scienter, holding: "A complaint will survive . . . if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 127 S. Ct. at 2510 (footnote

omitted). At a minimum, the allegations in the Complaint are certainly "at least as compelling as any opposing inference a reasonable person could draw from the facts alleged." *Id*. at 2510. Under *Tellabs*, that is sufficient for the Court to deny the motion to dismiss. *Id*.

### 2. BDO's Conscious Misbehavior and/or Recklessness

#### i. BDO's Recklessness Was So Egregious that BDO Did Not Merely Commit a Few GAAP And GAAS Violations, BDO Did No Audit At All

BDO claims that the inference that the auditor was fooled by CXTI's management is the more compelling inference and thus that the Court should dismiss Plaintiffs' complaint for lack of sufficient allegations that BDO acted knowingly or severely recklessly. *See* BDO Mem. at pp. 17-18. Under the facts alleged in the Complaint, however, BDO's desired inference is not the most compelling. The inference that BDO was severely reckless and deliberately turned a blind eye to the Company's fraud is more cogent and compelling than the inference BDO urges. In stark contrast to BDO's bald claim of ignorance, Plaintiffs allege an extraordinary fraud that would have been uncovered if BDO had adhered to any one of a number of fundamental accounting standards. Plaintiffs have met the scienter pleading standard and BDO's dismissal motion should be denied.

While the Second Circuit has held that allegations of GAAP violations "or accounting irregularities, standing alone, are insufficient to state a securities fraud claim" against an independent accountant, such allegations are sufficient where, as here, they are "coupled with evidence of 'corresponding fraudulent intent . . . .'" *Novak v. Kasaks*, 216 F.3d at 309 (citations omitted). This standard requires more than the auditor's "mere publication of inaccurate accounting figures, or a failure to follow GAAP." *Vladimir v. Deloitte & Touche LLP*, 1997 WL 151330, at *3 (S.D.N.Y. Mar. 31, 1997) (citing *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir. 1994)). Allegations of a recklessly performed audit approximate intent and will

thus suffice. *SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 378 (S.D.N.Y. 2006) (in determining scienter of auditor defendants, stating "[t]he Second Circuit has long held that recklessness fulfills the standard of proof under Section 10(b)"). "Courts in this Circuit have recognized that scienter may be inferred where an auditor consciously disregards 'red flags,' or substantially ignores GAAS." *SEC v. Gold*, 2006 WL 3462103, at *4 (E.D.N.Y. Aug. 18, 2006).

> The Second Circuit in *Rolf v. Blyth, Eastman Dillon & Co., Inc.* explained:
>
> [A] reckless misstatement, or an opinion based on grounds so flimsy as to lead to the conclusion that there was no genuine belief in its truth are . . . sufficient upon which to base liability. A refusal to see the obvious, a failure to investigate the doubtful, if sufficiently gross, may furnish evidence leading to an inference of fraud so as to impose liability for losses suffered by those who rely on the balance sheet. In other words, heedlessness and reckless disregard of consequence may take the place of deliberate intention.

570 F. 2d 38, 46 (2d Cir. 1978); *see also SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 379 (S.D.N.Y 2006) ("a Section 10(b) plaintiff must [allege that] the audit amounted to no audit at all, [there was] an egregious refusal to see the obvious, or to investigate the doubtful, or . . . the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts").

Indeed, several courts examining allegations of recklessness against an auditor have concluded that conscious misbehavior or recklessness is shown where a plaintiff alleges that: (1) the accounting practices were so deficient that the audit amounted to no audit at all; (2) the audit amounted to an egregious refusal to see the obvious, or to investigate the doubtful; **or** (3) the auditor's accounting judgments were such that no reasonable accountant would have made the same decisions if confronted with the same facts. *See*, *e.g.*, *In re Complete Management Inc. Sec. Litig.*, 153 F.Supp.2d 314, 333-34 (S.D.N.Y. 2001) (citing *SEC v. Price Waterhouse*, 797 F.Supp. 1217, 1240 (S.D.N.Y. 1992); *In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F.Supp.2d 290, 295 (S.D.N.Y. 1999).

27

BDO is liable under this exact standard. This case is an extraordinary fraud. In fact, the fraud perpetrated by CXTI, BDO, PKF HK, and PKF NY is worse than the notorious Enron and WorldCom cases. In those cases, revenue was inflated. Here, CXTI's business was a complete sham. Fully 99% of all of CXTI's revenue and accounts receivable recognized for fiscal years 2005 and 2006 in annual reports filed with the SEC simply never existed. ¶ 257.

BDO undertook to audit CXTI's 2005 and 2006 financial statements that the Company filed with the SEC in its annual reports. ¶ 23. BDO certified to American investors that CXTI recognized over $101 million in revenue during 2005 and 2006 supposedly earned pursuant to sixteen contracts with five Chinese local governments. ¶¶ 8, 79, 253. BDO could have easily and inexpensively confirmed the validity of the contracts, the revenue, and the accounts receivable related to work purportedly done for these five Chinese local governments, as they were obligated to do under GAAS. ¶ 71. Instead, BDO performed none of the required audit procedures and falsely certified as accurate CXTI's wholly fraudulent financial statements. BDO performed "no audit at all." ¶ 8.

Plaintiffs have alleged numerous GAAP and GAAS violations, as discussed above, that do not merely recite accounting principles, but set forth facts detailing the deficiencies in CXTI's financial reporting and BDO's audits of those financial reports. ¶¶ 225-71. These facts adequately particularize how BDO violated the enumerated auditing standards, to such an extent that Plaintiffs sufficiently allege that BDO entirely failed to audit the Company's financial statements. *Id.*

Had BDO done any audit, then they would have found documentation and financial records of CXTI and third parties, including the audits of financial statements of CXTI's operating subsidiary, Expert Network, filed with the local Chinese government showing only 2% of the revenue recognized in the annual reports BDO certified, indicating that there was

practically no revenue earned from the sixteen contracts with the five Chinese local governments and that practically no business was even done with them.  Had BDO done any audit at all, these red flags would have become obvious to them (as discussed in detail below in response to BDO's argument that the Complaint's allegations of red flags fails to support a strong inference of scienter).  ¶¶ 8, 79, 255.

> *In re WorldCom, Inc. Securities Litigation* is instructive:
>
> Had Andersen reviewed WorldCom's accounting systems and data, as it was obligated to do, it would have discovered the lack of documentation and the fraudulent accounting treatment. . . . The allegations identifying the steps Andersen should have taken and failed to take, and the fraud it would have discovered if it had taken those steps, create a strong inference that Andersen acted recklessly in conducting the WorldCom audits. . . Although the size of the fraud alone does not create an inference of scienter, the enormous amounts at stake coupled with the detailed allegations regarding the nature and extent of WorldCom's fraudulent accounting and Andersen's failure to conduct a thorough and objective audit create a strong inference that Andersen was reckless in not knowing that its audit opinions materially misrepresented WorldCom's financial state.

2003 WL 21488087, at *7 (S.D.N.Y. June 25, 2003).  *See also Complete Mgmt.*, 153 F. Supp. 2d at 334, citing *Oxford Health Plans*, 51 F.Supp.2d 290, 295 (S.D.N.Y. 1999) ("Here, plaintiffs make the critical allegation that if Andersen were conducting any kind of audit at all, they would have seen the potential problems with the GMMS receivables and the need to investigate further. . . . [S]uch allegations may be one of several 'red flags' that support an inference of scienter"); *In re Philip Services Corp. Sec. Litig.*, 383 F.Supp.2d 463, 475 (S.D.N.Y. 2004), quoting *In re Leslie Fay Cos. Sec. Litig.*, 871 F. Supp. 686, 699 (S.D.N.Y. 1995) ("'[B]ecause the red flags would be clearly evident to any auditor performing its duties, one could reasonably conclude that [Deloitte] must have noticed the red flags, but deliberately chose to disregard them to avoid antagonizing [Philip] and incidentally frustrating its fraudulent scheme'").

The most compelling and cogent inferences here are either (1) that BDO actually knew of the fraud, in which case its certifications were made knowingly falsely; or (2) that BDO did not

know of the fraud, which could only happen as a result of audit procedures that were so sub-standard that the auditors would have to have known they were sub-standard and the auditor was willingly refusing to investigate the doubtful. *See Philip Services Corp.*, 383 F. Supp. 2d at 475 ("The enormity of the fraud attributed to Philip makes this finding particularly appropriate"); *In re Leslie Fay Cos. Sec. Litig.*, 835 F. Supp. 167, 175 (S.D.N.Y. 1993) ("when tidal waves of accounting fraud are alleged, it may be determined that the accountant's failure to discover his client's fraud raises an inference of scienter on the face of the pleading"); *In re Royal Dutch/Shell Transport Sec. Litig.*, 380 F. Supp. 2d 509, 570 (D.N.J. 2005) (finding that magnitude of fraud coupled with specific GAAS and GAAP violations created strong inference of auditor's recklessness); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 651 (E.D. Va. 2000) (finding strong inference of auditor's scienter could be inferred from magnitude and pervasiveness of MicroStrategy's GAAP violations; relative simplicity of the accounting principles violated; and importance of contracts involved); *see also SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 378 (S.D.N.Y. 2006), quoting *McLean v. Alexander*, 599 F.2d 1190, 1198 (3d Cir. 1979) ("A showing of shoddy accounting practices amounting at best to a pretended audit, or of grounds supporting a representation so flimsy as to lead to the conclusion that there was no genuine belief back of it have traditionally supported a finding of liability in the face of repeated assertions of good faith. In such cases, the fact-finder may justifiably conclude that despite those assertions the danger of misleading was so obvious that the actor must have been aware of it").

BDO's plea of ignorance, and the inference it asks this Court to make, fails to account for the fact that BDO was charged with responsibilities under GAAS that it repeatedly claimed to have followed, but did not. Even if the Court assumes, *arguendo*, that BDO did not have actual knowledge of the fraud, it must find BDO acted recklessly with regard to the accuracy of its audit reports. BDO's claim of ignorance, therefore, does not exculpate BDO on a motion to

dismiss. *Leslie Fay*, 835 F. Supp. at 175 (refusing to entertain, on motion to dismiss, "as <u>BDO</u> contends, it was as much a victim of the fraudulent inventory cover-up . . . as were plaintiffs") (emphasis added).

Even if the documents CXTI provided BDO fooled the auditor into thinking that the contracts were real, it would have been impossible for BDO to have been fooled if it simply confirmed, as required by GAAS, with third parties including CXTI's five customers or looked at public documents filed with the local Chinese governments (including CXTI's audit reports, which stated CXTI earned at most 2% of the revenue it claimed in annual reports filed with the SEC, and Jinjiang Gongcheng Management Services Co., Ltd.'s registration documents, which showed it had no license to do business).

BDO inaptly relies on cases that note that it is possible for a company to hide its fraud from its auditor. *See* BDO Mem. at p. 17. These cases are distinguishable from the allegations here. In *Decker v. Massey-Ferguson, Ltd.*, the court found that the auditor there was not liable for being aware that Massey annually overbilled distributors on average $5 million per year over a five-year period and made illegal payments to distributors so that they would cooperate in being overbilled. 681 F.2d 111, 118 (2d Cir. 1982). However, the overbillings and illegal payments consisted of less than two tenths of one percent of total revenue received by Massey, which was in the amount of $2.5 billion in 1975. *Id.* at 114. Indeed, Massey "was the largest manufacturer in the Western World of agricultural tractors and sugar cane harvesters and believed that its aggregate agricultural equipment sales in the entire non-Communist world were exceeded only by two other United States companies," and as it was "a holding company with over 100 subsidiaries scattered about the world." *Id.* at 114, 117. The court thus found that recklessness could not be inferred merely because the auditor did not catch such a <u>relatively</u> tiny

error.[12]   Here, BDO enabled CXTI to make up essentially its entire business and all of its revenue; BDO made no confirmations with the five third party-customers or other sources independent of CXTI and thus did no audit at all.  BDO was severely reckless.

### ii.   BDO Recklessly Ignored Red Flags

Moreover, there were obvious red flags that required BDO to carefully investigate CXTI's revenue, cash, and accounts receivable, and such red flags were apparent even before BDO began its "audit."  Had BDO heeded the red flags, BDO would have discovered that 99% of CXTI's revenue did not exist.  *See In re LaBranche Sec. Litig.*, 405 F.Supp.2d 333, 358, 359-62 (S.D.N.Y. 2005) (holding that the red flag cases "stand for the proposition that non-conclusory allegations that a corporate officer ignored 'reasonably available data that would have indicated that [a company's] statements were false and misleading' are adequate to plead recklessness or conscious disregard," quoting *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F.Supp.2d 474, 491 (2004)).

---

[12] In addition to *Decker v. Massey-Ferguson, Ltd.*, BDO incorrectly relies on *In re Doral Financial Corp. Securities Litigation* the auditor was not liable for not making confirmations from independent sources because, among other reasons, the complaint alleged that the independent parties from whom the auditors should have made confirmations were manipulated by management of the audited company.  563 F. Supp. 2d 461, 465-66 (S.D.N.Y. 2008).  BDO also mistakenly relies on *In re Livent, Inc. Securities Litigation*, in whch the court found, contrary to BDO's suggestion, that "the magnitude of the alleged fraud will be considered in weighing whether the Complaint meets the pleading standard for scienter."  78 F. Supp. 2d 194, 217 (S.D.N.Y. 1999).  *Livent* merely found that because the degree to which the fraud was concealed from the auditor was as great as the magnitude of the fraud, the complaint did not infer a strong inference of scienter.  *Id.*  In *Livent*, among other reasons that the claims against the auditor failed were that the complaint acknowledged that third parties concealed the fraudulent aspect of their transactions with the audited company from the auditor and because there were side agreements with third parties.  Thus, the fraud was concealed from the auditor, again, such that third-party confirmations would be ineffective.  *Id.* at 202, 217-18.

The red flags obvious to BDO were:  **1)** CXTI's "business involves significant, unusual, or highly complex transactions," such as "significant operations located or conducted across international borders in jurisdictions where differing business environments and cultures exist" (¶¶ 288-89, 303; AU 316.85, Appendix); **2)** CXTI applied POC accounting, which is highly risky, to all of its contracts (¶¶ 290-91, 295-96; AU 316.41, 316.54, 316.29); **3)** accounts receivable grew substantially as a percentage of total assets each year to a high amount, the increase in accounts receivable each year relative to the revenue recognized in the respective year was also high, and the yearly increase in revenue was high (¶¶ 299-302; AU 316.70-72). *See also In re Winstar Communications*, 2006 WL 473885, at *11 (S.D.N.Y. Feb. 27, 2006) ("An auditor's reckless disregard of red flags, coupled with allegations of GAAP and GAAS violations, is sufficient to support a strong inference of scienter"); *Whalen v. Hibernia Foods PLC*, 2005 WL 1799370, at *3 (S.D.N.Y. Aug. 1, 2005) ("Plaintiffs allege . . . [Pricewaterhouse Cooper] knew about and ignored a wide variety of 'red flag' incidents or events, that should have put PwC on notice that fraud was afoot, and that taken together they are sufficient for the Court to find a strong inference of recklessness").

While it is a question of fact whether standing alone each of these red flags would have alerted a reasonable auditor that CXTI was committing fraud, each red flag certainly would have alerted an auditor that the risk of fraud was heightened.  BDO's argument basically amounts to the idea that if a company has a large increase in revenue or accounts receivable the auditor should assume there is no fraud, and therefore should not investigate "<u>further</u>."  BDO recklessly

certified BDO's financial statements because BDO did not investigate <u>at all</u>. BDO simply ignored the bright red flags and made no third party confirmations at all.[13]

### iii.  The Complaint Does Not Allege "Fraud by Hindsight"

Additionally, BDO cannot claim that Plaintiffs claim fraud "based on hindsight." Plaintiffs do not just assume that CXTI and BDO committed fraud because CXTI practically vanished, as BDO contends (see BDO Mem. at pp. 19-20). Indeed, as set forth in detail above, Plaintiffs have alleged facts based on the findings of its private investigator, which were corroborated by several independent investigations (and by public documents filed with local Chinese governments), that practically every contract from which CXTI supposedly earned any revenue was completely fake and that none of the money from the phony contracts was ever received.  ¶¶ 107-256.[14]  This is not a case of fraud by hindsight.

---

[13] As explained above, BDO cannot pretend it was not reckless by relying on the fact that the audit report filed with the local Chinese government states that cash in 2006 increased to almost $10 million because if BDO looked at the audit reports filed with the PRC, then BDO would have <u>known</u> that CXTI only earned 2% of the amount of revenue it claimed to have earned in its 2005 and 2006 annual reports filed with the SEC.

[14] BDO argues that it could not have known of the contradictory statements contained in the 2006 audit report filed with the local Chinese government because it was issued seven days after BDO certified CXTI's 2006 annual report filed with the SEC. However, BDO should have seen audit reports filed with the PRC in prior years, which revealed that CXTI's financial statements contained in prior annual reports filed with the SEC were false. For example, the 2004 audit report filed with the PRC states that Expert Network earned only $1.46 million in 2004, whereas the 2004 annual report filed with SEC states that CXTI earned $26.8 million from work done by Expert Network.  ¶¶ 74-75, 254.  Despite that PKF certified the 2004 annual report, BDO should have seen it and therefore been aware that CXTI's 2006 financial statements were very likely to be fraudulent, too.

### C.  The Complaint Pleads Loss Causation

The Court should reject BDO's claim that the Complaint fails to plead loss causation.[15] BDO cannot insulate itself from liability because neither BDO nor the Company provided American investors with a neatly packaged confession of securities fraud.  Plaintiffs' allegations that corrective information concerning the Company's substantial financial fraud and BDO's willing ignorance trickled into the marketplace, causing the stock to drop steeply, satisfy the pleading requirements.

The PSLRA requires plaintiffs to prove that a defendant's misrepresentations "caused the loss for which the plaintiff seeks to recover."  15 U.S.C. § 78u-4(b)(4).  In *Dura*, the Supreme Court elaborated on this requirement, holding that a plaintiff must demonstrate that the "share price fell … after the truth became known."  *Dura Pharmaceuticals, Inc. v. Broudo*, 554 U.S. 336, 347 (2005).  The Court cautioned, however, that this requirement was "not meant to impose a great burden upon a plaintiff."  *Id.*  A plaintiff must only provide a defendant with "some indication of the loss and the causal connection that the plaintiff has in mind."  *Id.*  This is the fundamental -- and only -- requirement of *Dura*.

Loss causation is established when damages suffered are a "foreseeable consequence" of the misrepresentation or omission.  *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172-73 (2d Cir. 2005).  Specifically, loss causation is established when the loss that occurred was "'within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor.'"  *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F. Supp. 2d 349, 359 (S.D.N.Y. 2008) (quoting *Lentell*, 396 F.3d at 173); *see also In re Public Offering Sec. Litig.*, 399 F.Supp.2d 298, 307 (S.D.N.Y. 2005) ("Where the alleged misstatement conceals

---

[15] Defendants PKF HG and PKF NY do not make any loss causation argument.  *See* PKF HK Mem. and PKF NY Mem.

a condition or event which then occurs and causes the plaintiff's loss, it is the materialization of the undisclosed condition or event that causes the loss").

Here, the losses caused by the Company's financial fraud were squarely within the ambit of the auditor's severely reckless certification of the Company's financial statements. In other words, the undisclosed risks that the Company's auditors were not complying with their duties and obligations and that consequently the auditors' work and certifications were neither trustworthy nor reliable materialized, as Plaintiffs and the market slowly learned. As the materialization of these undisclosed risks became known, the Company's stock price lost all of its value, leaving shareholders who had relied on the integrity of the market and the integrity of the auditors with valueless shares.

The series of corrective disclosures alleged here all related to the integrity of CXTI's financial statements (which were filed with the SEC on Form 10-K and certified by public accountants practicing before the PCAOB), providing to the market indications that the accuracy and integrity of the Company's financial statements, as certified by the Auditor Defendants and filed with the SEC, may not be reliable or trustworthy. The absence of a "confession" followed by a single drop is not required, and, as a practical matter, would create a twisted ability for fraudsters to avoid responsibility for their wrongdoing by simply remaining silent. That is not the law and certainly should not be.

Specifically, Plaintiffs demonstrate how each of the following reveal to the market the wrongdoing that had previously been concealed:  1) CXTI's CFO resigned, 2) CXTI was unable to timely file its 2Q07 10-Q quarterly report, 3) eventually the public became suspicious and talked about their suspicions and investigations of CXTI in public forums, 4) CXTI's auditor BDO was dismissed, and 5) the SEC halted trading of CXTI's shares.  Indeed, it was foreseeable that each of these events would occur as CXTI's fraud became clearer to CXTI's executives,

36

BDO, the market, and the SEC.  When the market became aware of each of these events, the price of CXTI's stock dropped tremendously.  Because all public auditors understand that the investing public relies on public auditors conducting themselves with the utmost care, integrity, and professionalism, auditors are charged with knowing that if they do not uphold such standards, plaintiff shareholders and the investing public will foreseeably be damaged by failures such as the ones described herein.  No reasonable auditor would have done what the Auditor Defendants did here (or, actually, failed to do) and therefore damage to the Plaintiffs was plainly foreseeable to the Auditor Defendants.  Plaintiffs have successfully pled loss causation.

BDO argues that the Complaint fails to plead loss causation because -- the resignation of CXTI's CFO, the dismissal of BDO, the notice that CXTI would file its 2Q07 quarterly report late, articles published by financial commentators calling into question CXTI's financials, its e-government Contracts, and its credibility, and the SEC order halting trading -- did not specifically and conclusively disclose that BDO's prior financial statements were false.  Neatly packaged confessions of fraud are not required.  *See*, *e.g.*, *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 305-06 (S.D.N.Y. 2005) ("An allegation that a corrective disclosure caused the plaintiff's loss may be sufficient to satisfy the loss causation requirement.  It is not, however, necessary.").

In *Dura*, the Supreme Court only suggested that the plaintiffs needed to have alleged in some fashion that "the truth became known" before "the share price fell."  554 U.S. at 347.  The pleading standard set forth in *Dura* did not "address what type of events or disclosures may reveal the truth" leading to a stock drop.  *In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828 (D.N.J. 2006) (citing *Dura*, 554 U.S. at 347).  *Dura* does not explain how a corrective disclosure must be communicated to the market.  *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 282-83 (S.D.N.Y. 2008) ("[A] given disclosure need not emanate from a

particular source, take a particular form[,] or be of a particular quality") (quotation marks and citation omitted). Indeed, "besides a formal corrective disclosure by a defendant . . . the market may learn of possible fraud from a number of sources [such as] whistleblowers, analysts' questioning financial results, resignations of CFOs or auditors, announcements by the company of changes in accounting treatment going forward, newspapers and journals, etc." *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 297, n.237 (S.D.N.Y. 2006); *see also In re Worldcom, Inc. Sec. Litig.*, 2005 WL 2319118, at *23 (S.D.N.Y. Sept. 21, 2005) (to satisfy loss causation under *Dura*, plaintiff must "establish that his losses were attributable to some form of revelation to the market of the wrongfully concealed information"); *In re NTL, Inc. Sec. Litig.*, 2006 WL 330113, at *9 (S.D.N.Y. Feb. 14, 2006), quoting *In re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 544 (E.D. Va. 2006) ("it is also conceivable that the inflationary effect of a misrepresentation might well diminish over time, even without a corrective disclosure, and thus in-and-out traders in this circumstance would be able to prove loss causation").

The July 19, 2007 announcement of the resignation of CXTI's CFO sufficiently pleads loss causation because the stock declined from $6.45 per share on July 19 to $4.88 on July 20, and to $3.72 on July 24. ¶ 342. BDO also fails to address that the relatively huge stock drop on October 15, 2007 immediately following the SEC order issued on October 1, 2007 that halted trading -- which questioned the accuracy of information CXTI disseminated about its financial performance, business prospects, and current financial condition -- pleads loss causation. ¶ 348. Prior to the SEC halt order, which is a corrective disclosure of Defendants' fraud, Company stock traded at $0.58 per share and at the close of October 15, 2007, when the halt was lifted, the stock traded at $0.19 per share. ¶ 349.

The Complaint does not allege that each event, including articles published by financial news commentators and the announcement of CXTI's dismissal of BDO, <u>standing alone</u>

38

sufficiently alleges loss causation.[16]  Rather, from July 19, 2007 through October 15, 2007 there

was a series of events that caused the market to gradually assimilate the truth that CXTI and

BDO made misrepresentations in CXTI's 2005 and 2006 annual reports about the contracts

Expert Network entered and the revenue CXTI claimed to have earned therefrom.  As a result the

price of CXTI stock dropped from $6.45 per share on July 19, 2007 to $0.19 per share on

October 15, 2007.  ¶¶ 342-50.

---

[16] BDO's argument that the Complaint fails to plead loss causation, which BDO makes by selectively mentioning certain articles published by financial commentators on the Internet, and noting the stock price went up on the particular day the articles were published, clearly misses the mark.  What the Complaint states is:  "Thereafter, articles were published by financial commentators calling into question CXTI's financials, its e-Government Contracts, and its credibility, which ultimately caused the Company's stock to trade down further from an August 14, 2007 closing price of $3.46 per share to a closing price of $0.56 per share on September 28, 2007."  ¶ 345.  The Complaint referred to just a few among many postings on the Internet in order to show that news was circulating within the market that CXTI and BDO made misleading statements about CXTI's contracts and revenue.  But, the Complaint does not claim to have read, and then made allegations about, every blog, article, and chatroom comment made on the World Wide Web during the Class Period.  During that particular one and half month period (mid-August to the end of September 2007) alleged in the Complaint, prices went up a bit on some days, and down on others.  Overall the price catapulted during that period from $3.46 to $0.56.  The information correcting the misrepresentations was circulating, and the price of CXTI stock was correspondingly dropping.

Moreover, it is unclear at what time in the day some of these blogs were first published, and for some of them the timing nullifies BDO's argument.  For example, BDO argues that the value of CXTI stock did not go up during the day on September 6, 2007, the day the Cabeza Howe blog was entered.  But, that blog was entered at 10:37 p.m., after close of trading, so there is no way information disseminated by Howe could have reached the market during trading on September 6.  *See* BDO Mem., Ex. I, p. 2.  The next day the price of CXTI fell from a closing price of $1.72 on September 6, 2007 to a closing price of $1.47 on September 7, 2007.  *See* Brown Decl., ¶ 4; Ex. 2.  Also, BDO fails to mention that the article by Roddy Boyd published in the widely-read *New York Post* on September 19, 2007 caused the stock to drop from an opening of $0.30 per share to a closing of $0.22 per share.  ¶¶ 230-33; Brown Decl., ¶ 4; Ex. 2.

This revelation of the "truth" about the fake contracts and revenue did not take the form of a single, unitary disclosure, but occurred through a series of disclosing events. These allegations of a series of partial disclosures causing a gradual decline in the stock price adequately demonstrate loss causation. *See*, *e.g.*, *In re Tycom Sec. Litig.*, 2005 WL 2127674, at *12-*13 (D.N.H. Sept. 2, 2005) (loss causation properly alleged where plaintiffs claimed that defendants made fraudulent misrepresentations regarding market demand for their product, plaintiffs purchased the company's stock at artificially high prices, and suffered losses when the company's stock declined over time as a result of a series of partial disclosures concerning reduced market demand); *Swack v. Credit Suisse First Boston*, 383 F. Supp. 2d 223, 244 (D. Mass. 2004) (plaintiff sufficiently pled loss causation where she alleged that she purchased defendant company's stock at artificially high price resulting from fraudulent misrepresentations, and price fell as the truth slowly emerged to the market); *Danis v. USN Communs., Inc.*, 73 F. Supp. 2d 923, 943 (N.D. Ill. 1999) (loss causation sufficiently pled where plaintiffs claimed that "the market responded to and 'corrected' the price of USN stock over the better part of a year as bits and pieces of negative information became available and it became apparent that USN was not capable of performing as originally represented"); *In re GeoPharma, Inc. Sec. Litig.*, 399 F. Supp. 2d 432, 453 (S.D.N.Y. 2005) (plaintiffs sufficiently pled loss causation where complaint alleged that pharmaceutical company made false or misleading statements regarding FDA approval of a new product causing artificial inflation of stock, followed by dissipation of that inflation after corrective disclosures).

Plaintiffs have demonstrated, consistent with *Dura*, that when the truth about CXTI being a total sham became known to the market, its share price fell, drastically. Plaintiffs have therefore adequately pled loss causation and BDO's dismissal motion should be denied.

40

### D.  Plaintiffs Should Be Granted Leave to Amend

Plaintiffs should be granted leave to amend the Complaint if the Court grants BDO's

motion to dismiss the Second Amended Complaint in any respect.  This Court has stated:

> It is often appropriate for a district court, when granting a motion to dismiss for failure to state a claim, to give the plaintiffs leave to file an amended complaint. . . . [A] court granting a 12(b)(6) motion should consider a dismissal without prejudice when a liberal reading of the complaint gives any indication that a valid claim might be stated. . . . In particular, regarding claims of fraud, "[p]laintiffs whose complaints are dismissed pursuant to Rule 9(b) are typically given an opportunity to amend their complaint."

*In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 596 (S.D.N.Y. 2007).

## CONCLUSION

For the foregoing reasons, BDO's motion to dismiss Plaintiffs' Second Amended

Complaint should be denied.

41

Respectfully submitted,

Dated January 28, 2010                    **THE ROSEN LAW FIRM, P.A.**

                                         /s/ Timothy W. Brown

                                         Laurence M. Rosen, Esq. (LR 5733)
                                         Timothy W. Brown, Esq. (TB 1008)
                                         Julie Kamps, Esq. (JK 6041)
                                         Phillip Kim, Esq. (PK 9384)
                                         350 Fifth Avenue, Suite 5508
                                         New York, New York 10118
                                         Telephone: (212) 686-1060
                                         Fax: (212) 202-3827
                                         Email: lrosen@rosenlegal.com
                                         Email: tbrown@rosenlegal.com
                                         Email: jkamps@rosenlegal.com
                                         Email: pkim@rosenlegal.com

                                         Lead Counsel for Plaintiffs and the Class

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of January, 2010, a true and correct copy of the foregoing PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO BDO McCABE LO LIMITED'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT was served by CM/ECF to the parties registered to the Court's CM/ECF system.

Notice was provided via mail to:

China Expert Technology, Inc.,
C/O Registered Agent
Incorp Services, Inc.
3155 East Patrick Lane, Suite 1
Las Vegas, NV 89120-3481

/s/ Timothy W. Brown

43