UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------X
CARLOS MUNOZ, INDIVIDUALLY AND                    CASE No.: 07-CV-10531 (AKH)
ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,
                                                   ECF
                Plaintiffs,

                vs.

CHINA EXPERT TECHNOLOGY, INC.;
PKF NEW YORK, CERTIFIED PUBLIC
ACCOUNTANTS, A PROFESSIONAL
CORPORATION, PKF HONG KONG,
CERTIFIED PUBLIC ACCOUNTANTS;
AND BDO MCCABE LO LIMITED
CERTIFIED PUBLIC ACCOUNTANTS,

                Defendants.
-----------------------------------------------------------------X

MEMORANDUM OF LAW IN OPPOSITION TO PKF HONG KONG'S
MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

THE ROSEN LAW FIRM, P.A.

Laurence M. Rosen, Esq.  (LR 5733)
Email: lrosen@rosenlegal.com
Timothy W. Brown, Esq. (TB 1008)
Email: tbrown@rosenlegal.com
Julie Kamps, Esq. (JK 6041)
Email: jkamps@rosenlegal.com
Phillip Kim, Esq. (PK 9384)
Email: pkim@rosenlegal.com
350 Fifth Avenue, Suite 5508
New York, New York 10118
Telephone: (212) 686-1060
Fax: (212) 202-3827

Lead Counsel for Plaintiffs and Class

## <u>TABLE OF CONTENTS</u>

**Page**

STATEMENT OF FACTS…………………………………………………………..……2

ARGUMENT……………………………………………………………………..…..…7

    A.      PKF HK Acted Knowingly or Severely Recklessly………………………..………7

          1.      Scienter Pleading Standard Under *Tellabs*……………………..…..……7

          2.      PKF HK's Recklessness Was So Egregious that PKF HK Did Not Merely Commit a Few GAAP And GAAS Violations, PKF HK Did No Audit At All……………………………………………………..……9

          3.      The Complaint Particularly Alleges That PKF HK Violated GAAS And GAAP…………………………………………………………...…14

               a.    PKF HK Violated GAAS By Not Confirming With Third Parties And Sources Independent of CXTI the Contractual Relationships Between Expert Network And Its Two Customers………………………14

               b.    PKF HK Violated GAAS By Not Confirming Customers Could Pay Despite CXTI's Use of the Percentage of Completion Method for Recognition of Revenue…………………………………………...21

          4.      PKF HK Recklessly Ignored Red Flags…………………..……………23

          5.      The Complaint Does Not Allege "Fraud by Hindsight"……………….24

    B.      Plaintiffs Should Be Granted Leave to Amend………...............……..……….……..25

CONCLUSION………………………………………………………………………..25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,*
     1324 F.Supp.2d 474 (2004) ..................................................................23

*In re Complete Management Inc. Sec. Litig.,*
     153 F.Supp.2d 314 (S.D.N.Y. 2001)...........................................10, 12

*In re IAC/InterActiveCorp Sec. Litig.,*
     478 F. Supp. 2d 574 (S.D.N.Y. 2007)..............................................25

*In re LaBranche Sec. Litig.,*
     405 F.Supp.2d 333 (S.D.N.Y. 2005)................................................23

*In re Leslie Fay Cos. Sec. Litig.,*
     871 F. Supp. 686 (S.D.N.Y. 1995).............................................12, 13

*In re MicroStrategy, Inc. Sec. Litig.,*
     115 F. Supp. 2d 620 (E.D. Va. 2000) ...............................................13

*In re Nortel Networks Corp. Sec. Litig.,*
     238 F.Supp.2d 613 (S.D.N.Y. 2003)...........................................7 n.2

*In re Oxford Health Plans, Inc. Sec. Litig.,*
     51 F.Supp.2d 290 (S.D.N.Y. 1999)............................................10, 12

*In re Philip Services Corp. Sec. Litig.,*
     383 F.Supp.2d 463 (S.D.N.Y. 2004).................................................12

*In re Royal Dutch/Shell Transport Sec. Litig.,*
     380 F. Supp. 2d 509 (D.N.J. 2005) ...................................................13

*In re Winstar Communications,*
     2006 WL 473885 (S.D.N.Y. Feb. 27, 2006)....................................24

*In re WorldCom, Inc. Sec. Litig.,*
     2003 WL 21488087 (S.D.N.Y. June 25, 2003) ...............................12

*McLean v. Alexander,*
     599 F.2d 1190 (3d Cir. 1979)............................................................13

*Novak v. Kasaks,*
     216 F.3d 300 (2d Cir. 2000).........................................................7, 8

*Rolf v. Blyth, Eastman Dillon & Co., Inc.*,
    570 F. 2d 38 (2d Cir. 1978)........................................................................................9-10

*SEC v. Gold*,
    2006 WL 3462103 (E.D.N.Y. Aug. 18, 2006).................................................................9

*SEC v. KPMG LLP*,
    412 F. Supp. 2d 349 (S.D.N.Y. 2006)..............................................................9, 10, 13

*SEC v. Price Waterhouse*,
    97 F.Supp. 1217 (S.D.N.Y. 1992)..................................................................................10

*Tellabs v. Makor Issues & Rights, Ltd.*,
    127 S. Ct. 2499 (2007).................................................................................................7, 8

*Whalen v. Hibernia Foods PLC*,
    2005 WL 1799370 (S.D.N.Y. Aug. 1, 2005)..................................................................24

## STATUTES AND RULES

15 U.S.C. § 78u-4(b)(1) ...........................................................................................................7
15 U.S.C. § 78u-4(b)(2) ...........................................................................................................7
PCAOB AU 150 ........................................................................................................................6
PCAOB AU 316.29 .................................................................................................................23
PCAOB AU 316.41 .................................................................................................................23
PCAOB AU 316.54 .................................................................................................................23
PCAOB AU 316.70-72 ............................................................................................................23
PCAOB AU 316.85 .................................................................................................................23
PCAOB AU 326 ..................................................................................................................6, 16
PCAOB AU 326.02-08 ............................................................................................................16
PCAOB AU 326.21(a) .............................................................................................................16
PCAOB AU 330.04 .................................................................................................................16
PCAOB AU 330.04-09 ..............................................................................................................6
PCAOB AU 330.06 .................................................................................................................16
PCAOB AU 330.09 .................................................................................................................16
PCAOB AU 330.32 ...................................................................................................................6
PCAOB AU 330.34 .............................................................................................................6, 16
PCAOB AU 330.35 .............................................................................................................6, 16
PCAOB AU 350 .................................................................................................................17 n.4

Lead Plaintiffs Joseph Nunn, Basil Hantash, Bashar Hantash, Anna Hantash and Kenneth Price, and named plaintiff Carlos Munoz, individually and on behalf of all other persons similarly situated ("Plaintiffs"), respectfully submit this memorandum of law in opposition to the motion to dismiss Plaintiffs' Second Amended Complaint ("Complaint")[1] filed by PKF Hong Kong ("PKF HK").

The Complaint alleges causes of action for securities fraud against China Expert Technology, Inc. (the "Company" or "CXTI") and PKF Hong Kong, as well as CXTI's other auditors, arising out of the Company's issuance, and the auditors' certifications, of entirely fraudulent financial statements for fiscal years 2003 to 2006. CXTI's 2003 and 2004 financial statements were audited and certified by PKF HK and PKF New York, Certified Public Accountants ("PKF NY") (collectively "PKF") and are the subject of this motion to dismiss by PKF HK and a separate motion to dismiss by PKF NY. This memorandum of law focuses only on the 2003 and 2004 financial statements audited and certified by PKF, and it addresses only the motion to dismiss by PKF HK in opposition thereto.

PKF NY's motion to dismiss is addressed by Plaintiffs' Memorandum of Law in Opposition to PKF NY's Motion to Dismiss Plaintiffs' Second Amended Complaint, dated January 28, 2010 and filed herewith. CXTI's 2005 and 2006 financial statements, which were audited and certified by BDO McCabe Lo Limited ("BDO") is the subject of a separate motion to dismiss by BDO and is addressed by Plaintiffs' Memorandum of Law in Opposition to BDO McCabe Lo Limited's Motion to Dismiss Plaintiffs' Second Amended Complaint, dated January 28, 2010 and filed herewith..

---

[1] Citations to the Second Amended Complaint will be referred to herein as "¶" followed by the numeral corresponding to the specific paragraph(s) cited therein.

1

Having established that CXTI was an absolute fraud at its core, Plaintiffs charged its auditor PKF HK with securities fraud for auditing, preparing and certifying CXTI's 2003 and 2004 financial statements. These fraud allegations are grounded on PKF HK's failure to perform the most basic audit procedures, violation of the most fundamental auditing standards, and ignoring red flags. Only an auditor that willfully turned a blind eye would have missed the red flags revealed by documentation and financial records of CXTI and third parties, including financial statements Expert Network filed with the Shenzen government and the registration documents filed by Jinjiang Gongcheng Management Services Co., Ltd., that show during 2003 and 2004 CXTI earned practically no revenue from the sixteen contracts with the five Chinese local governments and that CXTI practically did no business with them at all.

## STATEMENT OF FACTS

CXTI is a Nevada corporation that maintained its headquarters and operations in China at the time of the alleged fraud. ¶ 17. PKF HK is an accounting firm based in Hong Kong. ¶ 18. PKF HK provided audit services for the 2003 and 2004 audits of CXTI's financial statements. ¶ 19.

The class period begins on March 16, 2006 ("Class Period"), when CXTI filed with the SEC its fiscal 2005 annual report on Form 10-KSB, which included audited financial statements for the fiscal years 2003, 2004 and 2005 ("2005 Annual Report"). ¶ 82.

### *CXTI'S BUSINESS WAS A SHAM*

During the class period, CXTI issued financial statements claiming it had earned $134 million of revenue from sixteen e-government contracts. ¶ 76. Fully 99% of CXTI's reported revenue for these fiscal years was completely fictitious. ¶ 257. CXTI's auditors, including PKF HK, prepared and certified CXTI's financial statements without performing the most rudimentary auditing procedures to confirm that even one of the sixteen contracts was genuine or

that even a tiny portion of the $134 million of reported revenue had actually been earned.  ¶¶ 76, 359-63.  CXTI was a complete fraud and the auditors were highly reckless in not confirming the existence of even 1% of the reported revenue.  Indeed, when investors and regulators got wind of the fraud in Autumn 2007, CXTI and its management vanished into thin air.  ¶¶ 330-41.

CXTI's 2003 and 2004 financial statements reported revenue of $5.7 million and $26.8 million, and net income of $1.2 million and $4.8 million, respectively.  ¶ 91.  2003 revenue of $4.7 million was reported to have been earned from a single e-government contract entered into by CXTI's main operating subsidiary, Expert Network (Shenzhen) Limited ("Expert Network") and the Jinjiang municipal government.  ¶ 93.  $26.7 million of 2004 revenue was reportedly earned from the same initial Jinjiang e-government contract (earning $17.8 million) and a new contract with Dehua municipal government (earning $8.9 million).  Thus, CXTI's 2004 revenue was supposedly earned from only two contracts.  ¶ 93.

_THE TRUTH SLOWLY EMERGES_

On July 19, 2007, CXTI announced its Chief Financial Officer, Simon Fu, inexplicably resigned.  ¶ 342.  On August 14, 2007, CXTI announced it would file its quarterly report for the period ended June 30, 2007 with the SEC late.  ¶ 343.  Shortly thereafter rumors began spreading that CXTI's business was a fraud.  ¶ 345.  On September 27, 2007, CXTI announced it dismissed its auditor, BDO.  ¶ 346.  On October 1, 2007, the SEC issued an order halting trading of CXTI's stock because there "is a lack of current and accurate information concerning the securities of China Expert . . . [and] questions regarding the adequacy and accuracy of publicly disseminated information concerning [its] (1) financial performance and business prospects and (2) current financial condition.  The . . . public interest and the protection of investors require a suspension of trading in the securities . . . ."  ¶ 348.  Between July 19, 2007 when CXTI's CFO resigned and

3

the SEC's suspension of trading on October 1, 2007, CXTI's stock price dropped from nearly $7.0/share to less than $0.20/share, devastating investors. ¶¶ 342-49.

The Complaint contains detailed allegations that demonstrate that CXTI's financial statements were wholly fraudulent. The Complaint describes in depth Plaintiffs' investigator's conversations with Chinese government agencies whose representatives stated that the agencies did not enter into e-government contracts with Expert Network and that the purported revenue earned by CXTI was fake. ¶¶ 109-222. Also, two other investigations corroborated Plaintiffs' investigator's findings. ¶¶ 230-38.

CXTI purportedly earned over 99% of its revenue from CXTI's operating subsidiary, Expert Network. Audited financial statements that Expert Network filed with the regional Shenzhen government show only a tiny fraction of the revenue reported in the financial statements audited and certified by PKF HK. In its 2003 and 2004 audited financial statements filed with the Shenzhen government, Expert Network reported revenue of $1.46 million and $1.5 million, respectively, which stands in stark contrast to CXTI's 2003 and 2004 respective financial statements, certified by PKF HK, which reported revenue of $4.7 million and $26.7 million earned through Expert Network. ¶¶ 93, 240, 249, 254-55. Also, public registration records in the Industry and Commerce Administrative Bureau of Jinjiang City show that Expert Network's only customer in 2003 and largest of two customers in 2004, Jinjiang Gongcheng Management Services Co., Ltd., lost its business license in 2002. ¶¶ 79, 166-71.

*PKF HK'S SEVERELY RECKLESS "AUDIT"*

PKF HK audited and certified the 2003 and 2004 financial statements that were included in the 2004 Amended Annual Report. ¶¶ 89-93. PKF HK stated in its audit opinion, dated February 22, 2005:

> We have audited the accompanying consolidated balance sheets of China Expert Technology, Inc. and its subsidiaries as of December 31, 2004 and 2003 and the related consolidated statements of operations, stockholders' equity and cash flows for each of the three years in the period ended December 31, 2004. . .
>
> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). <u>Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.</u> <u>An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements.</u> An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.
>
> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of China Expert Technology, Inc. and its subsidiaries as of December 31, 2004 and 2003 and the consolidated results of their operations and their cash flows for each of the three years in the period ended December 31, 2004 in conformity with accounting principles generally accepted in the United States of America.

Exhibit A, at p. 14, to Declaration of Charles J. Ha made in support of PKF HK's Motion to Dismiss Plaintiffs' Second Amended Complaint; ¶ 263 (emphasis added).

Generally Accepted Auditing Standards ("GAAS"), which mandate the procedures an auditor must implement in auditing a publicly traded company, are promulgated by the Public Company Accounting Oversight Board ("PCAOB"). GAAS consists of ten standards. ¶¶ 264-65. The third General Standard is "Due professional care is to be exercised in the planning and performance of the audit and the preparation of the report." ¶ 266. The third Standard of Field Work is "Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit." ¶ 269.

GAAS required PKF HK to obtain competent evidence that China Expert truly entered into two valid e-government contracts and had actually earned $26.7 million in 2004 and $4.7 million in 2003 pursuant to those two contracts with two municipal governments. ¶¶ 264-69,

5

304 (citing PCAOB AU 150). PKF HK was obligated to ***confirm* with sources independent of China Expert** the existence of the $4.4 million of accounts receivable at year-end 2004, and $0 of accounts receivable at year-end 2003. ¶¶ 76, 92, 279 (citing AU 330.34, 330.35). Given CXTI's $4.7 million of reported revenue in 2003, and $0 accounts receivable at year-end 2003, PKF HK was required to confirm that CXTI actually received $4.7 million of cash in 2003; similarly, given CXTI's $26.7 million of reported revenue in 2004, and $4.4 million of accounts receivable at year-end 2004 (which grew from $0 at the beginning of 2004), PKF HK was required to confirm that CXTI actually received $22.3 million of cash in 2004. ¶¶ 271-81, 297, 303 (citing AU 326, 330.04-09, 330.32).

PKF HK failed to perform any audit at all on the $31.4 million in revenue CXTI earned through Expert Network during 2003 and 2004, given that of the two e-government contracts with two Chinese municipal governments from which China Expert claimed to have earned a total of $31.4 million in revenue during 2003 and 2004, (a) Jinjiang municipality stated that it terminated its sole contract with CXTI, which according to the contract filed with the SEC was dated November 22, 2005, after paying CXTI a total of only $600,000 (¶¶ 140, 173-74); (b) Jinjiang Gongcheng Management Services Co., Ltd., which entered the contract to work with Jinjiang Municipality -- according to the only contract filed with the SEC that was dated before 2005, lost its business license in 2002 (¶¶ 79, 134-140, 166-71); and (c) Dehua municipality terminated its only contract with CXTI in 2004 and paid them only $12,160. ¶¶ 189-97. Thus, nearly all of CXTI's reported revenue was fake. If PKF HG had preformed any of the required audit procedures by confirming the revenue, contracts, or accounts receivable with third parties, it would have discovered that the contracts with Expert Network did not exist or had been terminated, that CXTI had earned only about $12,000 in revenue in total (not the $31.4 million

reported as earned during 2003 and 2004), and that the $4.4 million of accounts receivable reported at year-end 2004 reported at year-end 2004 was fraudulent.[2]

## ARGUMENT

### A.  PKF HK Acted Knowingly or Severely Recklessly

PKF HK makes only one argument in support of its dismissal motion.  PKF HK contends that the Complaint does not sufficiently plead that it acted with scienter.  *See* Memorandum of Law In Support of Defendant PKF HK's Motion to Dismiss Plaintiffs' Second Amended Complaint ("PKF HK Mem.") at pp. 8-17.  As set forth below, under the applicable pleading standards, Plaintiffs' allegations against PKF HK state a valid claim and particularly provide a basis for showing that PKF HK acted knowingly or severely recklessly.  Thus, the Court must deny PKF HK's motion to dismiss.

### 1.  Scienter Pleading Standard Under *Tellabs*

The PSLRA requires the complaint to "state with particularity facts giving rise to a strong inference" of scienter.  *Novak v. Kasaks*, 216 F.3d 300, 306-07 (2d Cir. 2000) (quoting 15 U.S.C. § 78u-4(b)(1) and (b)(2)) (quotations omitted; emphasis omitted).  In evaluating scienter allegations, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically," and to "accept all factual allegations in the complaint as true." *Tellabs,*

---

[2] PKF HK suggests that Plaintiffs improperly obtained information contained in the Complaint because the Complaint contains information about Defendants' fraudulent misconduct that was obtained through, among other means, investigations carried out in the People's Republic of China (the "PRC").  Apart from being irrelevant at the pleading stage, at the appropriate time, Plaintiffs will show that evidence obtained from China is admissible in United States courts pursuant to the applicable United States law of evidence.  *See*, *e.g.*, *In re Nortel Networks Corp. Sec. Litig.*, 238 F.Supp.2d 613, 621 (S.D.N.Y. 2003) ("A pleading is not a trial and plaintiffs are not required to marshal their evidence and sustain a verdict at this stage.").  Moreover, PKF HK also submitted the results of its own investigation within the PRC, including a declaration of fact signed in Beijing.  See Declaration of Xixin Wang made in support of FNC Mem.

127 S. Ct. at 2509, 2511.  The Supreme Court in *Tellabs* articulated the measure to determine whether the complaint pleads facts that give rise to a strong inference of scienter, holding: "A complaint will survive . . . if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 127 S. Ct. at 2510 (footnote omitted).

In the Second Circuit, scienter can be pled "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."' *Id.* at 307 (citations omitted); *see also Tellabs v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2507 (2007).  Motive is not required to allege facts that give rise to a strong inference of scienter.  *Id.* at 2511.  Allegations supporting a cogent and compelling inference that Defendants acted with "conscious misbehavior or recklessness" satisfy Plaintiffs' scienter pleading burden.

The allegations in the Complaint raise a very strong inference of PKF HK's "conscious misbehavior or recklessness," that PKF HK "engaged in deliberately illegal behavior," "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor."  *Novak*, 216 F.3d at 308, 311. The most compelling and cogent inference here is that PKF HK knowingly or recklessly misled the investing public by performing none of the required audit procedures and falsely certifying as accurate CXTI's wholly fraudulent financial statements.  PKF HK, in essence, performed "no audit at all."  ¶ 6.

At a minimum, the allegations in the Complaint are certainly "at least as compelling as any opposing inference a reasonable person could draw from the facts alleged."  *Id*. at 2510.  Under *Tellabs*, that requires the Court to deny the motion to dismiss.  *Id.*

8

**2. PKF HK's Recklessness Was So Egregious that PKF HK Did Not Merely Commit a Few GAAP And GAAS Violations, PKF HK Did No Audit At All**

PKF HK claims that the inference that the auditor was fooled by CXTI's management is the more compelling inference and thus that the Court should dismiss Plaintiffs' complaint for lack of sufficient allegations that PKF HK acted knowingly or severely recklessly. *See* PKF HK Mem. at pp. 11, & n.10, 14. Under the facts alleged in the Complaint, however, PKF HK's desired inference is not the most compelling. The inferences that PKF HK either was severely reckless by failing to follow basic GAAS and GAAP and/or deliberately turned a blind eye to the Company's fraud are more cogent and compelling than the inference PKF HK urges, that it was "fooled." In stark contrast to PKF HK's bald claim of ignorance, Plaintiffs allege an extraordinary fraud that would have been uncovered if PKF HK had adhered to any one of a number of fundamental accounting standards. Plaintiffs have met the scienter pleading standard and PKF HK's dismissal motion should be denied.

Allegations of a recklessly performed audit approximate an auditor's intent and thus suffice to state a claim that the defendant auditor acted with scienter. *SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 378 (S.D.N.Y. 2006) (in determining scienter of auditor defendants, stating "[t]he Second Circuit has long held that recklessness fulfills the standard of proof under Section 10(b)"). "Courts in this Circuit have recognized that scienter may be inferred where an auditor consciously disregards 'red flags,' or substantially ignores GAAS." *SEC v. Gold*, 2006 WL 3462103, at *4 (E.D.N.Y. Aug. 18, 2006). Auditors are rightfully held to a standard of care in performing their audit responsibilities and making statements to the investing public about the quality of the audited financials that reckless disregard of those fundamental tasks stands in for an auditor's confession of fraud (a rare occasion indeed).

The Second Circuit in *Rolf v. Blyth, Eastman Dillon & Co., Inc.* explained:

9

> [A] reckless misstatement, or an opinion based on grounds so flimsy as to lead to the conclusion that there was no genuine belief in its truth are . . . sufficient upon which to base liability. A *refusal to see the obvious*, a *failure to investigate the doubtful*, if sufficiently gross, may furnish evidence leading to an inference of fraud so as to impose liability for losses suffered by those who rely on the balance sheet. In other words, heedlessness and reckless disregard of consequence may take the place of deliberate intention.

570 F. 2d 38, 46 (2d Cir. 1978) (emphasis added); *see also SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 379 (S.D.N.Y 2006) ("a Section 10(b) plaintiff must [allege that] the audit amounted to no audit at all, [there was] an egregious refusal to see the obvious, or to investigate the doubtful, or . . . the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts").

Conscious misbehavior or recklessness is shown where a plaintiff alleges that: (1) the accounting practices were so deficient that the audit amounted to no audit at all; (2) the audit amounted to an egregious refusal to see the obvious, or to investigate the doubtful; **or** (3) the auditor's accounting judgments were such that no reasonable accountant would have made the same decisions if confronted with the same facts. *See*, *e.g.*, *In re Complete Management Inc. Sec. Litig.*, 153 F.Supp.2d 314, 333-34 (S.D.N.Y. 2001) (citing *SEC v. Price Waterhouse*, 797 F.Supp. 1217, 1240 (S.D.N.Y. 1992)); *see also In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F.Supp.2d 290, 295 (S.D.N.Y. 1999).

PKF HK is liable under this exact standard. This case is an extraordinary fraud. In fact, the fraud perpetrated by CXTI, BDO, PKF HK, and PKF NY is worse than the notorious Enron and WorldCom cases, in which those companies used accounting manipulations to inflate their revenue. Here, CXTI's business was a complete sham. Fully 99% of all of CXTI's revenue and accounts receivable recognized for fiscal years 2003 and 2004 in annual reports filed with the SEC simply never existed. ¶ 257.

PKF HK undertook to audit CXTI's 2003 and 2004 financial statements that the Company filed with the SEC in its annual reports.  ¶ 19.  PKF HK certified to American investors that CXTI recognized over $31.4 million in revenue during 2003 and 2004 supposedly earned pursuant to two contracts with two Chinese local governments.  ¶¶ 8, 79, 253.  PKF HK could have easily and inexpensively confirmed the validity of the contracts, the revenue, and the accounts receivable related to work purportedly done for these two Chinese local governments, as they were obligated to do under GAAS.  ¶ 71.  Instead, PKF HK performed none of the required audit procedures and falsely certified as accurate CXTI's wholly fraudulent financial statements.  Instead, PKF HK performed "no audit at all."  ¶ 8.

Plaintiffs have alleged numerous GAAP and GAAS violations, as discussed below, that do not merely recite accounting principles, but set forth facts detailing the deficiencies in CXTI's financial reporting and PKF HK's audits of those financial reports.  ¶¶ 225-71.  These facts adequately particularize how PKF HK violated the enumerated auditing standards, to such an extent that Plaintiffs sufficiently allege that PKF HK entirely failed to audit the Company's financial statements.  *Id.*

Had PKF HK done any audit, then they would have found documentation and financial records of CXTI and third parties, including the audits of financial statements of CXTI's operating subsidiary, Expert Network, filed with the local Chinese government showing only a small fraction of the revenue recognized in the annual reports PKF HK certified, indicating that there was practically no revenue earned from the two contracts with the two Chinese local governments and that practically no business was even done with them.  Had PKF HK done any audit at all, these red flags would have become obvious to them (as discussed in detail below in response to PKF HK's argument that the Complaint's allegations of red flags fails to support a strong inference of scienter).  ¶¶ 8, 79, 255.

11

*In re WorldCom, Inc. Securities Litigation* is instructive:

> Had Andersen reviewed WorldCom's accounting systems and data, as it was obligated to do, it would have discovered the lack of documentation and the fraudulent accounting treatment. . . . The allegations identifying the steps Andersen should have taken and failed to take, and the fraud it would have discovered if it had taken those steps, create a strong inference that Andersen acted recklessly in conducting the WorldCom audits. . . Although the size of the fraud alone does not create an inference of scienter, the enormous amounts at stake coupled with the detailed allegations regarding the nature and extent of WorldCom's fraudulent accounting and Andersen's failure to conduct a thorough and objective audit create a strong inference that Andersen was reckless in not knowing that its audit opinions materially misrepresented WorldCom's financial state.

2003 WL 21488087, at *7 (S.D.N.Y. June 25, 2003). *See also Complete Mgmt.*, 153 F. Supp. 2d at 334, citing *Oxford Health Plans*, 51 F.Supp.2d 290, 295 (S.D.N.Y. 1999) ("Here, plaintiffs make the critical allegation that if Andersen were conducting any kind of audit at all, they would have seen the potential problems with the GMMS receivables and the need to investigate further. . . . [S]uch allegations may be one of several 'red flags' that support an inference of scienter"); *In re Philip Services Corp. Sec. Litig.*, 383 F.Supp.2d 463, 475 (S.D.N.Y. 2004), quoting *In re Leslie Fay Cos. Sec. Litig.*, 871 F. Supp. 686, 699 (S.D.N.Y. 1995) ("'[B]ecause the red flags would be clearly evident to any auditor performing its duties, one could reasonably conclude that [Deloitte] must have noticed the red flags, but deliberately chose to disregard them to avoid antagonizing [Philip] and incidentally frustrating its fraudulent scheme'").

The most compelling and cogent inferences here are either (1) that PKF HK actually knew of the fraud, in which case its certifications were made knowingly falsely; or (2) that PKF HK did not know of the fraud, which could only happen as a result of audit procedures that were so sub-standard that the auditors would have to have known they were sub-standard and the auditor willingly refused to investigate the doubtful. *See Philip Services Corp.*, 383 F. Supp. 2d at 475 ("The enormity of the fraud attributed to Philip makes this finding particularly appropriate"); *In re Leslie Fay Cos. Sec. Litig.*, 835 F. Supp. 167, 175 (S.D.N.Y. 1993) ("when

tidal waves of accounting fraud are alleged, it may be determined that the accountant's failure to discover his client's fraud raises an inference of scienter on the face of the pleading"); *In re Royal Dutch/Shell Transport Sec. Litig.*, 380 F. Supp. 2d 509, 570 (D.N.J. 2005) (finding that magnitude of fraud coupled with specific GAAS and GAAP violations created strong inference of auditor's recklessness); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 651 (E.D. Va. 2000) (finding strong inference of auditor's scienter could be inferred from magnitude and pervasiveness of MicroStrategy's GAAP violations; relative simplicity of the accounting principles violated; and importance of contracts involved); *see also SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 378 (S.D.N.Y. 2006), quoting *McLean v. Alexander*, 599 F.2d 1190, 1198 (3d Cir. 1979) ("A showing of shoddy accounting practices amounting at best to a pretended audit, or of grounds supporting a representation so flimsy as to lead to the conclusion that there was no genuine belief back of it have traditionally supported a finding of liability in the face of repeated assertions of good faith. In such cases, the fact-finder may justifiably conclude that despite those assertions the danger of misleading was so obvious that the actor must have been aware of it").

PKF HK's plea of ignorance, and the inference it asks this Court to make, fails to account for the fact that PKF HK was charged with responsibilities under GAAS that it repeatedly claimed to have followed, but did not.  Even if the Court assumes, *arguendo*, that PKF HK did not have actual knowledge of the fraud, it must find PKF HK acted recklessly with regard to the accuracy of its audit reports.  PKF HK's claim of ignorance, therefore, does not exculpate PKF HK on a motion to dismiss.  *Leslie Fay*, 835 F. Supp. at 175 (refusing to entertain, on motion to dismiss, "as BDO contends, it was as much a victim of the fraudulent inventory cover-up . . . as were plaintiffs").

Even if the documents CXTI provided PKF HK fooled the auditor into thinking that the contracts were real, it would have been impossible for PKF HK to have been fooled if it simply

confirmed, as required by GAAS, with third parties including CXTI's two customers or looked at

public documents filed with the local Chinese governments (including CXTI's audit reports,

which stated CXTI earned only a small fraction of the revenue it claimed in annual reports filed

with the SEC, and CXTI's only customer in 2003 and main customer in 2004, Jinjiang

Gongcheng Management Services Co., Ltd.'s registration documents, which showed it had no

license to do business). Rather, PKF HK's failure to follow basic procedures enabled CXTI to

make up essentially its entire business and all of its revenue; PKF HK made no confirmations

with the two third–party customers or other sources independent of CXTI, and thus did no audit

at all. PKF HK was severely reckless.

### 3. The Complaint Particularly Alleges That PKF HK Violated GAAS And GAAP

PKF HK's argument that Plaintiffs fail to allege that PKF HK violated GAAS and GAAP

(*see* PKF HK Mem. at 10-14), is specious. Plaintiffs have made numerous allegations of GAAP

and GAAS violations that do not merely recite accounting principles, but set forth facts detailing

the deficiencies in CXTI's financial reporting and PKF HK's audits of those financial reports.

¶¶ 257-305.

### a. PKF HK Violated GAAS By Not Confirming With Third Parties And Sources Independent of CXTI the Contractual Relationships Between Expert Network And Its Two Customers

Plaintiffs allege that PKF HK abrogated its most basic audit responsibilities by failing to

obtain any competent evidential matter to support its audit opinion. Whereas PKF HK certified

to American investors that CXTI recognized over $31.4 million in revenue during 2003 and 2004

supposedly earned pursuant to two contracts with two Chinese local governments, the Complaint

contends that PKF HK could have easily and inexpensively, as they were obligated under GAAS,

confirmed the validity of the contracts, the revenue, and the accounts receivable related to work

purportedly done for these two Chinese local governments.  ¶¶ 8, 72, 79, 253.  Instead, PKF HK performed none of the required audit procedures and falsely certified as accurate CXTI's wholly fraudulent financial statements.  Thus, PKF HK, in essence, performed no audit at all.  ¶ 8.

The central allegation in the Complaint is that PKF HK failed to obtain evidence from any third party or source independent of their client that their client's financial statements were truthful and non-fraudulent.  While it is *possible* for an independent auditor to be fooled by the company it is paid to audit, the Complaint alleges that the only reason PKF HK could have been "fooled" was that PKF HK did not do its job at all, failing to confirm with any third parties whether CXTI's representations were true or false, to check documents filed with the local Chinese governments, including CXTI's operating subsidiary's audit reports (which stated CXTI earned only a small fraction of the revenue it claimed in annual reports filed with the SEC), or to check registration documents of Jinjiang Gongcheng Management Services Co., Ltd. (which indicated it had no license to do business), from which Expert Network purportedly earned all of its revenue in 2003 and two thirds of its revenue in 2004.

The Complaint explains that at a minimum PKF HK violated the third General Standard and the third Standard of Field Work.  ¶¶ 264-65.  The third General Standard is "Due professional care is to be exercised in the planning and performance of the audit and the preparation of the report."  ¶ 266.  The third Standard of Field Work is "Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit."  ¶ 269.

Most of the independent auditor's work in forming his or her opinion on financial statements consists of obtaining and evaluating evidential matter concerning management's assertions concerning the financial statements, such as the existence of contracts, revenue and

15

accounts receivable. AU 326.02-08; ¶ 271. When evidential matter can be obtained from independent sources outside an entity, it provides greater assurance of reliability for the purposes of an independent audit than that secured solely within the entity. AU 326.21(a); ¶ 274. Thus, auditors are required to obtain audit evidence supporting management's assertions from independent third parties. This includes obtaining evidence confirming the existence of contracts, revenue, and accounts receivable upon which management bases assertions in the financial statements. ¶ 275. Confirmation is the process of obtaining and evaluating a direct communication from a third party in response to a request for information about a particular item affecting the financial statements. AU 330.04. Confirmation is undertaken to obtain evidence from third parties about financial statement assertions made by management because evidence from independent third parties is presumed to be more reliable. AU 330.06; AU 326; ¶ 276. In some instances, third party confirmations are insufficient to reduce audit risk to an acceptably low level and the auditor is required to perform additional substantive procedures and tests of financial statement assertions. AU 330.09; ¶ 277.

Moreover, AU Section 330.34 requires an auditor to confirm accounts receivable balances. Confirmation of accounts receivable balances is mandatory unless the auditor documents the existence and applicability of one of three exceptions, none of which existed for and/or applied to CXTI.[3] AU 330.35; ¶ 279.

In CXTI's case, all of the Company's revenue and accounts receivable were reported to have been earned for work done for two Chinese local governments pursuant to one contract in 2003 and two contracts in 2004, including the same contract in 2004. With only two contracts

---

[3] The exceptions are: (i) use of confirmations would be ineffective, (ii) audit risk can be reduced to an acceptably low level by other analytical procedures besides confirmations, and (iii) accounts receivable are immaterial to the financial statements.

and customers representing all of CXTI's revenue and accounts receivable in 2004, and only one such customer in 2003, GAAS requires PKF HK to have obtained sufficient evidential matter demonstrating the validity of each contract, the revenue derived therefrom, and accounts receivable claimed by the Company.   In this situation, PKF HK was required to contact customers directly to confirm the validity of the contracts, the revenue recognized, and the accounts receivable balance.   With such few customers, direct confirmation was the only appropriate method of confirmation.

There was no reason for the auditors to "sample," i.e., to confirm the contracts or accounts receivable with just a small portion of the total customers, as the total number of customers was under 10.[4]   ¶ 280.  PKF HK should have also tried to confirm that CXTI's representations were true by checking publicly available documents filed with the local Chinese governments including Expert Network's audit reports and the registration documents of Expert Network's customer Jinjiang Gongcheng Management Services Co., Ltd.  ¶¶ 166-71, 239-56.[5]

---

[4] PCAOB AU Section 350 requires auditors to "sample" account balances and transactions to ensure accuracy and detect material misstatements. Audit "sampling" is application of an audit procedure, such as confirming account balances with third parties, to less than 100 percent of the items with an account balance or class of transactions.  Audit sampling provides necessary audit evidence upon which an auditor may base its opinion on a company's financial statements.

[5] PKF HK asserts (see PKF HK Mem. at p. 17, n.17) that it could not have seen and reviewed the audit reports of Expert Network filed with the local Chinese government because Expert Network's audit report for fiscal year 2004 was filed eight days after PKG HK signed its certification of CXTI's financial statements for fiscal year 2004.  However, PKF HK should have and could have seen Expert Network's audit report for fiscal year 2003, which stated that Expert Network only recorded $1.5 million in revenue – one third the amount of revenue that CXTI recorded it earned through Expert Network in fiscal year 2003 ($4.7 million).  ¶¶ 240, 254.  Thus PKF HK was clearly reckless in certifying CXTI's 2003 financial statements.  Also, had PKF HK seen and recognized that CXTI's 2003 financial statements were thus fraudulent, PKF HK should not have gone ahead and certified CXTI's 2004 financial statements without disclosing the prior fraud and without investigating in much greater depth CXTI's 2004 financial

PKF HK argues that the Complaint cannot allege that CXTI falsely recognized $8.9 million in revenue in 2004 for work Expert Network did pursuant to the contract with the Dehua municipal government because, despite that Expert Network was only paid $12,000 due to Dehua municipal government's lack of funds, Expert Network did $8.9 million worth of work. *See* PKF Mem. at pp. 12-13. PKF HK suggests that Plaintiffs do not understand the difference between revenue and cash receipts. For the Court to believe that PKF HK's fable could <u>possibly</u> be true, CXTI's accounts receivable would have had to have increased from year-end 2003 to year-end 2004 by <u>at least</u> $8,888,000, that is, the difference between the cash receipts of $12,000 and the $8.9 million of purported revenue it earned. But, in fact, according to CXTI's 2004 financial statements, the accounts receivable of CXTI increased by only $4,438,331, that is from $0 at year-end 2003 to $4,438,331 at year-end 2004. ¶ 76.[6]

Considering that PKF HK is one of the larger accounting firms in the world, for it to attempt to make such an argument that defies not only accounting rules but elementary mathematics belies PKF HK's sincerity. The Complaint alleges that CXTI's 2004 financial statements, which were certified by PKF HK, falsely recorded $8.9 million in revenue that Expert Network never received – and never earned. CXTI received $12,000 in cash because

---

statements. Moreover, PKF HK could have consulted with the auditor of the annual reports filed with the local Chinese government about Expert Network's 2004 financial statements before they were filed.

[6] Nowhere in the consolidated statements of operations or in the notes to the financial statements of CXTI's 2004 10KSB is there any reference to $4,449,669 in debt that was written off. *See* Declaration of Timothy W. Brown made in Opposition to Defendants' Motions to Dismiss, ¶ 7; Ex. 5. The only way to reconcile that CXTI did $8.9 million worth of work, received $12,000 in cash, and had an increase in accounts receivable by year-end of only $4,438,331 is if the accounts receivable during, but before the end of, 2004 increased by $8,888,000, and later got reduced to $4,438,331 by year-end 2004 because the difference of $4,449,669 was written off as bad debt. In fact, CXTI made no reference to such bad debt.

CXTI did work that was worth only $12,000.  Thus, PKF HK was reckless in certifying that CXTI earned $8.9 million in revenue from work done pursuant to the contract with Dehua municipal government in 2004 – because it clearly did not confirm with the Dehua municipal government that Expert Network did $8.9 million worth of work for, and earned $8.9 million in revenue from, the Dehua municipal government.

Additionally, it belies common sense for PKF HK to argue that PKF HK knew that the reason CXTI was only paid $12,000 for the $8.9 million worth of work it did was that the Dehua municipality government terminated its contract with Expert Network.  If PKF HK in fact knew that CXTI's contract with Dehua municipal government was terminated, then PKH HK could not have certified financial statements that failed to disclose that the contract was terminated.  Indeed, the 2004 financial statements of CXTI stated that the contract was due to be completed in 2006, and that Expert Network would receive $15 million in total for the work it was obligated to do pursuant to the contract from 2004 through 2006.  ¶ 93.  The most compelling inference from the allegations in the Complaint is that PKF HK never confirmed with the Dehua municipality government how much work Expert Network did, or how much the Dehua municipality government paid Expert Network.  Indeed, there is no other competing inference that is plausible, or even possible.

PKF HK also argues that the Complaint does not and cannot allege that PKF HK failed to confirm with Expert Network's only customer in 2003 -- and largest of two customers in 2004, Jinjiang Gongcheng Management Services Co., Ltd., that it paid Expert Network $4.7 million in 2003 and $17.8 million in 2004, as stated in CXTI's financial statements certified by PKF HK.  *See* PKF Mem. at pp. 13-14.  PKF HK indirectly suggests that the most reasonable inference is that, although Jinjiang Gongcheng Management Services Co., Ltd. did not pay Expert Network any of the $22.5 million, Jinjiang Gongcheng Management Services Co., Ltd. confirmed with

PKF HK that it did pay Expert Network $22.5 million in order to aid CXTI in defrauding PKF HK. PKF HK's speculative and pity-seeking theory is based solely on the Complaint's allegation that the principal of Jinjiang Gongcheng Management Services Co., Ltd. was also a project manager at Expert Network. ¶ 172.

However, the Complaint alleges PKF HK violated GAAS by failing to confirm the contracts and the revenue CXTI reported it earned with Expert Network's customers – that is the Dehua municipality government and Jinjiang Gongcheng Management Services Co., Ltd. ¶ 294. The Complaint also alleges that PKF HK violated GAAS by failing to confirm the contracts and revenue not just from CXTI's customers, but third parties, i.e., the Jinjiang municipal government. ¶¶ 275-77. Indeed, if it were true that Jinjiang Gongcheng Management Services Co., Ltd. were appointed to hire a company to do work for the Jinjiang municipality government, then Jinjiang Gongcheng Management Services Co., Ltd. was merely a general contractor, and it behooved PKF HK to make a confirmation with the true and ultimate customer, the Jinjiang municipality government.[7] The Complaint clearly alleges that PKF did not and could not have confirmed with the Jinjiang municipality government that Expert Network was paid $8.9 million for work Expert Network did for Jinjiang municipality government in 2004. Indeed, the Jinjiang Municipality confirmed with Plaintiffs' private investigator that it only paid Expert Network

_____

[7] It should be noted that contrary to the quotations of the Complaint made out of context by PKF HK, Jinjiang Gongcheng Management Services Co., Ltd. was not appointed by the Jinjiang municipality government "to assume the direct investment responsibility and to appoint a contractor for . . ." its e-government project. *See* PFK Mem. at p. 4 (misquoting the Complaint at ¶ 148). Rather, the Complaint alleges there that one of the fake contracts that CXTI filed with the SEC falsely states that Jinjiang Gongcheng Management Services Co., Ltd. was given the responsibility to appoint a contractor. The Complaint also alleges that an employee of the e-Government Office of Jinjiang Municipality stated that the Jinjiang municipality government never hired or appointed Jinjiang Gongcheng Management Services Co., Ltd. to do anything. ¶¶ 152, 155.

$600,000, and it paid that $600,000 pursuant to a contract for which CXTI recorded the revenue in 2006, not in 2004.  ¶¶ 140, 156-58, 174.

If PKF HK made the most minimal attempts to obtain evidence that Jinjiang Gongcheng Management Services Co., Ltd. paid Expert Network $22.5 million, it would have discovered that Jinjiang Gongcheng Management Services Co., Ltd. was not conducting any business whatsoever during the time that CXTI claimed it hired Expert Network.  Indeed, public registration records in the Industry and Commerce Administrative Bureau of Jinjiang City show that Expert Network's only customer in 2003 and largest of two customers in 2004, Jinjiang Gongcheng Management Services Co., Ltd., lost its business license in 2002.  ¶¶ 79, 166-71.  If PKF HK learned anything at all about Jinjiang Gongcheng Management Services Co., Ltd., it would have known that it was not in a position to hire or to pay Expert Network because Jinjiang Gongcheng Management Services Co., Ltd. could not do any business at all.

PKF HK's plea that the Court believe PKF HK made a third-party confirmation with Jinjiang Gongcheng Management Services Co., Ltd., and that Jinjiang Gongcheng Management Services Co., Ltd. facilitated the fraud perpetrated by CXTI on PKF HK as much as CXTI defrauded Plaintiffs is all the more incredible when considered in light of the fact that PKF HK could not have made a third-party confirmation with CXTI's only other customer in 2003 and 2004, the Dehua municipality government.  The most compelling inference, and only plausible inference, is that PKF HK never made a confirmation with Jinjiang Gongcheng Management Services Co., Ltd. or with the Jinjiang municipality government that Expert Network did any work for the Jinjiang municipality government for which it received any money in 2003 or 2004.

        **b.  PKF HK Violated GAAS By Not Confirming Customers Could Pay Despite CXTI's Use of the Percentage of Completion Method for Recognition of Revenue**

In addition to the shortcomings described above, PKF HK's argument that it did not violate GAAS in certifying CXTI's financial statements also ignores numerous other GAAS violations alleged in the Complaint.

One gross GAAS violation is that PKF HK certified the financial statements despite that CXTI used the percentage of completion method for recognition of revenue ("POC") -- as Defendant PKF HK admits.  PKF HK Mem. at p. 5, n.6; ¶ 259.  Under GAAP, one of the four conditions that must be met in order to use POC is that the purchaser is able to perform its obligations under the contract, i.e., to pay.  ¶ 259; *see also* Declaration of Timothy W. Brown made in Opposition to Defendants' Motions to Dismiss ("Brown Decl."), ¶ 3; Ex. 1; SOP 81-1 (§ 10330.23), p. 18878.  The Complaint alleges that this condition, among others, was not satisfied. ¶¶ 260-61.  PKF HK was thus required to study the financial position of Expert Network's two customers and confirm with them that they were able to pay for the services they agreed to pay for pursuant to the two purported contracts.  PKF HK did not confirm with any of Expert Network's two customers that they were able to pay.  If PKF HK had confirmed the customers' ability to pay, PKF would have discovered that CXTI never earned the revenue it claimed in the annual reports filed with the SEC and that the contracts between Expert Network and the Chinese local governments were fake.

The facts that by the end of 2004 Dehua County Municipality had only paid Expert Network $12,000 out of a $15 million contract and terminated the contract because Dehua County Municipality lacked sufficient funds further supports Plaintiffs' allegation that PKF HK did not attempt to determine whether the two customers were capable of paying Expert Network. ¶ 194.  Tellingly, PKF HK admits that Dehua County Municipality lacked sufficient funds.  *See* PKF HK Mem at pp. 12-13.

PKF HK's audit opinions were thus false statements because CXTI's financial statements recorded revenue using the POC method despite that PKF HK did not confirm any of the two customers' ability to pay.

### 4. PKF HK Recklessly Ignored Red Flags

Moreover, there were obvious red flags that required PKF HK to carefully investigate CXTI's revenue, cash, and accounts receivable, and such red flags were apparent even before PKF HK began its "audit." Had PKF HK heeded the red flags, PKF HK would have discovered that 99% of CXTI's revenue did not exist. *See In re LaBranche Sec. Litig.*, 405 F. Supp. 2d 333, 358, 359-62 (S.D.N.Y. 2005) (holding that the red flag cases "stand for the proposition that non-conclusory allegations that a corporate officer ignored 'reasonably available data that would have indicated that [a company's] statements were false and misleading' are adequate to plead recklessness or conscious disregard," quoting *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F.Supp.2d 474, 491 (2004)).

The red flags obvious to PKF HK were: **1)** CXTI's "business involves significant, unusual, or highly complex transactions," such as "significant operations located or conducted across international borders in jurisdictions where differing business environments and cultures exist" (¶¶ 288-89, 303; AU 316.85, Appendix); **2)** CXTI applied POC accounting, which is highly risky, to all of its contracts (¶¶ 290-91, 295-96; AU 316.41, 316.54, 316.29); **3)** accounts receivable grew substantially as a percentage of total assets each year to a high amount, the increase in accounts receivable each year relative to the revenue recognized in the respective year was also high, and the yearly increase in revenue was high.[8] ¶¶ 299-302; AU 316.70-72.

---

[8] PKF HK incorrectly argues (*see* PKF HK Mem. at p. 16) that the Complaint does not allege that the rapid increases in accounts receivable relative to the revenue recognized and relative to total assets was a bright red-flag for PKF HK because we do not allege such an increase from

*See also In re Winstar Communications*, 2006 WL 473885, at *11 (S.D.N.Y. Feb. 27, 2006) ("An auditor's reckless disregard of red flags, coupled with allegations of GAAP and GAAS violations, is sufficient to support a strong inference of scienter"); *Whalen v. Hibernia Foods PLC*, 2005 WL 1799370, at *3 (S.D.N.Y. Aug. 1, 2005) ("Plaintiffs allege . . . [Pricewaterhouse Cooper] knew about and ignored a wide variety of 'red flag' incidents or events, that should have put PwC on notice that fraud was afoot, and that taken together they are sufficient for the Court to find a strong inference of recklessness").

While it is a question of fact whether standing alone each of these red flags would have alerted a reasonable auditor that CXTI was committing fraud, each red flag certainly would have alerted an auditor that the risk of fraud was heightened. PKF HK's argument basically amounts to the idea that if a company has a large increase in revenue or accounts receivable the auditor should assume there is no fraud, and therefore should not investigate further. PKF HK recklessly certified CXTI's financial statements because PKF HK did not investigate <u>at all</u>. PKF HK simply ignored the bright red flags and made no third party confirmations at all.

### 5. The Complaint Does Not Allege "Fraud by Hindsight"

Additionally, PKF HK cannot claim that Plaintiffs claim fraud "based on hindsight." Plaintiffs do not just assume that CXTI and PKF HK committed fraud because CXTI practically vanished and that Jinjiang Gongcheng Management Services Co., Ltd. cannot be contacted or found, as PKF HK contends (*see* PKF HK Mem. at pp. 10-12, 14, n.15). Indeed, as set forth in

---

2003 to 2004. PKF HK's assertion here is false because the Complaint clearly alleges that this relative increase in accounts receivable was a red flag for each of the Auditor Defendants, including BDO. ¶ 293. Moreover, the Complaint states that accounts receivable as a percentage of total assets grew from 0% at the end of 2003 to 23% at the end of 2004. ¶ 301. The Complaint also shows that accounts receivable as a percentage of revenue recognized grew from 0% at the end of 2003 to 17% at the end of 2004. ¶¶ 76, 300-01.

detail above, Plaintiffs have alleged facts based on the findings of its private investigator, which were corroborated by several independent investigations (and by public documents filed with local Chinese governments), that practically every contract from which CXTI supposedly earned any revenue was completely fake, that none of the money from the phony contracts was ever received, and that PKF HK could not possibly have made confirmations with third parties without realizing CXTI's gargantuan fraud. ¶¶ 107-256. This is not a case of fraud by hindsight.

### B.  Plaintiffs Should Be Granted Leave to Amend

Plaintiffs should be granted leave to amend the Complaint if the Court grants BDO's motion to dismiss the Second Amended Complaint in any respect. This Court has stated:

> It is often appropriate for a district court, when granting a motion to dismiss for failure to state a claim, to give the plaintiffs leave to file an amended complaint. . . . [A] court granting a 12(b)(6) motion should consider a dismissal without prejudice when a liberal reading of the complaint gives any indication that a valid claim might be stated. . . . In particular, regarding claims of fraud, "[p]laintiffs whose complaints are dismissed pursuant to Rule 9(b) are typically given an opportunity to amend their complaint."

*In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 596 (S.D.N.Y. 2007).

### CONCLUSION

For the foregoing reasons, PKF HK's motion to dismiss Plaintiffs' Second Amended Complaint should be denied.

Respectfully submitted,

Dated January 28, 2010          **THE ROSEN LAW FIRM, P.A.**

/s/ Timothy W. Brown

Laurence M. Rosen, Esq. (LR 5733)
Timothy W. Brown, Esq. (TB 1008)
Julie Kamps, Esq. (JK 6041)
Phillip Kim, Esq. (PK 9384)
350 Fifth Avenue, Suite 5508
New York, New York 10118
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: tbrown@rosenlegal.com
Email: jkamps@rosenlegal.com
Email: pkim@rosenlegal.com

Lead Counsel for Plaintiffs and the Class

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of January, 2010, a true and correct copy of the foregoing PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO PKF HONG KONG'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT was served by CM/ECF to the parties registered to the Court's CM/ECF system.

Notice was provided via mail to:

China Expert Technology, Inc.,
C/O Registered Agent
Incorp Services, Inc.
3155 East Patrick Lane, Suite 1
Las Vegas, NV 89120-3481

/s/ Timothy W. Brown

27