UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------------X
CARLOS MUNOZ, INDIVIDUALLY AND                    CASE No.: 07-CV-10531 (AKH)
ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,
                                                  ECF
            Plaintiffs,


            vs.


CHINA EXPERT TECHNOLOGY, INC.;
PKF NEW YORK, CERTIFIED PUBLIC
ACCOUNTANTS, A PROFESSIONAL
CORPORATION, PKF HONG KONG,
CERTIFIED PUBLIC ACCOUNTANTS;
BDO MCCABE LO LIMITED
CERTIFIED PUBLIC ACCOUNTANTS,


            Defendants.
--------------------------------------------------------------------X


MEMORANDUM OF LAW IN OPPOSITION TO PKF NEW YORK'S
 MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT


                                    THE ROSEN LAW FIRM, P.A.

                                    Laurence M. Rosen, Esq.  (LR 5733)
                                    Email: lrosen@rosenlegal.com
                                    Timothy W. Brown, Esq. (TB 1008)
                                    Email: tbrown@rosenlegal.com
                                    Julie Kamps, Esq. (JK 6041)
                                    Email: jkamps@rosenlegal.com
                                    Phillip Kim, Esq. (PK 9384)
                                    Email: pkim@rosenlegal.com
                                    350 Fifth Avenue, Suite 5508
                                    New York, New York 10118
                                    Telephone: (212) 686-1060
                                    Fax: (212) 202-3827

                                    Lead Counsel for Plaintiffs and Class

## TABLE OF CONTENTS

Page(s)

STATEMENT OF FACTS…………………………………………………………………..2

ARGUMENT……………………………………………………………………………….12

  A.  PKF NY Acted Knowingly or Severely Recklessly……………………………………...12

        1.  Scienter Pleading Standard Under *Tellabs*…………………………………..13

        2.  PKF NY's Recklessness Was So Egregious that PKF NY Did Not
            Merely Commit a Few GAAP And GAAS Violations, PKF NY Did
            No Audit At All……………………………………………………………...…14

        3.  The Complaint Particularly Alleges That PKF NY Violated GAAS
            And GAAP…………………………………………………………………...…20

               a.  PKF NY Violated GAAS By Not Confirming With Third Parties
                   And Sources Independent of CXTI the Contractual Relationships
                   Between Expert Network And Its Two Customers………..…………21

               b.  PKF NY Violated GAAS By Not Confirming Customers Could
                   Pay Despite CXTI's Use of the Percentage of Completion Method
                   for Recognition of Revenue…………………………………………24

        4.  PKF NY Recklessly Ignored Red Flags……………...…………………25

        5.  PKF NY's Motive And Opportunity To Commit Fraud……...…...…………26

    B.  Plaintiffs Should Be Granted Leave To Amend…..…………………………..28

CONCLUSION...…………………………………………………………..…………….28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## CASES

*Decker v. Massey-Ferguson, Ltd.,*
    681 F.2d 111 (2d Cir. 1982)............................................................................20

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,*
    324 F.Supp.2d 474 (2004) ............................................................................25

*In re Complete Management Inc. Sec. Litig.,*
    153 F.Supp.2d 314 (S.D.N.Y. 2001)..............................................16, 17, 27

*In re Doral Financial Corp. Sec. Litig.,*
    63 F. Supp. 2d 461 (S.D.N.Y. 2008)..........................................................20

*In re Global Crossing, Ltd. Sec. Litig.,*
    322 F.Supp.2d 319 (S.D.N.Y. 2004)..........................................................27

*In re IAC/InterActiveCorp Sec. Litig.,*
    478 F. Supp. 2d 574 (S.D.N.Y. 2007)........................................................28

*In re LaBranche Sec. Litig.,*
    405 F. Supp. 2d 333 (S.D.N.Y. 2005)........................................................25

*In re Leslie Fay Cos. Sec. Litig.,*
    871 F. Supp. 686 (S.D.N.Y. 1995)......................................................18, 19

*In re MicroStrategy, Inc. Sec. Litig.,*
    115 F. Supp. 2d 620 (E.D. Va. 2000) ...................................................18, 27

*In re Oxford Health Plans, Inc. Sec. Litig.,*
    51 F.Supp.2d 290 (S.D.N.Y. 1999).......................................................16, 17

*In re Philip Services Corp. Sec. Litig.,*
    383 F.Supp.2d 463 (S.D.N.Y. 2004)..........................................................18

*In re Royal Dutch/Shell Transport Sec. Litig.,*
    380 F. Supp. 2d 509 (D.N.J. 2005) ............................................................18

*In re Williams Sec. Litig.,*
    339 F. Supp. 2d 1242 (N.D. Okla., 2003)...................................................27

*In re Winstar Communications,*
    2006 WL 473885 (S.D.N.Y. Feb. 27, 2006)..............................................26

*In re WorldCom, Inc. Sec. Litig.*,
2003 WL 21488087 (S.D.N.Y. June 25, 2003) ....................................................17

*McLean v. Alexander*,
599 F.2d 1190 (3d Cir. 1979)...............................................................................18

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000).............................................................................13, 14

*Rolf v. Blyth, Eastman Dillon & Co., Inc.*,
570 F. 2d 38 (2d Cir. 1978)...................................................................................15

*SEC v. Gold*,
2006 WL 3462103 (E.D.N.Y. Aug. 18, 2006) ......................................................15

*SEC v. KPMG LLP*,
412 F. Supp. 2d 349 (S.D.N.Y. 2006)...............................................................15, 18

*SEC v. Price Waterhouse*,
797 F.Supp. 1217 (S.D.N.Y. 1992)........................................................................16

*Tellabs v. Makor Issues & Rights, Ltd.*,
127 S. Ct. 2499 (2007)....................................................................................13, 27

*Whalen v. Hibernia Foods PLC*,
2005 WL 1799370 (S.D.N.Y. Aug. 1, 2005) .........................................................26

iii

# STATUTES AND RULES

§ 10330.23 ........................................................................................................24

15 U.S.C. § 78u-4(b)(1) ....................................................................................13

15 U.S.C. § 78u-4(b)(2) ....................................................................................13

PCAOB AU 150 .................................................................................................11

PCAOB AU 311.02 ..............................................................................................9

PCAOB AU 316.29 .............................................................................................26

PCAOB AU 316.41 .............................................................................................26

PCAOB AU 316.54 .............................................................................................26

PCAOB AU 316.70-72 ........................................................................................26

PCAOB AU 316.85 .............................................................................................26

PCAOB AU 326 .............................................................................................11, 23

PCAOB AU 326.02-08 ........................................................................................22

PCAOB AU 326.21(a) .........................................................................................22

PCAOB AU 330.04 .............................................................................................22

PCAOB AU 330.04-09 ........................................................................................11

PCAOB AU 330.06 .............................................................................................23

PCAOB AU 330.09 .............................................................................................23

PCAOB AU 330.32 .............................................................................................11

PCAOB AU 330.34 .........................................................................................11, 23

PCAOB AU 330.35 .........................................................................................11, 23

PCAOB AU 350 .............................................................................................24 n.4

PCAOB AU 543.04 ..............................................................................................9

Rule 12(b)(6) ......................................................................................................27

Lead Plaintiffs Joseph Nunn, Basil Hantash, Bashar Hantash, Anna Hantash and Kenneth Price, and named plaintiff Carlos Munoz, individually and on behalf of all other persons similarly situated ("Plaintiffs"), respectfully submit this memorandum of law in opposition to the motion to dismiss Plaintiffs' Second Amended Complaint ("Complaint")[1] filed by PKF New York, Certified Public Accountants ("PKF NY").

The Complaint alleges causes of action for securities fraud against China Expert Technology, Inc. (the "Company" or "CXTI") and PKF NY, as well as CXTI's other auditors, arising out of the Company's issuance, and the auditors' certifications, of entirely fraudulent financial statements for fiscal years 2003 to 2006. CXTI's 2003 and 2004 financial statements were audited and certified by PKF NY and PKF Hong Kong, Certified Public Accountants ("PKF HK") (collectively "PKF") and are the subject of this motion to dismiss by PKF NY and a separate motion to dismiss by PKF HK. This memorandum of law focuses only on the 2003 and 2004 financial statements audited and certified by PKF, and it addresses only the motion to dismiss by PKF NY in opposition thereto.

PKF HK's motion to dismiss is addressed by Plaintiffs' Memorandum of Law in Opposition to PKF HK's Motion to Dismiss Plaintiffs' Second Amended Complaint, dated January 28, 2010 and filed herewith. CXTI's 2005 and 2006 financial statements, which were audited and certified by BDO McCabe Lo Limited ("BDO") is the subject of a separate motion to dismiss by BDO and is addressed by Plaintiffs' Memorandum of Law in Opposition to BDO McCabe Lo Limited's Motion to Dismiss Plaintiffs' Second Amended Complaint, dated January 28, 2010 and filed herewith..

---

[1] Citations to the Second Amended Complaint will be referred to herein as "¶" followed by the numeral corresponding to the specific paragraph(s) cited therein.

Having established that CXTI was an absolute fraud at its core, Plaintiffs charged its auditor PKF NY with securities fraud for auditing, preparing and certifying CXTI's 2003 and 2004 financial statements. These fraud allegations are grounded on PKF NY's failure to perform the most basic audit procedures, violation of the most fundamental auditing standards, and ignoring red flags. Only an auditor that willfully turned a blind eye would have missed the red flags revealed by documentation and financial records of CXTI and third parties, including financial statements Expert Network filed with the Shenzen government and the registration documents filed by Jinjiang Gongcheng Management Services Co., Ltd., that show during 2003 and 2004 CXTI earned practically no revenue from the sixteen contracts with the five Chinese local governments and that CXTI practically did no business with them at all.

**STATEMENT OF FACTS**

CXTI is a Nevada corporation that maintained its headquarters and operations in China at the time of the alleged fraud. ¶ 17. PKF NY is an accounting firm based in New York. ¶ 19. PKF HK is the Hong Kong-based affiliate of PKF NY. ¶ 18. PKF NY provided audit services for the 2003 and 2004 audits of CXTI's financial statements. ¶ 35.

The class period begins on March 16, 2006 ("Class Period"), when CXTI filed with the SEC its fiscal 2005 annual report on Form 10-KSB, which included audited financial statements for the fiscal years 2003, 2004 and 2005 ("2005 Annual Report"). ¶ 82.

*CXTI'S BUSINESS WAS A SHAM*

During the class period, CXTI issued financial statements claiming it had earned $134 million of revenue from sixteen e-government contracts. ¶ 76. Fully 99% of CXTI's reported revenue for these fiscal years was completely fictitious. ¶ 257. CXTI's auditors, including PKF NY, prepared and certified CXTI's financial statements without performing the most

2

rudimentary auditing procedures to confirm that even one of the sixteen contracts was genuine or that even a tiny portion of the $134 million of reported revenue had actually been earned.  ¶¶ 76, 359-63.  CXTI was a complete fraud and the auditors were highly reckless in not confirming the existence of even 1% of the reported revenue.  Indeed, when investors and regulators got wind of the fraud in Autumn 2007, CXTI and its management vanished into thin air.  ¶¶ 330-41.

CXTI's 2003 and 2004 financial statements reported revenue of $5.7 million and $26.8 million, and net income of $1.2 million and $4.8 million, respectively.  ¶ 91.  2003 revenue of $4.7 million was reported to have been earned from a single e-government contract entered into by CXTI's main operating subsidiary, Expert Network (Shenzhen) Limited ("Expert Network") and the Jinjiang municipal government.  ¶ 93.  $26.7 million of 2004 revenue was reportedly earned from the same initial Jinjiang e-government contract (earning $17.8 million) and a new contract with Dehua municipal government (earning $8.9 million).  Thus, CXTI's 2004 revenue was supposedly earned from only two contracts.  ¶ 93.

### THE TRUTH SLOWLY EMERGES

On July 19, 2007, CXTI announced its Chief Financial Officer, Simon Fu, inexplicably resigned.  ¶ 342.  On August 14, 2007, CXTI announced it would file its quarterly report for the period ended June 30, 2007 with the SEC late.  ¶ 343.  Shortly thereafter rumors began spreading that CXTI's business was a fraud.  ¶ 345.  On September 27, 2007, CXTI announced it dismissed its auditor, BDO.  ¶ 346.  On October 1, 2007, the SEC issued an order halting trading of CXTI's stock because there "is a lack of current and accurate information concerning the securities of China Expert . . . [and] questions regarding the adequacy and accuracy of publicly disseminated information concerning [its] (1) financial performance and business prospects and (2) current financial condition.  The . . . public interest and the protection of investors require a suspension

3

of trading in the securities . . . ." ¶ 348.  Between July 19, 2007 when CXTI's CFO resigned and the SEC's suspension of trading on October 1, 2007, CXTI's stock price dropped from nearly $7.0/share to less than $0.20/share, devastating investors.  ¶¶ 342-49.

The Complaint contains detailed allegations that demonstrate that CXTI's financial statements were wholly fraudulent.  The Complaint describes in depth Plaintiffs' investigator's conversations with Chinese government agencies whose representatives stated that the agencies did not enter into e-government contracts with Expert Network and that the purported revenue earned by CXTI was fake.  ¶¶ 109-222.  Also, two other investigations corroborated Plaintiffs' investigator's findings.  ¶¶ 230-38.

CXTI purportedly earned over 99% of its revenue from CXTI's operating subsidiary, Expert Network.  Audited financial statements that Expert Network filed with the regional Shenzhen government show only a tiny fraction of the revenue reported in the financial statements audited and certified by PKF NY.  In its 2003 and 2004 audited financial statements filed with the Shenzhen government, Expert Network reported revenue of $1.46 million and $1.5 million, respectively, which stands in stark contrast to CXTI's 2003 and 2004 respective financial statements, certified by PKF NY, which reported revenue of $4.7 million and $26.7 million earned through Expert Network.  ¶¶ 93, 240, 249, 254-55.  Also, public registration records in the Industry and Commerce Administrative Bureau of Jinjiang City show that Expert Network's only customer in 2003 and largest of two customers in 2004, Jinjiang Gongcheng Management Services Co., Ltd., lost its business license in 2002.  ¶¶ 79, 166-71.

## *PKF NY SUBSTANTIALLY PARTICIPATED IN THE FRAUD*

PKF NY together with PKF HK (collectively "PKF") audited CXTI's financial statements for the fiscal years ended December 31, 2003 and December 31, 2004, which were

contained in CXTI's annual reports filed with the SEC during the Class Period.  ¶ 35.  PKF NY planned, directed, controlled and substantially participated in the audits of CXTI.  ¶ 36.  PKF NY had the power to influence and control, and did in fact influence and control, directly PKF HK's conduct in the audits of CXTI, including the manner of the audit, the adherence or non-adherence to GAAS and SEC rules, and the content and dissemination of CXTI's financial statements filed with the SEC that Plaintiffs contend are false and misleading.  ¶ 37.  PKF NY was provided with and had unlimited access to copies of the CXTI's internal financial records, audit related documents and all other information related to CXTI's financial statements.  PKF NY exercised direct control over the audits of CXTI and had the ability to prevent the issuance of the false and misleading financial statements or to cause the false statements described herein to be corrected.  ¶ 38.

Documents produced by PKF NY include a letter executed by PKF NY delineating the details of PKF NY's engagement by CXTI to discuss, review, supervise, direct and participate in the audits of CXTI.  These documents show that PKF NY directed PKF HK in the conduct of the audits and gave specific direction to PKF HK in connection with the audits of CXTI.  ¶ 39.  PKF NY was substantially involved in planning and developing the way that PKF conducted the audit.  PKF NY directed PKF HK as to the application of GAAS in the United States.  PKF NY also directed PKF Hong as to the accounting policies PKF should follow to ensure that the financial statements are consistent with GAAP.  ¶ 40.

Further evidence that PKF NY substantially participated in PKF's audits of CXTI is that PKF NY reviewed PKF HK's audit planning procedures, audit programs, and fraud considerations. ¶ 41.  42.    PKF NY also notified and advised PKF HK of items in CXTI's financial statements that were red flags and questionable under SEC requirements for reporting,

and analyzed actual checklists prepared by PKF HK to determine whether CXTI committed fraud. PKF NY's role was to ensure that CXTI's audited financial statements complied with SEC accounting rules and GAAP.

In particular, PKF NY was responsible to ensure the audit of CXTI adhered to proper auditing standards and that any indications of fraud committed by CXTI were closely examined and dispelled. ¶ 42. PKF NY reviewed and analyzed how the GAAP, GAAS, and SEC rules must be implemented in the audit of CXTI. PKF NY also examined the application of GAAP, GAAS and SEC rules to the specific facts upon which the CXTI audit was based such as the amounts of revenue recognized, and accounts receivable reported in PKF's audits of CXTI's financial statements. ¶ 43. PKF NY's active participation in conducting the audits of CXTI is evidenced by a PKF engagement letter, which stated that PKF NY attended meetings not only with PKF HK, but with CXTI senior management and CXTI's attorneys during which they discussed the CXTI audits. ¶ 44.

PKF NY was ultimately responsible for the CXTI audits because the Managing Director of PKF NY, Henry Freire, was the final person that had to approve the audit opinions and ensure compliance with GAAP and GAAS before PKF signed the certifications of CXTI's 2003 and 2004 financial statements. ¶ 45. Thus, Both PKF NY and PKF HK jointly prepared and issued the false and misleading audit opinion and certified CXTI's false financial statements for fiscal years 2003 and 2004. ¶ 46.

*CXTI AND THE PUBLIC ATTRIBUTED PKF'S AUDIT OPINIONS OF CXTI TO PKF NY AND PKF HK*

Both PKF NY and PKF HK provided audit services for the 2003 and 2004 audits of CXTI's financial statements. ¶ 35. PKF NY and PKF HK are separate legal entities, but frequently provide their services and represent themselves under the same moniker "PKF

Certified Public Accountants." Often they both simply referred to themselves publicly as "PKF." ¶¶ 47-52. PKF HK conducts business under the following names: (i) PKF, Certified Public Accountants; (ii) PKF; (iii) PKF-Hong Kong, Certified Public Accountants; and (iv) PKF-Hong Kong. ¶ 47. PKF NY conducts business conducts business under the following names: (i) PKF, Certified Public Accountants; (ii) PKF; and (iii) PKF, Certified Public Accountants, P.C. ¶ 48. Letterhead used by PKF NY also identifies PKF NY merely as "PKF" or by "PKF "Certified Public Accountants." ¶50; *see* Brown Decl., ¶ 8; Ex. 6. Even in Court filings in this matter, PKF NY has stated that its legal name is "PKF, Certified Public Accountants," which is the same name that the Hong Kong office of PKF uses. ¶ 51. Indeed, PKF HK and PKF NY are identified and referred to using the identical name: "PKF" in the public domain, and in CXTI's SEC filings and annual reports. ¶ 52. Because CXTI's annual report and financial statements attribute the audits to "PKF Certified Public Accountants" and to "PKF," CXTI investors attributed the audits of CXTI's 2003 and 2004 financial statements to both PKF NY and to PKF HK. ¶ 53. PKF's signature in certifying CXTI's financial statements is simply "PKF." Underneath PKF's signature is its description of itself: "Certified Public Accountants." Underneath PKF's description of its firm is the location of the office in which PKF made its signature: "Hong Kong." ¶ 54; *see* Brown Decl., ¶ 7; Ex. 5 at p. 14 (audit opinion signed "PKF").

The way that PKF signed its certification of CXTI's financial statements has caused the public to attribute PKF's certification to PKF NY as much as to PKF HK, with the understanding that it was executed by PKF in Hong Kong. ¶ 55. As PKF NY reviewed, directed, and controlled the audit, and as PKF NY Managing Director, Henry Freire, was the person that reviewed and gave final approval to PKF's audits of CXTI's 2003 and 2004 financial statements

before PKF signed the audit opinions, PKF NY was responsible for causing PKF's signature and the CXTI audits to be attributed to both PKF NY and PKF HK.  ¶ 56.

As further evidence that in certifying CXTI's financial statements, PKF made itself out to CXTI's investors to be both PKF HK and PKF NY, CXTI's 2004 Annual Report used the same name, "PKF Certified Public Accountants," (a name under which both PKF HK and PKF NY do business) to refer to both the activities of PKF NY and of PKF HK:

> **Audit Fees**
> The aggregate fees billed by PKF Certified Public Accountants, CXTI's previous independent auditors, for the audit of the Company's annual consolidated financial statements and reviews of quarterly financial statements for the years ended December 31, 2005 and 2004 were $7,712 and $119,537 respectively.
> * * *
> **Tax Fees**
> The aggregate fees billed by PKF, Certified Public Accountants, for tax compliance, advice and planning were still unknown for the fiscal year ended December 31, 2004. The Company has not been billed but the fees are expected to be approximately $2,000.

¶ 57.  Interestingly, the 2004 Annual Report states that "PKF Certified Public Accountants" are CXTI's auditors. It also says that "PKF Certified Public Accountants" are CXTI's principal accountants for tax compliance, advice and planning. Thus, the annual report shows that the auditor and the tax advice provider are the same entity.  ¶ 58.  PKF NY's office specifically entered into a contract with CXTI to provide tax compliance. Indeed, PKF NY was the principal accountant providing tax advice. ¶59.  As the annual report indicates that the auditor and the tax accountants are the same entity – "PKF Certified Public Accountants," as both New York and Hong Kong offices of PKF participated in CXTI's audits, and as PKF NY was clearly CXTI's primary accountant for tax compliance, naturally the public attributed PKF's certifications of CXTI's financial statements to both offices.  ¶ 60.  As PKF NY's Managing Director, Henry Freire, was required to approve the CXTI audits to ensure compliance with GAAP and GAAS before PKF could sign the audit opinion for CXTI's 2003 and 2004 financial statements, PKF

NY was responsible for causing CXTI investors to attribute the tax compliance work and the audit work to both PKF NY and PKF HK.  ¶ 61. Clearly PKF NY and PKF HK caused the public to attribute the PKF's certifications of CXTI's financial statements to both offices.  ¶ 62.

At a minimum, according to PKF NY, the U.S. affiliate accounting firm participates in audits conducted by a foreign accounting firm as a "Filing Reviewer," as set forth in Appendix K of the SECPS Reference Manual, which was adopted by the PCAOB. According to Appendix K (.01)(C), the Filing Reviewer is responsible for ensuring that the audit is not conducted in violation of PCAOB and SEC rules.  ¶ 65.  The U.S. affiliate accounting firm may act as an "assistant" auditor, which the PCAOB defines as an "auditor." PCAOB AU 311.02 states in pertinent part: "The auditor with final responsibility for the audit may delegate portions of the planning and supervision of the audit to other firm personnel. For purposes of this section, (a) firm personnel other than the auditor with final responsibility for the audit are referred to as assistants and (b) the term auditor refers to either the auditor with final responsibility for the audit or assistants."  ¶ 66.  Frequently assistant auditors and supervisor auditors are not even mentioned in audit opinions signed by principal auditors. Indeed, AU 543.04 states:

> If the principal auditor is able to satisfy himself as to the independence and professional reputation of the other auditor . . . and takes steps he considers appropriate to satisfy himself as to the audit performed by the other auditor . . . , he may be able to express an opinion on the financial statements taken as a whole without making reference in his report to the audit of the other auditor. If the principal auditor decides to take this position, he should not state in his report that part of the audit was made by another auditor because to do so may cause a reader to misinterpret the degree of responsibility being assumed.

¶ 67.  Thus, the U.S. affiliate firm, whether it is conducting the audit as a supervisor or otherwise as an assistant, is an "auditor," but often not a signatory of the audit opinion in which the U.S. affiliate may not be mentioned.  ¶ 68.  Thus, PKF's certification of CXTI's financial statements using the same name that both PKF NY and PKF HK use ("PKF Certified Public

Accountants") in conjunction with PKF's references to the activities done by both offices as done by "PKF Certified Public Accountants" caused the public to attribute the audit opinion to both PKF NY and PKF HK.  That the public attributed PKF's certification to PKF NY is further supported by the fact that, in general, public investors attribute audit opinions signed by foreign accounting firms to their U.S. affiliates.  ¶ 69.

*PKF NY'S SEVERELY RECKLESS "AUDIT"*

PKF NY audited and certified the 2003 and 2004 financial statements that were included in the 2004 Amended Annual Report.  ¶¶ 89-93.  PKF NY, together with PKF HK, stated in their audit opinion, dated February 22, 2005:

> We have audited the accompanying consolidated balance sheets of China Expert Technology, Inc. and its subsidiaries as of December 31, 2004 and 2003 and the related consolidated statements of operations, stockholders' equity and cash flows for each of the three years in the period ended December 31, 2004. . .
>
> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).  <u>Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.</u>  <u>An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements.</u>  An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.
>
> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of China Expert Technology, Inc. and its subsidiaries as of December 31, 2004 and 2003 and the consolidated results of their operations and their cash flows for each of the three years in the period ended December 31, 2004 in conformity with accounting principles generally accepted in the United States of America.

¶ 263; Exhibit 5, at p. 14, attached to the Declaration of Timothy W. Brown made in opposition to Defendants' Motions to Dismiss Plaintiffs' Second Amended Complaint ("Brown Decl.") at ¶ 7 (emphasis added).

Generally Accepted Auditing Standards ("GAAS"), which mandate the procedures an auditor must implement in auditing a publicly traded company, are promulgated by the Public Company Accounting Oversight Board ("PCAOB").  GAAS consists of ten standards.  ¶¶ 264-65.  The third General Standard is "Due professional care is to be exercised in the planning and performance of the audit and the preparation of the report."  ¶ 266.  The third Standard of Field Work is "Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit."  ¶ 269.

GAAS required PKF NY to obtain competent evidence that China Expert truly entered into two valid e-government contracts and had actually earned $26.7 million in 2004 and $4.7 million in 2003 pursuant to those two contracts with two municipal governments.  ¶¶ 264-69, 304 (citing PCAOB AU 150).  PKF NY was obligated to ***confirm* with sources independent of China Expert** the existence of the $4.4 million of accounts receivable at year-end 2004, and $0 of accounts receivable at year-end 2003.  ¶¶ 76, 92, 279 (citing AU 330.34, 330.35).  Given CXTI's $4.7 million of reported revenue in 2003, and $0 accounts receivable at year-end 2003, PKF NY was required to confirm that CXTI actually received $4.7 million of cash in 2003; similarly, given CXTI's $26.7 million of reported revenue in 2004, and $4.4 million of accounts receivable at year-end 2004 (which grew from $0 at the beginning of 2004), PKF NY was required to confirm that CXTI actually received $22.3 million of cash in 2004.  ¶¶ 271-81, 297, 303 (citing AU 326, 330.04-09, 330.32).

PKF NY failed to perform any audit at all on the $31.4 million in revenue CXTI earned through Expert Network during 2003 and 2004, given that of the two e-government contracts with two Chinese municipal governments from which China Expert claimed to have earned a

total of $31.4 million in revenue during 2003 and 2004, (a) Jinjiang municipality stated that it terminated its sole contract with CXTI, which according to the contract filed with the SEC was dated November 22, 2005, after paying CXTI a total of only $600,000 (¶¶ 140, 173-74); (b) Jinjiang Gongcheng Management Services Co., Ltd., which entered the contract to work with Jinjiang Municipality -- according to the only contract filed with the SEC that was dated before 2005, lost its business license in 2002 (¶¶ 79, 134-140, 166-71); and (c) Dehua municipality terminated its only contract with CXTI in 2004 and paid them only $12,160. ¶¶ 189-97. Thus, nearly all of CXTI's reported revenue was fake. If PKF NY had preformed any of the required audit procedures by confirming the revenue, contracts, or accounts receivable with third parties, it would have discovered that the contracts with Expert Network did not exist or had been terminated, that CXTI had earned only about $12,000 in revenue in total (not the $31.4 million reported as earned during 2003 and 2004), and that the $4.4 million of accounts receivable reported at year-end 2004 reported at year-end 2004 was fraudulent.

## ARGUMENT

### A. PKF NY Acted Knowingly or Severely Recklessly

PKF NY makes only one argument in support of its dismissal motion.[2] PKF NY contends that the Complaint does not sufficiently plead that it acted with scienter. *See* PKF NY Mem. at pp. 9-18. As set forth below, under the applicable pleading standards, Plaintiffs'

---

[2] In its Motion to Dismiss the Second Amended Complaint, PKF NY does not contend that it did not make false and misleading statements of material fact to Plaintiffs. *See* Memorandum of Law In Support of Defendant PKF NY's Motion to Dismiss Plaintiffs' Second Amended Complaint ("PKF NY Mem."). PKF NY is thus precluded from arguing in the future before this Court that it did not make any false and misleading statements of material fact to Plaintiffs. As an abundance of caution, Plaintiffs herein incorporate by reference pages 6-18 of Plaintiffs Memorandum of Law in Opposition to PKF NY'S Motion to Dismiss the First Amended Complaint, which shows why PKF NY did makes false and misleading statements of material fact to Plaintiffs. Docket # 45.

12

allegations against PKF NY state a valid claim and particularly provide a basis for showing that PKF NY acted knowingly or severely recklessly.  Thus, the Court must deny PKF NY's motion to dismiss.

### 1.  Scienter Pleading Standard Under *Tellabs*

The PSLRA requires the complaint to "state with particularity facts giving rise to a strong inference" of scienter.  *Novak v. Kasaks*, 216 F.3d 300, 306-07 (2d Cir. 2000) (quoting 15 U.S.C. § 78u-4(b)(1) and (b)(2)) (quotations omitted; emphasis omitted).  In evaluating scienter allegations, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically," and to "accept all factual allegations in the complaint as true." *Tellabs,* 127 S. Ct. at 2509, 2511.  The Supreme Court in *Tellabs* articulated the measure to determine whether the complaint pleads facts that give rise to a strong inference of scienter, holding: "A complaint will survive . . . if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 127 S. Ct. at 2510 (footnote omitted).

In the Second Circuit, scienter can be pled "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Id.* at 307 (citations omitted); *see also Tellabs v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2507 (2007).  Motive is not required to allege facts that give rise to a strong inference of scienter. *Id.* at 2511.  Allegations supporting a cogent and compelling inference that Defendants acted with "conscious misbehavior or recklessness" satisfy Plaintiffs' scienter pleading burden.

The allegations in the Complaint raise a very strong inference of PKF NY's "conscious misbehavior or recklessness," that PKF NY "engaged in deliberately illegal behavior," "knew

facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor." *Novak*, 216 F.3d at 308, 311. The most compelling and cogent inference here is that PKF NY knowingly or recklessly misled the investing public by performing none of the required audit procedures and falsely certifying as accurate CXTI's wholly fraudulent financial statements. PKF NY, in essence, performed "no audit at all." ¶ 6. The allegations in the Complaint also raise a strong inference of PKF NY's motive to mislead the public by falsely certifying CXTI's financial statements.

At a minimum, the allegations in the Complaint are certainly "at least as compelling as any opposing inference a reasonable person could draw from the facts alleged." *Id*. at 2510. Under *Tellabs*, that requires the Court to deny the motion to dismiss. *Id.*

### 2. PKF NY's Recklessness Was So Egregious that PKF NY Did Not Merely Commit a Few GAAP And GAAS Violations, PKF NY Did No Audit At All

PKF NY claims that the inference that the auditor was fooled by CXTI's management is the more compelling inference and thus that the Court should dismiss Plaintiffs' complaint for lack of sufficient allegations that PKF NY acted knowingly or severely recklessly. *See* PKF NY Mem. at p. 15. Under the facts alleged in the Complaint, however, PKF NY's desired inference is not the most compelling. The inferences that PKF NY either was severely reckless by failing to follow basic GAAS and GAAP and/or deliberately turned a blind eye to the Company's fraud are more cogent and compelling than the inference PKF NY urges, that it was "fooled." In stark contrast to PKF NY's bald claim of ignorance, Plaintiffs allege an extraordinary fraud that would have been uncovered if PKF NY had adhered to any one of a number of fundamental accounting standards. Plaintiffs have met the scienter pleading standard and PKF NY's dismissal motion should be denied.

14

Allegations of a recklessly performed audit approximate an auditor's intent and thus suffice to state a claim that the defendant auditor acted with scienter.  *SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 378 (S.D.N.Y. 2006) (in determining scienter of auditor defendants, stating "[t]he Second Circuit has long held that recklessness fulfills the standard of proof under Section 10(b)").  "Courts in this Circuit have recognized that scienter may be inferred where an auditor consciously disregards 'red flags,' or substantially ignores GAAS."  *SEC v. Gold*, 2006 WL 3462103, at *4 (E.D.N.Y. Aug. 18, 2006).  Auditors are rightfully held to a standard of care in performing their audit responsibilities and making statements to the investing public about the quality of the audited financials that reckless disregard of those fundamental tasks stands in for an auditor's confession of fraud (a rare occasion indeed).

The Second Circuit in *Rolf v. Blyth, Eastman Dillon & Co., Inc.* explained:

> [A] reckless misstatement, or an opinion based on grounds so flimsy as to lead to the conclusion that there was no genuine belief in its truth are . . . sufficient upon which to base liability. A *refusal to see the obvious*, a *failure to investigate the doubtful*, if sufficiently gross, may furnish evidence leading to an inference of fraud so as to impose liability for losses suffered by those who rely on the balance sheet. In other words, heedlessness and reckless disregard of consequence may take the place of deliberate intention.

570 F. 2d 38, 46 (2d Cir. 1978) (emphasis added); *see also SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 379 (S.D.N.Y 2006) ("a Section 10(b) plaintiff must [allege that] the audit amounted to no audit at all, [there was] an egregious refusal to see the obvious, or to investigate the doubtful, or . . . the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts").

Conscious misbehavior or recklessness is shown where a plaintiff alleges that:  (1) the accounting practices were so deficient that the audit amounted to no audit at all; (2) the audit amounted to an egregious refusal to see the obvious, or to investigate the doubtful; **or** (3) the

auditor's accounting judgments were such that no reasonable accountant would have made the same decisions if confronted with the same facts. *See*, *e.g.*, *In re Complete Management Inc. Sec. Litig.*, 153 F.Supp.2d 314, 333-34 (S.D.N.Y. 2001) (citing *SEC v. Price Waterhouse*, 797 F.Supp. 1217, 1240 (S.D.N.Y. 1992)); *see also In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F.Supp.2d 290, 295 (S.D.N.Y. 1999).

PKF NY is liable under this exact standard. This case is an extraordinary fraud. In fact, the fraud perpetrated by CXTI, BDO, PKF HK, and PKF NY is worse than the notorious Enron and WorldCom cases, in which those companies used accounting manipulations to inflate their revenue. Here, CXTI's business was a complete sham. Fully 99% of all of CXTI's revenue and accounts receivable recognized for fiscal years 2003 and 2004 in annual reports filed with the SEC simply never existed. ¶ 257.

PKF NY undertook to audit CXTI's 2003 and 2004 financial statements that the Company filed with the SEC in its annual reports. ¶ 19. PKF NY together with PKF HK certified to American investors that CXTI recognized over $31.4 million in revenue during 2003 and 2004 supposedly earned pursuant to two contracts with two Chinese local governments. ¶¶ 8, 79, 253. PKF NY could have easily and inexpensively confirmed the validity of the contracts, the revenue, and the accounts receivable related to work purportedly done for these two Chinese local governments, as they were obligated to do under GAAS. ¶ 71. Instead, PKF NY performed none of the required audit procedures and falsely certified as accurate CXTI's wholly fraudulent financial statements. Instead, PKF NY performed "no audit at all." ¶ 8.

Plaintiffs have alleged numerous GAAP and GAAS violations, as discussed below, that do not merely recite accounting principles, but set forth facts detailing the deficiencies in CXTI's financial reporting and PKF NY's audits of those financial reports. ¶¶ 225-71. These facts

16

adequately particularize how PKF NY violated the enumerated auditing standards, to such an extent that Plaintiffs sufficiently allege that PKF NY entirely failed to audit the Company's financial statements. *Id.*

Had PKF NY done any audit, then they would have found documentation and financial records of CXTI and third parties, including the audits of financial statements of CXTI's operating subsidiary, Expert Network, filed with the local Chinese government showing only a small fraction of the revenue recognized in the annual reports PKF NY certified, indicating that there was practically no revenue earned from the two contracts with the two Chinese local governments and that practically no business was even done with them. Had PKF NY done any audit at all, these red flags would have become obvious to them (as discussed in detail below in response to PKF NY's argument that the Complaint's allegations of red flags fails to support a strong inference of scienter). ¶¶ 8, 79, 255.

> *In re WorldCom, Inc. Securities Litigation* is instructive:
>
> Had Andersen reviewed WorldCom's accounting systems and data, as it was obligated to do, it would have discovered the lack of documentation and the fraudulent accounting treatment. . . . The allegations identifying the steps Andersen should have taken and failed to take, and the fraud it would have discovered if it had taken those steps, create a strong inference that Andersen acted recklessly in conducting the WorldCom audits. . . Although the size of the fraud alone does not create an inference of scienter, the enormous amounts at stake coupled with the detailed allegations regarding the nature and extent of WorldCom's fraudulent accounting and Andersen's failure to conduct a thorough and objective audit create a strong inference that Andersen was reckless in not knowing that its audit opinions materially misrepresented WorldCom's financial state.

2003 WL 21488087, at *7 (S.D.N.Y. June 25, 2003). *See also Complete Mgmt.*, 153 F. Supp. 2d at 334, citing *Oxford Health Plans*, 51 F.Supp.2d 290, 295 (S.D.N.Y. 1999) ("Here, plaintiffs make the critical allegation that if Andersen were conducting any kind of audit at all, they would have seen the potential problems with the GMMS receivables and the need to investigate further. . . . [S]uch allegations may be one of several 'red flags' that support an inference of

scienter"); *In re Philip Services Corp. Sec. Litig.*, 383 F.Supp.2d 463, 475 (S.D.N.Y. 2004), quoting *In re Leslie Fay Cos. Sec. Litig.*, 871 F. Supp. 686, 699 (S.D.N.Y. 1995) ("'[B]ecause the red flags would be clearly evident to any auditor performing its duties, one could reasonably conclude that [Deloitte] must have noticed the red flags, but deliberately chose to disregard them to avoid antagonizing [Philip] and incidentally frustrating its fraudulent scheme'").

        The most compelling and cogent inferences here are either (1) that PKF NY actually knew of the fraud, in which case its certifications were made knowingly falsely; or (2) that PKF NY did not know of the fraud, which could only happen as a result of audit procedures that were so sub-standard that the auditors would have to have known they were sub-standard and the auditor willingly refused to investigate the doubtful. *See Philip Services Corp.*, 383 F. Supp. 2d at 475 ("The enormity of the fraud attributed to Philip makes this finding particularly appropriate"); *In re Leslie Fay Cos. Sec. Litig.*, 835 F. Supp. 167, 175 (S.D.N.Y. 1993) ("when tidal waves of accounting fraud are alleged, it may be determined that the accountant's failure to discover his client's fraud raises an inference of scienter on the face of the pleading"); *In re Royal Dutch/Shell Transport Sec. Litig.*, 380 F. Supp. 2d 509, 570 (D.N.J. 2005) (finding that magnitude of fraud coupled with specific GAAS and GAAP violations created strong inference of auditor's recklessness); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 651 (E.D. Va. 2000) (finding strong inference of auditor's scienter could be inferred from magnitude and pervasiveness of MicroStrategy's GAAP violations; relative simplicity of the accounting principles violated; and importance of contracts involved); *see also SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 378 (S.D.N.Y. 2006), quoting *McLean v. Alexander*, 599 F.2d 1190, 1198 (3d Cir. 1979) ("A showing of shoddy accounting practices amounting at best to a pretended audit, or of grounds supporting a representation so flimsy as to lead to the conclusion that there was no

genuine belief back of it have traditionally supported a finding of liability in the face of repeated assertions of good faith. In such cases, the fact-finder may justifiably conclude that despite those assertions the danger of misleading was so obvious that the actor must have been aware of it").

PKF NY's plea of ignorance, and the inference it asks this Court to make, fails to account for the fact that PKF NY was charged with responsibilities under GAAS that it repeatedly claimed to have followed, but did not. Even if the Court assumes, *arguendo*, that PKF NY did not have actual knowledge of the fraud, it must find PKF NY acted recklessly with regard to the accuracy of its audit reports. PKF NY's claim of ignorance, therefore, does not exculpate PKF NY on a motion to dismiss. *Leslie Fay*, 835 F. Supp. at 175 (refusing to entertain, on motion to dismiss, "as BDO contends, it was as much a victim of the fraudulent inventory cover-up . . . as were plaintiffs").

Even if the documents CXTI provided to PKF NY and PKF HK fooled the auditors into thinking that the contracts were real, it would have been impossible for PKF NY to have been fooled if it simply confirmed, as required by GAAS, with third parties including CXTI's two customers or looked at public documents filed with the local Chinese governments (including CXTI's audit reports, which stated CXTI earned only a small fraction of the revenue it claimed in annual reports filed with the SEC, and CXTI's only customer in 2003 and main customer in 2004, Jinjiang Gongcheng Management Services Co., Ltd.'s registration documents, which showed it had no license to do business). Rather, PKF NY's failure to follow basic procedures enabled CXTI to make up essentially its entire business and all of its revenue; PKF NY made no confirmations with the two third–party customers or other sources independent of CXTI, and thus did no audit at all. PKF NY was severely reckless.

PKF NY inaptly relies on cases that note that it is possible for a company to hide its fraud from its auditor. *See* PKF NY Mem. at pp. 13-15. These cases are distinguishable from the allegations here. In *In re Doral Financial Corp. Securities Litigation* the auditor was not liable for not making confirmations from independent sources because, among other reasons, the complaint alleged that the independent parties from whom the auditors should have made confirmations were manipulated by management of the audited company. 563 F. Supp. 2d 461, 465-66 (S.D.N.Y. 2008). PKF NY also incorrectly relies on *Decker v. Massey-Ferguson, Ltd.*, in which the court found that the auditor was not liable for being aware that Massey annually overbilled distributors on average $5 million per year over a five-year period and made illegal payments to distributors so that they would cooperate in being overbilled. 681 F.2d 111, 118 (2d Cir. 1982). However, the overbillings and illegal payments consisted of less than two tenths of one percent of total revenue received by Massey, which was in the amount of $2.5 billion in 1975. *Id.* at 114. Indeed, Massey "was the largest manufacturer in the Western World of agricultural tractors and sugar cane harvesters and believed that its aggregate agricultural equipment sales in the entire non-Communist world were exceeded only by two other United States companies," and as it was "a holding company with over 100 subsidiaries scattered about the world." *Id.* at 114, 117. The court thus found that recklessness could not be inferred merely because the auditor did not catch such a <u>relatively</u> tiny error. Here, PKF NY enabled CXTI to make up essentially its entire business and all of its revenue; PKF NY made no confirmations with the two third party-customers or other sources independent of CXTI and thus did no audit at all. PKF NY was severely reckless.

### 3. The Complaint Particularly Alleges That PKF NY Violated GAAS And GAAP

PKF NY's argument that Plaintiffs fail to allege that PKF NY violated GAAS and GAAP

(*see* PKF NY Mem. at p. 16), is specious. Plaintiffs have made numerous allegations of GAAP and GAAS violations that do not merely recite accounting principles, but set forth facts detailing the deficiencies in CXTI's financial reporting and PKF NY's audits of those financial reports. ¶¶ 257-305.

### a. PKF NY Violated GAAS By Not Confirming With Third Parties And Sources Independent of CXTI the Contractual Relationships Between Expert Network And Its Two Customers

Plaintiffs allege that PKF NY abrogated its most basic audit responsibilities by failing to obtain any competent evidential matter to support its audit opinion. Whereas PKF NY certified to American investors that CXTI recognized over $31.4 million in revenue during 2003 and 2004 supposedly earned pursuant to two contracts with two Chinese local governments, the Complaint contends that PKF NY could have easily and inexpensively, as they were obligated under GAAS, confirmed the validity of the contracts, the revenue, and the accounts receivable related to work purportedly done for these two Chinese local governments. ¶¶ 8, 72, 79, 253. Instead, PKF NY performed none of the required audit procedures and falsely certified as accurate CXTI's wholly fraudulent financial statements. Thus, PKF NY, in essence, performed no audit at all. ¶ 8.

The central allegation in the Complaint is that PKF NY failed to obtain evidence from any third party or source independent of their client that their client's financial statements were truthful and non-fraudulent. While it is *possible* for an independent auditor to be fooled by the company it is paid to audit, the Complaint alleges that the only reason PKF NY could have been "fooled" was that PKF NY did not do its job at all, failing to confirm with any third parties whether CXTI's representations were true or false, to check documents filed with the local Chinese governments, including CXTI's operating subsidiary's audit reports (which stated CXTI earned only a small fraction of the revenue it claimed in annual reports filed with the SEC), or to

check registration documents of Jinjiang Gongcheng Management Services Co., Ltd. (which indicated it had no license to do business), from which Expert Network purportedly earned all of its revenue in 2003 and two thirds of its revenue in 2004.

The Complaint explains that at a minimum PKF NY violated the third General Standard and the third Standard of Field Work.  ¶¶ 264-65.  The third General Standard is "Due professional care is to be exercised in the planning and performance of the audit and the preparation of the report."  ¶ 266.  The third Standard of Field Work is "Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit."  ¶ 269.

Most of the independent auditor's work in forming his or her opinion on financial statements consists of obtaining and evaluating evidential matter concerning management's assertions concerning the financial statements, such as the existence of contracts, revenue and accounts receivable.  AU 326.02-08; ¶ 271.  When evidential matter can be obtained from independent sources outside an entity, it provides greater assurance of reliability for the purposes of an independent audit than that secured solely within the entity.  AU 326.21(a); ¶ 274.  Thus, auditors are required to obtain audit evidence supporting management's assertions from independent third parties.  This includes obtaining evidence confirming the existence of contracts, revenue, and accounts receivable upon which management bases assertions in the financial statements.  ¶ 275.  Confirmation is the process of obtaining and evaluating a direct communication from a third party in response to a request for information about a particular item affecting the financial statements.  AU 330.04.  Confirmation is undertaken to obtain evidence from third parties about financial statement assertions made by management because evidence

from independent third parties is presumed to be more reliable.  AU 330.06; AU 326; ¶ 276.  In some instances, third party confirmations are insufficient to reduce audit risk to an acceptably low level and the auditor is required to perform additional substantive procedures and tests of financial statement assertions.  AU 330.09; ¶ 277.

Moreover, AU Section 330.34 requires an auditor to confirm accounts receivable balances.  Confirmation of accounts receivable balances is mandatory unless the auditor documents the existence and applicability of one of three exceptions, none of which existed for and/or applied to CXTI.[3]  AU 330.35; ¶ 279.

In CXTI's case, all of the Company's revenue and accounts receivable were reported to have been earned for work done for two Chinese local governments pursuant to one contract in 2003 and two contracts in 2004, including the same contract in 2004.  With only two contracts and customers representing all of CXTI's revenue and accounts receivable in 2004, and only one such customer in 2003, GAAS requires PKF NY to have obtained sufficient evidential matter demonstrating the validity of each contract, the revenue derived therefrom, and accounts receivable claimed by the Company.   In this situation, PKF NY was required to contact customers directly to confirm the validity of the contracts, the revenue recognized, and the accounts receivable balance.  With such few customers, direct confirmation was the only appropriate method of confirmation.

There was no reason for the auditors to "sample," i.e., to confirm the contracts or accounts receivable with just a small portion of the total customers, as the total number of

_____

[3] The exceptions are: (i) use of confirmations would be ineffective, (ii) audit risk can be reduced to an acceptably low level by other analytical procedures besides confirmations, and (iii) accounts receivable are immaterial to the financial statements.

customers was under 10.[4]  ¶ 280.  PKF NY should have also tried to confirm that CXTI's representations were true by checking publicly available documents filed with the local Chinese governments including Expert Network's audit reports and the registration documents of Expert Network's customer Jinjiang Gongcheng Management Services Co., Ltd, which was its only customer for 2003 and its largest customer for 2004.  ¶¶ 166-71, 239-56.

### b. PKF NY Violated GAAS By Not Confirming Customers Could Pay Despite CXTI's Use of the Percentage of Completion Method for Recognition of Revenue

In addition to the shortcomings described above, PKF NY's argument that it did not violate GAAS in certifying CXTI's financial statements also ignores numerous other GAAS violations alleged in the Complaint.

One gross GAAS violation is that PKF NY certified the financial statements despite that CXTI used the percentage of completion method for recognition of revenue ("POC") -- as Defendant PKF HK admits.  PKF HK Mem. at p. 5, n.6; ¶ 259.  Under GAAP, one of the four conditions that must be met in order to use POC is that the purchaser is able to perform its obligations under the contract, i.e., to pay.  ¶ 259; *see also* Brown Decl. at ¶ 3; Ex. 1; SOP 81-1 (§ 10330.23), p. 18878.  The Complaint alleges that this condition, among others, was not satisfied.  ¶¶ 260-61.  PKF NY was thus required to study the financial position of Expert Network's two customers and confirm with them that they were able to pay for the services they agreed to pay for pursuant to the two purported contracts.  PKF NY did not confirm with <u>any</u> of Expert Network's two customers that they were able to pay.  If PKF NY had confirmed the

---

[4] PCAOB AU Section 350 requires auditors to "sample" account balances and transactions to ensure accuracy and detect material misstatements. Audit "sampling" is application of an audit procedure, such as confirming account balances with third parties, to less than 100 percent of the items with an account balance or class of transactions.  Audit sampling provides necessary audit evidence upon which an auditor may base its opinion on a company's financial statements.

customers' ability to pay, PKF NY would have discovered that CXTI never earned the revenue it claimed in the annual reports filed with the SEC and that the contracts between Expert Network and the Chinese local governments were fake.

The facts that by the end of 2004 Dehua County Municipality had only paid Expert Network $12,000 out of a $15 million contract and terminated the contract because Dehua County Municipality lacked sufficient funds further supports Plaintiffs' allegation that PKF NY did not attempt to determine whether the two customers were capable of paying Expert Network. ¶ 194. Tellingly, Defendant PKF HK admits that Dehua County Municipality lacked sufficient funds. *See* PKF HK Mem at pp. 12-13.

PKF NY's audit opinions were thus false statements because CXTI's financial statements recorded revenue using the POC method despite that PKF NY did not confirm any of the two customers' ability to pay.

### 4. PKF NY Recklessly Ignored Red Flags

Moreover, there were obvious red flags that required PKF NY to carefully investigate CXTI's revenue, cash, and accounts receivable, and such red flags were apparent even before PKF NY began its "audit." Had PKF NY heeded the red flags, PKF NY would have discovered that 99% of CXTI's revenue did not exist. *See In re LaBranche Sec. Litig.*, 405 F. Supp. 2d 333, 358, 359-62 (S.D.N.Y. 2005) (holding that the red flag cases "stand for the proposition that non-conclusory allegations that a corporate officer ignored 'reasonably available data that would have indicated that [a company's] statements were false and misleading' are adequate to plead recklessness or conscious disregard," quoting *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F.Supp.2d 474, 491 (2004)).

The red flags obvious to PKF NY were: **1)** CXTI's "business involves significant, unusual, or highly complex transactions," such as "significant operations located or conducted

across international borders in jurisdictions where differing business environments and cultures exist" (¶¶ 288-89, 303; AU 316.85, Appendix); **2)** CXTI applied POC accounting, which is highly risky, to all of its contracts (¶¶ 290-91, 295-96; AU 316.41, 316.54, 316.29); **3)** accounts receivable grew substantially as a percentage of total assets each year to a high amount, the increase in accounts receivable each year relative to the revenue recognized in the respective year was also high, and the yearly increase in revenue was high.  ¶¶ 299-302; AU 316.70-72. *See also In re Winstar Communications*, 2006 WL 473885, at *11 (S.D.N.Y. Feb. 27, 2006) ("An auditor's reckless disregard of red flags, coupled with allegations of GAAP and GAAS violations, is sufficient to support a strong inference of scienter"); *Whalen v. Hibernia Foods PLC*, 2005 WL 1799370, at *3 (S.D.N.Y. Aug. 1, 2005) ("Plaintiffs allege . . . [Pricewaterhouse Cooper] knew about and ignored a wide variety of 'red flag' incidents or events, that should have put PwC on notice that fraud was afoot, and that taken together they are sufficient for the Court to find a strong inference of recklessness").

While it is a question of fact whether standing alone each of these red flags would have alerted a reasonable auditor that CXTI was committing fraud, each red flag certainly would have alerted an auditor that the risk of fraud was heightened.  PKF NY's argument basically amounts to the idea that if a company has a large increase in revenue or accounts receivable the auditor should assume there is no fraud, and therefore should not investigate further.  PKF NY recklessly certified CXTI's financial statements because PKF NY did not investigate <u>at all</u>.  PKF NY simply ignored the bright red flags and made no third party confirmations at all.

### 5.  PKF NY's Motive And Opportunity To Commit Fraud

PKF NY had the specific motive to relegate its duty as an independent auditor for the purpose of maintaining and building its relationship with CXTI as its consultant for tax

compliance, advice and planning. ¶ 313; *see* Brown Decl., ¶ 7-8, Ex. 5 at p. 43 (Item 14), Ex. 6. Indeed, courts in this Circuit have repeatedly held that plaintiffs are able to adequately plead motive against an auditor sufficient to survive Rule 12(b)(6) motions in cases where the auditing company plays a dual role with respect to the client, collecting nonaudit fees in addition to its auditing fees. *See In re Global Crossing, Ltd. Sec. Litig.*, 322 F.Supp.2d 319, 345 (S.D.N.Y. 2004) (the court found plaintiffs' allegations that Arthur Andersen's motive to make profit through consulting fees led it to "abandon its obligations as an independent auditor"); *see also In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 334 (S.D.N.Y. 2001) (payment of auditor for auditing services and consulting services gave rise to allegation for motive or opportunity; these inferences coupled with other red flags established scienter); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 654 (E.D. Va. 2000) (noting that in dual role situations, an auditor may take on "a vested interest in the performance and profitability" of its client, and consequently "weaken[ ] its ability to rely on its reputation in countering as "irrational allegations that it participated in a client's fraud"). Where the presence of non-auditing fees are coupled with allegations of GAAP and GAAS violations, and red flags, the allegations of a strong profit motive to defraud becomes even more significant. *See*, *e.g.*, *In re Williams Sec. Litig.*, 339 F. Supp. 2d 1242, 1265 (N.D. Okla., 2003) (holding that motive to collect consulting fees, coupled with allegations that Ernst & Young violated GAAP and GAAS and disregarded numerous red flags, was enough to plead scienter).

Thus, the Complaint also alleges a concrete benefit of PKF NY, which considered in conjunction with facts giving rise to the inference of PKF NY's conscious misbehavior or recklessness gives rise to a strong inference of scienter which is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 127 S. Ct. at 2505.

27

### B.    Plaintiffs Should Be Granted Leave To Amend

Plaintiffs should be granted leave to amend if the Court grants PKF NY's motion to dismiss in any respect. This Court has stated:

> It is often appropriate for a district court, when granting a motion to dismiss for failure to state a claim, to give the plaintiffs leave to file an amended complaint. . . . [A] court granting a 12(b)(6) motion should consider a dismissal without prejudice when a liberal reading of the complaint gives any indication that a valid claim might be stated. . . . In particular, regarding claims of fraud, "[p]laintiffs whose complaints are dismissed pursuant to Rule 9(b) are typically given an opportunity to amend their complaint."

*In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 596 (S.D.N.Y. 2007).

## CONCLUSION

For the foregoing reasons, PKF NY's motion to dismiss Plaintiffs' Second Amended Complaint should be denied.

Respectfully submitted,

Dated: January 28, 2010                **THE ROSEN LAW FIRM, P.A.**

/s/ Timothy W. Brown

Laurence M. Rosen, Esq. (LR 5733)
Timothy W. Brown, Esq. (TB 1008)
Julie Kamps, Esq. (JK 6041)
Phillip Kim, Esq. (PK 9384)
350 Fifth Avenue, Suite 5508
New York, New York 10118
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: tbrown@rosenlegal.com
Email: jkamps@rosenlegal.com
Email: pkim@rosenlegal.com

Lead Counsel for Plaintiffs and the Class

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of January, 2010, a true and correct copy of the foregoing PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO PKF NEW YORK'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT was served by CM/ECF to the parties registered to the Court's CM/ECF system.

Notice was provided via mail to:

China Expert Technology, Inc.,
C/O Registered Agent
Incorp Services, Inc.
3155 East Patrick Lane, Suite 1
Las Vegas, NV 89120-3481


/s/ Timothy W. Brown