**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (LR 5733)
lrosen@rosenlegal.com
Phillip Kim, Esq. (PK 9384)
pkim@rosenlegal.com
Timothy W. Brown, Esq. (TB 1008)
tbrown@rosenlegal.com
350 Fifth Avenue, Suite 5508
New York, New York 10118
Telephone: (212) 686-1060
Fax: (212) 202-3827

Attorneys for Lead Plaintiffs and the Class

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

CARLOS MUNOZ, INDIVIDUALLY AND ON
BEHALF OF ALL OTHERS SIMILARLY
SITUATED,

               Plaintiff,

           vs.

CHINA EXPERT TECHNOLOGY, INC.; PKF NEW
YORK, CERTIFIED PUBLIC ACCOUNTANTS, A
PROFESSIONAL CORPORATION, PKF HONG
KONG, CERTIFIED PUBLIC ACCOUNTANTS;
AND BDO MCCABE LO LIMITED CERTIFIED
PUBLIC ACCOUNTANTS,

               Defendants.

-------------------------------------------------------------X

CASE No.: 07-CV-10531 (AKH)

THIRD AMENDED
COMPLAINT

Class Action

**JURY TRIAL DEMANDED**

     Lead Plaintiffs Joseph Nunn, Basil Hantash, Bashar Hantash, Anna Hantash and Kenneth

Price ("Lead Plaintiffs"), and named plaintiff Carlos Munoz ("Named Plaintiff"), individually and

on behalf of all other persons similarly situated, collectively "Plaintiffs," by their undersigned

attorneys, allege in this third amended complaint against defendants (the "Complaint") the following

based upon personal knowledge as to themselves and their own acts, and information and belief as to

all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys

and private investigators.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons

other than defendants who purchased the publicly traded common stock of China Expert

Technology, Inc. ("CXTI", or the "Company") between March 31, 2006, and October 1, 2007,

inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of

federal securities laws and pursue remedies under the Securities Exchange Act of 1934 (the

"Exchange Act").

2.       Lead Plaintiffs and Named Plaintiff, as set forth in their certifications previously

filed with the Court, which are incorporated  by reference herein, purchased CXTI securities at

artificially inflated prices during the Class Period and have been damaged thereby.

3.      At all relevant times herein, the Company's common stock was actively traded on the

NASDAQ OTC Bulletin Board under ticker "CXTI."

4.      During the Class Period, CXTI, a Nevada Corporation headquartered in the People's

Republic of China ("PRC"), reported aggregate revenue for fiscal years 2003-2006 of over $131

million from 16 different contracts to build e-government computer systems in the People's

Republic of China.  Ninety-nine percent of this reported revenue was never earned by, and never

paid to, CXTI.  The $131 million of revenue reported by CXTI was a fraud.  The Company simply

forged these contracts and claimed to have earned over $131 million of contract revenue when its

true earnings were less than $1.0 million.  By late 2007 CXTI ceased communications or to do business, and since then has abandoned its offices and website.

5.     PKF New York, Certified Public Accountants ("PKF NY"), PKF Hong Kong Certified Public Accountants ("PKF HK"), collectively "PKF", and BDO McCabe Lo Limited ("BDO"), are certified public accounting firms that audited and certified CXTI's financial statements issued during the Class Period.  These defendants completely abrogated their responsibilities as the Company's auditors by failing to check or confirm the existence of the $131 million of contract revenue and related accounts receivable reported in CXTI's financial statements for fiscal years 2003-2006.

6.     PKF HK is the Hong Kong-based affiliate office of an international association of certified public accounting firms operating under the name PKF International Limited.  PKF HK maintains an affiliate office in New York, NY with PKF NY.  PKF HK, together with PKF NY, audited CXTI's financial statements for the fiscal years ended December 31, 2003 and December 31, 2004, which were contained in CXTI's annual reports filed with the SEC during the Class Period. PKF HK and PKF NY are registered with the Public Company Accounting Oversight Board.

7.     Defendant BDO is the Hong Kong-based member of an international network of certified public accounting firms operating under the name BDO Seidman Alliance.  BDO audited CXTI's financial statements for the fiscal years ended December 31, 2005 and December 31, 2006, which were contained in CXTI's annual reports filed with the SEC for those same fiscal years.  BDO is registered with the Public Company Accounting Oversight Board.

8.     BDO, PKF HK and PKF NY are referred to herein collectively as the "Auditor Defendants."

3

9.    CXTI's financial statements violated generally accepted accounting principles ("GAAP") by falsely reporting revenue and accounts receivable during the Class Period. The Auditor Defendants falsely certified and opined that CXTI's financial statements were accurate and were prepared in accordance with GAAP, when in truth they were not. The Auditor Defendants also falsely certified and misrepresented that they had conducted the audits in conformity with generally accepted auditing standards ("GAAS") of the Public Company Accounting Oversight Board ("PCAOB") and falsely stated that they had examined, on a test basis, evidence supporting the amounts and disclosures in CXTI's financial statements. In truth, the Auditor Defendants consciously did not perform the audits in conformity with GAAS and, in knowing violation of GAAS, failed to obtain any evidence of the $131 million of contract revenue and related accounts receivable.

10.    Thus, CXTI and the Auditor Defendants made materially false and misleading statements.

11.    BDO and PKF knowingly or recklessly failed to follow generally accepted auditing standards in performing the audits of CXTI's financial statements during the Class Period. BDO's and PKF's knowing violation of GAAS were of the highest magnitude, as both failed to adhere to the most basic auditing standards, which required these auditors to confirm the existence of the 16 contracts and the $131 million in revenue and related accounts receivable that CXTI recognized for fiscal years 2003-2006 and reported during the Class Period.

12.    BDO and PKF knowingly committed fraud, or, at a minimum, were highly reckless in their failure to conduct any genuine audit at all of CXTI.

## FALSE AND MISLEADING STATEMENTS

13.    All of the financial statements issued by CXTI during the Class period violated GAAP by falsely reporting revenue and accounts receivable from non-existent contracts. Virtually none of the revenue was ever earned by, or paid to, CXTI.

14.    The Auditor Defendants falsely certified and opined that CXTI's financial statements were accurate and were prepared in accordance with GAAP, when in fact they were not.

15.    The Auditor Defendants falsely certified that they conducted their audits in conformity with GAAS and misrepresented that they had obtained sufficient evidence that CXTI had earned the $131 million of revenue and that the related $53.5 million of accounts receivable was genuine and properly recorded under GAAP.

16.    The Auditor Defendants violated GAAS by failing to perform rudimentary auditing procedures to confirm the existence of the 16 contracts pursuant to which CXTI purportedly earned revenue, the $131 million of revenue recognized by CXTI under the 16 contracts, and the $53.5 million of accounts receivable reported by CXTI during fiscal years 2003 through 2006.

17.    CXTI reported increasing revenue of $5.7 million in 2003, $26.8 million in 2004, $35.6 million in 2005 and $66.1 million in 2006 (and $13.2 million in 1Q07).

18.    All of the $131 million in revenue CXTI recognized for work done during the four-year period ended on December 31, 2006 came from 16 "e-government" contracts entered into by its wholly-owned subsidiary Expert Network (Shenzhen) Company Limited ("Expert Network") located in the PRC. A snapshot of the revenue and accounts receivable is as follows.

5

|  | 2003 | 2004 | 2005 | 2006 | Total |
|---|---|---|---|---|---|
| Revenue | $5,666,934 | $26,831,135 | $35,568,606 | $66,059,245 | $134,125,920 |
| Contracts Revenue Recognized | $4,700,000 | $26,700,000 | $35,300,000 | $65,400,000 | $132,100,000 |
| Contract Revenue as % of All Revenue | 82.90% | 99.50% | 99.20% | 99.00% | 98.50% |
| Accounts Receivable at year end | $0 | $4,438,331 | $15,423,852 | $33,631,372 | |

19.     More than 99% of CXTI's reported revenue for fiscal years 2003 through 2006 was fictitious.  In short, CXTI fabricated nearly all of its reported revenue and related accounts receivable for these four fiscal years.

20.     The five different Chinese local governments with which CXTI claimed to have signed 16 contracts, and from which CXTI claimed it had earned revenue, have told Plaintiffs' private investigator, whose findings were corroborated by other investigations published in the media, that the contracts either did not exist at all, or to the extent a contract may have existed, that the true contract price and the related revenue earned were only a tiny fraction of what CXTI reported in its financial statements.

21.     On March 31, 2006, CXTI filed its annual report on Form 10-KSB for the fiscal year ended December 31, 2005 (the "2005 Annual Report"). The 2005 Annual Report included audited financial statements for the fiscal three years ended December 31, 2003, December 31, 2004 and December 31, 2005.

22.     The 2005 Annual Report contained the audit report of BDO dated March 10, 2006, as independent registered public accountants, opining that CXTI's financial statements for the year ended December 31, 2005 were prepared in conformity with GAAP. BDO misrepresented that it had conducted the audit in conformity with GAAS and that it had obtained reasonable assurance that the

financial statements were free from misstatement, including obtaining evidence supporting the amounts and disclosures in the financial statements.

23.    The 2005 Annual Report also contained the audit report of PKF dated February 22, 2005, as independent registered public accountants, opining that CXTI's financial statements for the two fiscal years ended December 31, 2003 and December 31, 2004 were prepared in conformity with GAAP. PKF misrepresented that it conducted the audit in conformity with GAAS and that it had obtained reasonable assurance that the financial statements were free from misstatement, including obtaining evidence supporting the amounts and disclosures in the financial statements.

24.    On June 16, 2006, CXTI filed an amended annual report on Form 10-KSB for the year ended December 31, 2004 (the "2004 Amended Annual Report"). The 2004 Amended Annual Report included audited financial statements for each of the years ended December 31, 2003 and December 31, 2004, respectively.

25.    The 2004 Amended Annual Report contained the audit reports of PKF dated February 22, 2005 and March 10, 2006, as independent registered public accountants, opining that CXTI's financial statements for each of the years ended December 31, 2003 and December 31, 2004, respectively, were prepared in conformity with GAAP. PKF misrepresented that it conducted the audit in conformity with GAAS and that it had obtained reasonable assurance that the financial statements were free from misstatement, including obtaining evidence supporting the amounts and disclosures in the financial statements.

26.    On April 12, 2007, CXTI filed its annual report on Form 10-KSB for the year ended December 31, 2006 (the "2006 Annual Report").  The 2006 Annual Report included audited

7

financial statements for the fiscal years ended December 31, 2004, December 31, 2005, and December 31, 2006, respectively.

27.    The 2006 Annual Report contained the audit report of BDO dated April 3, 2007, as independent registered public accountants, opining that CXTI's financial statements for each of the years in the periods ended December 31, 2006 and 2005 were prepared in conformity with GAAP. BDO also misrepresented that it conducted the audit in conformity with GAAS and that it had obtained reasonable assurance that the financial statements were free from misstatement, including obtaining evidence supporting the amounts and disclosures in the financial statements.

28.    The 2006 Annual Report also contained the audit report of PKF dated February 22, 2005 and March 10, 2006, as independent registered public accountants, opining that CXTI's financial statements for the year ended December 31, 2004 were prepared in conformity with GAAP. PKF misrepresented that it conducted the audit in conformity with GAAS and that it had obtained reasonable assurance that the financial statements were free from misstatement, including obtaining evidence supporting the amounts and disclosures in the financial statements.

29.    The 2006 Annual Report contained a schedule listing the specific contracts from which CXTI's revenue had been earned.[1]  The schedule is as follows:

CXTI Projects as of December 31, 2006 (in $Million)

| Projects | Tentative Start Date | Target Completion Date | Contract Sum | Recognized in 2003 | Recognized in 2004 | Recognized in 2005 | Recognized in 2006 | O/S Contract Sum |
|---|---|---|---|---|---|---|---|---|

1 The audited financial statements for fiscal years 2003 through 2005 contained in the 2005 Annual Report and the audited financial statements for fiscal years 2003 through 2004 contained in the 2004 Amended Annual Report provide substantially the same financial information, such as revenue earned from each contract and the related accounts receivable, etc., as that provided in the audited financial statements contained in the 2006 Annual Report for those respective fiscal years.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Jinjiang (1st Phase) | Apr 03 | Jan 05 | 24.7 | 4.7 | 17.8 | 2.2 | -- | -- |
| Jinjiang (2nd Phase) | May 05 | Aug 06 | 9.9 | -- | -- | 7.9 | 2 | -- |
| Jinjiang (3rd Phase) | May 05 | Aug 06 | 12.5 | -- | -- | 6.7 | 5.9 | -- |
| Jinjiang (4th Phase) | Jan 06 | Oct 06 | 5.4 | -- | -- | -- | 5.4 | -- |
| Jinjiang System & Application Training | Feb 06 | Nov 06 | 1.7 | -- | -- | -- | 1.7 | -- |
| Jinjiang System Maint. | Feb 06 | Jan 09 | 3.8 | -- | -- | -- | 1.2 | 2.6 |
| Dehua (1st Phase) | Apr 04 | Aug 06 | 15.6 | -- | 8.9 | 6.7 | -- | -- |
| Dehua (2nd Phase) | Jan 05 | Nov 05 | 11.8 | -- | -- | 11.8 | -- | -- |
| Dehua (3rd Phase) | Jan 06 | Jun 07 | 9.2 | -- | -- | -- | 7.1 | 2.1 |
| Dehua (4th Phase) | Mar 06 | Dec 06 | 11.3 | -- | -- | -- | 11.4 | -- |
| Nan'an (1st Phase) | Aug 05 | Mar 07 | 13.1 | -- | -- | -- | 12.5 | 0.6 |
| Nan'an (2nd Phase) | Aug 06 | Jul 07 | 18.3 | -- | -- | -- | 7.7 | 10.6 |
| Huian | Jan 06 | Jul 08 | 14.5 | -- | -- | -- | 9 | 5.5 |
| Licheng | Nov 06 | Oct 09 | 31.2 | -- | -- | -- | -- | 31.2 |
| Shishi City | Oct 06 | Sep 09 | 37 | -- | -- | -- | -- | 37 |
| Yinzhou District Ningbo City (design & plan) | Apr 06 | Oct 06 | 0.3 | -- | -- | -- | 0.3 | -- |
| Jinjiang Unified Command System | Nov 05 | Mar 06 | 0.6 | -- | -- | -- | 0.6 | -- |
| Dehua Unified Command System | Mar 06 | Jul 06 | 0.6 | -- | -- | -- | 0.6 | -- |
| Cangshan District, Fuzhou | Jul 07 | Jun 09 | 12.7 | -- | -- | -- | -- | 12.7 |
| Minqing County, Fuzhou | Oct 07 | Sep 10 | 22.3 | -- | -- | -- | -- | 22.3 |
| Quangang District | Jul 07 | Aug 10 | 30.8 | -- | -- | -- | -- | 30.8 |
| Pingtan County, Fuzhou | Oct 07 | Sep 10 | 22.4 | -- | -- | -- | -- | 22.4 |
| Mawei District, Fuzhou | Oct 07 | Sep 10 | 21.7 | -- | -- | -- | -- | 21.7 |
| Yongtai County, Fuzhou | Jul 07 | Jun 10 | 28.5 | -- | -- | -- | -- | 28.5 |
| Total | | | 359.9 | 4.7 | 26.7 | 35.3 | 65.4 | 227.8 |

30.     On May 14, 2007 CXTI filed with the SEC its quarterly report for the three months ended March 31, 2007 ("1Q07 Quarterly Report"), stating that in the first quarter of 2007 CXTI earned $13,238,886 of revenue through Expert Network, its wholly-owned subsidiary. The 1Q07 Quarterly Report stated that the financial statements therein were prepared in conformity with GAAP.

## FACTUAL BASIS FOR ALLEGATIONS THAT
## CXTI'S REPORTED REVENUE IS FALSE

31.     Plaintiffs' private investigator, Steele Business Investigation Center ("SBCS"), interviewed various knowledgeable employees of the government departments in charge of e-government construction for which Expert Network purportedly built e-government computer systems pursuant to the 16 e-government contracts.

32.     SBCS found that based on its interviews with the government employees, in addition to other research, the contracts were fraudulent and falsified, and to extent *any* revenue *at all* was earned, the amount actually earned was only a tiny fraction of the amount reported by CXTI in its financial statements.  SBCS interviewed representatives of the PRC governmental counter-parties for all of the $131 million Expert Network supposedly earned pursuant to the 16 e-Government Contracts during fiscal years 2003 through 2006, except that SBCS did not investigate $0.3 million of work done for one governmental entity, Yinzhou Municipality, pursuant to one of the 16 contracts.

33.     Attached as Allegation Addendum 1 and incorporated by reference herein is a set of more detailed allegations as to SBCS's investigation of Expert Network's purported e-government contracts and the false revenue CXTI reported in its SEC filings to have derived therefrom.[2]

34.     Moreover, CXTI's audited financial statements found in annual reports for fiscal years 2003 through 2006 that were filed with the SEC are contradicted by Expert Network's audited financial statements filed with the Industry and Commerce Administrative Bureau of Shenzhen City for each of those fiscal years.

---

[2]  At the hearing on defendants' motion to dismiss on April 15, 2010, the Court requested that Plaintiffs file a much shorter and more concise amended complaint.  Plaintiffs have placed additional factual details supporting the allegations of falsity and scienter in the allegation addenda to provide the specificity required under the PSLRA and

### *SBCS's Investigation of the 16 E-Government Contracts*

### Nan'an Contracts

35.     The two putative contracts for e-government projects done for the Nan'an Municipality were entered into between Expert Network and Nan'an City Administrative Electronic Information Management Company Limited (the two "Nan'an Contracts").

36.     Nan'an Municipality employees never heard of, and did not hire or pay, Nan'an City Administrative Electronic Information Management Company Limited or Expert Network.

37.     SBCS searched for, and did not find, any information related to Nan'an City Administrative Electronic Information Management Company Limited through internet research, relevant database research, and telephone directory assistance that indicates it exists or ever existed.

38.     Therefore, the two Nan'an Contracts were forged.

39.     The $20.2 million CXTI recognized for work done by Expert Network pursuant to the two Nan'an Contracts during fiscal year 2006 was entirely false.

### Huian Contract

40.     The putative contract for an e-government project done for the Huian Municipality was entered into between Expert Network and Huian County Electronic Administration Management Company (the "Huian Contract").

41.     Huian Municipality employees never heard of, and did not hire or pay, Huian County Electronic Administration Management Company or Expert Network.

---

Rule 9(b).

42.    SBCS searched for, and did not find, any information related to Huian County Electronic Administration Management Company through internet research, relevant database research, and telephone directory assistance that indicates it exists or ever existed.

43.    Therefore, the Huian Contract was forged.

44.    The $9 million CXTI recognized for work done by Expert Network pursuant to the Huian Contract during fiscal year 2006 was entirely false.

### Dehua Contracts

45.    There were five putative contracts for e-government projects done for the Dehua Municipality entered into by Expert Network (the five "Dehua Contracts").

46.    One of the five putative Dehua Contracts was entered into between Expert Network and the Dehua Municipality (the "Dehua 1st Phase Contract").

47.    The Dehua Municipality employees stated that they paid Expert Network $12,126 pursuant to a contract between Expert Network and Dehua Municipality.

48.    Therefore, $15,587,874 of the $15.6 million CXTI recognized for work done by Expert Network pursuant to the Dehua 1st Phase Contract during fiscal years 2004 and 2005 was false.

49.    One of the five Dehua Contracts was entered into between Expert Network and Dehua County Electronic Administration and Contraction Management Company Limited.

50.    The remaining three of the five Dehua Contracts was entered into between Expert Network and Fujian Province Dehua County E-Government Construction Project Management Company Limited.

12

51.     Dehua Municipality employees never heard of, and did not hire or pay, Dehua County Electronic Administration and Contraction Management Company Limited or Fujian Province Dehua County E-Government Construction Project Management Company Limited.

52.     SBCS searched for and did not find any information related to Dehua County Electronic Administration and Contraction Management Company Limited or Fujian Province Dehua County E-Government Construction Project Management Company Limited through internet research, relevant database research, and telephone directory assistance that indicates they exist or ever existed.

53.     Therefore, four of the Dehua Contracts were forged.

54.     The $30.3 million CXTI recognized for work done by Expert Network pursuant to the Dehua Contracts other than Dehua 1st Phase Contract during fiscal year fiscal years 2005 and 2006 was entirely false.

55.     Including the Dehua 1st Phase Contract, $45,887,874 of the $45.9 million CXTI recognized for work done by Expert Network pursuant to the five Dehua Contracts during fiscal years 2004 through 2006 was false.

**Jinjiang Contracts**

56.     There were seven putative contracts for e-government projects done for the Jinjiang Municipality entered into by Expert Network (the seven "Jinjiang Contracts").

57.     Six of the seven putative Jinjiang Contracts were entered into between Expert Network and Jinjiang Gongcheng Management Services Co., Ltd ("Jinjiang Gongcheng").

58.     The Jinjiang Municipality employees stated that they never heard of, and did not hire or pay, Jinjiang Gongcheng.

59.    SBCS searched for and did not find any information related to Jinjiang Gongcheng through internet research, relevant database research, and telephone directory assistance that indicates it existed or did business after 2002.

60.    The registration information of Jinjiang Gongcheng, which was registered at the Industry and Commerce Administrative Bureau of Jinjiang City, revealed that the business license of Jinjiang Gongcheng was revoked on December 28, 2002, despite that CXTI claimed Expert Network entered all the Jinjiang Contracts after 2002.

61.    Moreover, Jinjiang Gongcheng was not registered to do e-government construction projects, but instead to do financial management for "Fujian Seaward Pharmaceutical Co., Ltd." Chinese law strictly prohibited Jinjiang Gongcheng from conducting business for which it was not registered.

62.    Therefore, six of the seven Jinjiang Contracts –the contracts between Expert Network and Jinjiang Gongcheng -- were forged.

63.    One of the seven putative Jinjiang Contracts was entered into between Expert Network and the Jinjiang City E-Government Project Construction Command Bureau (the "Jinjiang 7th Contract").

64.    The Jinjiang Municipality employees stated that they did hire Expert Network pursuant to one contract between Expert Network and the Jinjiang City E-Government Project Construction Command Bureau.  CXTI claimed to have earned only $0.6 million pursuant to the Jinjiang 7th Contract during fiscal year 2006.

14

65.     Therefore, at least $55.5 of the $56.1 million CXTI recognized for work done by Expert Network pursuant to the seven Jinjiang Contracts during fiscal years 2003 through 2006 was false.

**Findings of Plaintiffs' Private Investigator That CXTI's Reported Revenue Is False Were Corroborated by Several Independent Investigations**

66.     Journalist Roddy Boyd reported in the New York Post on September 19, 2007 about two investigations of Expert Network's purported 16 e-government contracts. Both investigations corroborated the findings of Plaintiffs' private investigator, SBCS.

67.     Mr. Boyd reported that the investigations were conducted by a well-known United States-based law firm and a Hong-Kong based investigative agency, respectively.

68.     Mr. Boyd reported that the results of both investigations revealed that, in the cities in which CXTI claimed to have done e-government construction projects through Expert Network, all but one of the city officials responsible for managing and hiring contractors to conduct e-Government Construction Projects stated that they did not enter into any contracts with Expert Network, and worse, had never even heard of Expert Network.

69.     Mr. Boyd reported that the investigations confirmed only one contract: that entered into by Expert Network to do an e-government construction project in Jinjiang Municipality, which is consistent with the findings of Plaintiffs' private investigator.

70.     Additionally, an investor and highly-followed financial blogger, Cabeza Howe, reported about an investigation on September 6, 2008 of the contracts that CXTI claimed to have entered into through Expert Network.

71.     The results of the investigation Mr. Howe conducted during the period of time beginning August 13, 2008 and ending September 6, 2008 also corroborate the investigation done by Plaintiffs' private investigator.

72.     Mr. Howe reported that officials in the governments of five of the municipalities in China with which CXTI claimed to have entered into contracts confirmed that that they did not enter into any e-government contract with Expert Network.

73.     Mr. Howe also reported on a contract that Plaintiffs' private investigator did not investigate.  Mr. Howe reported that a contract CXTI claimed in its 1Q07 Quarterly Report to have entered into with Xi'an City, which was purported to commence in September 2007, and from which CXTI did not yet claim to have earned any revenue, did not exist.

74.     Mr. Howe reported that a key official responsible for the planning, assessment, and monitoring of the Xi'an City's e-government construction projects said that Xi'an City did not enter into any contract with Expert Network.

### CXTI's Audited Financial Statements in Its Annual Reports Filed with the SEC Are Contradicted by Expert Network's Audited Financial Statements Filed with the Shenzhen Government

75.     Expert Network, as a Shenzhen, China-based company, was required to file registration documents and annual reports with the Industry and Commerce Administrative Bureau of Shenzhen City.

76.     On August 6, 2008, Plaintiffs' private investigator, SBCS, visited the Industry and Commerce Administrative Bureau of Shenzhen City and obtained the registration documents and annual reports for Expert Network for each of the fiscal years 2003 through fiscal 2006.

77.    The fiscal year end December 31, 2006 annual report for Expert Network contained an audit report dated April 19, 2007, with audited financial statements for Expert Network prepared and signed by Shenzhen Dadi Certified Public Accountants Ltd. ("Shenzhen Dadi").

78.    The 2006 audit report lists a beginning cash balance on December 31, 2005 of 1.7 million RMB ($210,651) and ending cash balance on December 31, 2006 of 77.8 million RMB ($9,963,246).

79.    The 2006 audit report lists receivables as 48.7 million RMB ($6.03 million) on December 31, 2005 and 51.1 million RMB ($6.54 million) on December 31, 2006.

80.    The 2006 audit report lists Expert Network's revenue for 2006 as 8.25 million RMB ($1.05 million) and for 2005 as 6.9 million RMB ($854,997).

81.    The 2006 audit report records a profit of 53,536 RMB for 2006 ($6,856) and a loss of 552,133 RMB for 2005 (-$68,416).

82.    The fiscal year end December 31, 2004 annual report for Expert Network filed with the Industry and Commerce Administrative Bureau of Shenzhen City contained an audit report dated March 2, 2005, with audited financial statements for Expert Network prepared and signed by Shenzhen Guangxin Certified Public Accountants. ("Shenzhen Guangxin").

83.    The 2004 audit report lists a beginning cash balance on December 31, 2003 of 338,275 RMB ($41,019) and an ending cash balance on December 31, 2004 of 128,802 RMB ($15,618).

84.    The 2004 audit report lists receivables as 51,857,316 RMB ($6.3 million) on December 31, 2003 and 9,755,408 RMB ($1.2 million) on December 31, 2004.

85.     The 2004 audit report lists Expert Network's revenue for fiscal 2004 as 12.1 million RMB ($1.46 million) and for fiscal 2003 as 12.6 million RMB ($1.5 million).

86.     The 2004 audit report shows a profit of 2.37 million RMB for fiscal 2004 ($287,384) and a profit for fiscal 2003 of 7.15 million RMB ($867,003).

87.     The revenue reported for Expert Network with the Industry and Commerce Administrative Bureau of Shenzhen City differs substantially from that reported by CXTI in its audited financial statements filed with the SEC.

88.     CXTI's annual reports filed with the SEC for fiscal 2004, 2005, and 2006 state that all of CXTI's revenue is generated from work done pursuant to 16 e-government services contracts to which Expert Network is a party.

89.     The total revenue reported in CXTI's SEC-submitted financial statements for fiscal 2006 is $66.1 million, for fiscal 2005 $35.6 million, and for fiscal 2004 $26.8 million.  Of those amounts, $65.4 million was earned from Expert Network in 2006, $35.3 million in 2005, $26.7 million in 2004 and $4.7 million in 2003 – according to CXTI's Annual and Quarterly Reports. Thus, only about $700,000 of revenue in 2006, $300,000 in 2005 and $100,000 in 2004, and $966,900 in 2003 was earned from sources other than Expert Network.

90.     Expert Network's 2003, 2004, 2005, and 2006 audit reports and financial statements filed with Industry and Commerce Administrative Bureau of Shenzhen City report revenue of only $1.05 million for 2006, $854,997 for 2005, $1.46 million for 2004, and $1.5 million for 2003, as compared to CXTI's audited financial statements submitted to the SEC, which show revenue recognized through Expert Network of $65.4 million in 2006 and $35.3 million in 2005, $26.7 million in 2004 and $4.7 million in 2003.

91.    The difference between the revenue reported by Expert Network in its 2003, 2004, 2005, and 2006 audited financial statements submitted to the Industry and Commerce Administrative Bureau of Shenzhen City and the amounts reported in CXTI's audited financial statements for fiscal years 2003 through 2006 is extraordinary.  For 2005 and 2006, the revenue amounts reported by Expert Network to PRC regulators were only 2% of the amounts reported in CXTI's financial statements submitted to the SEC for those periods.  For 2004, the revenue amount reported to PRC regulators by Expert Network was only 5% of the amounts reported in CXTI's financial statements submitted to the SEC for that period.  For 2003, the revenue amount reported by Expert Network in its PRC filings was only 32% of the amount reported in CXTI's financial statements filed with the SEC for that period.

92.    The tremendous discrepancy between the amounts of revenue reported to the SEC by CXTI and the tiny amount of revenue reported to the regional Chinese authorities by Expert Network further demonstrates that the revenue reported to the SEC by CXTI for work Expert Network performed during fiscal years 2003 through 2006 was wholly false.

## THE AUDITOR DEFENDANTS KNOWINGLY OR RECKLESSLY VIOLATED GENERALLY ACCEPTED AUDITING STANDARDS

93.    BDO and PKF failed to follow generally accepted auditing standards in performing the audits of CXTI's financial statements during the Class Period.  BDO's and PKF's audit failures were of the highest magnitude, as both failed to adhere to the most basic auditing standards pursuant to GAAS, which required these auditors to confirm the existence of the 16 contracts and the $131 million in revenue and related accounts receivable that CXTI recognized for fiscal years 2003-2006 and reported during the Class Period.

94.    BDO and PKF knowingly committed fraud or at a minimum were highly reckless in their failure to conduct any genuine audit at all of CXTI.

95.    CXTI, through Expert Network, had five customers that consisted of different Chinese local governments.  These five Chinese local governments accounted for all of the $131 million of contract revenue recognized by CXTI during fiscal years 2003-2006, pursuant to 16 contracts.  The Auditor Defendants could have easily and inexpensively confirmed the validity of the contracts, the revenue, and the accounts receivable related to work purportedly done for these five Chinese local governments. GAAS and the auditing standards of the Public Company Accounting Oversight Board required PKF and BDO to confirm the existence of the contracts, revenue and accounts receivable, by making third-party confirmations with CXTI's customers.

96.    For some of the purported 16 e-government contracts, the Chinese local governments were the direct customers of Expert Network.

97.    For some of the purported 16 e-government contracts, the Chinese local governments were the indirect customers of Expert Network, such that subcontractors of the respective Chinese local governments were the direct customers of Expert Network.

98.    The Auditor Defendants were required under GAAS to confirm the existence of the contracts, and the related accounts receivable with Expert Network's direct customers, which were the Chinese local governments in some cases and the subcontractors of the Chinese local governments in other cases.

99.    The Auditor Defendants were also required under GAAS to make its third-party confirmations with the Chinese local governments in those cases in which they were Expert Network's indirect customers.

20

100.    BDO and PKF falsely represented in their audit certifications that they did follow GAAS and did confirm the amounts reported as revenue and accounts receivable, when in truth they did not.

101.    Instead, the Auditor Defendants recklessly or intentionally failed to make any third-party confirmations with any of Expert Network's customers and falsely certified as accurate CXTI's wholly fraudulent financial statements.  The auditor defendants, in essence, performed no audit at all.

102.    The Auditor Defendants' scienter is also evident in that they should have checked Expert Network's audited financial statements filed with the local Chinese government for fiscal years 2003 through 2006.  Indeed, all Hong Kong accounting firms know that Chinese companies doing business in the PRC must file audited financial statements with the local Chinese government.  Clearly the Auditor Defendants recklessly failed to check, or knowingly ignored, these audited financial statements filed in the PRC, which stated that Expert Network's revenue and accounts receivable were far less than reported by CXTI in the annual reports it filed with the SEC (see above).

103.    The Auditor Defendants' scienter is also evidenced by the fact that they failed to meet the requirement of GAAP to confirm CXTI's customers' ability to pay because CXTI used the Percentage of Completion ("POC") method of recognizing revenue.  Clearly the Auditor Defendants did not confirm CXTI's customers' ability to pay because the e-Government Contracts were not executed by the parties.

104.    The fraudulent financial statements issued by CXTI and certified by its auditors created a market for CXTI securities that otherwise would never have existed.  CXTI's entire

21

business and its artificially inflated stock price were built upon a completely fraudulent set of financial statements.  When this fraud was discovered, the value of CXTI's common stock declined to pennies, damaging investors, and CXTI essentially disappeared into the ether.  CXTI is no longer an operating company and has abandoned it business.

105.    The Auditor Defendants' scienter is also evidenced by their failure to withdraw their audit opinions certifying CXTI's financial statements for fiscal years 2003 through 2006 (as required by GAAS) after they realized the financial statements were fraudulent and not in compliance with GAAP.

106.    The Auditor Defendants' scienter is even further evidenced by the magnitude of the fraud in that 99% of the revenue and accounts receivable reported in CXTI's SEC filings were false.

107.    Indeed, PKF and BDO ignored obvious red flags of fraud, failed to investigate the doubtful and turned a blind-eye to CXTI's fraud.

108.    Attached as Allegation Addendum 2 and incorporated by reference herein is a set of more detailed allegations that the Auditor Defendants knowingly or recklessly committed violations of GAAS and knowingly or reckless certified that CXTI's financial statements for fiscal years 2003 through 2006 were prepared fairly and in compliance with GAAP.

109.    Additionally, PKF NY had the specific motive to consciously disregard its duty as an independent auditor for the purpose of maintaining and building its relationship with CXTI as it derived, and hoped to continue to derive, additional fee income as CXTI's consultant for tax compliance, advice and planning.

110.     Further, PKF NY drafted an engagement letter that stated that it had a limited role as a participant in the audits of CXTI's 2004 financial statements that it conducted together with PKF HK. Whereas, PKF certified the 2004 financial statements on February 22, 2005, the engagement letter drafted by PKF NY was dated July 5, 2005, several months after PKF certified CXTI's 2004 financial statements. This reveals PKF NY's attempt in vain to hide, after-the-fact, its actual role as a full-fledged participant in PKF's audits of CXTI.

## PKF NY SUBSTANTIALLY PARTICIPATED IN THE FRAUD

111.     PKF NY planned, directed, controlled and substantially participated in the audits of CXTI.

112.     PKF NY had the power to influence and control, and did in fact influence and control, directly PKF HK's conduct in the audits of CXTI, including the manner of the audit, the adherence or non-adherence to GAAS and SEC rules, and the content and dissemination of CXTI's financial statements filed with the SEC that Plaintiffs contend are false and misleading.

113.     PKF NY was provided with and had unlimited access to copies of CXTI's internal financial records, audit related documents and all other information related to CXTI's financial statements.  PKF NY exercised direct control over the audits of CXTI and had the ability to prevent the issuance of the false and misleading financial statements or to cause the false statements described herein to be corrected.

114.     Documents produced by PKF include a letter executed by PKF NY delineating the details of PKF NY's engagement by CXTI to discuss, review, supervise, direct and participate in the audits of CXTI to discuss, review, and direct the audits of CXTI. These documents show that PKF

NY directed PKF HK in the conduct of the audits and gave specific direction to PKF HK in connection with the audits of CXTI.

115.    PKF NY was substantially involved in planning and developing the way that PKF conducted the audit. PKF NY directed PKF HK as to the application of GAAS in the United States. PKF NY also directed PKF Hong as to the accounting policies PKF should follow to ensure that the financial statements are consistent with GAAP.

116.    Further evidence that PKF NY substantially participated in PKF's audits of CXTI is that PKF NY reviewed PKF HK's audit planning procedures, audit programs, and fraud considerations.

117.    PKF NY also notified and advised PKF HK of items in CXTI's financial statements that were red flags and questionable under SEC requirements for reporting, and analyzed actual checklists prepared by PKF HK to determine whether CXTI committed fraud. PKF NY's role was to ensure that CXTI's audited financial statements complied with SEC accounting rules and GAAP. In particular, PKF NY was responsible to ensure the audit of CXTI adhered to proper auditing standards and that any indications of fraud committed by CXTI were closely examined and dispelled.

118.    PKF NY reviewed and analyzed how the GAAP, GAAS, and SEC rules must be implemented in the audit of CXTI. PKF NY also examined the application of GAAP, GAAS and SEC rules to the specific facts upon which the CXTI audit was based such as the amounts of revenue recognized, and accounts receivable reported in PKF's audits of CXTI's financial statements.

119.    PKF NY actively participated in conducting the audits of CXTI as evidenced by a PKF engagement letter, which stated that PKF NY attended meetings not only with PKF HK, but with CXTI senior management and CXTI's attorneys during which they discussed the CXTI audits.

120.    PKF NY was ultimately responsible for the CXTI audits because the Managing Director of PKF NY, Henry Freire, was the final person that had to approve the audit opinions and ensure compliance with GAAP and GAAS before PKF signed the certifications of CXTI's 2003 and 2004 financial statements.

121.    Both PKF NY and PKF HK jointly prepared and issued the false and misleading audit opinion and certified CXTI's false financial statements for fiscal years 2003 and 2004.

## CXTI AND THE PUBLIC ATTRIBUTED PKF'S AUDIT OPINIONS OF CXTI TO BOTH PKF HK AND PKF NY

122.    PKF HK conducts business under the following names: (i) PKF, Certified Public Accountants; (ii) PKF; (iii) PKF-Hong Kong, Certified Public Accountants; and (iv) PKF-Hong Kong.

123.    PKF NY conducts business under the following names: (i) PKF, Certified Public Accountants; (ii) PKF; and (iii) PKF, Certified Public Accountants, P.C.

124.    Both PKF HK and PKF NY operate under the name "PKF, Certified Public Accountants" and the name "PKF" without any meaningful distinction between the offices.

125.    Letterhead used by PKF NY also identifies PKF NY merely as "PKF" or by "PKF "Certified Public Accountants." Attached as Exhibit 1 is a copy of PKF NY's letterhead.

126.    Even in Court filings in this matter, PKF NY has stated that its legal name is "PKF, Certified Public Accountants," which is the same name that the Hong Kong office of PKF uses.

127.    Indeed, PKF HK and PKF NY are identified and referred to using the identical name: "PKF" in the public domain, and in CXTI's SEC filings and annual reports.

128.    Because CXTI's annual report and financial statements attribute the audits to "PKF Certified Public Accountants" and to "PKF," CXTI investors attributed the audits of CXTI's 2003 and 2004 financial statements to both PKF NY and to PKF HK.

129.    PKF's signature in certifying CXTI's financial statements is simply "PKF." Underneath PKF's signature is its description of itself: "Certified Public Accountants." Underneath PKF's description of its firm is the location of the office in which PKF made its signature: "Hong Kong." Attached as Exhibit 2 is a copy of PKF's audit opinion signed as "PKF."

130.    The way that PKF signed its certification of CXTI's financial statements has caused the public to attribute PKF's certification to PKF NY as much as to PKF HK, with the understanding that it was executed by PKF **in** Hong Kong.

131.    As PKF NY reviewed, directed, and controlled the audit, and as PKF NY Managing Director, Henry Freire, was the person that reviewed and gave final approval to PKF's audits of CXTI's 2003 and 2004 financial statements before PKF signed the audit opinions, PKF NY was responsible for causing PKF's signature and the CXTI audits to be attributed to both PKF NY and PKF HK.

132.    As further evidence that in certifying CXTI's financial statements, PKF made itself out to CXTI's investors to be both PKF HK and PKF NY, CXTI's 2004 Annual Report used the same name, "PKF Certified Public Accountants," (a name under which both PKF HK and PKF NY do business) to refer to both the activities of PKF NY and of PKF HK:

**Audit Fees**

26

The aggregate fees billed by PKF Certified Public Accountants, CXTI's previous independent auditors, for the audit of the Company's annual consolidated financial statements and reviews of quarterly financial statements for the years ended December 31, 2005 and 2004 were $7,712 and $119,537 respectively.

* * *

**Tax Fees**

The aggregate fees billed by PKF, Certified Public Accountants, for tax compliance, advice and planning were still unknown for the fiscal year ended December 31, 2004. The Company has not been billed but the fees are expected to be approximately $2,000.

133. Interestingly, the 2004 Annual Report states that "PKF Certified Public Accountants" are CXTI's auditors. It also says that "PKF Certified Public Accountants" are CXTI's principal accountants for tax compliance, advice and planning. Thus, the annual report shows that the auditor and the tax advice provider are the same entity.

134. PKF NY's office specifically entered into a contract with CXTI to provide tax compliance. Indeed, PKF NY was the principal accountant providing tax advice.

135. As the annual report indicates that the auditor and the tax accountants are the same entity – "PKF Certified Public Accountants," as both New York and Hong Kong offices of PKF participated in CXTI's audits, and as PKF NY was clearly CXTI's primary accountant for tax compliance, naturally the public attributed PKF's certifications of CXTI's financial statements to both offices.

136. As PKF NY's Managing Director, Henry Freire, was required to approve the CXTI audits to ensure compliance with GAAP and GAAS before PKF could sign the audit opinion for CXTI's 2003 and 2004 financial statements, PKF NY was responsible for causing CXTI investors to attribute the tax compliance work and the audit work to both PKF NY and PKF HK.

137. Clearly PKF NY and PKF HK caused the public to attribute the PKF's certifications of CXTI's financial statements to both offices.

27

138.    Moreover, PKF NY, in its motion to dismiss the First Amended Complaint in this matter, acknowledged that a U.S. accounting firm always participates in an audit that is also conducted by a foreign firm.

139.    For this last reason also, the public attributed PKF's certification of CXTI's 2003 and 2004 financial statements to PKF NY.

140.    At a minimum, according to PKF NY, the U.S. affiliate accounting firm participates in audits conducted by a foreign accounting firm as a "Filing Reviewer," as set forth in Appendix K of the SECPS Reference Manual, which was adopted by the PCAOB. According to Appendix K(.01)(C), the Filing Reviewer is responsible for ensuring that the audit is not conducted in violation of PCAOB and SEC rules.

141.    The U.S. affiliate accounting firm may act as an "assistant" auditor, which the PCAOB defines as an "auditor." PCAOB AU 311.02 states in pertinent part: "The auditor with final responsibility for the audit may delegate portions of the planning and supervision of the audit to other firm personnel. For purposes of this section, (a) firm personnel other than the auditor with final responsibility for the audit are referred to as assistants and (b) the term auditor refers to either the auditor with final responsibility for the audit or assistants."

142.    Frequently assistant auditors and supervisor auditors are not even mentioned in audit opinions signed by principal auditors. Indeed, AU 543.04 states:

> If the principal auditor is able to satisfy himself as to the independence and professional reputation of the other auditor . . . and takes steps he considers appropriate to satisfy himself as to the audit performed by the other auditor . . . , he may be able to express an opinion on the financial statements taken as a whole without making reference in his report to the audit of the other auditor. If the principal auditor decides to take this position, he should not state in his report that part of the audit was made by another auditor because to do so may cause a reader to misinterpret the degree of responsibility being assumed.

28

143.    Thus, the U.S. affiliate firm, whether it is conducting the audit as a supervisor or otherwise as an assistant, is an "auditor," but often not a signatory of the audit opinion in which the U.S. affiliate may not be mentioned.

144.    Thus, PKF's certification of CXTI's financial statements using the same name that both PKF NY and PKF HK use ("PKF Certified Public Accountants") in conjunction with PKF's references to the activities done by both offices as done by "PKF Certified Public Accountants" caused the public to attribute the audit opinion to both PKF NY and PKF HK.  That the public attributed PKF's certification to PKF NY is further supported by the fact that, in general, public investors attribute audit opinions signed by foreign accounting firms to their U.S. affiliates.

## LOSS CAUSATION

145.    The relevant truth began to enter the market and/or materialize through partial disclosures.  After market close on July 19, 2007, CXTI announced that its CFO Fu had suddenly resigned.  This announcement shocked the market and caused the Company's stock to decline from its closing price on July 19, 2007, of $6.45 per share to a closing price of $4.88 per share on July 20, 2007—a 24% decline.  The Company's stock continued to fall and eventually closed at $3.72 per share on July 24, 2007.

146.    On August 14, 2007, the Company announced that it had submitted to the SEC an automatic five-day filing extension request for its report for the second quarterly period ended June 30, 2007.  The Company stated the delay was caused by the resignation of CXTI CFO Fu.

147.    Upon information and belief, Fu resigned as CFO and CXTI was unable to timely file its quarterly report on Form 10-Q because of questions being raised concerning Expert Network's fraudulent e-Government Contracts.

148.    On September 2, 2007, news reported that CXTI's ticker symbol was changing because it was delinquent in its SEC filings. CXTI was delinquent because questions were being raised concerning the financial statements, particularly in the wake of the resignation of its CFO. This caused the stock price to fall 50%.

149.    Thereafter, articles were published by financial commentators calling into question CXTI's financials, its e-Government Contracts, and its credibility. This adverse news collectively caused the Company's stock to trade down further from an August 14, 2007 closing price of $3.46 per share to a closing price of $0.56 per share on September 28, 2007.

150.    On September 27, 2007, the Company filed a Form 8-K with the SEC announcing that on August 17, 2007, it had dismissed its auditor, BDO.

151.    Upon information and belief, CXTI dismissed BDO as its auditor because of questions being raised concerning Expert Network's fraudulent e-Government Contracts.

152.    On October 1, 2007, the SEC issued an order halting trading of the Company's stock from October 1, 2007, through October 12, 2007.  The SEC Order stated in relevant part:

> It appears to the Securities and Exchange Commission that there is a lack of current and accurate information concerning the securities of China Expert Technology, Inc. ("China Expert") because of questions regarding the adequacy and accuracy of publicly-disseminated information concerning, among other things, China Expert's: (1) financial performance and business prospects and (2) current financial condition. The Commission is of the opinion that the public interest and the protection of investors require a suspension of trading in the securities of the above-listed company.

153.    The Company's stock's last trade prior to the trading halt was at $0.58 per share.  On the first day of trading after the trading halt was lifted, the Company stock closed at $0.19 per share on October 15, 2007.

154.    Upon information and belief, the SEC halted trading in CXTI stock because suspicions were raised concerning Expert Network's fraudulent e-Government Contracts. The stock dropped as a result of the trading halt and the adverse news concerning CXTI's financial information.

## Applicability of Presumption of Reliance: Fraud-on-the-Market Doctrine

155.    At all relevant times, the market for CXTI's common stock was an efficient  market for the following reasons, among others:

(a)    CXTI's stock met the requirements for listing, and was listed and actively traded on the NASDAQ Bulletin Board, a highly efficient and automated market;

(b)    During the class period, on average,  2 million shares of  CXTI stock were traded on a weekly basis, demonstrating a very active and broad market for CXTI stock and permitting a very strong presumption of an efficient market;

(c)    As a regulated issuer, CXTI filed periodic public reports with the SEC and was eligible to file, and did file, short form registration statements with the SEC on Form S-3 during the Class Period;

(d)    CXTI regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the

31

national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)     CXTI was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace;

(f)     More than ten NASD member firms were active market-makers in CXTI stock at all times during the Class Period; and

(g)     Unexpected material news about CXTI was rapidly reflected and incorporated into the Company's stock price during the Class Period.

156.     As a result of the foregoing, the market for CXTI's common stock promptly digested current information regarding CXTI from all publicly available sources and reflected such information in CXTI's stock price. Under these circumstances, all purchasers of CXTI's common stock during the Class Period suffered similar injury through their purchase of CXTI's common stock at artificially inflated prices, and a presumption of reliance applies.

157.     Plaintiffs are also entitled to a presumption of reliance on the "fraud created the market" doctrine. The Company's fraudulent reports of false revenue and accounts receivable were the foundation on which the Company was built. Absent the false financial statements, CXTI would never have been able to trade in the public markets.

**JURISDICTION AND VENUE**

158.    The claims asserted herein arise under and pursuant to Section 10(b) of the Exchange Act, (15 U.S.C. §78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

159.    This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

160.    Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Moreover, during the Class Period CXTI common stock was traded on the NASDAQ OTC Bulletin Board, which is located in the Southern District of New York.

161.    The Court has jurisdiction over each of the defendants who filed and certified false and misleading financial statements with Securities & Exchange Commission.

162.    In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities exchange.

**PLAINTIFFS' CLASS ACTION ALLEGATIONS**

163.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons who purchased the common stock of CXTI during the Class Period and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company at all relevant times, members of their

immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

164.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, CXTI's securities were actively traded on the NASDAQ Bulletin Board.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds of members in the proposed Class.  Members of the Class may be identified from records maintained by CXTI or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

165.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

166.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

167.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)  whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether the financial statements issued by CXTI and audited by the Auditor Defendants were materially false; and

(c)  to what extent the members of the Class have sustained damages and the proper measure of damages.

168.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**FIRST CLAIM**
**Violation of Section 10(b) of**
**The Exchange Act Against and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

169.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

170.    This first claim for violation of §10(b) is alleged against all defendants.

171.    During the Class Period, Defendants CXTI, PKF HK, PKF NY and BDO carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other members of the Class to purchase CXTI's common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.  Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in

35

an effort to maintain artificially high market prices for CXTI's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein.

172.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of CXTI as specified herein.

173.    These Defendants employed devices, schemes and artifices to defraud and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of CXTI's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about CXTI and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of CXTI's common stock during the Class Period.

174.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of misrepresenting CXTI's true financial performance, operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock.

36

As demonstrated by Defendants' overstatements and misstatements of the Company's financial condition throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

175.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of CXTI's common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of CXTI's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired CXTI common stock during the Class Period at artificially high prices and were or will be damaged thereby.

176.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding CXTI's financial results, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their CXTI common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices that they paid.

177.    The Auditor Defendants each issued, caused to be issued or directed the issuance of the false and misleading CXTI audit opinions, and CXTI's fraudulent financial statements during the Class Period, as described above.

178.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

179.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

180.    This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of securities giving rise to the cause of action.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

(a)  Determining that this action is a proper class action, designating Lead Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiffs' counsel as Lead Counsel;

(b)  Awarding compensatory damages in favor of Plaintiffs against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)  Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)  Such other and further relief as the Court may deem just and proper.

38

Dated: May 28, 2010                    Respectfully submitted,

                                       **THE ROSEN LAW FIRM, P.A.**

                                       _____
                                       Timothy W. Brown, Esq. (TB 1008)
                                       Laurence Rosen, Esq. (LR 5733)
                                       Phillip Kim, Esq.  (PK 9384)
                                       350 Fifth Avenue, Suite 5508
                                       New York, NY  10118
                                       Phone: (212) 686-1060
                                       Fax: (212) 202-3827

                                       Lead Counsel for Lead Plaintiffs and the Class

41

# Allegation Addendum 1

## FACTUAL BASIS FOR ALLEGATIONS THAT
## CXTI'S REPORTED REVENUE IS FALSE

1.      All of the revenue recognized by CXTI and reported in its financial statements for the period beginning January 1, 2003 and ending March 31, 2007 ("CXTI's Annual and Quarterly Reports") was purportedly earned from 18 e-government contracts entered into between CXTI's wholly-owned subsidiary, Expert Network, and various Chinese regional governmental agencies.[1]  Each of the contracts was fraudulent and falsified, and to extent *any* revenue *at all* was earned, the amount actually earned was only a tiny fraction of the amount reported by CXTI in its financial statements.[2]

2.      The basis for the allegations that the 18 contracts are fraudulent is set forth below.

### Nan'an Contracts

3.      CXTI's Annual and Quarterly Reports were false and misleading in reporting that CXTI earned $12.5 million of revenue in 2006 and $0.6 million of revenue in 1Q07 from work Expert Network performed pursuant to an e-Government Contract with Nan'an City Administrative Electronic Information Management Company Limited dated July 12, 2005 (the "Nan'an 1st Phase Contract"), attached to Amendment No. 1 to the Registration Statement as reported in Form SB-2/A filed with SEC on May 3, 2006.

---

[1] Of the 18 e-Government contracts from which CXTI reported it recognized revenue in its 1Q07 Quarterly Report, revenue earned from work done pursuant to two of those contracts, those with government institutions in Licheng and Shishi City, was not recognized until the first quarter of 2007. CXTI reported revenue from work done pursuant to the other 16 e-Government contracts during the fiscal years 2003-2006.

[2] However, $2.8 million supposedly earned pursuant to three of the 18 e-Government Contracts has not been investigated as of yet.

4.      CXTI's Annual and Quarterly Reports were false and misleading in reporting that CXTI earned $7.7 million of revenue in 2006 and $4.7 million of revenue in 1Q07 from work Expert Network did pursuant to an e-Government Contract with Nan'an City Administrative Electronic Information Management Company Limited dated July 10, 2006 (the "Nan'an 2nd Phase Contract"), attached to the Current Report as reported in Form 8-K filed with SEC on July 18, 2006. (Nan'an 2nd Phase Contract).

5.      The statement made in the Registration Statement as reported in Form SB-2 filed with SEC on December 29, 2005, about the existence of an e-Government Contract entered into on May 8, 2003 by Expert Network and the People's Municipal Government of Nan'an City was false (the "Nan'an Municipal Government Contract").  *See* Nan'an Municipal Government Contract, attached to the Registration Statement as reported in Form SB-2 filed with SEC on December 29, 2005.[3]

6.      According to Nan'an 1st Phase Contract, Expert Network entered into a contract with the Nan'an City Administrative Electronic Information Management Company Limited "to undertake the planning, design and construction of the Nan'an e-Government System" ("Nan'an e-Government Project 1").

7.      According to Nan'an 2nd Phase Contract, Expert Network entered into a contract with the Nan'an City Administrative Electronic Information Management Company Limited "to undertake the Phase 2 of Nan'an City e-government construction project" ("Nan'an e-Government Project 2").

---

3  Although CXTI never recognized any revenue from the Nan'an Municipal Government Contract, that this contract never existed, and was forged, is supportive of the allegation that all of CXTI's contracts and revenue were fraudulent.

8.      According to Nan'an Municipal Government Contract, Expert Network entered into a contract with the People's Municipal Government of Nan'an City to undertake "the complete planning of the Nan'an city electronic government project and to design the construction proposal as well as to provide experts inquiry services"("Nan'an e-Government Project 3").

9.      According to Nan'an 1st Phase Contract, Nan'an City Administrative Electronic Information Management Company Limited "is a company directly authorized by the Nan'an City People's Government to carry out the planning, construction implementation and management of the Nan'an City e-government system on behalf of Nan'an City People's Government."

10.     On or about June 11, 2008, Ms. Juan Wu ("Private Investigator"), an employee of Steele Business Investigation Center ("SBCS"), interviewed via telephone an employee of the Nan'an Municipality Office.

11.     The employee of Nan'an Municipality Office said he never heard of Expert Network or of Nan'an City Administrative Electronic Information Management Company Limited, the company that, according to Nan'an 1st Phase Contract, is authorized by Nan'an Municipality to manage e-Government Construction Projects for Nan'an Municipality, including Nan'an e-Government Projects 1 and 2, which Expert Network was hired to do pursuant to Nan'an 1st Phase Contract and Nan'an 2nd Phase Contract.

12.     The employee of Nan'an Municipality Office said that the Private Investigator should speak to the Network Office of Nan'an Municipality, which is in charge of e-Government Construction Projects for Nan'an Municipality.

13.    On or about June 11, 2008, the Private Investigator interviewed via telephone an employee of the Network Office of Nan'an Municipality.

14.    The employee of Network Office of Nan'an Municipality stated that there were no e-Government Construction Projects for Nan'an Municipality after 2004, whereas Nan'an 1st Phase Contract was purportedly signed on July 12, 2005 and Nan'an 2nd Phase Contract was purportedly signed on July 10, 2006.

15.    The employee of Network Office of Nan'an Municipality stated that the only companies ever hired to do e-Government Construction Projects for Nan'an Municipality were companies based in Nan'an City, whereas Expert Network was based in another city: Shenzen City.

16.    The employee of Network Office of Nan'an Municipality stated that Nan'an Municipality did not enter a contract with Expert Network, and that he had never heard of Expert Network.

17.    The employee of Network Office of Nan'an Municipality stated that: a) Nan'an Municipality did not authorize Nan'an City Administrative Electronic Information Management Company Limited to manage e-Government Construction Projects for Nan'an Municipality, and b) he had never heard of Nan'an City Administrative Electronic Information Management Company Limited, the company that, according to Nan'an 1st Phase Contract, is authorized by Nan'an Municipality to manage e-Government Construction Projects for Nan'an Municipality, including Nan'an e-Government Projects 1 and 2, which Expert Network claimed it was hired to do pursuant to Nan'an 1st Phase Contract and Nan'an 2nd Phase Contract.

18.    The employee of Network Office of Nan'an Municipality stated that Network Office of Nan'an Municipality is in charge of website construction for Nan'an Municipality, and

that Administrative Service Center of Nan'an Municipality is in charge of other kinds of e-Government Construction Projects for Nan'an Municipality.

19.    On or about June 11, 2008, the Private Investigator interviewed on the telephone an employee, named Mr. Ye, of the Administrative Service Center of Nan'an Municipality.

20.    Mr. Ye stated that the Administrative Service Center of Nan'an Municipality was in charge of e-Government Construction Projects for Nan'an Municipality. Mr. Ye also stated that all e-Government Construction Projects for Nan'an Municipality are signed by the Administrative Service Center of Nan'an Municipality.

21.    On or about June 11, 2008, the Private Investigator sent a copy of Nan'an Municipal Government Contract, of Nan'an 1st Phase Contract, and of Nan'an 2nd Phase Contract, to Mr. Ye via e-mail.

22.    On or about June 11, 2008, the Private Investigator continued to interview via telephone Mr. Ye. Mr. Ye stated to the Private Investigator that: a) he had never before seen Nan'an Municipal Government Contract, Nan'an 1st Phase Contract, or Nan'an 2nd Phase Contract; b)  he had never heard of Expert Network; and c) Nan'an Municipality had never contracted an e-Government Construction Project to Expert Network.

23.    Mr. Ye also stated that if a company were authorized by Nan'an Municipality to hire (on Nan'an Municipality's behalf) other companies to do e-Government Construction Projects, any contracts entered into among those parties would have to be submitted to Nan'an Municipality for review and approval. Yet, not only were the employees of the Network Office of Nan'an Municipality and the Administrative Service Center of Nan'an Municipality unfamiliar with Nan'an Municipal Government Contract, Nan'an 1st Phase Contract, and Nan'an 2nd Phase Contract, but they had never even heard of Expert Network.

24.    SBCS did a search for Nan'an City Administrative Electronic Information Management Company Limited, the company that, according to Expert Network's Nan'an 1st Phase Contract, is authorized by Nan'an Municipality to manage e-Government Construction Projects for Nan'an Municipality.  Among those putative construction projects were Nan'an e-Government Projects 1 and 2, which Expert Network claims that it was hired to do pursuant to Nan'an 1st Phase Contract and Nan'an 2nd Phase Contract. However, SBCS did not find any information related to Nan'an City Administrative Electronic Information Management Company Limited through internet research, relevant database research, and telephone directory assistance.

25.    CXTI's Annual and Quarterly Reports misrepresented that CXTI had earned revenue from the Nan'an 1st and 2nd Phase Contracts. The reports falsely stated that CXTI earned $12.5 million of revenue in 2006 and $0.6 million of revenue in 1Q07 through Expert Network pursuant to Nan'an 1st Phase Contract, and falsely reported that CXTI earned $7.7 million of revenue in 2006 and $4.7 million of revenue in 1Q07 through Expert Network pursuant to Nan'an 2nd Phase Contract. The reported data were false because:

(a)    Administrative Service Center of Nan'an Municipality, which manages e-Government Construction Projects for Nan'an Municipality, never signed Nan'an 1st Phase Contract, Nan'an 2nd Phase Contract, or any other contract with Expert Network;

(b)    Administrative Service Center of Nan'an Municipality did not authorize Nan'an City Administrative Electronic Information Management Company Limited to manage any e-Government Construction Projects for Nan'an Municipality, including Nan'an e-Government Projects 1 and 2, which Expert

Network was hired to do pursuant to Nan'an 1st Phase Contract and Nan'an 2nd Phase Contract;

(c)      Nan'an City Administrative Electronic Information Management Company Limited does not exist;

(d)      Neither Nan'an 1st Phase Contract nor Nan'an 2nd Phase Contract was ever signed by Nan'an City Administrative Electronic Information Management Company Limited;

(e)      Nan'an 1st Phase Contract and Nan'an 2nd Phase Contract are forged documents; and

(f)      Employees in each of the Nan'an Municipality Office, the Network Office of Nan'an Municipality, and the Administrative Service Center of Nan'an Municipality have never even heard of Expert Network.

26.      Thus, none of the $25.5 million of Revenue Reported in CXTI's Annual and Quarterly Reports for e-Government Construction Projects done by Expert Network for the Nan'an Municipality was ever earned by CXTI.

27.      Additionally, the statement made in the Registration Statement as reported in Form SB-2 filed with SEC on December 29, 2005 about the existence of the "Nan'an Municipal Government Contract" was false and misleading because:

(a)      Administrative Service Center of Nan'an Municipality, which manages e-Government Construction Projects for Nan'an Municipality, never signed Nan'an Municipal Government Contract or any other contract with Expert Network;

(b)    The People's Municipal Government of Nan'an City never signed the Nan'an Municipal Government Contract or any other contract with Expert Network;

(c)    Nan'an Municipal Government Contract is a forged document; and

(d)    Employees in each of the Nan'an Municipality Office, the Network Office of Nan'an Municipality, and the Administrative Service Center of Nan'an Municipality have never even heard of Expert Network.

### Jinjiang Contracts

28.    CXTI's Annual and Quarterly Reports misrepresented virtually the entire amount of revenue it reportedly earned from a putative e-Government Contract with Jinjiang Gongcheng Management Services Co., Ltd. (the "Jinjiang Gongcheng 1st Phase Contract"). The financial statements falsely stated that CXTI earned $4.7 million of revenue in 2003, $17.8 million of revenue in 2004, and $2.2 million of revenue in 2005 from work Expert Network did pursuant to Jinjiang Gongcheng 1st Phase Contract, which was dated April 30, 2003 and was attached to the Registration Statement as reported in Form SB-2 filed with SEC on December 29, 2005.

29.    CXTI's Annual and Quarterly Reports were false and misleading in reporting that CXTI earned $7.9 million of revenue in 2005 and $2.0 million of revenue in 2006 from work Expert Network did pursuant to an e-Government Contract with Jinjiang Gongcheng Management Services Co., Ltd. dated March 20, 2005 (the "Jinjiang Gongcheng 2nd Phase Contract"), attached to the Registration Statement as reported in Form SB-2 filed with SEC on December 29, 2005.

30.    CXTI's Annual and Quarterly Reports were false and misleading in reporting that CXTI earned $6.7 million of revenue in 2005 and $5.9 million of revenue in 2006 from work

Expert Network did pursuant to an e-Government Contract with Jinjiang Gongcheng Management Services Co., Ltd. dated May 5, 2005 (the "Jinjiang Gongcheng 3rd Phase Contract"), attached to the Registration Statement as reported in Form SB-2 filed with SEC on December 29, 2005.

31.    CXTI's Annual and Quarterly Reports were false and misleading in reporting that CXTI earned $5.4 million of revenue in 2006 from work Expert Network did pursuant to an e-Government Contract with Jinjiang Gongcheng Management Services Co., Ltd. dated December 29, 2005 (the "Jinjiang Gongcheng 4th Phase Contract"), attached to Amendment No. 1 to the Registration Statement as reported in Form SB-2/A filed with SEC on May 3, 2006.

32.    CXTI's Annual and Quarterly Reports were false and misleading in reporting that CXTI earned $1.7 million of revenue in 2006 from work Expert Network did pursuant to an e-Government Contract with Jinjiang Gongcheng Management Services Co., Ltd. dated February 15, 2005 (the "Jinjiang System & Application Training Contract" or the "Jinjiang Gongcheng 5th Contract"),[4] attached to Amendment No. 1 to the Registration Statement as reported in Form SB-2/A filed with SEC on May 3, 2006.

---

[4] The Amendment No. 1 to the Registration Statement as reported in Form SB-2/A filed with SEC on May 3, 2006 on page II-8 refers to the name of the party that entered the Jinjiang Gongcheng 5th Contract with Expert Network as "Jinjiang City E-Government Project Construction Command Bureau," whereas the Jinjiang Gongcheng 5th Contract itself refers to the name of that party as "Jinjiang City Gong Cheng Management Limited Company." (See, CXTI SB-2/A  5-3-06), p. II-8; (Jinjiang Gongcheng 5th Contract). That CXTI sometimes called the company that supposedly hired Expert Network according to the Jinjiang Gongcheng 5th Contract by one name and sometimes by another name supports Plaintiffs' claim that Jinjiang Gongcheng 5th Contract is forged. Similarly, Amendment No. 1 to the Registration Statement as reported in Form SB-2/A filed with SEC on May 3, 2006 does not consistently refer to the party that entered the Jinjiang Gongcheng 2nd Phase Contract with Expert Network by the same name. Indeed, on page 30 of Form SB-2/A that party is referred to as "Jinjiang Gongcheng Management Co. Ltd," whereas on page II-4 of Form SB-2/A the party is referred to as "Jinjiang Gongcheng Management Services Co., Ltd." *See* SB-2/A 5-3-06, p. 30, II-4.

33.     CXTI's Annual and Quarterly Reports were false and misleading in reporting that CXTI earned $1.2 million of revenue in 2006 and $0.3 million of revenue in 1Q07 from work Expert Network did pursuant to an e-Government Contract with Jinjiang Gongcheng Management Service Co., Ltd. dated January 30, 2005 (the "Jinjiang System Maintenance Contract" or the  "Jinjiang Gongcheng 6th Contract"), attached to Amendment No. 1 to the Registration Statement as reported in Form SB-2/A filed with SEC on May 3, 2006.

34.     CXTI's Annual and Quarterly Reports were false and misleading in reporting that CXTI earned $0.6 million of revenue in 2006 from work Expert Network did pursuant to an e-Government Contract with Jinjiang City E-Government Project Construction Command Bureau dated November 22, 2005 (the Jinjiang Unified Command System Contract" or the "Jinjiang 7th Contract"), attached to Amendment No. 1 to the Registration Statement as reported in Form SB-2/A filed with SEC on May 3, 2006.

35.     According to Jinjiang Gongcheng 1st Phase Contract, Expert Network entered into a contract with Jinjiang Gongcheng Management Services Co., Ltd. "to provide comprehensive planning, design and construction plan . . .on Jinjiang Electronic Administration, and to provide comprehensive expert consultation on government information construction" ("Jinjiang e-Government Project 1").

36.     According to Jinjiang Gongcheng 2nd Phase Contract, Expert Network entered into a contract with Jinjiang Gongcheng Management Services Co., Ltd. to "fully implement the Coordinated Office System (including Documents Exchange System) and the Unified Administration Approval System in all the municipal government departments, towns and streets, so that the full implementation of the Jinjiang Electronic Administration is ensuring [sic]." ("Jinjiang e-Government Project 2").

37.    According to Jinjiang Gongcheng 3rd Phase Contract, Expert Network entered into a contract with Jinjiang Gongcheng Management Services Co., Ltd. to "undertake the main contract of Jinjiang Electronic Business Construction Project." ("Jinjiang e-Government Project 3").

38.    According to Jinjiang Gongcheng 4th Phase Contract, Expert Network entered into a contract with Jinjiang Gongcheng Management Services Co., Ltd. to "undertake the project of Jinjiang City Society Medical Insurance Information System." ("Jinjiang e-Government Project 4").

39.    According to Jinjiang Gongcheng 5th Contract, Expert Network entered into a contract with Jinjiang Gongcheng Management Services Co., Ltd. to "undertake the Jinjiang e-government System Administration and Applied Technology training." ("Jinjiang e-Government Project 5").

40.    According to Jinjiang Gongcheng 6th Contract, Expert Network entered into a contract with Jinjiang Gongcheng Management Services Co., Ltd. to "carry on the repairing and maintenance of the Jinjiang E-government Project systems' operation after the one-year free warranty period has been expired."[5] ("Jinjiang e-Government Project 6").

41.    According to Jinjiang 7th Contract, Expert Network entered into a contract with Jinjiang City E-Government Project Construction Command Bureau to "set up the Jinjiang City 'Unified Command System' for public security, which corresponds to the plan of negotiation about technology" ("Jinjiang e-Government Project 7").

---

[5] That Expert Network was supposedly hired by Jinjiang Gongcheng Management Services Co., Ltd. pursuant to Jinjiang Gongcheng 6th Contract to maintain and repair the e-government project that it was hired to do pursuant to Jinjiang Gongcheng 5th Contract further supports Plaintiffs' assumption that the party that was supposed to have hired Expert Network pursuant to Jinjiang Gongcheng 5th Contract was also Jinjiang Gongcheng Management Services Co., Ltd.

42.    According to Jinjiang Gongcheng 3rd Phase Contract, Jinjiang Gongcheng Management Services Co., Ltd. "is the body designated by the Municipal government of Jinjiang City to assume the direct investment responsibility and to appoint contractor for the project."

43.    On or about June 11, 2008, the Private Investigator interviewed via telephone an employee of the Jinjiang Municipality Office.

44.    The employee of Jinjiang Municipality Office said he did not know of Expert Network.

45.    The employee of Jinjiang Municipality Office said that the Private Investigator should speak to the e-Government Office of Jinjiang Municipality, which is in charge of e-government construction projects for Jinjiang Municipality.

46.    On or about June 11, 2008, the Private Investigator interviewed via telephone an employee, named Mr. Chen, of the e-Government Office of Jinjiang Municipality. Mr. Chen stated that the e-Government Office of Jinjiang Municipality is an office that is part of the Jinjiang City E-Government Project Construction Command Bureau.

47.    Mr. Chen stated that the Jinjiang City E-Government Project Construction Command Bureau is an institution of the Jinjiang Municipality Office.

48.    Mr. Chen confirmed that the Jinjiang City E-Government Project Construction Command Bureau is in charge of e-government construction projects for Jinjiang Municipality.

49.    Mr. Chen stated that: a) Jinjiang Municipality did not authorize Jinjiang Gongcheng Management Services Co., Ltd. to manage e-government construction projects for Jinjiang Municipality, and b) he had never heard of Jinjiang Gongcheng Management Services Co., Ltd., the company that, according to Jinjiang Gongcheng 3rd Phase Contract, is authorized by Jinjiang Municipality to manage e-government construction projects for Jinjiang

Municipality, including Jinjiang e-Government Projects 1, 2, 3, 4, 5, and 6, which Expert Network claimed it was hired to do pursuant to Jinjiang Gongcheng 1st Phase Contract, Jinjiang Gongcheng 2nd Phase Contract, Jinjiang Gongcheng 3rd Phase Contract, Jinjiang Gongcheng 4th Phase Contract, Jinjiang Gongcheng 5th Contract, and Jinjiang Gongcheng 6th Contract.

50.     Mr. Chen stated that Expert Network was the only company ever hired by Jinjiang Municipality to do an e-government construction project.

51.     Mr. Chen stated that the only e-government contract Jinjiang Municipality entered into pursuant to which Expert Network was hired to do an e-government construction project, namely Jinjiang e-Government Project 7, was signed by Jinjiang City E-Government Project Construction Command Bureau, which by CXTI's own admission signed only  Jinjiang 7th Contract.

52.     Whereas the Revenue Reported in CXTI's Annual and Quarterly Reports includes revenue Expert Network earned through seven e-Government Construction Projects in Jinjiang Municipality, which Expert Network supposedly earned pursuant to the seven aforementioned e-Government Contracts, CXTI disclosed in documents it filed with the SEC that Expert Network entered into only *one* e-government contract with Jinjiang City E-Government Project Construction Command Bureau, namely Jinjiang 7th Contract.[6]

53.     Although Jinjiang Gongcheng 4th Phase Contract stated that Expert Network was hired by Jinjiang Gongcheng Management Services Co., Ltd. to "undertake the project of Jinjiang City Society Medical Insurance Information System," Mr. Chen stated that no e-

---

[6] The other six e-Government contracts from which Expert Network claimed to have earned revenue in Jinjiang Municipality were purportedly entered into with Jinjiang Gongcheng Management Services Co., Ltd.

Government project related to medical insurance was ever done or contracted to be done for the Jinjiang Municipality.

54.    Mr. Chen was very familiar with Expert Network. Indeed, he referred to two senior executives of Expert Network who managed Jinjiang e-Government Project 7, namely Mr. Zhu Xiaoxin, the Company's CEO, President and Director, and Mr. Song Feng. Mr. Chen also referred to Expert Network's project manager for Jinjiang e-Government Project 7, namely Jiang Shaoheng.

55.    Mr. Chen mentioned further that the work Expert Network did on Jinjiang e-Government Project 7 was not good, and that Expert Network would not be hired for any other projects by the Jinjiang Municipality Office.

56.    Mr. Chen stated that as to Jinjiang e-Government Project 7, which Expert Network was hired to do by Jinjiang City E-Government Project Construction Command Bureau, Expert Network subcontracted all of the work to other companies, including Shenzen Yingyuan Science and Technology Co., Ltd. and Sinosoft Co., Ltd.

57.    On or about June 12, 2008, the Private Investigator interviewed via telephone an employee, named Mr. Li Gan, of Shenzen Yingyuan Science and Technology Co., Ltd., a subcontractor that was hired by Expert Network to do work Expert Network was hired to do pursuant to Jinjiang 7th Contract.

58.    Mr. Li Gan stated that Jinjiang e-Government Project 7 was completed and that Shenzen Yingyuan Science and Technology Co., Ltd. had no subsequent contact with Expert Network.

59.    Mr. Li Gan stated that he had never heard of Jinjiang Gongcheng Management Services Co., Ltd.

60.    On or about June 12, 2008, SBCS tried to contact Jinjiang Gongcheng Management Services Co., Ltd., the company that, according to CXTI's "Jinjiang Gongcheng 3rd Phase Contract," is authorized by Jinjiang Municipality to manage e-Government Construction Projects for Jinjiang Municipality. Among these projects are, purportedly, Jinjiang e-Government Projects 1, 2, 3, 4, 5, and 6, which Expert Network claims that it was hired to do pursuant to Jinjiang Gongcheng 1st Phase Contract, Jinjiang Gongcheng 2nd Phase Contract, Jinjiang Gongcheng 3rd Phase Contract, Jinjiang Gongcheng 4th Phase Contract, Jinjiang Gongcheng 5th Contract, and Jinjiang Gongcheng 6th Contract.

61.    Although the Jinjiang Gongcheng 1st Phase Contract stated that the address of Jinjiang Gongcheng Management Services Co., Ltd. was No. 1 Bajialou, Qingyang, Jinjiang City, SBCS' internet research, relevant database research, and communications with telephone directory assistance revealed that Jinjiang Gongcheng Management Services Co., Ltd. was not located at that address.

62.    The amendment to Jinjiang Gongcheng 1st Phase Contract, entitled "Supplementary Provisions to Contract," dated June 10, 2003 ("Amendment to Jinjiang Gongcheng 1st Phase Contract", attached to the Registration Statement as reported in Form SB-2 filed with SEC on December 29, 2005), stated that: a) the address of Jinjiang Gongcheng Management Services Co., Ltd. was South Main Street, Jinjiang City; b) the telephone number of Jinjiang Gongcheng Management Services Co., Ltd. was 0595-5785565; and c) the name of legal representative of Jinjiang Gongcheng Management Services Co., Ltd. was Chen Zengrong.

63.    The Private Investigator interviewed the person who answered the telephone at the number, 0595-5785565, which was stated as the telephone number for Jinjiang Gongcheng Management Services Co., Ltd. in Amendment to Jinjiang Gongcheng 1st Phase Contract. The

man who spoke to the Private Investigator on the telephone stated that: a) the telephone number did not belong to Jinjiang Gongcheng Management Services Co., Ltd. or Chen Zengrong; and b) neither Jinjiang Gongcheng Management Services Co., Ltd. nor Chen Zengrong were located at the address corresponding to that telephone number. The man who spoke to the Private Investigator on the telephone stated that the telephone number previously belonged to Chen Zengrong, who was previously located at the address corresponding to the telephone number, but had moved.

64.    SBCS also searched the registration information of Jinjiang Gongcheng Management Services Co., Ltd., which was registered at the Industry and Commerce Administrative Bureau of Jinjiang City. The Industry and Commerce Administrative Bureau is the government institution that oversees Chinese companies. Chinese companies must register with the Industry and Commerce Administrative Bureau, and after initial registration must submit annual audit reports issued by certified accounting firms. The Industry and Commerce Administrative Bureau reviews the qualifications of companies based on materials they submit and decides whether to allow them to remain in business. Materials submitted by companies are kept on file at the Industry and Commerce Administrative Bureau. The registration information of Jinjiang Gongcheng Management Services Co., Ltd. revealed that Jinjiang Gongcheng Management Services Co., Ltd. was not registered to do e-government construction projects but instead to do financial management for "Fujian Seaward Pharmaceutical Co., Ltd." The registration information also revealed that Jinjiang Gongcheng Management Services Co., Ltd. was incorporated on December 17, 2001, but that the business license of Jinjiang Gongcheng Management Services Co., Ltd. was revoked on December 28, 2002. The registration information stated that the business license of Jinjiang Gongcheng Management Services Co.,

Ltd. was revoked because Jinjiang Gongcheng Management Services Co., Ltd. violated Chinese law by not filing the required annual financial audit with the government.

65.    According to all six e-Government Contracts that Expert Network entered into with Jinjiang Gongcheng Management Services Co., Ltd., all such contracts were entered into during the period of time beginning in 2003 and ending in 2005; however, it was impossible for Jinjiang Gongcheng Management Services Co., Ltd. to have entered into any of those contracts because its business license had already been revoked back in 2002. Under Chinese law, a company may not conduct business or enter into contracts if its business license has been revoked. Thus, Jinjiang Gongcheng Management Services Co., Ltd. could not have entered into contracts, much less have performed its business obligations pursuant to the contracts.

66.    The registration information of Jinjiang Gongcheng Management Services Co., Ltd. also stated that the principal of Jinjiang Gongcheng Management Services Co., Ltd. was Jiang Shaoheng. As stated above, Mr. Chen stated that, Jiang Shaoheng was also Expert Network's project manager. Simon Fu, CXTI's CFO and director, independently confirmed that Jiang Shaoheng was also Expert Network's project manager. That the same person, Jiang Shaoheng, was both the principal of Jinjiang Gongcheng Management Services Co., Ltd. and the project manager of Expert Network strongly supports the inference that Mr. Jiang may have facilitated the forgery of the six e-Government contracts supposedly entered into by Expert Network and Jinjiang Gongcheng Management Services Co., Ltd.

67.    CXTI's Annual and Quarterly Reports were false and misleading in disclosing that: 1) CXTI earned $4.7 million of revenue in 2003, $17.8 million of revenue in 2004, and $2.2 million of revenue in 2005 through Expert Network pursuant to Jinjiang Gongcheng 1st Phase Contract; 2) CXTI earned $7.9 million of revenue in 2005 and $2.0 million of revenue in 2006

through Expert Network pursuant to Jinjiang Gongcheng 2nd Phase Contract; 3) CXTI earned $6.7 million of revenue in 2005 and $5.9 million of revenue in 2006 through Expert Network pursuant to Jinjiang Gongcheng 3rd Phase Contract; 4) CXTI earned $5.4 million of revenue in 2006 through Expert Network pursuant to Jinjiang Gongcheng 4th Phase Contract; 5) CXTI earned $1.7 million of revenue in 2006 through Expert Network pursuant to Jinjiang Gongcheng 5th Contract; and 6) CXTI earned $1.2 million of revenue in 2006 and $0.3 million of revenue in 1Q07 through Expert Network pursuant to Jinjiang Gongcheng 6th Contract because:

(a)     Jinjiang City E-Government Project Construction Command Bureau, which manages e-government construction projects for Jinjiang Municipality, never signed Jinjiang Gongcheng 1st Phase Contract, Jinjiang Gongcheng 2nd Phase Contract, Jinjiang Gongcheng 3rd Phase Contract, Jinjiang Gongcheng 4th Phase Contract, Jinjiang Gongcheng 5th Contract, or Jinjiang Gongcheng 6th Contract;

(b)     Jinjiang Municipality did not authorize Jinjiang Gongcheng Management Services Co., Ltd. to manage any e-government construction projects for Jinjiang Municipality, including Jinjiang e-Government Projects 1, 2, 3, 4, 5, and 6, which Expert Network claimed that it was hired to do pursuant to Jinjiang Gongcheng 1st Phase Contract, Jinjiang Gongcheng 2nd Phase Contract, Jinjiang Gongcheng 3rd Phase Contract, Jinjiang Gongcheng 4th Phase Contract, Jinjiang Gongcheng 5th Contract, and Jinjiang Gongcheng 6th Contract;

(c)     Jinjiang Gongcheng Management Services Co., Ltd. could not manage any of the e-Government Construction Projects for Jinjiang Municipality, because the business license of Jinjiang Gongcheng Management Services Co.,

Ltd. was revoked prior to each of the dates on which it supposedly entered into Jinjiang Gongcheng 1st Phase Contract, Jinjiang Gongcheng 2nd Phase Contract, Jinjiang Gongcheng 3rd Phase Contract, Jinjiang Gongcheng 4th Phase Contract, Jinjiang Gongcheng 5th Contract, and Jinjiang Gongcheng 6th Contract;

(d)    Employees in each of the Jinjiang Municipality Office, the e-Government Office of Jinjiang Municipality, and Shenzen Yingyuan Science and Technology Co., Ltd. have never even heard of Jinjiang Gongcheng Management Services Co., Ltd.;

(e)    None of Jinjiang Gongcheng 1st Phase Contract, Jinjiang Gongcheng 2nd Phase Contract, Jinjiang Gongcheng 3rd Phase Contract, Jinjiang Gongcheng 4th Phase Contract, Jinjiang Gongcheng 5th Contract, or Jinjiang Gongcheng 6th Contract was ever signed by Jinjiang Gongcheng Management Services Co., Ltd.; and

(f)    Jinjiang Gongcheng 1st Phase Contract, Jinjiang Gongcheng 2nd Phase Contract, Jinjiang Gongcheng 3rd Phase Contract, Jinjiang Gongcheng 4th Phase Contract, Jinjiang Gongcheng 5th Contract, and Jinjiang Gongcheng 6th Contract are forged documents.

68.    CXTI recognized and reported $55.8 of revenue in its Annual and Quarterly Reports for e-Government Construction Projects done by Expert Network in the Jinjiang Municipality pursuant to the six fake contracts entered into with Jinjiang Gongcheng Management Services Co., Ltd., and in the additional amount of $0.6 million for work done pursuant to the single legitimate contract, Jinjiang 7th Contract, entered into with Jinjiang City E-Government Project Construction Command Bureau. However, the maximum amount of revenue

that Expert Network could have possibly earned in the Jinjiang Municipality was only $0.6 million, as Revenue Reported in CXTI's Annual and Quarterly Reports pursuant to the Jinjiang 7th Contract was only $0.6 million, while the remaining six contracts – and, likewise, the $55.8 million claimed to have been earned therefrom – were fictitious.

69.    Thus, at least $55.8 million out of the $56.4 million of Revenue Reported in CXTI's Annual and Quarterly Reports for e-Government Construction Projects done by Expert Network for the Jinjiang Municipality was never earned by CXTI.

**Dehua Contracts**

70.    The Revenue Reported in CXTI's Annual and Quarterly Reports was false and misleading in reporting that CXTI earned $8.9 million of revenue in 2004 and $6.7 million of revenue in 2005 from work Expert Network did pursuant to an e-Government Contract with Dehua County People's Municipality of Fujian Province dated April 9, 2004 (the "Dehua 1st Phase Contract"), attached to the Registration Statement as reported in Form SB-2 filed with SEC on December 29, 2005.

71.    CXTI's Annual and Quarterly Reports were false and misleading in reporting that CXTI earned $11.8 million of revenue in 2005 from work Expert Network did pursuant to an e-Government Contract with Dehua County Electronic Administration and Contraction Management Company Limited of Fujian Province dated January 5, 2005 (the "Dehua 2nd Phase Contract"), attached to the Registration Statement as reported in Form SB-2 filed with SEC on December 29, 2005.

72.    CXTI's Annual and Quarterly Reports were false and misleading in reporting that CXTI earned $7.1 million of revenue in 2006 and $1.9 million of revenue in 1Q07 from work Expert Network did pursuant to an e-Government Contract with Fujian Province Dehua County

E-Government Construction Project Management Company Limited dated January 4, 2006 (the "Dehua 3rd Phase Contract"), attached to Amendment No. 1 to the Registration Statement as reported in Form SB-2/A filed with SEC on May 3, 2006.

73.     CXTI's Annual and Quarterly Reports were false and misleading in reporting that CXTI earned $11.4 million of revenue in 2006 from work Expert Network did pursuant to an e-Government Contract with Fujian Province Dehua County E-Government Construction Project Management Company Limited dated March 5, 2006 (the "Dehua 4th Phase Contract"), attached to Amendment No. 1 to the Registration Statement as reported in Form SB-2/A filed with SEC on May 3, 2006.

74.     CXTI's Annual and Quarterly Reports were false and misleading in reporting that CXTI earned $0.6 million of revenue in 2006 from work Expert Network did pursuant to an e-Government Contract with Fujian Province Dehua County E-Government Construction Project Management Company Limited dated February 13, 2006 (the "Unified Command System" or the "Dehua 5th Contract"), attached to Amendment No. 1 to the Registration Statement as reported in Form SB-2/A filed with SEC on May 3, 2006.

75.     According to Dehua 1st Phase Contract, Expert Network entered into a contract with Dehua County People's Municipality of Fujian Province "to undertake the project of Electronic Administration Planning, Design and Construction" of Dehua County ("Dehua e-Government Project 1").

76.     According to Dehua 2nd Phase Contract, Expert Network entered into a contract with Dehua County Electronic Administration and Contraction [sic] Management Company Limited of Fujian Province "to undertake the project of Electronic Administration Construction (Phase 2)" of Dehua County ("Dehua e-Government Project 2").

77.    According to Dehua 3rd Phase Contract, Expert Network entered into a contract with Fujian Province Dehua County E-Government Construction Project Management Company Limited to "fully implement the Coordinated Office System (including Documents Exchange System) and the Unified Administration Approval System in all the governmental departments, towns and streets, so that the full implementation of the Dehua E-Government Construction Project is ensured" ("Dehua e-Government Project 3").

78.    According to Dehua 4th Phase Contract, Expert Network entered into a contract with Fujian Province Dehua County E-Government Construction Project Management Company Limited to "undertake the main contract of Dehau [sic] Electronic Business Construction Project" ("Dehua e-Government Project 4").

79.    According to Dehua 5th Contract, Expert Network entered into a contract with Fujian Province Dehua County E-Government Construction Project Management Company Limited to "undertake the Dehua County Public Security Unified Command System Construction Project" ("Dehua e-Government Project 5").

80.    Both Dehua County Electronic Administration and Contraction [sic] Management Company Limited of Fujian Province, which entered Dehua 2nd Phase Contract with Expert Network, and Fujian Province Dehua County E-Government Construction Project Management Company Limited, which entered Dehua 3rd Phase Contract, Dehua 4th Phase Contract, and Dehua 5th Contract with Expert Network, were, according to CXTI, authorized by Dehua County People's Municipality of Fujian Province to manage e-Government Construction Projects for Dehua County People's Municipality of Fujian Province.

81.    Indeed, the Dehua 2nd Phase Contract stated, "As per . . . the good cooperation relations at the performance in The Electronic Administration Construction of Dehua County

(Phase 1), A [Dehua County Electronic Administration and Contraction [sic] Management Company Limited of Fujian Province] formally *entrusts* B [Expert Network] to undertake the project of Electronic Administration Construction (Phase 2)." Thus, according to Dehua 2nd Phase Contract, Expert Network was hired to continue work it completed pursuant to Dehua 1st Phase Contract, which Expert Network signed with Dehua County People's Municipality of Fujian Province. Therefore, according to Dehua 2nd Phase Contract, Dehua County Electronic Administration and Contraction [sic] Management Company Limited of Fujian Province must have been authorized by Dehua County People's Municipality of Fujian Province.

82.    Also, according to Dehua 4th Phase Contract, "the body designated by the Municipal government of Dehau [sic] County to assume the direct investment responsibility and to appoint contractor for the project. . . [was] Fujian Province Dehua County E-Government Construction Project Management Company Limited."

83.    On or about June 17, 2008 the Private Investigator interviewed via telephone an employee of the People's Government of Dehua County, Quanzhou City, Fujian Province.

84.    The employee of the People's Government of Dehua County, Quanzhou City, Fujian Province stated that Network Office of the People's Government of Dehua County, Quanzhou City, Fujian Province was in charge of e-Government Construction Projects for Dehua County of Fujian Province.

85.    The employee of the People's Government of Dehua County, Quanzhou City, Fujian Province further stated that Mr. Wang, an employee of Network Office of the People's Government of Dehua County, Fujian Province was responsible, on behalf of Network Office of the People's Government of Dehua County, for managing e-government construction projects for Dehua County of Fujian Province.

86.     On or about August 14, 2008, the Private Investigator interviewed via telephone the employee, Mr. Wang, of the Network Office of the People's Government of Dehua County, Fujian Province.

87.     Mr. Wang stated that the Network Office of the People's Government of Dehua County, Fujian Province was in charge of e-government construction projects for Dehua County of Fujian Province.

88.     Mr. Wang stated that in 2004, the People's Government of Dehua County, Quanzhou City, Fujian Province and Expert Network did sign a contract, pursuant to which Expert Network was hired to implement what he stated was the general planning project of the e-Government Construction Project for the Dehua County of Fujian Province. However, according to Mr. Wang, that project was terminated because the People's Government of Dehua County, Quanzhou City, Fujian Province did not have sufficient capital and thus paid Expert Network only RMB 100,000, equivalent to only $12,126.00, according to the exchange rate in 2004, (RMB 8.2468 to $1.00), as stated by CXTI in Amendment No. 1 to the Registration Statement as reported in Form SB-2/A filed with SEC on May 3, 2006. (See, CXTI SB-2/A 5-3-06), p. F-12. According to Mr. Wang, although the project was planned to be completed in 2006, it was terminated in 2004. Mr. Wang also stated that that was the only contract that the People's Government of Dehua County entered into with Expert Network.

89.     Mr. Wang stated that after the termination in 2004 of the contract that the People's Government of Dehua County, Quanzhou City, Fujian Province had entered into with Expert Network, the People's Government of Dehua County, Quanzhou City, Fujian Province did not enter into any other contracts with Expert Network.

90.    Mr. Wang stated that after the 2004 termination of the contract that Dehua County People's Municipality of Fujian Province had entered into with Expert Network, the People's Government of Dehua County, Quanzhou City, Fujian Province never paid Expert Network any more money.

91.    Mr. Wang stated that after the termination of the contract that the People's Government of Dehua County, Quanzhou City, Fujian Province had entered into with Expert Network, Expert Network never did any other work on e-government construction projects, or work of any kind whatsoever, for Dehua County of Fujian Province.

92.    Mr. Wang stated that: a) the People's Government of Dehua County, Quanzhou City, Fujian Province did not authorize Dehua County Electronic Administration and Contraction Management Company Limited of Fujian Province to manage e-Government Construction Projects for Dehua County People's Municipality of Fujian Province; and b) he never heard of Dehua County Electronic Administration and Contraction Management Company Limited of Fujian Province, the company that, according to Dehua 2nd Phase Contract, is authorized by the People's Government of Dehua County, Quanzhou City, Fujian Province to manage e-Government Construction Projects for Dehua County of Fujian Province, including Dehua e-Government Project 2, which Expert Network claimed it was hired to do pursuant to Dehua 2nd Phase Contract.

93.    Mr. Wang stated that: a) the People's Government of Dehua County, Quanzhou City, Fujian Province did not authorize Fujian Province Dehua County E-Government Construction Project Management Company Limited to manage e-government construction projects for Dehua County of Fujian Province; and b) he has never heard of Fujian Province Dehua County E-Government Construction Project Management Company Limited, the

company that, according to Dehua 4th Phase Contract, is authorized by the People's Government of Dehua County, Quanzhou City, Fujian Province to manage e-government construction projects for Dehua County of Fujian Province, including Dehua e-Government Projects 3, 4, and 5, which Expert Network claimed it was hired to do pursuant to Dehua 3rd Phase Contract, Dehua 4th Phase Contract, and Dehua 5th Contract.

94.     SBCS did a search for Dehua County Electronic Administration and Contraction Management Company Limited of Fujian Province, the company that, according to Dehua 2nd Phase Contract, is authorized by the People's Government of Dehua County, Quanzhou City, Fujian Province to manage e-government construction projects for Dehua County of Fujian Province, including Dehua e-Government Project 2, which Expert Network was hired to do pursuant to Dehua 2nd Phase Contract. However, SBCS did not find any information related to Dehua County Electronic Administration and Contraction Management Company Limited of Fujian Province through internet research, relevant database research, or contacting telephone directory assistance.

95.     SBCS did a search for Fujian Province Dehua County E-Government Construction Project Management Company Limited, the company that, according to Dehua 4th Phase Contract, is authorized by the People's Government of Dehua County, Quanzhou City, Fujian Province to manage e-government construction projects for Dehua County of Fujian Province, including Dehua e-Government Projects 3, 4, and 5, which Expert Network was hired to do pursuant to Dehua 3rd Phase Contract, Dehua 4th Phase Contract, and Dehua 5th Contract. However, SBCS did not find any information related to Fujian Province Dehua County E-Government Construction Project Management Company Limited through internet research, relevant database research, or contacting telephone directory assistance.

96.    Therefore, CXTI's Annual and Quarterly Reports were false and misleading in disclosing that: 1) CXTI earned $11.8 million of revenue in 2005 through Expert Network pursuant to Dehua 2nd Phase Contract; 2) CXTI earned $7.1 million of revenue in 2006 and $1.9 million of revenue in 1Q07 through Expert Network pursuant to Dehua 3rd Phase Contract; 3) CXTI earned $11.4 million of revenue in 2006 through Expert Network pursuant to Dehua 4th Phase Contract; and 4) CXTI earned $0.6 million of revenue in 2006 through Expert Network pursuant to Dehua 5th Contract because:

(a)    the People's Government of Dehua County, Quanzhou City, Fujian Province never signed Dehua 2nd Phase Contract, Dehua 3rd Phase Contract, Dehua 4th Phase Contract, or Dehua 5th Contract;

(b)    Network Office of the People's Government of Dehua County, Fujian Province, which manages e-government construction projects for Dehua County People's Municipality of Fujian Province, never signed Dehua 2nd Phase Contract, Dehua 3rd Phase Contract, Dehua 4th Phase Contract, or Dehua 5th Contract;

(c)    the People's Government of Dehua County, Quanzhou City, Fujian Province did not authorize Dehua County Electronic Administration and Contraction Management Company Limited of Fujian Province to manage any e-government construction projects for Dehua County People's Municipality of Fujian Province, including Dehua e-Government Project 2, which Expert Network claims it was hired to do pursuant to Dehua 2nd Phase Contract;

(d)    the People's Government of Dehua County, Quanzhou City, Fujian Province did not authorize Fujian Province Dehua County E-Government

Construction Project Management Company Limited to manage any e-government construction projects for Dehua County People's Municipality of Fujian Province, including Dehua e-Government Projects 3, 4, and 5, which Expert Network claimed it was hired to do pursuant to Dehua 3rd Phase Contract, Dehua 4th Phase Contract, and Dehua 5th Contract;

(e)     The employee of Network Office of the People's Government of Dehua County, Fujian Province, who was in charge of managing e-government construction projects for Dehua County People's Municipality of Fujian Province, and who was in charge of the only e-Government Construction Project ever done in Dehua County of Fujian Province, had never even heard of Dehua County Electronic Administration and Contraction Management Company Limited of Fujian Province;

(f)     The same employee of Network Office of the People's Government of Dehua County, Fujian Province had never even heard of Fujian Province Dehua County E-Government Construction Project Management Company Limited;

(g)     Dehua 2nd Phase Contract was never signed by Dehua County Electronic Administration and Contraction Management Company Limited of Fujian Province;

(h)     None of Dehua 3rd Phase Contract, Dehua 4th Phase Contract, or Dehua 5th Contract was ever signed by Fujian Province Dehua County E-Government Construction Project Management Company Limited; and

(i)      Dehua 2nd Phase Contract, Dehua 3rd Phase Contract, Dehua 4th Phase Contract, and Dehua 5th Contract are forged documents.

97.      Additionally, CXTI's Annual and Quarterly Reports were false and misleading in disclosing that CXTI earned $8.9 million of revenue in 2004 and $6.7 million of revenue in 2005 through Expert Network pursuant to Dehua 1st Phase Contract, because only $12,126.00  was paid by the People's Government of Dehua County, Quanzhou City, Fujian Province to Expert Network for the work done pursuant to the only e-government contract it entered into with the People's Government of Dehua County, Quanzhou City, Fujian Province.

98.      CXTI's Annual and Quarterly Reports reported revenue of $48.4 million from five e-government contracts pursuant to which Expert Network supposedly performed work in Dehua County of Fujian Province.  The $48.4 million was reportedly earned for work done pursuant to five contracts: one fake contract entered into with Dehua County Electronic Administration and Contraction Management Company Limited of Fujian Province, the three fake contracts entered into with Fujian Province Dehua County E-Government Construction Project Management Company Limited, and one contract in the amount of $15.6 million - the Dehua 1st Phase Contract.   In truth, Expert Network did not earn any money from any of the five contracts, except for the Dehua 1st Contract with the People's Government of Dehua County, Quanzhou City, Fujian Province, pursuant to which Expert Network earned only $12.1 *thousand* rather than the $15.6 *million* CXTI reported earning from the Dehua 1st Contract.

99.      Thus, CXTI earned only $12 thousand of the $48.4 million of Revenue it reported earning in CXTI's Annual and Quarterly Reports for e-Government Construction Projects done by Expert Network for the Dehua County of Fujian Province.

**Huian Contract**

100.    CXTI's Annual And Quarterly Reports were false and misleading in reporting that CXTI earned $9 million of revenue in 2006 and $3.1 million of revenue in 1Q07 from work Expert Network did pursuant to an e-government contract with Huian County Electronic Administration Management Company, Limited dated June 17, 2005 (the "Huian Contract"), attached to Amendment No. 1 to the Registration Statement as reported in Form SB-2/A filed with SEC on May 3, 2006.

101.    According to the Huian Contract, Expert Network entered into a contract with Huian County Electronic Administration Management Company, Limited to undertake "Huian County's electronic administration planning, design and construction" ("Huian e-Government Project 1").

102.    According to the Huian Contract, Huian County Electronic Administration Management Company, Limited "is directly under the Huian County People's Municipality and receives from it the full authority to be in charge of Huian County's electronic administration planning, construction implementation and management."

103.    On or about August 14, 2008, the Private Investigator interviewed via telephone an employee of the Duty Room of the People's Government of Huian County of Fujian Province.

104.    The employee of the Duty Room of the People's Government of Huian County of Fujian Province said she never heard of Expert Network.

105.    The employee of the Duty Room of the People's Government of Huian County of Fujian Province said that the Private Investigator should speak to the Network Engineering Management Center of Huian County because it is in charge of network system projects and e-

government construction projects for the People's Government of Huian County of Fujian Province.

106.    On or about August 14, 2008, the Private Investigator interviewed via telephone an employee, named Mr. Wu, of the Network Engineering Management Center of Huian County.

107.    Mr. Wu stated that the Network Engineering Management Center of Huian County was a department of the People's Government of Huian County of Fujian Province.

108.    Mr. Wu stated that the Network Engineering Management Center of Huian County is in charge of network system projects and e-government construction projects for the People's Government of Huian County of Fujian Province.

109.    Mr. Wu stated that: a) he had never heard of Expert Network; and b) the People's Government of Huian County of Fujian Province had never entered into any contract for an e-government construction project or network system project with Expert Network.

110.    Mr. Wu stated that the network system of the People's Government of Huian County of Fujian Province consisted of: a) an Office Automation System, and b) the official website of the People's Government of Huian County of Fujian Province.

111.    Mr. Wu stated that a company other than Expert Network, named Lanwei company, was hired to build the Office Automation System.

112.    Mr. Wu stated that a company other than Expert Network, named Zhaoheng company, was hired to build the official website of the People's Government of Huian County of Fujian Province.

113.    Mr. Wu stated that: a) the People's Government of Huian County of Fujian Province did not authorize Huian County Electronic Administration Management Company, Limited to manage network system projects or e-government construction projects for the

People's Government of Huian County of Fujian Province; and b) he had never heard of Huian County Electronic Administration Management Company, Limited, the company that, according to the Huian Contract, is authorized by the People's Government of Huian County of Fujian Province to manage Huian e-Government Project 1, which Expert Network claims it was hired to do pursuant to the Huian Contract.

114.    SBCS did a search for Huian County Electronic Administration Management Company, Limited, the company that, according to CXTI's Huian Contract, is authorized by the People's Government of Huian County of Fujian Province to manage Huian e-Government Project 1, which CXTI claimed Expert Network was hired to do pursuant to the Huian Contract. However, SBCS did not find any information related to Huian County Electronic Administration Management Company, Limited through internet research, relevant database research, or contacting telephone directory assistance.

115.    Therefore, CXTI's Annual and Quarterly Reports were false and misleading in disclosing that CXTI earned $9 million of revenue in 2006 and $3.1 million of revenue in 1Q07 through Expert Network pursuant to Huian Contract because:

       (a)    Network Engineering Management Center of Huian County, which manages the entire computer and internet network system for the People's Government of Huian County of Fujian Province, never signed Huian Contract, or any other contract with Expert Network;

       (b)    Network Engineering Management Center of Huian County did not authorize Huian County Electronic Administration Management Company, Limited to manage any network system projects or e-government construction projects for the People's Government of Huian County of Fujian Province,

including Huian e-Government Project 1, which Expert Network claimed it was hired to do pursuant to the Huian Contract;

(c)     The employee of the Network Engineering Management Center of Huian County had never even heard of Huian County Electronic Administration Management Company, Limited;

(d)     Huian County Electronic Administration Management Company, Limited does not exist;

(e)     The Huian Contract was never signed by Huian County Electronic Administration Management Company, Limited;

(f)     The Huian Contract is a forged document; and

(g)     Employees in each of the Duty Room of the People's Government of Huian County of Fujian Province and the Network Engineering Management Center of Huian County have never even heard of Expert Network.

116.    Thus, none of the $12.1 million of Revenue Reported in CXTI's Annual and Quarterly Reports for network system projects and e-Government Construction Projects done by Expert Network for the People's Government of Huian County of Fujian Province was ever earned by CXTI.

## Summary of *Actual* Revenue Earned from Work Done Pursuant to All e-Government Contracts

117.    CXTI's Annual and Quarterly Reports reported total aggregate revenue of $145.2 million during the period beginning January 1, 2003 and ending March 31, 2007, for all network system projects and e-government construction projects done by Expert Network for all community and municipality governments in China pursuant to a total of 18 e-government contracts.

118.    Whereas Revenue Reported in CXTI's Annual and Quarterly Reports for e-Government Construction Projects done by Expert Network in the Nan'an Municipality pursuant to two e-government contracts was in the amount of $25.5 million, the two e-government contracts were fake and CXTI earned none of the $25.5 million.

119.    Whereas Revenue Reported in CXTI's Annual and Quarterly Reports for e-Government Construction Projects done by Expert Network in the Jinjiang Municipality pursuant to seven e-government contracts was in the amount of $56.4 million, six of the seven e-government contracts were fake, and CXTI earned at most $0.6 million of the $56.4 million.

120.    Whereas Revenue Reported in CXTI's Annual and Quarterly Reports for e-government construction projects done by Expert Network in Dehua County of Fujian Province pursuant to five e-government contracts was in the amount of $48.4 million, four of the five e-government contracts were fake, and CXTI earned only $12.1 *thousand* of the $48.4 million.

121.    Whereas Revenue Reported in CXTI's Annual and Quarterly Reports for network system projects and e-government construction projects done by Expert Network for the People's Government of Huian County of Fujian Province pursuant to one e-government contract was in the amount of $12.1 million, that one e-government contract was fake, and CXTI earned none of the $12.1 million.

122.    The Revenue Reported in CXTI's Annual and Quarterly Reports for e-government construction projects done by Expert Network in each of Licheng, Shishi City, and Yinzhou District Ningbo City pursuant to three other e-government contracts was in the amount of $2.8 million, SBCS did not attempt to investigate whether these three e-government contracts were fake and whether CXTI had actually earned any of the $2.8 million. (See 10Q 1Q07, p. 23.)

123.     In summary, whereas Revenue Reported in CXTI's Annual and Quarterly Reports for network system projects and e-government construction projects done by Expert Network for all community and municipality governments in China pursuant to a total of 18 e-government contracts was in the amount of $145.2 million, 13 of 15 of the e-government contracts investigated were completely fake (three of the 18 e-government contracts were not investigated), and CXTI earned at most only between $0.6 million and $3.4 million of the $145.2 million. ($2.8 million supposedly earned pursuant to three of the 18 e- government contracts was not investigated and might possibly, but doubtfully, have been earned.)

# Allegation Addendum 2

## THE AUDITOR DEFENDANTS KNOWINGLY VIOLATED GENERALLY ACCEPTED AUDITING STANDARDS

1.      PKF and BDO opined that CXTI's financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP").  In violation of GAAP, CXTI's financial statements: a) improperly recognized over $66 million of revenue and reported accounts receivable of over $33 million for the fiscal year ended December 31, 2006; b) improperly recognized over $35 million of revenue and reported accounts receivable of over $15 million for the fiscal year ended December 31, 2005; and c) improperly recognized over $26 million of revenue and reported accounts receivables of over $4 million for the fiscal year ended December 31, 2004. Over 99% of all of revenue and accounts receivable recorded for these years was fabricated and non-existent.

2.      Recognition of non-existing contracts violates Financial Accounting Standard Board's ("FASB") Statement of Concepts of Financial Accounting Concepts No. 2, "Qualitative Characteristics of Accounting Information," ("CON 2") and FASB Statement of Financial Accounting Concepts No. 5, "Recognition and Measurement in Financial Statements of Business Enterprises" ("CON 5").

3.      The company violated GAAP because it used the Percentage of Completion ("POC") method of recognizing revenue.  Under GAAP, all of the following conditions must be met in order to use POC:

a)      The contractor has the ability to make reasonably dependable estimates of the extent of progress toward completion, contract revenues, and contract costs.

b)      The contracts must be executed by the parties and clearly specify the enforceable rights regarding the services to be provided and received by the parties, the consideration to be paid, and the manner and terms of payment.

     c)       The purchaser is able to satisfy its obligations under the contract.

     d)       The contractor is able to perform its obligations under the contract.

     4.       All of the aforementioned conditions were not met because the e-Government Contracts were not executed by the parties and the purchasers were not able to satisfy their obligations pursuant to the falsified contracts.  In particular, 13 of the 16 purported e-Government Contracts pursuant to which CXTI claimed to have earned revenue from 2003-2006 were faked and had never been entered into by the purported counter-parties.[1]  Of the remaining three of the 16 contracts, the Dehua 1st Phase Contract was terminated in 2004 with Expert Network receiving only $12,126 in payment, not the $15.6 million reported by CXTI.   The contract with Jinjiang City E-Government Project Construction Command Bureau was for only $600,000, and, thus, the revenue reported therefrom was immaterial. The one contract that Plaintiffs' private investigator, SBCS, did not attempt to confirm, with Yinzhou District Ningbo City, was for only $300,000, also an immaterial amount.

     5.       At least 13 of the 16 e-Government Contracts from which CXTI purportedly earned revenue from 2003-2006 were completely fraudulent.  Thus, there was no reasonable basis on which to believe that CXTI would receive or collect payment or earn revenue from any of the contracts.

     6.       All independent accounting firms that audit and certify financial statements of companies filing annual financial statements with the SEC are required to adhere to the auditing

---

[1]  Of the 18 e-Government contracts from which CXTI reported it recognized revenue in its 1Q07 Quarterly Report, revenue earned from work done pursuant to two of those contracts, those with government institutions in Licheng and Shishi City, was not recognized until the first quarter of 2007.

standards of the Public Company Accounting Oversight Board ("PCAOB"). PCAOB Rule 3100.[2]

7.     Both PKF and BDO stated in their audit opinions on the financial statements of CXTI that, "[w]e conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States)."  The Auditor Defendants violated the standards of the PCAOB.

8.     Pursuant to PCAOB AU Section 150, entitled, "Generally Accepted Auditing Standards" ("GAAS"), the GAAS consist of ten standards.  The ten standards are comprised of three General Standards, three Standards of Field Work and four Standards of Reporting.

9.     At a minimum, the Auditor Defendants violated the third General Standard and the third Standard of Field Work.

10.     The third General Standard is:

Due professional care is to be exercised in the planning and performance of the audit and the preparation of the report.

11.     Under this Standard, auditors are required to exercise professional skepticism, which is an attitude that includes a questioning mind and a critical assessment of audit evidence. The objective is to obtain sufficient competent evidential matter to provide a reasonable basis for forming an opinion.

12.     The auditor has a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud.  AU.110.02

13.     The third Standard of Field Work is:

---

2  All cites to AU are to the PCAOB Interim Auditing Standards currently in effect and found at www.pcaob.com.

> Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.

14.     The pertinence of the evidence, its objectivity, its timeliness, and the existence of other evidential matter that corroborates the conclusions of the auditor all bear on the competence of the evidence.  Evidential matter that supports the financial statements consists of the underlying accounting data and all corroborating information that is available.

> Corroborating evidential matter includes both written and electronic information such as checks; records of electronic fund transfers; invoices; contracts; minutes of meetings; confirmations and other written representations by knowledgeable people; information obtained by the auditor from inquiry, observation, inspection, and physical examination; and other information developed by, or available to, the auditor which permits him or her to reach conclusions through valid reasoning. . . .

AU 326.17

15.     Most of the independent auditor's work in forming his or her opinion on financial statements consists of obtaining and evaluating evidential matter concerning management's assertions concerning the financial statements, such as the existence of contracts, revenue and accounts receivable.  AU 326.02-08

16.     Evidential matter supporting the financial statements consists of the underlying accounting data and all corroborating information available to the auditor.  AU 326.

17.     To be competent, evidential matter must be obtained in a manner that supports its reliability.  AU 326.21

18.     When evidential matter can be obtained from independent sources outside an entity, it provides greater assurance of reliability for the purposes of an independent audit than that secured solely within the entity.  AU 326.21(a).

19.     Thus, auditors are typically required to obtain audit evidence supporting management's assertions from independent third parties.  This includes obtaining evidence

confirming the existence of contracts, revenue, and accounts receivable upon which management bases assertions in the financial statements.

20.    Confirmation is the process of obtaining and evaluating a direct communication from a third party in response to a request for information about a particular item affecting the financial statements.  AU 330.04.  Confirmation is undertaken to obtain evidence from third parties about financial statement assertions made by management because evidence from independent third parties is presumed to be more reliable.  AU 330.06; AU 326.

21.    The greater the level of audit risk, the greater the need for an auditor to obtain confirming evidence of financial statement assertions directly from independent third parties. AU 330.07.  This usually entails obtaining "confirmation" of the specific financial statement assertion (existence of a contract, revenue, or receivable) directly from the third party involved in the transaction.   In some instances, third party confirmations are insufficient to reduce audit risk to an acceptably low level and the auditor is required to perform additional substantive procedures and tests of financial statement assertions. AU 330.09.

22.    The auditor should exercise an appropriate level of professional skepticism throughout the confirmation process.  AU 330.15.

23.    AU Section 330.34 requires an auditor to confirm accounts receivable balances. Confirmation of accounts receivable balances is mandatory unless the auditor documents the existence and applicability of one of three exceptions, none of which existed for and/or applied to CXTI.[3]   AU 330.35.

_____

3   The exception are: (i) use of confirmations would be ineffective, (ii) audit risk can be reduced to an acceptably low level by other analytical procedures besides confirmations, and (iii) accounts receivable are immaterial to the financial statements.

24.    In CXTI's case, all of Expert Network's revenue and accounts receivable for fiscal years 2003 through 2006 were reported to have been earned for work done for 5 Chinese local governments pursuant to 16 contracts. With so few contracts and customers representing all of CXTI's revenue and accounts receivable, GAAS requires an auditor to obtain sufficient evidential matter demonstrating the validity of the contracts, revenue, and accounts receivable claimed by the Company. In this situation, the Auditor Defendants were required to contact customers directly to confirm the validity of the contracts, the revenue recognized, and the accounts receivable balance. With only a handful of customers, direct confirmation was the only appropriate method of confirmation. There was no reason for the auditors to "sample," i.e., to confirm the contracts or accounts receivable with just a small portion of the total customers, as the total number of customers was under 10.[4]

25.    AU Section 326.23 provides that the auditor may consider the relationship between the costs of obtaining audit evidence relative to the usefulness of the information obtained.  However, the matter of difficulty or expense involved is not in itself a valid basis for omitting an audit procedure for which there is no appropriate alternative.  As a guiding rule there should be a rational relationship between the cost of obtaining evidence and the usefulness of information obtained. The matter of difficulty or expense involved is not a valid basis for omitting the test.  AU 326.24. Thus, there is no excuse for the Auditor Defendants' failure to contact Expert Network's customers to confirm the contracts, revenue, and accounts receivable.

---

4  PCAOB AU Section 350 requires auditors to "sample" account balances and transactions to ensure accuracy and detect material misstatements.  Audit "sampling" is application of an audit procedure, such as confirming account balances with third parties, to less than 100 percent of the items with an account balance or class of transactions.  Audit sampling provides necessary audit evidence upon which an auditor may base its opinion on a company's financial statements.

26.    AU Section 326 requires that the auditor obtain audit evidence to draw reasonable conclusions on which to base the audit opinion by performing audit procedures to detect material misstatements.

27.    AU Section 311.03 states that "[t]he auditor should establish the overall audit strategy for the audit. . . "    In establishing the overall audit strategy, the auditor should consider risk of material error or fraud or the existence of related party transactions.  PCAOB AU 311.03(g).

28.    The auditor is required to perform analytic procedures in an effort to uncover management misstatements and fraud. AU 329.10; 329.21

29.    Under the Standards of Fieldwork is AU 316, "Consideration of Fraud in a Financial Statement Audit".  PCAOAB AU Section 316.01 states, "[t]he auditor has a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud."

30.    The auditor's responsibility to detect and report misstatements resulting from illegal acts having a direct and material effect on the determination of financial statement amounts is the same as the auditor's responsibility to detect and report misstatements caused by error or fraud.  AU 317.

31.    AU Section 316.35-42 requires the auditor to identify risks of material misstatement of the financial statements due to fraud.  The auditor must evaluate the audit evidence with a heavy dose of professional skepticism to determine whether fraud is present. The auditor's search for fraud must be integrated into the overall audit process so that at each step of the audit process, the auditor should evaluate the risk of misstatement due to fraud.  AU 316.03.

32.     An auditor must be particularly wary and perform additional substantive audit testing where the opportunity for fraud is heightened.  Companies have greater opportunity to commit fraud where: (i) reports of assets and revenue are based on significant estimates that involve subjective judgments or uncertainties that are difficult to corroborate; and (ii) their business involves significant, unusual, or highly complex transactions. Another example of an obvious risk factor for fraudulent financial reporting includes significant operations located or conducted across international borders in jurisdictions where differing business environments and cultures exist.   AU 316.85, Appendix.

33.     Certain accounts, classes of transactions, and assertions that have high inherent risk because they involve a high degree of management judgment and subjectivity also may present risks of material misstatement due to fraud because they are susceptible to manipulation by management. For instance, revenues for software developers may be deemed to have high inherent risk because of the complex accounting principles applicable to the recognition and measurement of software revenue transactions.  AU 316.39.

34.     The auditor must presume that there is a risk of material misstatement due to fraud relating to revenue recognition.  AU 316.41.  This is particularly true given the highly risky nature of POC accounting, which CXTI applied to all of its contracts.   AU 316.54 lists specific auditing procedures the auditor should perform to address the higher risk of fraud in revenue recognition under risky circumstances, such as in POC accounting.

35.     The auditor must perform analytical procedures relating to revenue with the objective of identifying unusual or unexpected relationships involving revenue accounts that may indicate a material misstatement due to fraudulent financial reporting.  AU 316.29.

36.     In 2005, CXTI's $11.0 million increase in its accounts receivable balance was very high relative to the $35.6 million in revenue it recognized, and the ratio remained high in 2006. Accounts receivable as a percentage of total assets was already 23% in 2004 and grew to the high levels of 43% in 2005 and 50% in 2006. Revenue grew rapidly from $4.7 million in 2003 to $66 million in 2006.

37.     The rapid increases in revenue and accounts receivable- and the increasing ratio of accounts receivable to revenue were bright red-flags for fraud and required the Auditors to investigate the legitimacy of these accounts. It was obvious that accounts receivable and revenue were major areas of concern for potential misstatement and fraud.

38.     BDO and PKF committed fraud by failing to follow the requirements of GAAS and perform an in-depth investigation of CXTI contracts, revenue and accounts receivable and confirm their existence by direct communications with the customers.

39.     CXTI is a United States corporation operating its entire business in mainland China, through Expert Network, where it is very difficult for U.S. investors and regulatory agencies or even Hong Kong auditors to obtain verification of financial statement assertions. All of its revenue is generated by software contracts under the POC method, which is easily subject to manipulation by management. Thus, there was obvious and substantial fraud risk that the Auditor Defendants were required to minimize through application of thorough audit procedures and analytic testing.

40.     CXTI recognized revenue from work it purportedly did from 2003-2006 pursuant to 16 e-Government Contracts that were entered into between its mainland Chinese subsidiary, Expert Network, and local Chinese governments as well as a local Chinese company, whose business license was revoked. These contracts obliged Expert Network to engage in complex

software system development projects and required CXTI to use the POC revenue recognition method, which required reliance on CXTI management's estimate of the stage of completion of the contract and estimate of the likelihood of payment by the customer. Given the presence of these obvious risk factors, together with the ballooning accounts receivable, which indicated that CXTI may have never received payment for any of the revenue it purportedly earned pursuant to the 16 e-Government Contracts, the Auditor Defendants were aware, or should have been aware, of substantial fraud risk factors requiring the Auditor Defendants to evaluate carefully the audit evidence of CXTI's revenue and accounts receivable.

41.     AU Section 330.32 provides for alternative procedures to confirm accounts receivable, including examination of subsequent cash receipts (including the matching of such receipts with the actual items being paid), shipping documents, or other documentation. CXTI claimed to have actually received payment of $100.5 million of the revenue it recognized for work performed from 2003 through 2006 pursuant to the e-Government Contracts. CXTI never actually received that $100.5 million. Had the Auditor Defendants made the slightest effort to evaluate additional evidence of these claimed cash receipts, they would have discovered the fraud.

42.     Of the 16 e-Government Contracts from which CXTI recognized revenue in fiscal years 2003 through 2006, Plaintiffs' private investigator determined that 13 of the contracts were completely fraudulent, and of the remaining three, that the Dehua 1st Phase Contract had been terminated in 2004 after merely $12,126 was paid to CXTI; for the Jinjiang Unified Command System Contract, CXTI recognized only $600,000 in revenue; and for the contract with Yinzhou District Ningbo City, CXTI recognized only $300,000 in revenue, an insignificant portion of the $131 million of revenue CXTI recognized for work done by Expert Network during the fiscal

years 2003–2006.  Had the Auditor Defendants made an effort to confirm the existence of even

one of Expert Network's significant e-Government Contracts or the accounts receivable derived

therefrom, they would have discovered the fraud.

43.    As part of the auditors' responsibility to perform analytical procedures to detect

fraud, the Auditor Defendants were required to perform analytical procedures to determine

whether revenue and accounts receivable trends were unusual or indicated a risk of fraud.  AU

316.71.  The indicators of fraud, which should have been investigated by the Auditor

Defendants, included the relationship between and among revenue, net income, accounts

receivable, total assets, and cash flow.  Here, accounts receivable grew substantially as a

percentage of total assets each year to a high amount, and the increase in accounts receivable

each year relative to the revenue recognized in the respective year was also high.  The growing

accounts receivable balances relative to revenue and asset growth were red flags indicating

potential fraud that the Auditor Defendants ignored.

44.    CXTI's accounts receivable balance at year-end as a percentage of revenue

recognized in each year grew substantially from 2004, when it was 17% ($4.4 million/$26.8

million), to 2005, when it was 43% ($15.4 million/$35.6 million).  In 2006, CXTI's accounts

receivable as a percentage of revenue recognized increased even further to 51% ($33.6

million/$66.0 million).

45.    CXTI's accounts receivable (balance) as a percentage of total assets grew

substantially from 2003 through 2006, with accounts receivable growing from zero percent in

2003 ($0/$2.5 million) to 23% in 2004 ($4.4 million/$19.2 million) to 43% in 2005 ($15.4

million/$35.8 million) and to a very high 50% of total assets in 2006 ($33.6 million/$67.6

million).

46.     Under the auditing standards of the PCAOB, the Auditor Defendants were required to perform extensive analytical procedures relating to revenue and income, such as comparing each to end of year cash flow and accounts receivable, in an effort to root out fraud. AU 316.70-72.   The Auditor Defendants did not perform the required procedures.  If they had, they would have discovered the fraud.

47.     Given the abundance of red flags surrounding CXTI's growing accounts receivable, the dramatic revenue increase each year, and the mainland China environment in which Expert Network operated, PKF and BDO were required to contact the customers and to obtain written and verbal confirmation of the e-Government Contracts and amounts earned therefrom each year.  Instead, PKF and BDO never obtained reliable confirmation.

48.     Based on the information that an overwhelming number of e-Government Contracts were fraudulent and because GAAP was violated in CXTI's financial statements, the only conclusion that can be reached is that the Auditor Defendants violated, at a minimum, the third General Standard and the third Standard of Field Work of GAAS.

49.     The Auditor Defendants were required by GAAS to inquire about Expert Network's customers and to confirm the existence of the 16 purported e-Government Contracts pursuant to which CXTI claimed to have earned revenue from 2003-2006. The Auditor Defendants were likewise required by GAAS to inquire about and to confirm the existence of the accounts receivable stated on CXTI's balance sheets related to those 16 contracts.  Because 13 of the 16 contracts were completely fraudulent, the Auditor Defendants clearly did not obtain sufficient audit evidence or perform satisfactory substantive tests to confirm the existence of

these contracts and the reported revenue CXTI claimed to have earned therefrom, which totaled

over $131 million.[5]

---

5  Of the three confirmed contracts, one had been prematurely terminated in 2004 with only a
tiny amount of revenue earned and paid, and from the other two CXTI claimed to have earned
only $900,000 in revenue.

Ex. 1



Certified Public Accountants
A Professional Corporation

29 Broadway • New York, NY 10006
Telephone: (212) 867-8000 • Telefax: (212) 687-4346
E-mail: info@pkfny.com • www.pkfnewyork.com
Member of PKF International Limited

December 28, 2004

Mr. Jeff Cheung
China Expert Technology Inc. (CXTI)
c/o PKF
18 Whitfield Road
Causeway Bay HONG KONG

Dear Mr. Cheung:

Thank you for requesting our proposal for PKF tax compliance services.

The following letter sets forth the proposed tax services to be rendered by PKF.

<u>Services</u>

In addition to preparing an income tax return for CXTI, CXTI would be required to file Federal Form 5471, Information Return of U.S. Persons with Respect to Certain Foreign Corporations. We will prepare this as a part of our engagement.

<u>PKF Fees</u>

Our fee for the preparation of December 31, 2004 tax returns would be no greater than $2,000.

As discussed in our e-mail, the fixed fee is based upon limited knowledge of the activity of the foreign subsidiaries. Should there be significant controlled foreign corporation Subpart F income, there is a potential for significant additional hours. However, we do remain committed to our fixed fee of $2,000 unless there is a significant additional amount of time required. We will advise you in advance should this situation arise for your advance approval.

PKF 000000830

2

We are pleased to have this opportunity to provide these services.  If this letter correctly expresses your understanding of the terms of our engagement, please sign the enclosed copy where indicated and return it to us.

Very truly yours,

**PKF**
Certified Public Accountants
A Professional Corporation

By: _____
Leo Parmegiani, CPA
Tax Director

LP/tm
Enc.

The services described in the foregoing letter are in accordance with our requirements and are acceptable to us.

**CHINA EXPERT TECHNOLOGY INC.**

BY: _____

TITLE: _____

DATE: _____

PKF  000000831



**Certified Public Accountants**
A Professional Corporation

29 Broadway • New York, NY 10006
Telephone: (212) 867-8000 • Telefax: (212) 687-4346
E-mail: info@pkfny.com • www.pkfnewyork.com
*Member of PKF International Limited*

July 5, 2005

Mr. Patrick P.K. Li
PKF Hong Kong
26/F Citicorp Centre
18 Whitfield Road
Causeway Bay
**HONG KONG**

Dear Patrick:

This letter will serve to confirm the services which we will provide to PKF Hong Kong (PKF-HK), member firm of the International Association of PKF, in connection with the audit of the 2004 and the 2005 quarterly reviews of the financial statements of its client China Expert Technologies, Inc. (China Expert) to be included in filings with the United States (US) Securities and Exchange Commission (SEC).

The SEC endeavors to assure that the audits of financial statements by foreign auditors included in filings with the SEC are comparable to the audits of financial statements by US auditors, and that the audits conducted by foreign auditors are as extensive as those conducted by US auditors.  With these overall objectives, **PKF, Certified Public Accountants, A Professional Corporation** (PKF-NY) will consult with PKF-HK to ensure that PKF-HK professional personnel involved with the China Expert audit are knowledgeable of:

- accounting principles generally accepted in the United States of America (US GAAP)

- auditing standards of the Public Company Accounting Oversight Board (United States of America) (US GAAS)

- the SEC's rules and other pronouncements with respect to auditing, accounting and independence

In light of the above, PKF-NY will perform, as needed, the following agreed-upon consulting procedures to assist PKF-HK in connection with the audit of the annual financial statements of China Expert in the following manner:

- supply PKF-HK with all pertinent current accounting, auditing and SEC literature, as needed.

- discuss with PKF-HK US GAAS and the SEC's rules and other pronouncements concerning independence to ensure that these rules have been followed in connection with the China Expert audit.

PKF  000000832

<u>2</u>

- discuss with PKF-HK the application of generally accepted auditing standards (GAAS) in the US vs. HK and discuss with audit personnel policies followed to establish that HK GAAS is comparable to US GAAS.

- review your planning procedures including audit programs and fraud considerations, as necessary.

- review financial statements of China Expert and advise PKF-HK of items that are questionable under US GAAP and that require further clarification.

- advise PKF-HK of SEC requirements for reporting, inclusion of financial statements of significant subsidiaries, independence, timing of filings, etc.

- advise on formatting financial statements into a US presentation.

- review the entire filings with the SEC for compliance with SEC rules and agree amounts disclosed in the documents to the audited and unaudited financial statements.

- attend meetings and discuss various auditing and accounting issues with PKF-HK, management and the client's attorneys, as needed.

We will not perform any audit or review services on the accounts of China Expert and, therefore, will not issue an opinion on any financial statements of China Expert entities. Our services will be limited to consulting with PKF-HK on US GAAP, US GAAS and SEC related matters.

Our fee for these consultation services will be billed to you at our prevailing hourly rates, which currently are US $450 for a director, plus expenses. We estimate our fee for this engagement to range between $10,000 to $12,000.

We trust that the services we will provide, as outlined above, are useful in assisting your client with its filing with the SEC.

Very truly yours,

**PKF**
Certified Public Accountants
A Professional Corporation

By: _____
Henry A. Freire CPA, Director

HAF/tm

Acknowledgement of Scope of Services:

By: _____

Title: _____Partner_____

PKF
**Certified Public Accountants**
**A Professional Corporation**



29 Broadway
New York, NY 10006
USA

Tel      212 867 8000
Fax     212 687 4346
www    pkfnewyork.com
E-mail  info@pkfny.com

March 21, 2007

Mr. Simon Fu
China Expert Technology, Inc.
Room 2703-04
Great Eagle Centre
23 Harbour Road
Wanchai
**HONG KONG**

Dear Mr. Fu:

Thank you for requesting PKF tax compliance services.

This letter is to confirm and specify the terms of our engagement with China Expert Technology, Inc. ("CET") for the tax year ended December 31, 2006 and to clarify the nature and extent of the services we will provide.

The following sets forth the tax returns we will prepare for CET:

- Federal Corporation Income Tax Return
- Form 5471 - Information Return of U.S. Persons With Respect to Certain Foreign Corporations
  - Hong Zhong Holdings Ltd.
  - China Expert Network Company Ltd.
  - Expert Network Shenzhen Company
- Form 5472 – Information Return of a 25% Foreign-Owned U.S. Corporation or a Foreign Corporation Engaged in a U.S. Trade or Business
  - China Data Holdings Ltd.

You will provide us with the accounting records needed to prepare the tax returns. Our work in connection with the preparation of your tax returns does not include any procedures designed to discover defalcations or other irregularities, should any exist.

We will use our judgment in resolving questions where the tax law is unclear, or where there may be conflicts between the taxing authorities' interpretations of the law and other supportable positions. Unless otherwise instructed by you, we will resolve such questions in your favor whenever possible.

*Member of PKF International Limited, an association of legally independent firms.*

PKF  000000834

<u>2</u>

The law provides various penalties that may be imposed when taxpayers understate their tax liability. If you would like information on the amount or circumstances of these penalties, please contact us.

Management is responsible for the proper recording of transactions in the books of accounts, for the safeguarding of assets and for the substantial accuracy of the financial records. You have the final responsibility for the income tax returns and, therefore, you should review them carefully before you sign and file them.

**PKF Fees**

Our fee for the above services will be $2,500 based upon our estimate of professional time required to prepare complete and accurate returns.

Our standard billing rates are:

|              |        |
|--------------|--------|
| Tax Senior   | $200   |
| Tax Manager  | $275   |
| Tax Director | $425   |

If we become aware of issues and/or transactions which require significant additional time, we will discuss with you in advance.

In addition to the listed services, we will be available to provide consultation during the year. Consultation could include tax examinations, compliance issues or special research and planning projects. If a project requires more than a minimal amount of time (one to two hours), we will bill you for the time incurred at our standard billing rates. We will obtain your approval before commencing any projects.

We are pleased to have this opportunity to provide these services. If this letter correctly expresses your understanding of the terms of our engagement, please sign the enclosed copy where indicated and return it to us.

Very truly yours,

**PKF**
Certified Public Accountants
A Professional Corporation

By: _____
    Henry A. Freire, CPA, Director

By: _____
    K. Joseph Lee, CPA
    Tax Director

HAF&KJL/tm
Enc.

PKF 000000835

The services described in the foregoing letter are in accordance with our requirements and are acceptable to us.

**CHINA EXPERT TECHNOLOGY, INC.**

BY: _____ SIMON FU

TITLE: _____CFO_____

DATE: _____8/4/2007_____

Under Section 6662 of the Internal Revenue Code, an accuracy-related penalty may be imposed on an underpayment of tax unless it can be shown that there was a reasonable cause for the underpayment and the taxpayer acted in good faith with respect to the underpayment. Pursuant to IRS Circular 230 regulations, we wish to advise you that this communication, including any attachments hereto, has not been prepared to be used, and cannot be used, by you for the purpose of avoiding such penalties should any be imposed.

PKF 000000836

# Ex. 2

# CHINA EXPERT TECHNOLOGY, INC.

## CONSOLIDATED FINANCIAL STATEMENTS

## CONTENTS

| | PAGES |
|---|---|
| Report of Independent Registered Public Accounting Firm | 14 |
| Consolidated balance sheets | 15 |
| Consolidated statements of operations | 16 |
| Consolidated statements of stockholders' equity | 17 |
| Consolidated statements of cash flows | 18 |
| Notes to consolidated financial statements | 19 |

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Stockholders of
China Expert Technology, Inc.

We have audited the accompanying consolidated balance sheets of China Expert Technology, Inc. and its subsidiaries as of December 31, 2004 and 2003 and the related consolidated statements of operations, stockholders' equity and cash flows for each of the three years in the period ended December 31, 2004. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of China Expert Technology, Inc. and its subsidiaries as of December 31, 2004 and 2003 and the consolidated results of their operations and their cash flows for each of the three years in the period ended December 31, 2004 in conformity with accounting principles generally accepted in the United States of America.

PKF
Certified Public Accountants
Hong Kong
February 22, 2005

14

**ITEM 14.    PRINCIPAL ACCOUNTANT FEES AND SERVICES**

### Audit Fees

The aggregate fees billed by PKF, Certified Public Accountants for audit of the Company's annual financial statements were [$**] for the fiscal year ended December 31, 2004, and $0 for the fiscal year ended December 31, 2003. The aggregate fees billed by PKF, Certified Public Accountant, for review of the Company's financial statements included in its quarterly reports on Form 10-QSB were $23,077 during the period ended December 31, 2004. PKF, Certified Public Accountant, has been retained on December 29, 2004 to audit the Company's annual financial statements for the fiscal year ended December 31, 2004. PKF, Certified Public Accountant, adopting reverse takeover accounting treatment for financial reporting purpose, audited the annual financial statements of the Company as a continuity of China Expert for the fiscal year ended December 31, 2003 and December 31, 2002.

** The Company has not been billed but the fees are expected to be approximately $102,564.

The aggregate fees billed by Telford Sadovnick, P.L.L.C. for audit of the Company's annual financial statements were $5,000 for the fiscal year ended December 31, 2003, and $0 for the fiscal year ended December 31, 2002. The aggregate fees billed by Telford Sadovnick, P.L.L.C. for review of the Company's financial statements included in its quarterly reports on Form 10-QSB were $0 during the period ended December 31, 2003, and $0 during the period ended December 31, 2002. Telford Sadovnick, P.L.L.C., was retained in January 2004 to audit the Company's annual financial statements for the fiscal year ended December 31, 2003. They were not involved prior to January 2004 and thus did not audit the Company's annual financial statements for the fiscal year ended December 31, 2002 and to review the quarterly reports for the fiscal year ended December 31, 2003 or earlier.

### Audit-Related Fees

PKF, Certified Public Accountants, did not bill the Company any amounts for assurance and related services that were related to its audit or review of the Company's financial statements during the fiscal years ending December 31, 2004.

Telford Sadovnick, P.L.L.C. did not bill the Company any amounts for assurance and related services that were related to its audit or review of the Company's financial statements during the fiscal years ending December 31, 2003.

### Tax Fees

The aggregate fees billed by PKF, Certified Public Accountants, for tax compliance, advice and planning were still unknown for the fiscal year ended December 31, 2004. The Company has not been billed but the fees are expected to be approximately $2,000.

The aggregate fees billed by Telford Sadovnick, P.L.L.C. for tax compliance, advice and planning were $0 for the fiscal year ended December 31, 2002.

### All Other Fees

PKF, Certified Public Accountants, did not bill the Company for any products and services other than the foregoing during the fiscal years ended December 31, 2004.

Telford Sadovnick, P.L.L.C.did not bill the Company for any products and services other than the foregoing during the fiscal years ended December 31, 2002.

**SIGNATURES**

In accordance with Section 13 or 15(d) of the Exchange Act, the registrant caused this report to be signed on its behalf by the undersigned, thereunto duly authorized on March 14, 2005.

**CHINA EXPERT TECHNOLOGY, INC.**
(Registrant)

By: /s/ Zhu Xiaoxin
Zhu Xiaoxin, President and Director

In accordance with the Exchange Act, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

By: /s/ Zhu Xiaoxin
Zhu Xiaoxin, President and Director
Date: March 14, 2005

By /s / Kung Sze Chau
Chief Executive Officer and Director
Date: March 14, 2005

By /s /Chiang Min Liang
Chief Financial Officer
Date: March 14, 2005

44

## **CERTIFICATE OF SERVICE**

The undersigned certifies and declares as follows:

I am over the age of 18 and not a party to this action. My business address is 350 Fifth Avenue, Suite 5508, New York, New York, 10118, which is in the county where the mailing described below took place.

On May 28, 2010, I served the within THIRD AMENDED CLASS ACTION COMPLAINT by U.S. mail. I placed a true and correct copy thereof in a sealed envelope addressed as set forth on the attached service list and caused such envelope, with first class postage thereupon fully prepaid, to be placed in the U.S. Mail at New York, NY, and certify that such envelope was placed for collection and mailing following ordinary business practices.

I declare that I am employed in the office of a member of the bar of this court at whose direction service was made.

Executed May 28, 2010 in New York, New York.

_____
Erica Stone

1

## SERVICE LIST

Thomas R. Manisero, Esq
Peter J. Larkin, Esq.
William J. Kelly, Esq.
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
3 Gannett Drive
White Plains, NY 10604
Attorneys for Defendants PFK Certified Public Accountants

Charles J. Ha, Esq.
Orrick, Herrington & Sutcliffe LLP
701 Fifth Avenue
Suite 5700
Seattle, Washington 98104
Attorneys for PKF Hong Kong, Certified Public Accountants

Christopher Harris, Esq.
Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
Attorneys for BDO McCabe Lo Limited Certified Public Accountants

China Expert Technology, Inc.
C/O Registered Agent
Incorp Services, Inc.
3155 East Patrick Lane, Suite 1
Las Vegas, Nevada 89120-3481