**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (LR 5733)
lrosen@rosenlegal.com
Phillip Kim, Esq. (PK 9384)
pkim@rosenlegal.com
Timothy W. Brown, Esq. (TB 1008)
tbrown@rosenlegal.com
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827

Attorneys for Lead Plaintiffs and the Class

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

CARLOS MUNOZ, INDIVIDUALLY AND ON
BEHALF OF ALL OTHERS SIMILARLY
SITUATED,

               Plaintiff,

          vs.

CHINA EXPERT TECHNOLOGY, INC.; PKF NEW
YORK, CERTIFIED PUBLIC ACCOUNTANTS, A
PROFESSIONAL CORPORATION, PKF HONG
KONG, CERTIFIED PUBLIC ACCOUNTANTS;
AND BDO MCCABE LO LIMITED CERTIFIED
PUBLIC ACCOUNTANTS,

               Defendants.

-------------------------------------------------------------X

CASE No.:  07-CV-10531 (AKH)

FOURTH AMENDED
COMPLAINT

Class Action

**<u>JURY TRIAL DEMANDED</u>**

       Lead Plaintiffs Joseph Nunn, Basil Hantash, Bashar Hantash, Anna Hantash and Kenneth

Price ("Lead Plaintiffs"), and named plaintiff Carlos Munoz ("Named Plaintiff"), individually and

on behalf of all other persons similarly situated, "Plaintiffs," allege against defendants the following

complaint:

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased the publicly traded common stock of China Expert Technology, Inc. ("CXTI", or the "Company") between March 31, 2006, and October 1, 2007, inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Lead Plaintiffs and Named Plaintiff, as set forth in their certifications previously filed with the Court, purchased CXTI securities at artificially inflated prices during the Class Period and have been damaged thereby.

3.      Defendant CXTI is a Nevada Corporation formerly headquartered in the People's Republic of China ("PRC").  CXTI conducted 100% of its operations through its wholly owned subsidiary Expert Network (Shenzhen) Co. Ltd. ("Expert Network").

4.      Defendants PKF New York, Certified Public Accountants ("PKF NY") and PKF Hong Kong Certified Public Accountants ("PKF HK"), collectively "PKF", are affiliates operating within PKF International Limited, an international accounting firm.  PKF NY is based in New York and PKF Hong Kong is based in Hong Kong.

5.      PKF audited and certified CXTI's financial statements for fiscal years ended December 31, 2003 and 2004.

6.      Defendant BDO McCabe Lo Limited ("BDO") is a certified public accounting firm that audited and certified CXTI's financial statements for fiscal years ended December 31, 2005 and 2006.

2

7.    During the Class Period, CXTI reported aggregate revenue of over $132 million from 16 different contracts to build e-government computer systems in the People's Republic of China. Ninety-nine percent of this reported revenue was never earned by, and never paid to, CXTI.  The $132 million of revenue recognized by CXTI was a fraud.  The Company simply forged these contracts and claimed to have earned over $132 million of contract revenue when its true earnings were less than $1.0 million.

8.    All of CXTI's operating revenue in fiscal years 2003 through 2006 was generated from these long-term-fixed price e-government contracts that recognized revenue through percentage of completion accounting.

9.    BDO and PKF failed to follow generally accepted auditing standards for percentage of completion revenue recognition for long-term fixed-price contracts in performing the audits of CXTI's financial statements during the Class Period.  BDO's and PKF's audit failures were of the highest magnitude, as both failed to adhere to the most basic auditing standards, which required these auditors to confirm (1) the 16 contracts, (2) the $132 million in revenue and related accounts receivable, and (3) CXTI's customers' ability to pay the amounts due under the contracts, including the accounts receivable.

**CXTI'S FRAUDULENT FISCAL 2003 AND 2004 FINANCIAL STATEMENTS**

10.    On March 31, 2006, CXTI filed its annual report on Form 10-KSB for the fiscal year ended December 31, 2005 (the "2005 Annual Report"). The 2005 Annual Report included audited financial statements for the two fiscal years ended December 31, 2003, 2004 (and 2005).

11.    CXTI's 2003 and 2004 financial statements showed the following:[1]

---

1  2003 balance sheet amounts obtained from CXTI's 2004 10-K filed with SEC on March 14,

|  | 2003 | 2004 |
|---|---|---|
| Revenue | $ 5,666,934 | $ 26,831,135 |
| Contract Revenue | $ 4,700,000 | $ 26,700,000 |
| Accounts Receivable at Year End* | $        0 | $    4,438,331 |

12.     CXTI recognized revenue pursuant to just two contracts in 2003 and 2004 between Expert Network and two customers.[2]  In 2003, CXTI earned revenue from just one of those two contracts.

| Projects | Total Contract Sum | Revenue Recognized in 2003 | Revenue Recognized in 2004 | Total Revenue Recognized in 2003/2004 |
|---|---|---|---|---|
| Jinjiang(1st Phase) | $24,700,000 | $ 4,700,000 | $17,800,000 | $22,500,000 |
| Dehua (1st Phase) | $15,600,000 | $        0 | $ 8,900,000 | $ 8,900,000 |
|  |  | $ 4,700,000 | $26,700,000 | $31,400,000 |

13.     CXTI's financial statements for 2003 and 2004 were false and misleading because its operating subsidiary, Expert Network, did not earn the revenue reported for these purported contracts in 2003 and 2004.

14.     The Jinjiang (1st Phase) contract was supposedly entered into between Expert Network and Jinjiang Gongcheng Management Services Co., Ltd., on behalf of the City of Jinjiang for total contract sum of $24.7 million.

15.     On or about June 11, 2008, Plaintiffs' Private Investigator interviewed an employee, named Mr. Chen, of the e-Government Office of Jinjiang Municipality.  He stated that his office is

---

2005. The 2003 income statement amounts are presented in CXTI's 2004 audited financial statements.

2   CXTI filed unsigned English translations of the purported contracts with the SEC.

part of the Jinjiang City E-Government Project Construction Command Bureau, which is in charge of e-government construction projects for Jinjiang Municipality.

16.    Mr. Chen stated that: a) Jinjiang Municipality did not authorize Jinjiang Gongcheng Management Services Co., Ltd. to manage e-government construction projects for Jinjiang Municipality, b) he had never heard of Jinjiang Gongcheng Management Services Co., Ltd., the signer of the Jinjiang (1st Phase) contract with Expert Network, and c) Jinjiang Municipality did not enter into or authorize the Jinjiang (1st Phase) contract.

17.    Therefore, the Jinjiang (1st Phase) contract and CXTI's recognition of $4,700,000 of revenue in 2003 and $17,800,000 in 2004 is fraudulent.

18.    The Dehua (1st Phase) contract was supposedly entered into between Expert Network and Dehua County People's Municipality of Fujian Province for a total contract sum of $15.6 million.

19.    On or about June 17, 2008 Plaintiffs' Private Investigator interviewed an employee of the People's Government of Dehua County, Quanzhou City, Fujian Province, who stated that Mr. Wang, a manager in the Network Office of the People's Government of Dehua County was in charge of e-Government Construction Projects for Dehua County.

20.    On or about August 14, 2008, the Private Investigator interviewed Mr. Wang, who confirmed that his office, the Network Office of the People's Government of Dehua County, Fujian Province, was in charge of e-government construction projects for Dehua County of Fujian Province.

21.    Mr. Wang stated that in 2004 Dehua County and Expert Network did sign a contract, pursuant to which Expert Network was hired to implement the general planning project of the e-Government Construction Project for Dehua County. Mr. Wang stated that the project was

5

terminated in 2004 because Dehua County did not have sufficient capital, and as a result Dehua paid Expert Network a total of only RMB 100,000, equivalent to only $12,126.00. Mr. Wang also stated that Dehua (1st Phase) was the only contract that Dehua County ever entered into with Expert Network.

22.    Therefore, Expert Network's recognition of $8.9 million of revenue in 2004 for the Dehua (1st Phase) contract is fraudulent.

23.    CXTI recognized revenue from the Jinjiang (1st Phase) and Dehua (1st Phase) contracts according to the percentage of completion accounting method.

### GAAP Governing Percentage Of Completion Revenue Recognition

24.    CXTI's annual financial statements stated that CXTI recognized revenue on long-term fixed price contracts under the percentage-of-completion method in accordance with the American Institute of Certified Public Accountants' Statement of Position 81-1 "Accounting for Performance of Construction-Type and Certain Production-Type Contracts" ("SOP").

25.    Generally Accepted Accounting Principles ("GAAP") has created a special set of rules for long-term fixed-price contracts such as the ones at issue here. The American Institute for Certified Public Accountants ("AICPA") Accounting Research Bulletin ("ARB") No. 45, Long-Term Construction-Type Contracts, (1955) and the SOP (1981) (which was issued by the Accounting Standards Division) address how to account for long-term fixed-price contracts specifically.

26.    The AICPA Audit and Accounting Guide – Construction Contractors (which was prepared by the Construction Contractor Guide Committee) that includes the SOP ("GUIDE") also addresses percentage of completion accounting.

6

27.     GAAP for using the percentage-of-completion method is stated in the SOP at paragraph 23 as follows:

> The use of the percentage-of-completion method depends on the ability to make reasonably dependable estimates. For the purposes of this statement, "the ability to make reasonably dependable estimates" relates to estimates of the extent of progress toward completion, contract revenues, and contract costs. The division believes that the percentage-of-completion method is preferable as an accounting policy in circumstances in which reasonably dependable estimates can be made and in which all the following conditions exist:
>
> • Contracts executed by the parties normally include provisions that clearly specify the enforceable rights regarding goods or services to be provided and received by the parties, the consideration to be exchanged, and the manner and terms of settlement.
> • The buyer can be expected to satisfy his obligations under the contract.
> • The contractor can be expected to perform his contractual obligations.

28.     It is important to note that the need to estimate in connection with percentage of completion revenue recognition relates only to what portion of the total expected revenue may be recognized in the current period.  There is no "estimation" involved in determining whether the buyer can perform his contractual obligations, i.e. pay for the goods or services as required under the contract.

29.     Revenues for software involve a high degree of management judgment and subjectivity and therefore have a high inherent risk of material misstatement due to fraud.  AU 316.39.

30.     The auditor should ordinarily presume that there is a risk of material misstatement due to fraud relating to revenue recognition.  AU 316.41.  PKF, as auditor, knew that it must scrutinize these contracts, and associated revenues very closely in the audit.

31.     Under PCAOB AU Section 150, the auditors are required to exercise professional skepticism which is an attitude that includes a questioning mind and a critical assessment of audit

7

evidence. The objective is to obtain sufficient competent evidential matter to provide a reasonable basis for forming an opinion.

32.     The GUIDE states that in audits of construction contractors:

the primary focus is on the profit centers, usually individual contracts, for recognizing revenues, accumulating costs, and measuring income. The auditor must obtain a thorough understanding of the contracts that underlie the financial statements, and the audit procedures followed in an audit of a contractor should be related to those contracts. Evaluation of the profitability of contracts or profit centers is central to the total audit process and to the determination of whether the information in the financial statements is presented in conformity with generally accepted accounting principles.

33.     Pursuant to AU § 150, the third Standard of Field Work is: "Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit."

34.     PCAOB § 326 – "Evidential Matter" requires the auditor to (1) obtain sufficient valid and relevant evidence to form conclusions about individual financial statement assertions and (2) consider all evidence obtained that either corroborates or contradicts the clients assertions.

35.     The pertinence of the evidence, its objectivity, its timeliness, and the existence of other evidential matter that corroborates the conclusions of the auditor all bear on the competence of the evidence.  Evidential matter that supports the financial statements consists of the underlying accounting data and all corroborating information that is available.

Corroborating evidential matter includes both written and electronic information such as checks; records of electronic fund transfers; invoices; contracts; minutes of meetings; confirmations and other written representations by knowledgeable people; information obtained by the auditor from inquiry, observation, inspection, and physical examination; and other information developed by, or available to, the auditor which permits him or her to reach conclusions through valid reasoning. . . .

AU 326.17.

36.     Evidential matter supporting the financial statements consists of the underlying accounting data and all corroborating information available to the auditor.  AU 326.

37.     Most of the independent auditor's work in forming his or her opinion on financial statements consists of obtaining and evaluating evidential matter concerning management's assertions concerning the financial statements; such as the existence of contracts, revenue and accounts receivable.  *See* AU 326.02-362.08.

38.     To be competent, evidential matter must be obtained in a manner that supports its reliability.  AU 327.21.

39.     When evidential matter can be obtained from independent sources outside an entity, it provides greater assurance of reliability for the purposes of an independent audit than that secured solely within the entity.  AU 327.21(a).

40.     Thus, auditors are typically required to obtain audit evidence supporting management's assertions from independent third parties.  This includes obtaining confirming evidence of the existence of contracts, revenue, and customers' ability to pay amounts due under the contracts upon which management bases assertions in the financial statements.

41.     Confirmation is the process of obtaining and evaluating a direct communication from a third party in response to a request for information about a particular item affecting the financial statements.  AU 330.04.  Confirmation is undertaken to obtain evidence from third parties about financial statement assertions made by management because evidence from independent third parties is presumed to be more reliable.  AU 330.06; AU 326.

42.     The greater the level of audit risk, the greater the need for an auditor to obtain confirming evidence of financial statement assertions directly from independent third parties

directly. AU 330.07.   This usually entails obtaining "confirmation" of the specific financial statement assertion (existence of a contract, revenue or receivable) directly from the third party involved in the transaction.   In some instances, third party confirmations are insufficient to reduce audit risk to an acceptably low level and the auditor is required to perform additional substantive procedures and tests of financial statement assertions. AU 330.09.

43.    The auditor has a responsibility to plan and perform the audit to obtain reasonable assurance that the financial statements are free of material misstatement caused by fraud. The responsibility for the detection of fraud is discussed in PCAOB AU Section 316: "Consideration of Fraud in a Financial Statement Audit."

44.    One of the requirements for using the percentage-of-completion method of revenue recognition is that "THE BUYER CAN BE EXPECTED TO SATISFY HIS OBLIGATIONS UNDER THE CONTRACT". Pursuant to PCAOB AU Sections 311, 319 and 326, PKF, as auditor, was required to, at a minimum, review the CXTI's determination that for each contract the customer met that criteria. Some of the procedures that the PKF as auditor was required to perform to assure that each Buyer can satisfy his obligations to pay under each contract are:

a)    Obtain a credit agency report on the buyer.
b)    Obtain information from the buyer's bank.
c)    Review the financial statements of the buyer.
d)    Review financing arrangements entered into by the buyer.
e)    Review bonding arrangements, if any, entered into to guarantee payment.
f)    Determine whether the buyer had authority to enter into the contract.
g)    Determine whether the buyer was licensed to do business.
h)    Determine whether the buyer's funding for the contract was properly authorized and is secure.

45.    PKF was required to obtain competent evidence from third parties that Expert Network's customers were capable of satisfying their obligations under the contracts.

10

Jinjiang Goncheng Was a Defunct Company and Unable to Satisfy Its Purported Obligations

46.     Expert Network's only contract in fiscal 2003 was the Jinjiang (1st Phase) contract entered into between Expert Network and Jinjiang Gongcheng Management Services Co., Ltd. ("Jinjiang Gongcheng").

47.     Plaintiffs' private investigator in PRC searched for and did not find any information related to Jinjiang Gongcheng through internet research, relevant database research, and telephone directory assistance that indicates Jinjiang Gongcheng existed or did business after 2002.

48.     The registration information of Jinjiang Gongcheng, which was registered at the Industry and Commerce Administrative Bureau of Jinjiang City, revealed that the business license of Jinjiang Gongcheng was revoked on December 28, 2002, despite that CXTI claimed Expert Network entered all the Jinjiang Contracts after 2002.

49.     Moreover, Jinjiang Gongcheng was not registered to do e-government construction projects, but instead to do financial management for "Fujian Seaward Pharmaceutical Co., Ltd." Chinese law strictly prohibited Jinjiang Gongcheng from conducting business for which it was not registered.

Chinese Law Forbids Unlicensed or Defunct Companies from Operating Bank Accounts

50.     Under regulations issued by the People's Bank of China,[3] a corporate depositor is required to present an original valid business license in order to establish a bank account.[4] If a corporation's business license is revoked, it is required that the bank account be closed.[5]

---

3   People's bank of China in PRC is equivalent to the Federal Reserve in the U.S.
4   "Measures for the Administration of RMB Bank Settlement Accounts" issued in April 2003 ( No.5 [2003]) ("RMB Settlement Accounts Reg."), Article 17.
5   RMB Settlement Accounts Reg."), Article 49.

51.     PRC Banks are required to carry out annual inspections on accounts already opened o

check compliance with the regulations.  This includes verifying the authenticity of account opening

materials and a requirement that corporations provide to the bank copies of its annual inspection and

business certificate which has passed the annual inspection by the Industry and Commerce

Administrative Department ("SAIC"), which is the local PRC authority regulating corporations.[6]

52.     Thus, had PKF made any effort to check whether Expert Network's customer,

Jinjiang Gongcheng, was cable of satisfying its obligations under the contract, by contacting its bank

and determining its financial wherewithal and creditworthiness, PKF would have discovered that

Jinjiang Gongcheng's bank account was suspended and it could no longer do business and therefore,

that the Jiniang (1st Phase) contract was fraudulent.

Credit Reports and SAIC Filings Would Have
Demonstrated that Jinjiang Goncheng was Defunct and the Contracts Fraudulent

53.     In addition, PKF could have easily obtained a commercial credit report on Jinjiang

Gongcheng which would have showed that Jinjiang Gongcheng had its business license revoked and

was not an operating business.  The commercial credit reports in the PRC typically include annual

financial statements for the company, a list of officers, directors, managers and legal representatives,

a list of shareholders, affiliates and other pertinent information.

54.     PKF should  have obtained an annual report and financial statement for Gongcheng

Management through the SAIC to check whether Jinjiang Gongcheng was licensed to do business

and capable of performing its obligations under the contracts.

_____

6  One PRC Bank, Agriculture Bank of China (Shen Zhen branch), posts a notice to customers
on its website stating that bank accounts opened before December 31, 2009, must file the annual
inspection reports with the bank or they will be temporarily suspended from using the account.
*See* http://www.95599.cn/cn/branch/szx/news/201012/t20101209_45259.htm.

55.    Each PRC locality has a central registry, the SAIC, where every business must file annual reports and financial statements, including annual financial statements, list of directors, officers, legal representatives, and shareholders, capitalization by shareholder, affiliates, and scope of authorized business.

56.    Had PKF obtained a credit report or an SAIC report for Jinjiang Concheng, PKF would have discovered that its business license was revoked in 2002, it had never been licensed to do software development,[7] it had no bank accounts or its bank accounts were suspended, the person listed as its principal executive, Jiang Shaoheng, was also a project manager employed by Expert Network, and most importantly, that it did not have the financial ability – nor was it permitted under Chinese law - to satisfy its obligations under the Jinjiang (1st Phase) contract, as it was a defunct company without any legal authorization to engage in software development.

57.    PKF was required to contact Dehua County and determine whether the contract was valid and in force and whether Dehua was capable and willing to satisfy its obligations under the contract.  Dehua County terminated the contract in 2004 for lack of sufficient funds and had no intention or ability to pay Expert Network more than $12,126–yet CXTI recognized $8.9 million of revenue that period -PKF clearly failed to perform the necessary audit procedure of contacting Dehua County to confirm the existence of the contract and Dehua County's ability and willingness to pay the contract price.

58.    Had PKF performed the required procedures, PKF would have determined that the contracts and revenue recognized and associated accounts receivable were fraudulent.

<u>PKF Failed to Perform Required Job Site Visits that Would Have Shown Fraud</u>

---

7  In China, business licenses strictly govern what type of business a company may engage in.

59.     In order to adhere to the field work standard, which mandates an auditor review the company's internal controls (PCAOB AU § 319), and to adhere to the sufficient competent evidential standard (AU § 326), the GUIDE (which calls this a major auditing procedure) states that the auditor should make job site visits for the following reasons:

- To gain an understanding of the contractor's method of operations.
- To review the system of internal accounting control over records maintained at the job sites, if the auditor expects to rely on the system.
- To obtain information relating to job status and problems (if any) that may be useful in other phases of the examination.

60.     Had PKF performed that procedure, namely, job site visits, PKF would have discovered that CXTI was perpetrating a fraud through the 2 bogus long-term fixed-price contracts.

61.     Either PKF was aware of the fraud or PKF did not do any of the required Generally Accepted Auditing Procedures that it represented it had done in its audit opinion.

PKF Recklessly Failed to Review Expert Network's PRC Audited Financial Statements

62.     The revenue reported by Expert Network with the SAIC for fiscal 2003 and 2004 is substantially less than the revenue CXTI reported in its audited financial statements filed with the SEC.[8, 9, 10]

---

8   Expert Network's 2003 and 2004 annual reports contained audited financial statements certified by Shenzhen Guangxin Certified Public Accountants for fiscal 2002/2003 and fiscal 2003/2004 respectively.
9   Fiscal 2003 information derived from Expert Network's SAIC annual report filed 7/28/2004. Fiscal 2004 information derived from Expert Network's SAIC annual report filed 6/23/2005.
10   Exchange rate: 2003: RMB 8.277b: USD 1;   2004: RMB 8.27 (Source: PRC State Administration of Foreign Currency).

| (In USD) | SAIC 2003 | SEC 2003 | SAIC Amount as % of SEC | SAIC 2004 | SEC 2004 | SAIC Amount as % of SEC |
|---|---|---|---|---|---|---|
| Contract Revenue | $ 1,522,291 | $ 4,700,000 | 32.4% | $ 1,457,045 | $ 26,700,000 | 5.5% |
| Cash at Yr. End | $ 40,869 | $ 47,223 | 86.5% | $ 15,561 | $ 3,265,318 | 0.5% |
| Accounts Receivable | $ 6,265,231 | $ - | n/a | $ 1,178,616 | $ 4,438,331 | 26.6% |
| Net profit | $ 863,590 | $ 1,210,413 | 71.3% | $ 286,459 | $ 4,826,841 | 5.9% |
| Filing Date | 7/28/2004 | | | 6/23/2005 | | |

63.     Had PKF bothered to review Expert Network's publicly available financial records as part of its audit, PKF would have known that Expert Network did not earn the revenue and income that CXTI claimed in its SEC filings to have earned for those years.[11]

64.     Either PKF recklessly failed to review Expert Networks PRC audited financial statements or PKF knowingly certified CXTI's financial statements with actual knowledge that Expert Network did not earn the revenue and income recorded on CXTI's financial statements.

### PKF's Audit Opinion Was False and Misleading

65.     In CXTI's 2005 10-K, PKF provided an audit opinion for CXTI's 2003 and 2004 financial statements in the 10-K falsely stating:

- It has conducted its audits in accordance with the standards of the Public Company Accounting Oversight Board ("PCAOB") formerly known as generally accepted auditing standards ("GAAS").
- It has obtained reasonable assurance that CXTI's financial statements are free of any material misstatements.
- It has examined sufficient evidence supporting the amounts and disclosures in the financial statements.
- CXTI's financial statements are accurate.
- CXTI's financial statements conform to GAAP

---

11   Beginning in fiscal 2004 Chinese companies were required to use percentage of completion accounting for long term fixed price contracts. Notice of the Ministry of Finance on Accounting of Construction Businesses (Letter No. 27 [2003] of the Ministry of Finance), Issued 9/25/2003 and effective since January 1, 2004.  Chinese GAAP for percentage of completion contracts is substantially the same as U.S. GAAP.  Prior to fiscal 2004, percentage of completion accounting was one of three options permitted.  The percentage of revenue recorded was tied to milestones embedded in the contract.

66.    PKF failed to conduct the audits in accordance with the standards of the Public Accounting Oversight Board ("PCAOB") and certified CXTI's financial statements as accurate even though they were false and misleading. Among other things, CXTI's fiscal 2003 and 2004 income statements recognized revenue under the percentage-of-completion method based on fraudulent contracts.

67.    Had PKF conducted audits according to their representations, they would have discovered that not only was the percentage-of-completion method not appropriate but also that CXTI's contracts were fraudulent.

**CXTI'S FRAUDULENT FISCAL 2005 FINANCIAL STATEMENTS**

68.    CXTI's fiscal 2005 financial statements included in the 2005 Annual Report showed the following revenue and balance sheet amounts:

|  | 2005 |
|---|---|
| Revenue | $ 35,568,606 |
| Contract Revenue | $ 35,300,000 |
| Accounts Receivable at Yr. End | $ 15,423,852 |

69.    For fiscal 2005, CXTI recognized revenue from five contracts for Expert Network to provide e-government computer development services to two governmental customers in China as follows:

| Projects | Total Contract Sum | Revenue Recognized in 2005 |
|---|---|---|
| Jinjiang (1st Phase) | $24,700,000 | $2,200,000 |
| Jinjiang (2nd Phase) | $9,900,000 | $7,900,000 |
| Jinjiang (3rd Phase) | $12,500,000 | $6,700,000 |
| Dehua (1st Phase) | $15,600,000 | $6,700,000 |
| Dehua (2nd Phase) | $11,800,000 | $11,800,000 |
| | | $35,300,000 |

70.     CXTI's financial statements for 2005 were false and misleading because its operating subsidiary, Expert Network, did not earn the revenue reported for these purported contracts in 2005.

71.     According to CXTI's filings with the SEC, the Jinjiang (1st Phase), (2nd Phase), and (3rd Phase) contracts were entered into between Expert Network and Jinjiang Gongcheng, the same entity for which Expert Network purportedly did work and for which CXTI recognized revenue in 2003 and 2004 pursuant to the Jinjiang (1st Phase) contract.

72.     The Jinjiang (1st Phase), (2nd Phase), and (3rd Phase) contracts did not exist and were fraudulent for the reasons set forth in ¶ 14-16, 47-49 above.

73.     Thus, the $16.8 million in revenue that CXTI recognized from the Jinjiang 1st Phase, 2nd phase and 3rd Phase contracts in 2005 was fraudulent.

74.     Moreover, Jinjiang Gongcheng was a defunct company. Expert Network could not have entered into or performed work pursuant to $47 million of contracts with a defunct company. *See* ¶ 47-49.

75.     The Dehua (1st Phase) contract, pursuant to which CXTI also recognized revenue in 2004 was fraudulent for the reasons stated in ¶ 18-22 above.  The contract was terminated in 2004,

and CXTI earned no more than about $12,126 in total in fiscal 2004 and zero in 2005 and subsequent years.

76.    Thus, the $6.7 million of revenue from the Dehua (1st Phase) Contract that CXTI recognized in 2005 was fraudulent.

77.    According to CXTI's SEC filings, the Dehua (2nd Phase) contract was purportedly entered into between Expert Network and Dehua County Electronic Administration and Contraction [sic] Management Company Limited of Fujian Province ("DCEACMC").

78.    Mr. Wang, the manager in the Network Office of the People's Government of Dehua County, in charge of e-Government Construction Projects for Dehua County, told Plaintiffs' private investigator that: a) Dehua County did not authorize DCEACMC to manage e-Government Construction Projects for Dehua County; and b) he has never heard of DCEACMC.

79.    Plaintiffs' private investigator did an extensive search, including searching the local SAIC business registry of Dehua County. DCEACMC, the counter-party to the Dehua (2nd Phase) contract, did not exist in the business registry, as is required for a business under Chinese law. Nor did the investigator find any mention of DCEACMC in any other business related database or on the internet. And no telephone was registered in its name.

80.    Thus, the Dehua (2nd Phase) contract never existed and the $11.8 million of revenue CXTI recognized for work done pursuant to the Dehua (2nd Phase) Contract in 2005 was fraudulent.

81.    Of the $35.3 million of contract revenue recognized by CXTI in 2005, 100% of it was fraudulent.

## GAAS and GAAP Governing Percentage Of Completion Revenue Recognition Required BDO to Obtain Evidence from Independent Third Parties that The Contracts Exist and that the Customers are Able to Satisfy Obligations to Pay Contract Price

82.     All of CXTI's $35.3 million of 2005 revenue was derived from 5 long-term fixed-price contracts with only 3 customers.

83.     CXTI's fiscal 2005 annual financial statements stated that it recognized revenue on long-term fixed price contracts under the percentage-of-completion method in accordance with the SOP 81-1 as described in ¶ 24 above.

84.     As set forth in ¶ 24-45 above, GAAS require that BDO perform extensive procedures to obtain sufficient audit evidence that the contracts exist, that the revenue was earned, that the accounts receivable exist and that the customers had the financial ability to pay the amounts due under the contracts.

85.     All of the fiscal 2005 revenue was derived from just 3 customers and 5 contracts. Though it was quite easy to do, BDO failed to perform the required audit procedures and determine that the customers and contracts do not exist and that recognizing $35.3 million of revenue is fraudulent.

86.     As set forth in ¶ 44 above, one of the requirements for using the percentage-of-completion method of revenue recognition is that "THE BUYER CAN BE EXPECTED TO SATISFY HIS OBLIGATIONS UNDER THE CONTRACT". Pursuant to PCAOB AU Sections 311, 319 and 326 (identified above) the BDO, as auditor, was required to, at a minimum, review CXTI's determination that for each contract the customer met that criteria. Some of the procedures that the BDO as auditor was required to perform to assure that each Buyer can satisfy his obligations to pay under each contract are:

    a)      Obtain a credit agency report on the buyer.
    b)      Obtain information from the buyer's bank.
    c)      Review the financial statements of the buyer.
    d)      Review financing arrangements entered into by the buyer.

e)      Review bonding arrangements, if any, entered into to guarantee payment.
f)      Determine whether the buyer had authority to enter into the contract.
g)      Determine whether the buyer is licensed to do business.
h)      Determine whether the buyer's funding for the contracts is properly authorized and is secure.

87.    BDO was required to obtain competent evidence from third parties that Expert Network's customers were capable of satisfying their obligations under the contracts.

<u>Chinese Law Forbids Unlicensed or Defunct Companies from Operating Bank Accounts</u>

88.    As discussed in ¶ 50-52 above, a defunct or unlicensed company is not permitted to maintain a bank account in PRC and if a company fails to provide its bank with evidence annually of a current business license, the bank will suspend the bank account.

89.    Had BDO made any effort to check whether Expert Network's customer, Jinjiang Gongcheng, was capable of satisfying its obligations under the contracts, by contacting its bank and determining its financial wherewithal and creditworthiness, BDO would have discovered that Jinjiang Gongcheng's bank account was suspended and it could no longer do business and therefore, that the Jinjiang (1st Phase) (2nd Phase) and (3rd Phase) contracts and revenue recognized pursuant to those contracts were fraudulent.

90.    Had BDO attempted to contact DCEACMC's bank it would have discovered that it had no bank account because DCEACMC did not have a business license and did not exist. Under Chinese law, a company cannot open a bank account without a valid business license; DCEACMS did not have any business license. *See* ¶ 79 above. Without a bank account, DCEACMC could not have demonstrated that it could satisfy its obligations under the contract.

<u>Credit Reports and SAIC Filings Would Have Demonstrated that Jinjiang Goncheng was Defunct and DCEAMCMC Never Existed and that the Contracts Are Fraudulent</u>

20

91.     Had BDO obtained a credit report on Jinjiang Gongcheng it would have discovered it had its business license revoked in 2002, was not an operating business and was not permitted under Chinese law to perform its obligations under the Jinjiang (1st Phase) (2nd Phase) and (3rd Phase) contracts.

92.     Had BDO attempted to obtain a credit report for DCEACMC it would have discovered that DCEACMC does not exist, never had a business license and was unable – and not permitted under Chinese law - to perform its obligations under the Dehua (2nd Phase) contract.

93.     BDO also should have checked the SAIC filings for Jinjiang Gongcheng and DCEACMC.

94.     Had BDO checked the SAIC filings, BDO would have discovered that Jinjiang Gongcheng had its business license revoked in 2002, it had never been licensed to do software development, the person listed as its principal executive, Jiang Shaoheng, was also a project manager employed by Expert Network, and most importantly, that Jinjiang Gongcheng did not have the financial ability or legal authorization to satisfy its obligations under the Jinjiang (1st Phase) (2nd Phase) and (3rd Phase) contracts, as it was a defunct company.

95.     Had BDO checked the SAIC filings for DCEACMC to ensure it was a validly authorized business and financially capable of performing its obligations under the Dehua (2nd Phase) contract, BDO would have discovered that DCEACMC does not exist, has never been licensed and did not have the financial ability or legal authorization to perform its obligations under the Dehua (2nd Phase) contract.

96.     BDO should also have contacted each of the 3 customers directly to confirm the existence of the contracts, the customers' ability and willingness to pay the amounts under the

contract, and the amount of revenue recorded and related accounts receivable recognized under the contracts.[12]

### BDO Failed to Perform Required Job Site Visits that Would Have Shown Fraud

97.   BDO was also required to make job site visits to each of the 3 customers in order to review internal accounting controls and obtain sufficient competent audit evidence pertaining to revenue and accounts receivable for each customer as set forth in ¶ 59-60 above.

98.   Had it performed the required procedures, BDO would have determined that the contracts and revenue recognized and associated accounts receivable were fraudulent.

### BDO Recklessly Failed to Review Expert Network's PRC Audited Financial Statements

99.   The revenue reported by Expert Network in its SAIC filings for fiscal years 2003, 2004 and 2005 is substantially less than the revenue CXTI reported in its audited financial statements filed with the SEC for those years.[13, 14]   The amounts for fiscal 2003 and 2004 are set forth above.  The amounts for fiscal 2005 are as follows:

| (In USD) | | SAIC 2005 | SEC 2005 | SAIC Amount as % of SEC |
|---|---|---|---|---|
| Contract Revenue | $ | 844,323 | $ 35,300,000 | 2.4% |
| Cash at Yr. End | $ | 211,023 | 7,326,595 | 2.9% |
| Accounts Receivable | $ | 5,948,991 | 15,423,852 | 38.6% |
| Net profit | $ | (67,399) | 6,503,319 | -1.0% |
| Filing Date" | | 3/27/2006 | | |

---

12   In fiscal 2005, accounts receivable from revenue recognized pursuant to the contracts totaled $15.4 million.

13   Fiscal 2005 information derived from Expert Network's SAIC annual report filed 3/27/2006. Expert Network's 2005 annual report contained audited financial statements certified by Shenzhen Zhongxiang Certified Public Accountants.

14   Exchange rate:  2005: RMB 8.192 : USD 1 (Source: PRC State Administration of Foreign Currency).

100.    Had BDO bothered to review Expert Network's publicly available financial records for fiscal 2003, 2004 and 2005 as part of its audit, BDO would have known that Expert Network did not earn the revenue and income that CXTI claimed in its 2003, 2004 and 2005 SEC filings to have earned.

101.    Either BDO recklessly failed to review Expert Networks PRC audited financial statements or BDO knowingly certified CXTI's financial statements with actual knowledge that Expert Network did not earn the revenue and income recorded on CXTI's financial statements.

<u>BDO's Audit Opinion Was False and Misleading</u>

102.    In CXTI's 2005 10-K, BDO provided an audit opinion for CXTI's 2005 financial statements falsely stating:

- •    It has conducted its audits in accordance with the standards of the Public Company Accounting Oversight Board ("PCAOB") formerly known as generally accepted auditing standards ("GAAS").
- •    It has obtained reasonable assurance that CXTI's financial statements are free of any material misstatements.
- •    It has examined sufficient evidence supporting the amounts and disclosures in the financial statements.
- •    CXTI's financial statements are accurate.
- •    CXTI's financial statements conform to GAAP

103.    BDO failed to conduct the audits in accordance with the standards of the PCAOB and certified CXTI's financial statements as accurate even though they were false and misleading. Among other things, CXTI's fiscal 2005 income statement recognized revenue under the percentage-of-completion method based on fraudulent contracts.

104.    Had BDO conducted audits according to their representations, they would have discovered that not only was the percentage-of-completion method not appropriate but also that all of CXTI's contracts were fraudulent.

## CXTI'S FRAUDULENT FISCAL 2006 FINANCIAL STATEMENTS

105.    On April 12, 2007, CXTI filed its annual report on Form 10-KSB for the fiscal year ended December 31, 2006 (the "2006 Annual Report"). The 2006 Annual Report included audited financial statements for the three fiscal years ended December 31, 2004, 2005, and 2006.

|  | 2004 | 2005 | 2006 | Total |
|---|---|---|---|---|
| Revenue | $26,831,135 | $35,568,606 | $66,059,245 | $128,458,986 |
| Contract Revenue | $26,700,000 | $35,300,000 | $65,400,000 | $127,400,000 |
| Accounts Receivable Yr. End | $ 4,438,331 | $15,423,852 | $33,631,372 | |

106.    CXTI's 2004 and 2005 financial statements, included in the 2006 Annual Report were fraudulent for the same reasons set forth in ¶ 10-23 and ¶ 68-81, respectively.  PKF and BDO recklessly performed the audit on CXTI's 2004 and 2005 financial statements for the same reasons set forth in ¶ 46-67 and ¶ 82-104, respectively.

107.    For fiscal year 2006, CXTI recognized $65.4 million in revenue from 13 contracts for Expert Network to provide e-government computer development services to governmental customers in China as follows:

|  | Total Contract Sum | Revenue Recognized in 2006 |
|---|---|---|
| Projects |  |  |
| Jinjiang (2nd Phase) | $9,900,000 | $2,000,000 |
| Jinjiang (3rd Phase) | $12,500,000 | $5,900,000 |
| Jinjiang (4th Phase) | $5,400,000 | $5,400,000 |
| Jinjiang System & Application Training | $1,700,000 | $1,700,000 |
| Jinjiang System Maint. | $3,800,000 | $1,200,000 |
| Jinjiang Unified Command System | $600,000 | $600,000 |
| Dehua (3rd Phase) | $9,200,000 | $7,100,000 |
| Dehua (4th Phase) | $11,300,000 | $11,400,000 |
| Dehua Unified Command System | $600,000 | $600,000 |
| Nan'an (1st Phase) | $13,100,000 | $12,500,000 |
| Nan'an (2nd Phase) | $18,300,000 | $7,700,000 |
| Huian | $14,500,000 | $9,000,000 |
| Yinzhou District Ningbo City (design & plan) | $300,000 | $300,000 |
|  | $101,200,000 | $65,400,000 |

<u>Jinjiang Contracts are Fraudulent</u>

108.     The contracting parties for each of the Jinjiang (2nd Phase), (3rd Phase), (4th Phase), Jinjiang System & Application Training, and Jinjiang System Maintenance contracts were Expert Network and Jinjiang Gongcheng, the same entity for which Expert Network purportedly did work and for which CXTI recognized revenue in 2003 and 2004 pursuant to the Jinjiang (1st Phase) contract, and in 2005 pursuant to the Jinjiang (1st Phase), (2nd Phase), and (3rd Phase) contracts.

109.     Each of the Jinjiang (2nd Phase), (3rd Phase), (4th Phase), Jinjiang System & Application Training, and Jinjiang System Maintenance contracts were fraudulent for the same reasons stated in ¶ 14-16, 47-49, above.[15]

---

15 The only contract for work done in Jinjiang City that Plaintiffs' Private Investigator found may not be fake is the Jinjiang Unified Command System contract for which CXTI recognized only $600,000. This contract was entered by Jinjiang City E-Government Project Construction

## Dehua Contracts are Fraudulent

110.    The contracting parties for the Dehua (3rd Phase), (4th Phase) and Dehua Unified Command System contracts were Expert Network and Fujian Province Dehua County E-Government Construction Project Management Company Limited ("Dehua CPMC").

111.    Mr. Wang, the manager in the Network Office of the People's Government of Dehua County, in charge of e-Government Construction Projects for Dehua County, told Plaintiffs' private investigator that: a) Dehua County did not authorize Dehua CPMC to manage e-Government Construction Projects for Dehua County; and b) he has never heard of Dehua CPMC.

112.    Mr. Wang stated that, after the termination of the Dehua (1st Phase) Contract in 2004 for which only \$12,126 was paid, Expert Network never did any other work on e-government construction projects, or work of any kind whatsoever, for Dehua County of Fujian Province.

113.    Plaintiffs private investigator did an extensive search, including searching the local SAIC business registry of Dehua County, for Dehua CPMC. It did not exist in the business registry, as is required for a business under Chinese law.  Nor did the investigator find any mention of Dehua CPMC in any other business related database or on the internet. And no telephone was registered in its name.   Therefore, the Dehua (2nd Phase), (3rd Phase) and (4th Phase) contracts are fraudulent.

## Nan'an Contracts are Fraudulent

114.    The Nan'an (1st Phase) and (2nd Phase) contracts was purportedly between Expert Network and the Nan'an City Administrative Electronic Information Management Company Limited ("NCAEIMC").

---

Command Bureau, not Jinjiang Gongcheng.

115.    According to Nan'an 2nd Phase Contract, NCAEIMC "is a company directly authorized by the Nan'an City People's Government to carry out the planning, construction implementation and management of the Nan'an City e-government system on behalf of Nan'an City People's Government."

116.    On or about June 11, 2008, Plaintiffs' private investigator interviewed an employee of the Nan'an Municipality Office who said he had never heard of Expert Network or of NCAEIMC.

117.    The employee of Nan'an Municipality Office said that the Private Investigator should speak to the Network Office of Nan'an Municipality, which is in charge of e-Government Construction Projects for Nan'an Municipality.

118.    On or about June 11, 2008, the Private Investigator interviewed an employee of the Network Office of Nan'an Municipality.

119.    The employee of Network Office of Nan'an Municipality stated that there were no e-Government Construction Projects for Nan'an Municipality after 2004, whereas Nan'an (1st Phase) contract was purportedly signed on July 12, 2005 and Nan'an (2nd Phase) contract was purportedly signed on July 10, 2006.

120.    The employee of Network Office of Nan'an Municipality stated that the only companies ever hired to do e-Government Construction Projects for Nan'an Municipality were companies based in Nan'an City, whereas Expert Network was based in another city: Shenzen City.

121.    The employee of Network Office of Nan'an Municipality stated that Nan'an Municipality did not enter a contract with Expert Network, and that he had never heard of Expert Network.

122.    The employee of Network Office of Nan'an Municipality stated that: a) Nan'an Municipality did not authorize NCAEIMC to manage e-Government Construction Projects for Nan'an Municipality, and b) he had never heard of NCAEIMC.

123.    Plaintiffs private investigator did an extensive search, including searching the local SAIC business registry, for NCAEIMC. It did not exist in the business registry, as is required for a business under Chinese law.  Nor did the investigator find any mention of NCAEIMC in any other business related database or on the internet. And no telephone was registered in its name.

124.    The employee of Network Office of Nan'an Municipality stated that Network Office of Nan'an Municipality is in charge of website construction for Nan'an Municipality, and that Administrative Service Center of Nan'an Municipality is in charge of other kinds of e-Government Construction Projects for Nan'an Municipality.

125.    On or about June 11, 2008, the Private Investigator interviewed on the telephone an employee, named Mr. Ye, of the Administrative Service Center of Nan'an Municipality.

126.    Mr. Ye confirmed that the Administrative Service Center of Nan'an Municipality was in charge of e-Government Construction Projects for Nan'an Municipality. Mr. Ye also stated that all e-Government Construction Projects for Nan'an Municipality are signed by the Administrative Service Center of Nan'an Municipality.

127.    On or about June 11, 2008, the Private Investigator sent a copy of Nan'an Municipal Government Contract, of Nan'an (1st Phase) contract, and of Nan'an (2nd Phase) contract, to Mr. Ye via e-mail.

128.    On or about June 11, 2008, Mr. Ye stated that: a) he had never before seen the Nan'an Municipal Government Contract, Nan'an (1st Phase) contract, or Nan'an (2nd Phase)

28

contract; b) he had never heard of Expert Network; and c) Nan'an Municipality had never contracted an e-Government Construction Project to Expert Network.

129.    Mr. Ye also stated that if a company were authorized by Nan'an Municipality to hire (on Nan'an Municipality's behalf) other companies to do e-Government Construction Projects, any contracts entered into among those parties would have to be submitted to Nan'an Municipality for review and approval. Yet, upon his inquiry, the employees of the Network Office of Nan'an Municipality and the Administrative Service Center of Nan'an Municipality were unfamiliar with Nan'an (1st Phase) contract, and Nan'an (2nd Phase) contract. Moreover, they had never even heard of Expert Network.

130.    Therefore, both of the Nan'an contracts are fraudulent.

<u>Huian Contract is Fraudulent</u>

131.    The Huian Contract was purportedly between Expert Network and Huian County Electronic Administration Management Company, Limited ("HCEAMC").

132.    According to the Huian Contract, HCEAMC is an entity "directly under the Huian County People's Municipality and receives from it the full authority to be in charge of Huian County's electronic administration planning, construction implementation and management."

133.    On or about August 14, 2008, Plaintiffs' Private Investigator interviewed via telephone an employee of the Duty Room of the People's Government of Huian County of Fujian Province, who said she never heard of Expert Network. The employee recommended the Private Investigator speak to the Network Engineering Management Center of Huian County ("NEMC") because it is in charge of network system projects and e-government construction projects for Huian County.

134.     On or about August 14, 2008, the Private Investigator interviewed an employee, named Mr. Wu, of NEMC, who stated that NEMC was a department of the People's Government of Huian County.

135.     Mr. Wu stated that: a) Huian County did not authorize HCEAMC to manage network system projects or e-government construction projects it; and b) he had never heard of HCEAMC.

136.     Mr. Wu stated that: a) he had never heard of Expert Network; and b) the People's Government of Huian County had never entered into any contract for an e-government construction project or network system project with Expert Network.

137.     Mr. Wu named two companies, other than Expert Network, that were hired to manage network and internet projects for Huian County.  Thus, he was knowledgeable on the subject of Huian County's network and internet projects and stated Expert Network never was hired to perform any work for Huian County.

138.     Plaintiffs private investigator did an extensive search, including searching the local SAIC business registry, for HCEAMC. It did not exist in the business registry, as is required for a business under Chinese law.  Nor did the investigator find any mention of HCEAMC in any other business related database or on the internet. And no telephone was registered in its name.

139.     Therefore the Hunian Contract is fraudulent.

<u>Summary of Fraudulent Contract Revenue Recognized in 2006</u>

140.     Plaintiffs' private investigator confirmed that 11 of the 13 contracts by which CXTI recognized revenue in 2006 were wholly fraudulent. $64.5 million of the $65.4 million of contract revenue that CXTI recognized in 2006 was completely fake.  The investigator did not attempt to confirm the smallest contract, Yinzhou District Ningbo City (design & plan) from which CXTI

recognized $300,000 in revenue. As stated above, while the Jinjiang Unified Command System did enter a contract with Expert Network, CXTI recognized only $600,000 for work done pursuant to it. Thus, the total purported revenue from these two contracts was insignificant: $900,000 out of a total of $65.4 million in 2006.

141.    Expert Network's annual report filed with the SAIC on 8/8/2007 further demonstrates the contracts and revenue were fraudulent because in its SAIC audited financials Expert Network recorded only $1,057,861 of revenue for fiscal 2006, instead of the $64.5 million of contract revenue reported in CXTI's SEC filings.

<u>BDO Failed to Perform any of the Required Audit Procedures for 2006 Revenue</u>

142.    All of CXTI's $65.4 million of 2006 revenue was derived from long-term fixed-price contracts.

143.    CXTI's fiscal 2006 annual financial statements stated that it recognized revenue on long-term fixed price contracts under the percentage-of-completion method in accordance with the SOP 81-1 as described in ¶ 24 above.

144.    As set forth in ¶ 24-45 above, GAAS require that BDO perform extensive procedures to obtain sufficient audit evidence that the contracts exist, that the revenue was earned, and that the customers had the financial ability to pay the amounts due under the contracts.

145.    Since $64.5 million of the $65.4 million in fiscal 2005 revenue was derived from just 13 contracts with only 4 customers, it would have been very easy for BDO to perform the required audit procedures and to determine the customers and contracts do not exist and that recognition of $64.5 million of revenue is fraudulent.

146.    As set forth in ¶ 44 above, one of the requirements for using the percentage-of-completion method of revenue recognition is that "THE BUYER CAN BE EXPECTED TO SATISFY HIS OBLIGATIONS UNDER THE CONTRACT". Pursuant to PCAOB AU Sections 311, 319 and 326 (discussed above), BDO, as auditor, was required to, at a minimum, review CXTI's determination that for each contract the customer met that standard. Some of the procedures that the BDO as auditor was required to perform to assure that each Buyer can satisfy his obligations to pay under each contract are:

a)    Obtain a credit agency report on the buyer.
b)    Obtain information from the buyer's bank.
c)    Review the financial statements of the buyer.
d)    Review financing arrangements entered into by the buyer.
e)    Review bonding arrangements, if any, entered into to guarantee payment.
f)    Determine whether the buyer had authority to enter into the contract.
g)    Determine whether the buyer is licensed to do business.
h)    Determine whether the buyer's funding for the contracts is properly authorized and is secure.

147.    BDO was required to obtain competent evidence from third parties that Expert Network's customers were capable of satisfying their obligations under the contracts.

<u>Chinese Law Forbids Unlicensed or Defunct Companies from Operating Bank Accounts</u>

148.    As discussed in ¶ 50-52 above, a defunct or unlicensed company is not permitted to maintain a bank account in PRC and if a company fails to provide its bank with evidence annually of a current business license, the bank will suspend the bank account.

149.    Had BDO made any effort to check whether Expert Network's customer, Jinjiang Gongcheng, was cable of satisfying its obligations under the contract, by contacting its bank and determining its financial wherewithal and creditworthiness, BDO would have discovered that Jinjiang Gongcheng's bank account was suspended and it could no longer do business and therefore,

that the Jiniang (2nd Phase), (3rd Phase) and (4th Phase), Jinjiang System & Application Training, and Jinjiang System Maintenance contracts and revenue recognized pursuant to the contracts were fraudulent.

150.    Had BDO attempted to contact the banks for Expert Network's other customers, Dehua CPMC, NCAEIMC and HCEAMC, BDO would have discovered that the customers had no bank account because Dehua CPMC, NCAEIMC and HCEAMC did not have business licenses and did not exist.  Under Chinese law, a company cannot open a bank account without a valid business license; Dehua CPMC, NCAEIMC and HCEAMC did not have any business license.  *See* ¶ 113, 123, 138, above.

Credit Reports and SAIC Filings Would Have<br>Demonstrated that Jinjiang Goncheng was Defunct and the Contracts Fraudulent

151.    Had BDO obtained a credit report on Jinjiang Gongcheng it would have discovered it had its business license revoked in 2002, was not an operating business and was not permitted under Chinese law to perform its obligations under the contract.

152.    Had BDO attempted to obtain credit reports for Dehua CPMC, NCAEIMC and HCEAMC, BDO would have discovered that Dehua CPMC, NCAEIMC and HCEAMC, do not exist, never have had a business license and were unable financially–and not permitted under Chinese law--to perform their obligations under the contracts.

153.    BDO also should have checked the SAIC filings for Jinjiang Gongcheng, Dehua CPMC, NCAEIMC and HCEAMC.

154.    Had it checked the SAIC filings, BDO would have discovered that Jinjiang Gongcheng had its business license revoked in 2002, it had never been licensed to do software development, the person listed as its principal executive, Jiang Shaoheng, was also a project

33

manager employed by Expert Network, and most importantly, that Jinjiang Gongcheng did not have the financial ability or legal authorization to satisfy its obligations under the Jinjiang (2nd Phase), (3rd Phase) and (4th Phase), Jinjiang System & Application Training, and Jinjiang System Maintenance contracts, as it was a defunct company.

155.    Had BDO checked the SAIC filings for Dehua CPMC, NCAEIMC and HCEAMC to ensure they were validly authorized businesses and financially able to perform their obligations under the contracts, BDO would have discovered that Dehua CPMC, NCAEIMC and HCEAMC do not exist, have never been licensed and did not have the financial ability or legal authorization to perform their obligations under the contracts.

156.    BDO should also have contacted each of the customers directly to confirm the existence of the contracts, the customers' ability and willingness to pay the amounts due under the contract, and the amount of revenue recognized under the contracts and associated accounts receivable.

<u>BDO Failed to Perform Required Job Site Visits that Would Have Shown Fraud</u>

157.    BDO was also required to make job site visits to each of the customers in order to review internal accounting controls and obtain sufficient competent audit evidence pertaining to revenue and accounts receivable for each customer as set forth in ¶ 59-60, above.

158.    Had it performed the required procedures, BDO would have determined that the contracts and revenue recognized were fraudulent.

<u>BDO Recklessly Failed to Review Expert Network's PRC Audited Financial Statements</u>

159.    The revenue reported by Expert Network with the SAIC for fiscal 2003, 2004 and 2005 is a tiny fraction of the revenue CXTI reported in its audited financial statements filed with the

SEC for those years. The fiscal 2003 and 2004 amounts reported by Expert Network in its SAIC filings are set forth in ¶ 62, above. The fiscal 2005 amounts are set forth in ¶ 99, above.

160. Had BDO bothered to review Expert Network's publicly available financial records for fiscal 2003, 2004 and 2005 as part of its audit, BDO would have known that Expert Network did not earn the revenue and income that CXTI claimed in its SEC filings to have earned for those years.

161. Either BDO recklessly failed to review Expert Network's PRC audited financial statements or BDO knowingly certified CXTI's financial statements for fiscal year 2006 with actual knowledge that Expert Network did not earn the revenue and income recognized in CXTI's financial statements.

<u>BDO's Audit Opinion Was False and Misleading</u>

162. In CXTI's 2006 10-K, BDO provided an audit opinion for CXTI's 2005 and 2006 financial statements falsely stating:

- It has conducted its audits in accordance with the standards of the Public Company Accounting Oversight Board ("PCAOB") formerly known as generally accepted auditing standards ("GAAS").
- It has obtained reasonable assurance that CXTI's financial statements are free of any material misstatements.
- It has examined sufficient evidence supporting the amounts and disclosures in the financial statements.
- CXTI's financial statements are accurate.
- CXTI's financial statements conform to GAAP.

163. BDO failed to conduct the audits in accordance with the standards of the PCAOB and certified CXTI's financial statements as accurate even though they were false and misleading. Among other things, CXTI's fiscal 2005 income statement recognized revenue under the percentage-of-completion method based on fraudulent contracts.

164.    Had BDO conducted audits according to their representations, they would have discovered that not only was the percentage-of-completion method not appropriate but also that at least 11 of CXTI's 13 contracts pursuant to which it recognized revenue in 2006 were fraudulent.

165.    PKF also included an audit opinion in CXTI's 2006 Annual Report. The Audit Opinion was updated as of March 10, 2006 to account for a restatement of CXTI's 2004 financial statements that reduced revenue by $2.9 million.

166.    PKF's audit opinion in the 2006 Annual Report was materially false and misleading for the same reasons set forth in ¶ 10-23.

## PLAINTIFFS' PRIVATE INVESTIGATOR'S FINDINGS ARE CORROBORATED BY SEVERAL INDEPENDENT INVESTIGATIONS

167.    Journalist Roddy Boyd reported in the New York Post on September 19, 2007 about two investigations of Expert Network's purported e-government contracts. Both investigations corroborated the findings of Plaintiffs' Private Investigator.   Mr. Boyd reported that the investigations were conducted by a well-known United States-based law firm and Hong-Kong based investigative agency, respectively.

168.    Mr. Boyd reported that the results of both investigations revealed that, in the cities in which CXTI claimed Expert Network did e-government construction projects, all but one of the city officials responsible for managing and hiring contractors to conduct the projects stated that they did not enter into any contracts with Expert Network, and worse, had never even heard of Expert Network.

169.    Mr. Boyd reported that the investigations confirmed only one contract: that entered into by Expert Network to do an e-government construction project in Jinjiang City, which is consistent with the findings of Plaintiffs' Private Investigator.

170.    Additionally, an investor and highly-followed financial blogger, Cabeza Howe, reported about an investigation on September 6, 2008, of the contracts that CXTI claimed to have entered into through its wholly-owned subsidiary, Expert Network.

171.    Mr. Howe reported that officials in the governments of five of the cities in China with which CXTI claimed to have entered into contracts confirmed that that they did not enter into any e-government contract with CXTI's wholly-owned subsidiary, Expert Network.

## ADDITIONAL SCIENTER ALLEGATIONS

172.    BDO's and PKF's scienter is even further evidenced by the magnitude of the fraud in that 99% of the revenue and accounts receivable reported in CXTI's SEC filings were false.

173.    BDO's and PKF's scienter is also evidenced by their failure to withdraw their audit opinions certifying CXTI's financial statements for fiscal years 2003 through 2006 (as required by GAAS) after they realized the financial statements were fraudulent and not in compliance with GAAP.

174.    Additionally, PKF NY had the specific motive to consciously disregard its duty as an independent auditor for the purpose of maintaining and building its relationship with CXTI as it derived, and hoped to continue to derive, additional fee income as CXTI's consultant for tax compliance, advice and planning.

175.    Further, PKF NY drafted an engagement letter that stated that it had a limited role as a participant in the audits of CXTI's 2004 financial statements that it conducted together with PKF HK. Whereas, PKF certified the 2004 financial statements on February 22, 2005, the engagement letter drafted by PKF NY was dated July 5, 2005, several months after PKF certified

37

CXTI's 2004 financial statements. This reveals PKF NY's attempt in vain to hide, after-the-fact, its actual role as a full-fledged participant in PKF's audits of CXTI.

## LOSS CAUSATION

176.    The relevant truth concerning the defendants fraudulent conduct began to enter the market and through partial disclosures beginning on July 19, 2007, when after market close, CXTI announced that its CFO Fu had suddenly resigned.

177.    This announcement shocked the market and caused the Company's stock to decline from its closing price on July 19, 2007, of $6.45 per share to a closing price of $4.88 per share on July 20, 2007—a 24% decline.  The Company's stock continued to fall and eventually closed at $3.72 per share on July 24, 2007.

178.    On August 14, 2007, the Company announced that it had submitted to the SEC an automatic five-day filing extension request for its report for the second quarterly period ended June 30, 2007.  The Company stated the delay was caused by the resignation of CXTI CFO Fu.

179.    Upon information and belief, Fu resigned as CFO and CXTI was unable to timely file its quarterly report on Form 10-Q because of questions being raised concerning Expert Network's fraudulent e-Government Contracts.

180.    On September 2, 2007, new agencies reported that CXTI's ticker symbol was changing because it was delinquent in its SEC filings. CXTI was delinquent because questions were being raised concerning the financial statements, particularly in the wake of the resignation of its CFO. This caused the stock price to fall 50%.

181.    Thereafter, articles were published by financial commentators calling into question CXTI's financials, its e-Government Contracts, and its credibility. This adverse news collectively

caused the Company's stock to trade down further from an August 14, 2007 closing price of $3.46 per share to a closing price of $0.56 per share on September 28, 2007.

182.   On September 19, 2007 a New York Post writer Roddy Boyd published an article stating that BDO resigned as CXTI's auditors more than a month ago, but that CXTI had failed to disclose this fact, which is a violation of SEC rules.

183.   Boyd also asserted that two independent investigations by a Hong Kong law firm and a Hong Kong based investigative agency designed to determine the validity of CXTI's contracts found that most of the city officials responsible for awarding the technology contracts denied knowledge of the contracts and were not familiar with Expert Network.

184.   As a result of the Boyd article, CXTI's share price dropped 36%.

185.   On September 27, 2007, the Company filed a Form 8-K with the SEC announcing that on August 17, 2007, it had dismissed its auditor, BDO.

186.   Upon information and belief, the market price dropped because investors were concerned that dismissal of BDO as its auditor was inconsistent with the Boyd article that claimed BDO had resigned, and raised further questions concerning the legitimacy of Expert Network's e-Government Contracts.

187.   On October 1, 2007, the SEC issued an order halting trading of the Company's stock from October 1, 2007, through October 12, 2007.  The SEC Order stated in relevant part:

> It appears to the Securities and Exchange Commission that there is a lack of current and accurate information concerning the securities of China Expert Technology, Inc. ("China Expert") because of questions regarding the adequacy and accuracy of publicly-disseminated information concerning, among other things, China Expert's: (1) financial performance and business prospects and (2) current financial condition. The Commission is of the opinion that the public interest and the protection of investors require a suspension of trading in the securities of the above-listed company.

188.    The Company's stock's last trade prior to the trading halt was at $0.58 per share.  On the first day of trading after the trading halt was lifted, the Company stock closed fell to close at $0.19 per share on October 15, 2007.

189.    Upon information and belief, the SEC halted trading in CXTI stock because suspicions were raised concerning Expert Network's fraudulent e-Government Contracts. The stock dropped as a result of the trading halt and the adverse news concerning CXTI's financial information.

190.    Loss causation is further demonstrated by the fact that CXTI was complete fraud from top to bottom.  More than 99% of its reported revenue was fraudulent.

<u>Applicability of Presumption of Reliance:</u>
<u>Fraud-on-the-Market Doctrine</u>

191.    At all relevant times, the market for CXTI's common stock was an efficient market for the following reasons, among others:

(a)     CXTI's stock met the requirements for listing, and was listed and actively traded on the NASDAQ Bulletin Board, a highly efficient and automated market;

(b)     During the class period, on average 2 million shares of CXTI stock were traded on a weekly basis, amounting to 6.4% of shares outstanding, demonstrating a very active and broad market for CXTI stock and permitting a very strong presumption of an efficient market;

(c)     As a regulated issuer, CXTI filed periodic public reports with the SEC and was eligible to file, and did file, short form registration statements with the SEC on Form S-3 during the Class Period;

(d)      CXTI regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)      CXTI was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace;

(f)      More than ten NASD member firms were active market-makers in CXTI stock at all times during the Class Period; and

(g)      Unexpected material news about CXTI was rapidly reflected and incorporated into the Company's stock price during the Class Period.

192.      As a result of the foregoing, the market for CXTI's common stock promptly digested current information regarding CXTI from all publicly available sources and reflected such information in CXTI's stock price. Under these circumstances, all purchasers of CXTI's common stock during the Class Period suffered similar injury through their purchase of CXTI's common stock at artificially inflated prices, and a presumption of reliance applies.

193.      Plaintiffs are also entitled to a presumption of reliance on the "fraud created the market" doctrine. The Company's fraudulent reports of false revenue and accounts receivable were the foundation on which the Company was built. Absent the false financial statements, CXTI would never have been able to trade in the public markets.

## JURISDICTION AND VENUE

194.    The claims asserted herein arise under and pursuant to Section 10(b) of the Exchange Act, (15 U.S.C. §78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

195.    This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

196.    Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  During the Class Period CXTI common stock was traded on the NASDAQ OTC Bulletin Board, which is located in the Southern District of New York.

197.    The Court has jurisdiction over each of the defendants who filed and certified false and misleading financial statements with Securities & Exchange Commission.

198.    In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities exchange.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

199.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons who purchased the common stock of CXTI during the Class Period and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

200.   The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, CXTI's securities were actively traded on the NASDAQ Bulletin Board.   While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds of members in the proposed Class.   Members of the Class may be identified from records maintained by CXTI or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

201.   Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

202.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

203.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether the financial statements issued by CXTI and audited by PKF and BDO were materially false; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

204.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## PKF NY SUBSTANTIALLY PARTICIPATED IN THE FRAUD

205.    PKF NY planned, directed, controlled and substantially participated in the audits of CXTI.

206.    PKF NY had the power to influence and control, and did in fact influence and control, directly PKF HK's conduct in the audits of CXTI, including the manner of the audit, the adherence or non-adherence to GAAS and SEC rules, and the content and dissemination of CXTI's financial statements filed with the SEC that Plaintiffs contend are false and misleading.

207.    PKF NY was provided with and had unlimited access to copies of CXTI's internal financial records, audit related documents and all other information related to CXTI's financial statements.

208.    Documents produced by PKF include a letter executed by PKF NY delineating the details of PKF NY's engagement by CXTI to discuss, review, supervise, direct and participate in the audits of CXTI. These documents show that PKF NY directed PKF HK in the conduct of the audits and gave specific direction to PKF HK in connection with the audits of CXTI.

209.    PKF NY directed PKF HK as to the application of GAAS in the United States. PKF NY also directed PKF Hong as to the accounting policies PKF should follow to ensure that the financial statements are consistent with GAAP.

44

210.    PKF NY reviewed PKF HK's audit planning procedures, audit programs, and fraud considerations.

211.    PKF NY also notified and advised PKF HK of items in CXTI's financial statements that were red flags and questionable under SEC requirements for reporting, and analyzed actual checklists prepared by PKF HK to determine whether CXTI committed fraud.

212.    PKF NY reviewed and analyzed how the GAAP, GAAS, and SEC rules must be implemented in the audit of CXTI.  PKF NY also examined the application of GAAP, GAAS and SEC rules to the specific facts upon which the CXTI audit was based such as the amounts of revenue recognized, and accounts receivable reported in PKF's audits of CXTI's financial statements.

213.    PKF NY actively participated in conducting the audits of CXTI as evidenced by a PKF engagement letter, which stated that PKF NY attended meetings not only with PKF HK, but with CXTI senior management and CXTI's attorneys during which they discussed the CXTI audits.

214.    PKF NY was ultimately responsible for the CXTI audits because the Managing Director of PKF NY, Henry Freire, was the final person that had to approve the audit opinions and ensure compliance with GAAP and GAAS before PKF signed the certifications of CXTI's 2003 and 2004 financial statements.

215.    Both PKF NY and PKF HK jointly prepared and issued the false and misleading audit opinion and certified CXTI's false financial statements for fiscal years 2003 and 2004.

## CXTI AND THE PUBLIC ATTRIBUTED PKF'S AUDIT OPINIONS OF CXTI TO BOTH PKF HK AND PKF NY

216.    PKF HK conducts business under the following names: (i) PKF, Certified Public Accountants; (ii) PKF; (iii) PKF-Hong Kong, Certified Public Accountants; and (iv) PKF-Hong Kong.

45

217.   PKF NY conducts business under the following names: (i) PKF, Certified Public Accountants; (ii) PKF; and (iii) PKF, Certified Public Accountants, P.C.

218.   Both PKF HK and PKF NY operate under the name "PKF, Certified Public Accountants" and the name "PKF" without any meaningful distinction between the offices.

219.   Letterhead used by PKF NY also identifies PKF NY merely as "PKF" or by "PKF "Certified Public Accountants." Attached as Exhibit 1 is a copy of PKF NY's letterhead.

220.   Even in Court filings in this matter, PKF NY has stated that its legal name is "PKF, Certified Public Accountants," which is the same name that the Hong Kong office of PKF uses.

221.   Indeed, PKF HK and PKF NY are identified and referred to using the identical name: "PKF" in the public domain, and in CXTI's SEC filings and annual reports.

222.   Because CXTI's annual report and financial statements attribute the audits to "PKF Certified Public Accountants" and to "PKF," CXTI investors attributed the audits of CXTI's 2003 and 2004 financial statements to both PKF NY and to PKF HK.

223.   PKF's signature in certifying CXTI's financial statements is simply "PKF." Underneath PKF's signature is its description of itself: "Certified Public Accountants." Underneath PKF's description of its firm is the location of the office in which PKF made its signature: "Hong Kong." Attached as Exhibit 2 is a copy of PKF's audit opinion signed as "PKF."

224.   The way that PKF signed its certification of CXTI's financial statements has caused the public to attribute PKF's certification to PKF NY as much as to PKF HK, with the understanding that it was executed by PKF in Hong Kong.

225.   As PKF NY reviewed, directed, and controlled the audit, and as PKF NY Managing Director, Henry Freire, was the person that reviewed and gave final approval to PKF's audits of

CXTI's 2003 and 2004 financial statements before PKF signed the audit opinions, PKF NY was

responsible for causing PKF's signature and the CXTI audits to be attributed to both PKF NY and

PKF HK.

226.    As further evidence that in certifying CXTI's financial statements, PKF made itself

out to CXTI's investors to be both PKF HK and PKF NY, CXTI's 2004 Annual Report used the

same name, "PKF Certified Public Accountants," (a name under which both PKF HK and PKF NY

do business) to refer to both the activities of PKF NY and of PKF HK:

> **Audit Fees**
> The aggregate fees billed by PKF Certified Public Accountants, CXTI's previous
> independent auditors, for the audit of the Company's annual consolidated financial
> statements and reviews of quarterly financial statements for the years ended
> December 31, 2005 and 2004 were $7,712 and $119,537 respectively.
> * * *
> **Tax Fees**
> The aggregate fees billed by PKF, Certified Public Accountants, for tax compliance,
> advice and planning were still unknown for the fiscal year ended December 31, 2004.
> The Company has not been billed but the fees are expected to be approximately
> $2,000.

227.    Interestingly, the 2004 Annual Report states that "PKF Certified Public Accountants"

are CXTI's auditors. It also says that "PKF Certified Public Accountants" are CXTI's principal

accountants for tax compliance, advice and planning. Thus, the annual report shows that the auditor

and the tax advice provider are the same entity.

228.    PKF NY's office specifically entered into a contract with CXTI to provide tax

compliance. Indeed, PKF NY was the principal accountant providing tax advice.

229.    As the annual report indicates that the auditor and the tax accountants are the same

entity – "PKF Certified Public Accountants," as both New York and Hong Kong offices of PKF

participated in CXTI's audits, and as PKF NY was clearly CXTI's primary accountant for tax

compliance, naturally the public attributed PKF's certifications of CXTI's financial statements to both offices.

230.    As PKF NY's Managing Director, Henry Freire, was required to approve the CXTI audits to ensure compliance with GAAP and GAAS before PKF could sign the audit opinion for CXTI's 2003 and 2004 financial statements, PKF NY was responsible for causing CXTI investors to attribute the tax compliance work and the audit work to both PKF NY and PKF HK.

231.    Clearly PKF NY and PKF HK caused the public to attribute the PKF's certifications of CXTI's financial statements to both offices.

232.    Moreover, PKF NY, in its motion to dismiss the First Amended Complaint in this matter, acknowledged that a U.S. accounting firm always participates in an audit that is also conducted by a foreign firm.

233.    For this last reason also, the public attributed PKF's certification of CXTI's 2003 and 2004 financial statements to PKF NY.

## FIRST CLAIM
### Violation of Section 10(b) of
### The Exchange Act Against and Rule 10b-5
### Promulgated Thereunder Against All Defendants

234.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

235.    This first claim for violation of §10(b) is alleged against all defendants.

236.    During the Class Period, Defendants CXTI, PKF HK, PKF NY and BDO carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other members of the Class to purchase CXTI's common stock at artificially

48

inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein. Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for CXTI's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein.

237.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of CXTI as specified herein.

238.    These Defendants employed devices, schemes and artifices to defraud and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of CXTI's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about CXTI and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of CXTI's common stock during the Class Period.

239.   Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of misrepresenting CXTI's true financial performance, operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by Defendants' overstatements and misstatements of the Company's financial condition throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

240.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of CXTI's common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of CXTI's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired CXTI common stock during the Class Period at artificially high prices and were or will be damaged thereby.

241. At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding CXTI's financial results, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their CXTI common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices that they paid.

242. CXTI, PKF HK, PKF NY and BDO each issued, caused to be issued or directed the issuance of the false and misleading CXTI audit opinions, and CXTI's fraudulent financial statements during the Class Period, as described above.

243. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

244. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

245. This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of securities giving rise to the cause of action.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

(a) Determining that this action is a proper class action, designating Lead Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiffs' counsel as Lead Counsel;

(b)  Awarding compensatory damages in favor of Plaintiffs against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)  Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)  Such other and further relief as the Court may deem just and proper.

<u>**JURY TRIAL DEMANDED**</u>

Plaintiffs hereby demand a trial by jury.

Dated: April 4, 2011                    Respectfully submitted,

                                        THE ROSEN LAW FIRM, P.A.

                                        Timothy W. Brown, Esq. (TB 1008)
                                        Laurence Rosen, Esq. (LR 5733)
                                        Phillip Kim, Esq.  (PK 9384)
                                        275 Madison Avenue, 34th Floor
                                        New York, New York 10016
                                        Phone: (212) 686-1060
                                        Fax: (212) 202-3827

                                        Lead Counsel for Lead Plaintiffs and the Class

52

# Ex. 1



**Certified Public Accountants**
A Professional Corporation

29 Broadway • New York, NY 10006
Telephone: (212) 867-8000 • Telefax: (212) 687-4346
E-mail: info@pkfny.com • www.pkfnewyork.com
*Member of PKF International Limited*

December 28, 2004

Mr. Jeff Cheung
China Expert Technology Inc. (CXTI)
c/o PKF
18 Whitfield Road
Causeway Bay **HONG KONG**

Dear Mr. Cheung:

Thank you for requesting our proposal for PKF tax compliance services.

The following letter sets forth the proposed tax services to be rendered by PKF.

<u>Services</u>

In addition to preparing an income tax return for CXTI, CXTI would be required to file Federal Form 5471, Information Return of U.S. Persons with Respect to Certain Foreign Corporations. We will prepare this as a part of our engagement.

<u>PKF Fees</u>

Our fee for the preparation of December 31, 2004 tax returns would be no greater than $2,000.

As discussed in our e-mail, the fixed fee is based upon limited knowledge of the activity of the foreign subsidiaries. Should there be significant controlled foreign corporation Subpart F income, there is a potential for significant additional hours. However, we do remain committed to our fixed fee of $2,000 unless there is a significant additional amount of time required. We will advise you in advance should this situation arise for your advance approval.

PKF  000000830

We are pleased to have this opportunity to provide these services.  If this letter correctly expresses your understanding of the terms of our engagement, please sign the enclosed copy where indicated and return it to us.

Very truly yours,

PKF
Certified Public Accountants
A Professional Corporation

By: Leo Parmegiani, CPA
Tax Director

LP/tm
Enc.

The services described in the foregoing letter are in accordance with our requirements and are acceptable to us.

**CHINA EXPERT TECHNOLOGY INC.**

BY: _____

TITLE: _____

DATE: _____



**Certified Public Accountants**
**A Professional Corporation**

29 Broadway • New York, NY 10006
Telephone: (212) 867-8000 • Telefax: (212) 687-4346
E-mail: info@pkfny.com • www.pkfnewyork.com
*Member of PKF International Limited*

July 5, 2005

Mr. Patrick P.K. Li
PKF Hong Kong
26/F Citicorp Centre
18 Whitfield Road
Causeway Bay
**HONG KONG**

Dear Patrick:

This letter will serve to confirm the services which we will provide to PKF Hong Kong (PKF-HK), member firm of the International Association of PKF, in connection with the audit of the 2004 and the 2005 quarterly reviews of the financial statements of its client China Expert Technologies, Inc. (China Expert) to be included in filings with the United States (US) Securities and Exchange Commission (SEC).

The SEC endeavors to assure that the audits of financial statements by foreign auditors included in filings with the SEC are comparable to the audits of financial statements by US auditors, and that the audits conducted by foreign auditors are as extensive as those conducted by US auditors. With these overall objectives, PKF, Certified Public Accountants, A Professional Corporation (PKF-NY) will consult with PKF-HK to ensure that PKF-HK professional personnel involved with the China Expert audit are knowledgeable of:

- accounting principles generally accepted in the United States of America (US GAAP)

- auditing standards of the Public Company Accounting Oversight Board (United States of America) (US GAAS)

- the SEC's rules and other pronouncements with respect to auditing, accounting and independence

In light of the above, PKF-NY will perform, as needed, the following agreed-upon consulting procedures to assist PKF-HK in connection with the audit of the annual financial statements of China Expert in the following manner:

- supply PKF-HK with all pertinent current accounting, auditing and SEC literature, as needed.

- discuss with PKF-HK US GAAS and the SEC's rules and other pronouncements concerning independence to ensure that these rules have been followed in connection with the China Expert audit.

PKF   000000832

- discuss with PKF-HK the application of generally accepted auditing standards (GAAS) in the US vs. HK and discuss with audit personnel policies followed to establish that HK GAAS is comparable to US GAAS.

- review your planning procedures including audit programs and fraud considerations, as necessary.

- review financial statements of China Expert and advise PKF-HK of items that are questionable under US GAAP and that require further clarification.

- advise PKF-HK of SEC requirements for reporting, inclusion of financial statements of significant subsidiaries, independence, timing of filings, etc.

- advise on formatting financial statements into a US presentation.

- review the entire filings with the SEC for compliance with SEC rules and agree amounts disclosed in the documents to the audited and unaudited financial statements.

- attend meetings and discuss various auditing and accounting issues with PKF-HK, management and the client's attorneys, as needed.

We will not perform any audit or review services on the accounts of China Expert and, therefore, will not issue an opinion on any financial statements of China Expert entities.  Our services will be limited to consulting with PKF-HK on US GAAP, US GAAS and SEC related matters.

Our fee for these consultation services will be billed to you at our prevailing hourly rates, which currently are US $450 for a director, plus expenses.  We estimate our fee for this engagement to range between $10,000 to $12,000.

We trust that the services we will provide, as outlined above, are useful in assisting your client with its filing with the SEC.

Very truly yours,

PKF
Certified Public Accountants
A Professional Corporation

By: _____
     Henry A. Freire CPA, Director

HAF/tm

Acknowledgement of Scope of Services:

By: _____

Title: _____Partner_____

PKF 000000833

**PKF**
**Certified Public Accountants**
**A Professional Corporation**



29 Broadway
New York, NY 10006
USA

Tel     212 867 8000
Fax     212 687 4346
www     pkfnewyork.com
E-mail  info@pkfny.com

March 21, 2007

Mr. Simon Fu
China Expert Technology, Inc.
Room 2703-04
Great Eagle Centre
23 Harbour Road
Wanchai
**HONG KONG**

Dear Mr. Fu:

Thank you for requesting PKF tax compliance services.

This letter is to confirm and specify the terms of our engagement with China Expert Technology, Inc. ("CET") for the tax year ended December 31, 2006 and to clarify the nature and extent of the services we will provide.

The following sets forth the tax returns we will prepare for CET:

- Federal Corporation Income Tax Return
- Form 5471 - Information Return of U.S. Persons With Respect to Certain Foreign Corporations
    o  Hong Zhong Holdings Ltd.
    o  China Expert Network Company Ltd.
    o  Expert Network Shenzhen Company
- Form 5472 – Information Return of a 25% Foreign-Owned U.S. Corporation or a Foreign Corporation Engaged in a U.S. Trade or Business
    o  China Data Holdings Ltd.

You will provide us with the accounting records needed to prepare the tax returns.  Our work in connection with the preparation of your tax returns does not include any procedures designed to discover defalcations or other irregularities, should any exist.

We will use our judgment in resolving questions where the tax law is unclear, or where there may be conflicts between the taxing authorities' interpretations of the law and other supportable positions.  Unless otherwise instructed by you, we will resolve such questions in your favor whenever possible,

*Member of PKF International Limited, an association of legally independent firms.*

PKF  000000834

2

The law provides various penalties that may be imposed when taxpayers understate their tax liability.  If you would like information on the amount or circumstances of these penalties, please contact us.

Management is responsible for the proper recording of transactions in the books of accounts, for the safeguarding of assets and for the substantial accuracy of the financial records.  You have the final responsibility for the income tax returns and, therefore, you should review them carefully before you sign and file them.

**PKF Fees**

Our fee for the above services will be $2,500 based upon our estimate of professional time required to prepare complete and accurate returns.

Our standard billing rates are:

| | |
|---|---|
| Tax Senior | $200 |
| Tax Manager | $275 |
| Tax Director | $425 |

If we become aware of issues and/or transactions which require significant additional time, we will discuss with you in advance.

In addition to the listed services, we will be available to provide consultation during the year.  Consultation could include tax examinations, compliance issues or special research and planning projects.  If a project requires more than a minimal amount of time (one to two hours), we will bill you for the time incurred at our standard billing rates.  We will obtain your approval before commencing any projects.

We are pleased to have this opportunity to provide these services.  If this letter correctly expresses your understanding of the terms of our engagement, please sign the enclosed copy where indicated and return it to us.

Very truly yours,

**PKF**
Certified Public Accountants
A Professional Corporation

By: _____
Henry A. Freire, CPA, Director

By: _____
K. Joseph Lee, CPA
Tax Director

HAF&KJL/tm
Enc.

PKF 000000835

<u>3</u>

The services described in the foregoing letter are in accordance with our requirements and are acceptable to us.

**CHINA EXPERT TECHNOLOGY, INC.**

BY: _____ SIMON FU

TITLE: _____ CFO

DATE: _____ 8/4/2007

Under Section 6662 of the Internal Revenue Code, an accuracy-related penalty may be imposed on an underpayment of tax unless it can be shown that there was a reasonable cause for the underpayment and the taxpayer acted in good faith with respect to the underpayment.  Pursuant to IRS Circular 230 regulations, we wish to advise you that this communication, including any attachments hereto, has not been prepared to be used, and cannot be used, by you for the purpose of avoiding such penalties should any be imposed.

# Ex. 2

# CHINA EXPERT TECHNOLOGY, INC.

## CONSOLIDATED FINANCIAL STATEMENTS

## CONTENTS

|  | PAGES |
|---|---|
| Report of Independent Registered Public Accounting Firm | 14 |
| Consolidated balance sheets | 15 |
| Consolidated statements of operations | 16 |
| Consolidated statements of stockholders' equity | 17 |
| Consolidated statements of cash flows | 18 |
| Notes to consolidated financial statements | 19 |

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Stockholders of
China Expert Technology, Inc.

We have audited the accompanying consolidated balance sheets of China Expert Technology, Inc. and its subsidiaries as of December 31, 2004 and 2003 and the related consolidated statements of operations, stockholders' equity and cash flows for each of the three years in the period ended December 31, 2004. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of China Expert Technology, Inc. and its subsidiaries as of December 31, 2004 and 2003 and the consolidated results of their operations and their cash flows for each of the three years in the period ended December 31, 2004 in conformity with accounting principles generally accepted in the United States of America.

PKF
Certified Public Accountants
Hong Kong
February 22, 2005

14

## ITEM 14.    PRINCIPAL ACCOUNTANT FEES AND SERVICES

**Audit Fees**

The aggregate fees billed by PKF, Certified Public Accountants for audit of the Company's annual financial statements were [$**] for the fiscal year ended December 31, 2004, and $0 for the fiscal year ended December 31, 2003. The aggregate fees billed by PKF, Certified Public Accountant, for review of the Company's financial statements included in its quarterly reports on Form 10-QSB were $23,077 during the period ended December 31, 2004. PKF, Certified Public Accountant, has been retained on December 29, 2004 to audit the Company's annual financial statements for the fiscal year ended December 31, 2004. PKF, Certified Public Accountant, adopting reverse takeover accounting treatment for financial reporting purpose, audited the annual financial statements of the Company as a continuity of China Expert for the fiscal year ended December 31, 2003 and December 31, 2002.

** The Company has not been billed but the fees are expected to be approximately $102,564.

The aggregate fees billed by Telford Sadovnick, P.L.L.C. for audit of the Company's annual financial statements were $5,000 for the fiscal year ended December 31, 2003, and $0 for the fiscal year ended December 31, 2002. The aggregate fees billed by Telford Sadovnick, P.L.L.C. for review of the Company's financial statements included in its quarterly reports on Form 10-QSB were $0 during the period ended December 31, 2003, and $0 during the period ended December 31, 2002. Telford Sadovnick, P.L.L.C., was retained in January 2004 to audit the Company's annual financial statements for the fiscal year ended December 31, 2003. They were not involved prior to January 2004 and thus did not audit the Company's annual financial statements for the fiscal year ended December 31, 2002 and to review the quarterly reports for the fiscal year ended December 31, 2003 or earlier.

**Audit-Related Fees**

PKF, Certified Public Accountants, did not bill the Company any amounts for assurance and related services that were related to its audit or review of the Company's financial statements during the fiscal years ending December 31, 2004.

Telford Sadovnick, P.L.L.C. did not bill the Company any amounts for assurance and related services that were related to its audit or review of the Company's financial statements during the fiscal years ending December 31, 2003.

**Tax Fees**

The aggregate fees billed by PKF, Certified Public Accountants, for tax compliance, advice and planning were still unknown for the fiscal year ended December 31, 2004. The Company has not been billed but the fees are expected to be approximately $2,000.

The aggregate fees billed by Telford Sadovnick, P.L.L.C. for tax compliance, advice and planning were $0 for the fiscal year ended December 31, 2002.

**All Other Fees**

PKF, Certified Public Accountants, did not bill the Company for any products and services other than the foregoing during the fiscal years ended December 31, 2004.

Telford Sadovnick, P.L.L.C.did not bill the Company for any products and services other than the foregoing during the fiscal years ended December 31, 2002.

43

**SIGNATURES**

In accordance with Section 13 or 15(d) of the Exchange Act, the registrant caused this report to be signed on its behalf by the undersigned, thereunto duly authorized on March 14, 2005.

**CHINA EXPERT TECHNOLOGY, INC.**
(Registrant)


By: /s/ Zhu Xiaoxin
Zhu Xiaoxin, President and Director


In accordance with the Exchange Act, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.


By: /s/ Zhu Xiaoxin
Zhu Xiaoxin, President and Director
Date: March 14, 2005


By /s / Kung Sze Chau
Chief Executive Officer and Director
Date: March 14, 2005


By /s /Chiang Min Liang
Chief Financial Officer
Date: March 14, 2005

44

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned certifies and declares as follows:

I am over the age of 18 and not a party to this action. My business address is 275 Madison Avenue, 34th Floor, New York, New York, 10016, which is in the county where the mailing described below took place.

On April 4, 2011, at New York, NY, I caused the within FOURTH AMENDED CLASS ACTION COMPLAINT to be served by first class U.S. mail to those on the attached service list.

I declare that I am employed in the office of a member of the bar of this court at whose direction service was made.

Executed April 4, 2011 in New York, New York.

Ilya Glinchenko

1

## SERVICE LIST

Thomas R. Manisero, Esq
Peter J. Larkin, Esq.
William J. Kelly, Esq.
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
3 Gannett Drive
White Plains, NY 10604
Attorneys for Defendants PFK Certified Public Accountants

Charles J. Ha, Esq.
Orrick, Herrington & Sutcliffe LLP
701 Fifth Avenue
Suite 5700
Seattle, Washington 98104
Attorneys for PKF Hong Kong, Certified Public Accountants

Christopher Harris, Esq.
Latham & Watkins LLP
885 Third Avenue
New York, NY 10022
Attorneys for BDO McCabe Lo Limited Certified Public Accountants